IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| E.D., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 16-2750 |
| | : | |
| v. | : | |
| | : | |
| DANIEL SHARKEY, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                                                 August 11, 2017

      The Due Process Clause of the Fifth Amendment provides immigration detainees with the right to be free from physical attack, including sexual assault. The plaintiff has brought allegations of institutional sexual assault by a staff member while she was detained at a county immigration family center. The plaintiff has sued the assaulting staff member, the immigration family center, the county, various county employees, and a federal immigration officer. She contends, *inter alia*, that the employees at the county immigration family center knew of the alleged sexual assault but failed to protect her. The federal immigration officer has moved to dismiss the failure to protect claim against him, contending that the plaintiff has failed to state a claim upon which relief can be granted and that he is entitled to qualified immunity from suit. The court has reviewed the third amended complaint and the parties' submissions, and will grant the motion to dismiss with prejudice because the plaintiff has failed state a claim upon which relief can be granted, thus entitling the federal immigration officer to qualified immunity.

                    **I.     ALLEGATIONS AND PROCEDURAL HISTORY**

      In the third amended complaint, E.D. alleges that she came to the United States seeking to escape domestic violence and sexual assault in or around May 2014. Third Am. Compl. at ¶

15. Upon her entry, E.D. was detained in an immigration facility in Texas for approximately one week until she was transferred to the Berks County Residential Center-Immigration Family Center ("BCRC-IFC"), which is located in Leesport, Pennsylvania. *Id.* at ¶¶ 16, 17. Berks County operates the BCRC-IFC pursuant to a contract with United States Immigration and Customs Enforcement ("ICE") to hold immigration detainees there. *Id.* at ¶¶ 5, 18. At the time of E.D.'s detention, the BCRC-IFC housed approximately ninety women and children. *Id.* at ¶ 20. Upon her detention at the BCRC-IFC, E.D. was placed in a room with three adults and three children. *Id.* at ¶ 24. There was a staff area in the center of the facility, and the residents' rooms were located on each side of the staff area. *Id.* at ¶ 21. Although there were surveillance cameras in the common areas and recreation yard, there were no cameras in the sleeping areas. *Id.* at ¶ 22. Security personnel conducted three "counts" during the day and made rounds every ten to fifteen minutes at night. *Id.* at ¶ 23.

The defendants in this action are: Daniel Sharkey ("Sharkey"), a former Berks County employee at the BCRC-IFC, *id.* at ¶ 7; Diane Edwards ("Edwards"), the Director of the BCRC-IFC, *id.* at ¶ 8; Jeremiah Petrey ("Petrey"), an ICE deportation officer working at the BCRC-IFC, *id.* at ¶¶ 9, 45, 47; and John Behm, Jamie Himmelberger, Erika Taylor, Matthew Malinowski, and Brittany Rothermel, current Berks County employees working at the BCRC-IFC. *Id.* at ¶¶ 10-14. Petrey was an ICE deportation officer stationed at BCRC-IFC who worked at the facility every day, and he was the only ICE employee who worked on the premises. *Id.* at ¶¶ 46-48. He wore a badge and a uniform that indicated that he worked for ICE, and the detainees knew him as the "law." *Id.* at ¶ 47. Petrey conducted intake interviews, custody reviews, and departure interviews. *Id.* at ¶ 49. All requests for release went through Petrey, and he made many or all

arrangements for a detainee's release. *Id.* at ¶ 50. Petrey frequently interacted with the detainees and came out of his office every day to the areas where the detainees were located. *Id.* at ¶ 52.

Shortly after E.D.'s arrival at the BCRC-IFC, she met Sharkey. *Id.* at ¶ 25. After approximately a month, Sharkey attempted to befriend E.D. by giving her and her son treats, such as chocolate and extra food. *Id.* at ¶ 26. Sharkey continued to groom her by continuing to bestow favors upon her, including allowing her to use his cell phone to call her mother and take pictures, and giving E.D. and her son toys and clothes. *Id.* at ¶ 27. Sharkey even promised to assist E.D. with her immigration issues by helping her get released from the BCRC-IFC. *Id.* at ¶ 28. Sharkey then began touching and kissing E.D. on various occasions. *Id.* at ¶¶ 29, 30. Although E.D. was upset with the attention, she feared that he would retaliate against her if she protested. *Id.* at ¶ 31. She refused to touch Sharkey, which angered him and led to him insulting her. *Id.* at ¶ 32. Sharkey also told E.D. that if she told anyone about their relationship, she would be deported back to Honduras. *Id.* at ¶ 39. Petrey and Sharkey had overlapping work shifts, and they were friends. *Id.* at ¶¶ 52-54.

Starting in July 2014, Sharkey began forcing E.D. to engage in sexual intercourse. *Id.* at ¶¶ 33, 34. On one occasion when they were having intercourse in a bathroom, a seven-year-old girl walked in and reported what she saw to her mother. *Id.* at ¶ 35. On another occasion in August 2014, E.D. and Sharkey were having intercourse in another resident's room. The resident returned to the room, but it appears that E.D. was able to convince the resident to leave. *Id.* at ¶¶ 36, 37. A few days later, Sharkey approached E.D. while she was in the outdoor recreation area and tried to pull her pants down, but E.D. refused to submit because there were children present. *Id.* at ¶ 38. Sharkey left his job or was terminated after this incident. *Id.* at ¶ 63.

Other residents and BCRC-IFC staff members, including John Behm, Jamie Himmelberger, Erika Taylor, Matthew Malinowski, and Brittany Rothermel, noticed the attention E.D. was receiving. *Id.* at ¶ 40. BCRC-IFC is a small facility, and federal ICE employees and Berks County employees have frequent contact and interaction. *Id.* at ¶ 41. Detainees must walk down the same hallways as the ICE and Berks County employees, allowing opportunities for the employees to observe the detainees. *Id.* at ¶ 42. By August 2014, several staff members, including John Behm, Jamie Himmelberger, Erika Taylor, Matthew Malinowski, Brittany Rothermel, and Petrey, were aware of E.D. and Sharkey's intimate relationship, but failed to take any steps to protect E.D. *Id.* at ¶ 56. The relationship also became obvious to detainees at the facility, who had observed them together. *Id.* at ¶ 57. Several detainees complained to the staff about the relationship, Edwards was eventually notified, and the staff launched an investigation. *Id.* at ¶¶ 58-60. They interviewed E.D., who denied the sexual assaults because she feared deportation. *Id.* at ¶ 61. Neither BCRC-IFC staff nor ICE officers informed E.D. that she had not broken any state or federal laws, that she was a victim, that Sharkey would be considered an abuser, or that the incidents would not affect her immigration status. *Id.* at ¶ 62.

E.D. continued to conceal her relationship with Sharkey until she eventually informed her immigration attorney and the attorney's assistant in the fall of 2014. *Id.* at ¶ 64. The attorney and his assistant contacted various ICE employees and offices and informed them of the incidents. *Id.* at ¶ 65. At this point, ICE officials took E.D. to the Berks County District Attorney's office where a detective and an ICE special agent interviewed her. *Id.* at ¶ 66. E.D. informed her interviewers about her relationship with Sharkey. *Id.*

After E.D. reported the incidents with Sharkey through her attorney, the defendants "began denying [E.D.] and her son privileges, such as denying a request for a haircut for [her] son, even though other children were permitted haircuts." *Id.* at ¶ 71. In approximately November 2014, Edwards directed the BCRC-IFC and staff to take "many of the women's and girls' clothing, place[] them in garbage bags, and g[i]ve the residents other clothing that they claimed were more appropriate." *Id.* at ¶ 72. In addition, Edwards and the BCRC-IFC began prohibiting women residents from wearing any skirts, dresses, tight clothing, or clothing that revealed any cleavage. *Id.* at ¶ 73. The other BCRC-IFC residents blamed E.D. for the change in clothing policy and isolated her. *Id*. Due "in large part to the above-related incidents," E.D. formally requested immediate parole in October and December 2014. *Id.* at ¶¶ 75, 76. On both occasions, E.D. was denied parole. *Id.* Nonetheless, E.D. was eventually released from the BCRC-IFC on an order of supervision and she moved to Georgia. *Id.* at ¶ 77. Sharkey was later arrested and convicted of institutional sexual assault for his conduct with E.D. *Id.* at ¶ 78.

ICE policies and standards, along with federal law, prohibit sexual abuse and sexual assault of immigration detainees by staff and define any sexual contact between staff and detainees, whether consensual or not, as sexual abuse. *Id.* at ¶ 67. ICE standards require that the Field Office Director be notified anytime an employee, contractor, or volunteer is alleged to be a perpetrator of resident sexual abuse or assault. *Id.* at ¶ 69. Further, the ICE/DRO Residential Standards require residential facilities holding immigration detainees to affirmatively act to prevent sexual abuse and sexual assault of the residents, including the provision of staff training, and prompt and effective intervention. *Id.* at ¶ 79. Thus, as an ICE employee, Petrey has a duty to, upon a reasonable suspicion that a detainee is at substantial risk of imminent sexual abuse, immediately act to protect the detainee. *Id.* at ¶ 51.

E.D. filed a complaint against the defendants on June 8, 2016. Doc. No. 3. E.D. filed an amended complaint on August 4, 2016, and a second amended complaint on October 21, 2016. Doc. Nos. 11, 31. On May 16, 2017, the court granted Petrey's motions to dismiss the second amended complaint because E.D. failed to allege that he was subjectively aware of the risk of harm Sharkey posed to E.D., but provided E.D. with the opportunity to replead her failure to protect claim against Petrey.[1] Doc. Nos. 56, 57. Accordingly, E.D. filed a third amended complaint on May 31, 2017. Doc. No. 60. Petrey filed a motion to dismiss the third amended complaint on June 23, 2017. Doc. No. 64. The remaining defendants, the BCRC-IFC, County of Berks, Edwards, John Behm, Jamie Himmelberger, Matthew Malinowski, Brittany Rothermel, and Erika Taylor filed an answer to the third amended complaint on July 10, 2017. Doc. No. 66. On July 18, 2017, E.D. filed a response in opposition to Petrey's motion to dismiss. Doc. No. 67. On August 1, 2017, Petrey filed a reply brief in support of his motion to dismiss. Doc. No. 69.

## II. DISCUSSION

### A. Standard of Review for Rule 12(b)(6) Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint or a portion of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). As the moving party, "[t]he defendant bears the burden of showing that

---

[1] An originally-named defendant, Thomas Decker, also had joined in the motion to dismiss. The court determined that Mr. Decker was entitled to qualified immunity as to counts II and III of the second amended complaint and that E.D. lacked a right of action against Decker in count V of the second amended complaint. *See* Memorandum Op. at 17-25, Doc. No. 56. Therefore, Mr. Decker is no longer a defendant in this litigation.

6

no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

In general, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted). Ultimately, a complaint must contain facts sufficient to nudge any claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In implementing the overarching plausibility standard, the court is required to conduct a three-part inquiry. First, the court must "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian*, 696 F.3d at 365 (citations omitted). Second, the court must identify allegations that are not "entitled to the assumption of truth" because they "are no more than conclusions." *Id.* (citations omitted). Thus, legal conclusions, whether in pure form or "couched as factual allegation[s]," and conclusory factual allegations are not entitled to be assumed true. *See Iqbal*, 556 U.S. at 678, 681 (quoting *Twombly*, 550 U.S. at 555); *Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012). Finally, the court must "look for well-pled factual allegations, assume their veracity, and then 'determine whether they

plausibly give rise to an entitlement to relief.'" *Bistrian*, 696 F.3d at 365 (quotations omitted). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

The court generally limits this three-part inquiry to "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). However, the court may also properly consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* (citations omitted).

### B. Petrey's Motion to Dismiss

The third amended complaint contains one individual capacity claim against Petrey in Count II: a constitutional failure to protect claim against all defendants, including Petrey, alleging that each defendant failed to protect E.D. from sexual abuse and assault in violation of her rights under the Fourteenth Amendment. Third Am. Compl. at ¶¶ 88-89. Petrey contends that the court must dismiss the failure to protect claim against him because (1) the court should not create a *Bivens* remedy in this context;[2] (2) E.D. has failed to state a claim against him insofar as the third amended complaint does not allege Petrey's subjective awareness of an excessive risk of harm to E.D.; and (3) he is entitled to qualified immunity. Brief in Supp. of Def. Jeremiah Petrey's Mot. to Dismiss Pl.'s Third Am. Compl. at 5-14, Doc. No. 64-1.

---

[2] Because Petrey is a federal employee, the failure to protect claim against him must be analyzed as a *Bivens* claim pursuant to the Due Process Clause of the Fifth Amendment. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). 42 U.S.C. § 1983 only provides a right of action against state actors, and a *Bivens* action "is the federal equivalent of the § 1983 cause of action against state actors." *See Brown v. Philip Morris Inc*., 250 F.3d 789, 800 (3d Cir. 2001). Further, the due process clause of the Fourteenth Amendment is only applicable to the states. Analyzing due process violations under the Fifth Amendment, however, is analogous to that under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520 (1979) (applying the Fifth Amendment due process clause to federal pre-trial detainees).

1. Sufficiency of the Failure to Protect Claim

The Third Circuit has recognized the right to be free from physical attack and injury as a liberty interest protected by the Due Process Clause and, accordingly, has recognized the viability of failure to protect claims brought by prisoners. *See Davidson v. O'Lone*, 752 F.2d 817, 821-22 (3d Cir. 1984), *aff'd sub nom. Davidson v. Cannon*, 474 U.S. 344 (1986). While E.D. was an immigration detainee at the time of the alleged constitutional violations, rather than a prisoner, immigration detainees are entitled to the same constitutional protections as pretrial detainees. *Adekoya v. Chertoff*, 431 F. App'x 85, 88 (3d Cir. 2011) (per curiam). "[A] pretrial detainee presenting a failure-to-protect claim must plead that the prison official acted with deliberate indifference to the detainee's health or safety." *Burton v. Kindle*, 401 F. App'x 635, 638 (3d Cir. 2010) (per curiam). "Deliberate indifference" is a subjective standard in that "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Beers–Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)). Thus, a plaintiff must show that the defendant was subjectively aware of the risk of harm to the plaintiff's health or safety, and disregarded it. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). "[S]ubjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol*, 256 F.3d at 133 (citations omitted).

The third amended complaint is still devoid of factual allegations that Petrey ever observed any interaction between E.D. and Sharkey, or that any detainee or Berks County employee ever told him about the relationship. *See* Mem. Op. at 11-12, Doc. No. 56. To support her general allegation that Petrey knew about E.D.'s relationship with Sharkey, and in an attempt

to raise an inference "through circumstantial evidence that Petrey was aware of the improper 'relationship,'" Pl.'s Resp. to Def. Petrey's Mot. to Dismiss at 9, Doc. No. 67, E.D. has added the following factual allegations to the third amended complaint with respect to Petrey's conduct and state-of-mind:

- "BCRC-IFC is a relatively small facility, so that federal employees such as Defendant Petrey and the Berks County employees have frequent contact and interaction." Third Am. Compl. at ¶ 41.

- "[Petrey] was stationed at BCRC-IFC, had his only (or primary) office of business there, and worked at the facility every day." *Id.* at ¶ 46.

- "Petrey was a Deportation Officer located at BCRC-IFC, he wore a badge and a shirt or uniform that indicated he was with ICE, and was known as the "law" by the immigration detainees." *Id.* at ¶ 47.

- "Petrey was the only, or one of only a few, federal or ICE employees who worked on the premises of BCRC-IFC." *Id.* at ¶ 48.

- "Petrey conducted all intake interviews of the immigration detainees when they were admitted to BCRC-IFC, he conducted custody reviews, and interviewed the detainees upon their departure." *Id.* at ¶ 49.

- "Any requests for a release by an immigration detainee went through Defendant Petrey, and Defendant Petrey made many or all the arrangements for an immigration detainee's release." *Id.* at ¶ 50.

- "As an ICE employee, Defendant Petrey has a duty to, upon a reasonable suspicion that a detainee is at substantial risk of imminent sexual abuse, immediately act to protect the detainee." *Id.* at ¶ 51.

- "Petrey had frequent interaction with the immigration detainees, beyond the interactions listed above, and came out from his office every day to the space(s) where the residents lived and were permitted to be." *Id.* at ¶ 52.

- "Petrey and Defendant Sharkey had overlapping work shifts and were friends." *Id.* at ¶ 53.

- "Defendant Sharkey also had informed Plaintiff E.D. that he and Defendant Petrey were friends." *Id.* at ¶ 54.

- "By August 2014, several staff members including . . . Petrey were aware of Plaintiff E.D. and Defendant Sharkey's intimate relationship, but failed to take any steps to protect Plaintiff." *Id.* at ¶ 56.

These facts, however, fail to allege that the risk of harm was so obvious as to put Petrey on notice of the risk or to entitle E.D.'s general allegation that Petrey was aware of the relationship to a presumption of truth. First, while the third amended complaint alleges facts to raise the inference that Petrey often dealt with Berks County employees and detainees, and that he often interacted with Sharkey specifically, an inference that Petrey *could have* learned of the risk Sharkey posed is not the same as an inference that Petrey *actually* learned of the risk. The third amended complaint still contains no allegation that Petrey was aware of other complaints against Sharkey or any other Berks County employee, or any other fact that could raise the inference that Petrey knew Sharkey was dangerous. Second, while E.D. has alleged that Petrey had a duty to protect her upon a reasonable suspicion that she was at risk of sexual abuse in the third amended complaint, she has not alleged facts suggesting that he did have such a reasonable suspicion of the risk. Finally, as to E.D.'s additional explanation of Petrey's job duties at the BCRC-IFC, she has not alleged that Petrey handles complaints of sexual assault or any fact to allow the court to infer that the other detainees' complaints about E.D. and Sharkey's relationship went through Petrey as opposed to the Berks County employees. The circumstances pleaded simply do not suggest that "a substantial risk of [detainee] attacks was longstanding, pervasive, well-documented, or expressly noted" by officials in the past, or that Petrey "had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1970). Accordingly, E.D. has failed to state a claim for failure to protect against Petrey because the allegations in the third amended complaint do not state a plausible claim of deliberate indifference.

The court recognizes that in civil rights cases, "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment

would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). Allowing E.D. to replead her claim against Petrey in a fourth amended complaint, however, would be futile. E.D. has filed four complaints in this case thus far, and in granting Petrey's first motion to dismiss the court provided E.D. the opportunity to replead her failure to protect claim against Petrey along with examples of ways in which she could cure the second amended complaint's factual deficiencies. Because E.D. has not cured the factual deficiencies with a third amended complaint, the court must assume that she cannot allege any further facts that would plausibly state a claim against Petrey and, accordingly, will dismiss Count II against Petrey with prejudice.

### 2. Qualified Immunity

Petrey is entitled to qualified immunity unless the facts alleged show that his conduct violated a constitutional or statutory right that was clearly established at the time of the violation. *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008). Because the court has concluded that E.D. has failed to plausibly allege that Petrey's conduct constituted a violation of her constitutional rights, Petrey is entitled to qualified immunity. Further, because the court will not allow E.D. a fourth opportunity to replead her failure to protect claim against Petrey, the court need not address whether the right Petrey allegedly violated was clearly established at the time of the conduct.[3]

### III. CONCLUSION

For the foregoing reasons, the court will grant Jeremiah Petrey's motion to dismiss. Because E.D. has failed to state a claim upon which relief can be granted, Petrey is entitled to

---

[3] As Petrey has argued, a *Bivens* remedy in this context may no longer be viable in light of the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). However, because E.D. has failed to state a claim against Petrey, and because Petrey is entitled to qualified immunity, it is unnecessary to reach that issue in this case.

qualified immunity, and allowing E.D. to file a fourth amended complaint would be futile, Count II against Petrey is dismissed with prejudice.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.