**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| E.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 16 Civ. 2750 |
| | : | |
| DANIEL SHARKEY et al., | : | Judge Edward G. Smith |
| Defendants | : | |
| | : | Filed via ECF |
| | : | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff E.D. filed this lawsuit pursuant to 42 U.S.C. §1983 for the violation of her

constitutional rights and state tort law, based on the sexual abuse and sexual assaults by a Berks

County Residential Center-Immigration Family Center (BCRC) employee named Daniel

Sharkey while Plaintiff was held there as an immigration detainee.  She alleges that Berks

County, BCRC, and its staff members failed to protect her and retaliated against her afterwards.

Defendants have filed a motion for summary judgment, and for the reasons discussed below, this

motion should be denied.

## II.      STATEMENT OF FACTS

Plaintiff E.D. entered the United States in May 2014 with her three-year old son, fleeing

domestic violence and sexual assault in Honduras.  She and her son were then detained at BCRC,

an immigration family detention facility with a contract with the United States Immigration and

Enforcement Agency (ICE).  While detained, a BCRC staff member named Daniel Sharkey

began bestowing favors on Plaintiff and making promises about helping her with her

immigration issues. Sharkey then advanced his physical relationship with Plaintiff E.D. by touching Plaintiff on the hand, kissing her in locations without surveillance camera (such as the laundry room), and touching her breasts and buttocks while they were alone in the sleeping quarters. Sharkey also asked Plaintiff to have pictures taken of herself in her bra and underwear with his cell phone, and she complied. Sharkey told her that if anyone found out about the nature of their "relationship," Plaintiff would be deported. If Plaintiff refused to touch Sharkey, he became angry and insulted her. Plaintiff thus felt obligated to comply with Sharkey's requests. This culminated in Sharkey having sexual intercourse with Plaintiff E.D. at least twice in July and/or August 2014.

Plaintiff has presented evidence that BCRC staff were aware that something improper was going on between Sharkey and E.D. Sharkey testified that people knew about the "relationship," that it was a joke at the daily briefings where all staff on that shift attended, that people joked if E.D. did her laundry on Sharkey's shift (as the laundry room had no cameras), and that one staff member even texted a photo of E.D. in her bra and panties to Sharkey while he was on vacation.

There is also evidence that Defendants had inadequate policies and practices relating to training, supervision, and reporting. For example, Sharkey testified when he started at BCRC, his training consisted of being handed a binder with documents and his going through and signing them. Sharkey told three supervisors that E.D. was "flirting" with him, but two of them failed to report these statements, and Program Director David Smith testified that if he had received these other two, he would have conducted a more in-depth investigation at that time. In handwritten notes by Smith while interviewing staff, several employees reportedly stated that Sharkey spent a lot of time with E.D., was hardly on the floor, and that Sharkey disappeared a

lot. One employee did not report it to the supervisors because he felt it wouldn't have been handled. In the Department of Homeland Security (DHS) investigation interview summaries, one detainee reported to a staff member that Sharkey and E.D. were kissing, and the employee responded, "No comprendo" [I don't understand]. The detainee then indicated kissing with hand gestures, and he responded "No problema" [No problem].

In August 2014, a child witnessed Sharkey and E.D. having sexual intercourse and reported it. An investigation was launched, and at first, Plaintiff E.D. denied the sexual assaults because she feared deportation. However, Plaintiff E.D. eventually received a pro bono immigration attorney, made a report in about October 2014, and participated in several interviews with law enforcement. Sharkey was arrested and convicted of Institutional Sexual Assault. Sharkey admitted in his deposition to hugging, kissing, and having sexual intercourse with Plaintiff.

After Plaintiff reported the incidents, she suffered from adverse actions from staff and felt targeted by staff, receiving an increased number of write-ups. The facility instituted a Resident Dress Code policy (dated November 1, 2014) that included instructions that "Residents must wear tops that cover their shoulders, chest, stomach and lower back," "form fitting shirts/tops are not permitted," "dresses and skirts are not permitted, unless approved for religious reasons," etc. Plaintiff had clothing confiscated and received write-ups, which did not occur prior to her report of the "relationship." Staff confiscated clothing from other detainees and they blamed Plaintiff. Her son was denied a haircut and other privileges permitted to other detainees. When Plaintiff spoke to other detainees, those detainees would be questioned by staff, and this led to the other detainees avoiding and shunning her, which exacerbated her isolation and depression.

A Response to Defendants' Statement of Material Facts and Counterstatement of Material Facts is submitted under separate cover and provides further details and citations to the record, and is incorporated by reference.

## I. PROCEDURAL SYNOPSIS

Plaintiff filed her complaint on June 3, 2016 (Docket No. 1-1) against the Berks County defendants, plus two federal employees. Discovery proceeded with respect to the Berks County Defendants, while the federal employees filed motions to dismiss, who were ultimately dismissed. Extensive discovery has been completed. Plaintiff also filed a corresponding case, E.D. v. United States, which currently has a motion to dismiss pending.

## III. ARGUMENT

### A. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). The party opposing summary judgment is required to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

### B. DEFEDANTS FAILED TO PROTECT PLAINTIFF FROM A CONSTITUTIONAL VIOLATION

Defendants failed to protect E.D. from several sexual assaults by Daniel Sharkey. As an immigration detainee, she is protected under the Fifth Amendment or the Fourteenth Amendment's Due Process Clause. Bistrian v. Levi, 696 F.3d 352, 366-367 (3d Cir. 2012)

(citing <u>Bell v. Wolfish</u>, 441 U.S 520, 535 n.16 (1979)).  An immigration detainee is entitled to the same constitutional protections as a pretrial detainee.  <u>Adekoya v. Chertoff</u>, 431 Fed. Appx. 85, 88 (3d Cir. 2011) (unpublished).[1]

Generally, courts have viewed the standards applied to detainees under the Eighth Amendment standard, using the Eighth Amendment as a floor.  <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 188 n.10 (3d Cir. 1993).  In the excessive force context, however, the Supreme Court has provided greater guidance to the applicable standard acts of excessive force against pre-trial detainees that is distinct from the standard applied to prisoners.  In <u>Kingsley v. Hendrickson</u>, the Supreme Court explained that the standard to prove deliberate indifference, in the context of pretrial detainees, allows for an *objective showing* that the actions under scrutiny are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose.  <u>See</u> <u>Kingsley</u>, 135 S. Ct. at 2473 (internal quotations omitted) (emphasis added) ("[A]s <u>Bell</u> itself shows (and as our later precedent affirms), a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.").  Thus, proof of a defendant's mental state is not required.

Even for prisoners, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society" and that assault of a prisoner "serves no legitimate penological objective[e], any more than it squares with evolving standards of decency."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) (quotation marks omitted); <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) (explaining that the "unnecessary and wanton

---

[1] Unpublished opinions are cited not for their precedential effect but for their persuasive qualities.

infliction of pain" on a prisoner constitutes cruel and unusual punishment in violation of the

Eighth Amendment); Bucano v. Austin, C.A. No. 15-67 Erie, 2017 U.S. LEXIS 170136, at *14

n.9 ("[T]he Court reiterated the obvious concept that sexual assault serves absolutely no

penological purpose and that the Eighth Amendment prohibits all punishment that is totally

without penological justification." (internal citations omitted)).

As such, the Eighth Amendment imposes on prison officials "a duty to protect prisoners

from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (quotation marks

omitted); see also Beers-Capitol v. Whetzel, 256 F.3d 120, 130-33 (3d Cir. 2001); Hamilton v.

Leavy, 117 F.3d 742, 746 (3d Cir. 1997). It is well-established that a government official's

inaction in the wake of a constitutional violation committed by another can itself also be a basis

for liability. See, e.g., Farmer, 511 U.S. 825, 835 (1994); Smith v. Mensinger, 293 F.3d 641, 650

(3d Cir. 2002). Farmer v. Brennan is the seminal case that outlines that standard for a failure to

protect case for prisoners, and the underlying facts revolve around sexual assault of a prisoner.

To state a claim for failure to protect sexual abuse or assault of a pretrial detainee, the

detainee was required to establish that the defendant was deliberately indifferent to a risk of

serious harm and that the defendant knew of the risk. See Burton v. Kindle, 401 Fed. Appx. 635,

637-38 (3d Cir. 2010); Beers-Capitol v, 256 F. 3d at 133.[2] Where a prison official is aware of a

---

[2] The applicability of this subjective "deliberate indifference" standard to failure-to-protect claims by pretrial detainees has been called into question by the Kingsley decision. While the Third Circuit has not had occasion to consider the implications of Kingsley for other types of claims brought by pretrial detainees, some courts, including the Ninth Circuit, have held that Kingsley's objective standard applies to failure-to-protect claims or conditions of confinement claims by pretrial detainees. See, e.g., Castro v. Cty. of Los Angeles, 833 F. 3d 1060, 1070 (9th Cir. 2016) (noting that the Kingsley court "did not limit its holding to 'force' but spoke to 'the challenged governmental action' generally"); Abila v. Funk, No. CIV 14-1002 JB/SMV, 2016 U.S. Dist. LEXIS 162474, at *147-151 (D.N.M Nov. 23, 2016) (applying Kingsley's objective standard to a conditions-of-confinement claim by a pretrial detainee rather than the subjective deliberate indifference standard). The Ninth Circuit held that, in a failure-to-protect case, a

risk and fails to act, he can be held liable for failure to protect. See, e.g., Beers-Capitol v. Whetzel, 256 F. 3d 120, 141 (3d Cir. 2001) (denying summary judgment to youth detention center counselor who failed to investigate alleged abuse even though she had reason to believe her supervisor had had sexual relations with inmates in the past); Bucano v. Austin, 2016 U.S. Dist. LEXIS 32332, *11 (W.D. Pa. Mar. 14, 2016) (denying motion to dismiss where a woman prisoner alleged that other prison staff were aware that a correctional officer was sexually abusing her and failed to act); Nicholas v. Carter, 736 F. Supp. 2d 866, 872 (D. Del. 2010) (denying summary judgment to prison official who failed to act to protect the plaintiff even though he allegedly knew the plaintiff feared being assaulted by his cellmate and knew of the cellmate's propensity for violence); White v. Ottinger, 442 F. Supp. 2d 236, 249-50 (E.D. Pa. 2006) (denying summary judgment to prison official who chose not to investigate allegations of sexual misconduct even though he "had concerns" that there was a sexual relationship between a guard and an inmate).

Defendants argue that they did not fail to protect E.D. because none of them knew that Sharkey and E.D. were having sexual intercourse. However, that is not the standard under deliberate indifference. Plaintiff must demonstrate that there was an awareness of a substantial *risk* of serious harm, but do not have to know the precise nature of the risk. See Farmer, 511 U.S. at 843 ("Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of

---

pretrial detainee need only establish that "there [was] a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take[,]" not that the defendant was aware of the risk of harm. Castro, 833 F. 3d at 1070.

serious harm…"); <u>Nestor v. Dir. of Ne. Region Bureau of Prisons</u>, CIV. 11-4683 RBK/AMD, 2012 WL 6691791, *5 (D.N.J. Dec. 20, 2012) (The focus of the knowledge requirement concerns "the general concept of risk," rather than the victim's identity).

Actual knowledge can also be inferred if a risk is obvious. <u>See Hope v. Pelzer</u>, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.") "[A] defendant's knowledge of a risk can be proved indirectly by circumstantial evidence." <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 131 (3d Cir. 2001); <u>see also Bistrian v. Levi</u>, 696 F.3d 352, 367 (3d Cir. 2012).

In the case here, BCRC is a relatively small facility where staff all know each other and work together. The physical structure is relatively small and you can easily see down hallways. (<u>See</u> Ex. 45: Diagrams). Several of the Defendants and other BCRC staff members admitted that they saw a close relationship between Sharkey and E.D. or Sharkey spending more time with E.D. Each BCRC Defendant also admitted to being trained on with the Code of Ethics that provides guidance that staff must not be too friendly with the detainees. Plaintiff does not argue that a violation of facility or county rules is a violation of the Constitution. Rather, in this case, the rules provide the contours of what acceptable behavior is, and puts staff on notice of what is acceptable and unacceptable behavior. If staff saw behavior that clearly violated policy, it can be inferred that this violation could lead to serious harm to a detainee.

Furthermore, in this case, there is evidence that BCRC staff, and specifically all staff who worked the same shift as Sharkey, were aware that something improper was happening. At his deposition, Sharkey testified that: (1) other staff members knew and it "became a joke to everybody" at the daily briefings at the beginning of his shift that all were required to attend, and that staff would send Plaintiff to Sharkey (<u>Ex. 3: Sharkey Dep. Tr.</u> 212:9-213:24); (2) his shift

supervisors who ran the daily briefings knew;[3] (3) it was a facility joke that E.D. was his "girlfriend" (Id. 80:15-18); (4) his shift supervisor joking that there were a bunch of "John Reiches," in reference to a Berks County employee who hit on females (Id. 214:5-11); and (5) Sharkey told staff member Darrius Palmer about the "relationship" and that while Sharkey was on vacation, Palmer texted a photo of Plaintiff in her bra and panties to him (Id. 199:5-200:2).

Defendants argue that they could not have failed to protect E.D., arguing that there is no constitutional violation because the "relationship" between Sharkey and E.D. was "consensual." However, just as a minor under the age of 16 cannot consent to sex under Pennsylvania's statutory rape laws, see 18 Pa.C.S. 3122.1, a person in custody cannot consent to sex with those tasked with her care and custody in a custodial setting such as BCRC, and in this case, Sharkey was in fact convicted of institutional sexual assault. See 18 Pa.C.S. 3142.2. Berks County and BCRC itself claims to have a "zero tolerance" policy against sexual abuse and sexual assault, yet now claims that there is no harm done just because it was "consensual." (See Ex. 40: BCRC SAAPI policy at 1.)

In the Carrigan v. Davis case, the court found that a comparable criminal statute to Pennsylvania's statute on institutional sexual assault emphasizes the special relationship between as "a custodial relationship in which one party relies on the other party for care and protection" and "recognizes the vulnerability of inmates to abuse by those empowered to control the inmate's existence." 70 F. Supp. 2d 448, 459 (D. Del. 1999).[4] Thus, the Carrigan court held that the

---

[3] Q. "What supervisors knew about it?" A. "Jason Mills and Len Kopetsky. Every day when I come into briefing. Oh, she waited to do her laundry on second [Sharkey's] shift. That must be for Sharkey." (Ex. 3: Sharkey Dep. Tr. 214:18-24).

[4] Defendants cite to Stubbs v. DeRose, No. 03-cv-2362, 2007 U.S. Dist. LEXIS 17830 (M.D. Pa. March 12, 2007), which is distinguishable in several ways. In Stubbs, the prisoner continued a sexual relationship with the contracted prison priest after her release, the prison priest had not

prisoner was incapable of giving a voluntary waiver and consent to a sexual act. See also Wood v. Beauclair, 692 F.3d 1041, 1049 (9th Cir. 2012) (holding that inmates are entitled to a presumption that sexual conduct was not consensual); Cash v. County of Erie, No. 04-cv-0182, 2009 WL 3199558, at *2 (W.D.N.Y. 2009) (holding that a prisoner's incarceration made her incapable of consenting to sex with a correctional officer).

Furthermore, E.D. disputes that she actually "consented" to what happened. Defendants point out to E.D.'s statements that it was "consensual," but then notably leave out her consistent assertions that she feared that she would be deported such that she felt that she had to comply with Sharkey's requests or demands, and that she felt obligated to have sexual intercourse with him. (See Ex. 1: E.D. Decl. at 27; Ex. 2: E.D. Dep. Tr. 85:7-19; 96:8-11; Ex. 14: Affidavit of Probable Cause, filed Jan. 20, 2015 (at Berks 2934)).[5]

E.D. also suffered serious harm from the incidents with Sharkey. Plaintiffs have produced an expert report from Dr. Cooke, who diagnosed E.D. with Posttraumatic Stress Disorder. He opined that her depression and anxiety generally increased, in part due to fear that, if she did not cooperate in the relationship, she would be deported and possibly also might be in

---

been convicted of institutional sexual assault, and furthermore, the incidents and lawsuit occurred prior to the implementation of the Prison Rape Elimination Act regulations, which require facilities to adopt a zero tolerance policy. The cases, Freitas v. Ault, 109 F.3d 1335 (8th Cir. 1997) and Graham v. Sheriff of Logan County, 741 F.3d 1118 (10th Cir. 2013), are also distinguishable on their facts, and the Graham court still noted that "we recognize a need to examine consent carefully in the prison context." 741 F.3d at 1120.

[5] On a motion for summary judgment, where inferences are made in the light most favorable to the non-movant, this should be enough to infer that the "relationship" was not "consensual." However, there is other evidence that supports this. For example, Himmelberger testified in her deposition that Sharkey was "manipulative" and Smith wrote notes indicating that another staff member said Sharkey was an "ass." (See Ex. 18: Smith Notes at Berks 02611).

danger of death,[6] and due to the social isolation where she felt that the staff and detainees were judging and ostracizing her.  (See Ex. 13: Dr. Cooke Expert Report at pp. 12-13).

Defendants incorrectly argue that only severe or repetitive abuse has been found to rise to the level of an Eighth Amendment violation (and do not cite to any Third Circuit cases to support their proposition.  In fact, the cases they cite are ones where severe and/or repeated sexual abuse constituted an Eighth Amendment violation, but those cases do not preclude constitutional violations where there has been less.  A single act may be sufficient.  See Rosado v. Kissinger, No. 4:CV-03-0535, 2003 U.S. Dist. LEXIS 29374, *3 (M.D. Pa. Oct. 21, 2003) (one act of forced sexual contact sufficient for a constitutional violation); see also Bucano v. Austin, C.A. No. 15-67 Erie, 2017 U.S. Dist. LEXIS 170136, *14 n.9 ("[T]he Court strongly admonishes [the correctional officer's] counsel for his continued assertion that even if [the correctional officer] inserted his fingers into Plaintiff's vagina, the 'penetration only occurred once and briefly;' and therefore, [the correctional officer's] conduct, even if proven, is 'de minimis' and not implicative of the Eighth Amendment . . . .  [T]he Magistrate Judge found [the] persistence in this argument deeply troubling, given his simultaneous duty to report and initiate prosecution against any DOC personnel accused of the same conduct . . . [and because i]t is beyond peradventure that the commission of institutional sexual assault is a violation of an inmate's constitutional right to be free from cruel and unusual punishment.").

---

[6] From her past experience of domestic violence and having no recourse in Hondorus, E.D. feared being in Honduras so much that, after her first attempt to come to the United States resulted in her immediate deportation, she tried coming back to the United States within only one week, despite both trips that entailed walking for hours or days, including walking through the desert for two days without food or water.  (See Ex. 2: E.D. Dep. Tr. 32:17-33:18; 43:14-44:8).  Thus her fear of deportation was very strong.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." <u>Farmer</u>, 511 US at 842. Here, Plaintiff has provided ample evidence such that there are genuine issues of material fact that Defendants failed to protect her, and summary judgment should be denied.

C.       <u>DEFENDANTS RETALIATED AGAINST PLAINTFF</u>

Plaintiff has presented sufficient evidence of retaliation that summary judgment should be denied. To state a claim for retaliation, a prisoner or detainee must show (1) constitutionally protected conduct, (2) an adverse action taken by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. <u>Mack</u>, 839 F.3d at 297 (citing <u>Mitchell v. Horn</u>, 318 F. 3d 523, 530 (3d Cir. 2003).

In the case here, after a detainee reported the improper conduct of Sharkey with Plaintiff, rather than provide support for a potential victim, BCRC staff almost immediately began to target E.D. and place her under great scrutiny. For the first time since she arrived, E.D. was subjected to a series of write-ups, called "Informational Reports," where multiple actions led to being "counseled" and her parenting was questioned. These include:

1. **August 17, 2014** Informational Report by Katie Reabold:
   a. written up for "Disobedience/Disrespect" for not doing enough when her son climbed on another child's walker
2. **August 17, 2014** Informational Report by Beth Hrezik:
   a. written up for "Violation of Program Rules" for allegedly not supervising children.
3. **August 18, 2014** Informational Report by Sandra Kreager:
   a. written up for "Violation of Program Rules" for allegedly not supervising children while they were on the toys in the outside recreation area.
4. **September 4, 2014** Informational Report by Katie Reabold:
   a. written up for "Violation of Program Rules" for allegedly joking about suicide.

5. **September 11, 2017** Information Report by Brittany Rothermel
   a. Written up for "Violation of Program Rules" and "Contraband" for having lotion that contained alcohol, mirrored compact, domestic and foreign money, and a crushed up Dramamine pill in her closet
6. **September 13, 2017** Informational Report by Beth Hrezik:
   a. Written up for "Violation of Program Rules" and "Disobedience/Disrespect" and counseled for son riding a bike that was too big
7. **September 19, 2017** Informational Report by Erika Taylor
   a. Written up for "Violation of Program Rules" and counseled for allegedly dancing inappropriately
8. **September 21, 2017** Informational Report by Josiah Scott-Manga:
   a. Written up for "Violation of Program Rules" and counseling E.D. for alleging kicking her son and placed on mental health PCs.

(See Exs. 21-27, 33).[7]

Whenever E.D. talked to other detainees, those detainees were questioned soon after, such that detainees did not want to talk to her anymore. The Informational Reports also reveal that if she was with other detainees, these detainees might also be subject to write-ups about their parenting skills. (See, e.g. Ex. 22: Informational Report of 8/17/14; Ex. 23: Information Report of 8/18/14). Thus Plaintiff E.D. became socially isolated from the other detainees at a point when she most needed support.

By mid- to late-October, E.D. had confided in her *pro bono* immigration attorney and decided to come forward, and she reported what had happened via her attorney, who faxed, emailed and mailed ICE representatives. (See Ex. 34: Letter of M.Archambeault). Again, almost immediately, she was subjected to intensified retaliatory acts, this time openly sanctioned by Diane Edwards and management. A new clothing policy was issued that prohibited clothing that was too tight, revealing, short, and no dresses or skirts were allowed at all unless for religious reasons. (See Ex. 36: Resident Dress Code Policy of 11/1/14). Staff collected the

_____

[7] E.D.'s entire BCRC file was requested, and no Informational Reports were produced that pre-date August 17, 2014.

detainees' handbooks and returned the handbooks to them with stickers with printed changes relating to the clothing policy. (See Ex. 37 Resident Handbook (Spanish version given to E.D.) at p.11; Ex. 38: Resident Handbook (Spanish) at 13; Ex. 39: Resident Handbook (English) at 12).

Staff came through to all the detainee's rooms and confiscated large numbers of clothing, spurring other detainees to blame E.D. Defendants claim they made regular hygiene checks, yet they the only room inspection sheet that indicates clothing being taken is from November 2014. (See Ex. 35: Room Inspections at 11/17/14). In terms of individual enforcement, E.D. felt targeted and was ordered multiple times to change out of what she was wearing. Many times she was verbally told to change out of her clothing, and she also was written up and counseled about it. (See Ex. 31, 32: Informational Reports of 12/14/14, 12/15/14). She witnessed other detainees wearing similar clothing to hers, yet staff did not instruct the other detainees to change out of their clothing. (See Ex. 1: E.D. Decl. at ¶53.) Plaintiff E.D. was so upset that she asked a medical staff person to translate and express to the staff that she felt singled out about the clothing policy. (See id. at ¶54).

Plaintiff E.D. and her son were also restricted from participating in certain programs and activities. For example, her son was unable to go and get a haircut when other children were permitted. (See Ex. 1: E.D. Decl. at ¶42). Plaintiff E.D. was told by Brittany Rothermel that she (E.D.) was placed on a "Restriction." (See id. at ¶43). Plaintiff also continued to receive Informational Reports for minor matters. (See Ex. 29: Informational Report 11/20/14: P found dime in couch; Informational Report 12/9/14: staff member thought son was being inappropriate but was fixing a zipper). Plaintiff became increasingly stressed and depressed due to the ostracization and being singled out. These were adverse actions that might deter an ordinary

person from exercising their constitutional rights, and E.D. in fact, did regret coming forward. (See Ex. 1: E.D. Decl. at ¶55).

Defendants argue that the clothing policy had been in the works for many months, and that E.D. was not treated any differently from other residents. However, the timing of all of the actions suggest a connection with her reporting of what happened. See Rauser, 241 F.3d at 334 (explaining that "suggestive temporal proximity" is relevant to proving whether plaintiff's protected activity was a substantial factor when evaluation the causation prong). At a minimum, this presents genuine issues of material fact most appropriate for a factfinder. C.f. Booth v. King, 346 F. Supp. 2d 751, 762 (E.D. Pa. 2004) (determining that whether actions constituted adverse action should be decided by the fact-finder). Therefore, summary judgment should be denied.

D.    DEFENDANTS WERE PERSONALLY INVOLVED

Plaintiff has sufficient evident to show the personal involvement of each Defendant. A prison official may be liable through personal involvement in the committed wrongs, either through personal direction or through his knowledge and acquiescence. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). To be liable for the acts of subordinates, the record must contain evidence that the official was deliberately indifferent to the health or safety of inmates. Farmer, 511 U.S. at 837. Moreover, "policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). In Beers-Capitol, the Third Circuit outlined a four-prong test for supervisory liability: "(1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was

aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." Beers-Capitol, 256 F.3d at 134, citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); see also Savage v. Bonavitacola, 2005 WL 568045 (E.D. Pa. March 9, 2005) ("There is a second theory of supervisory liability under Section 1983 . . . . Under this theory, a supervisor may be liable as a policy maker for failing to exercise his supervisory authority if he "exhibited deliberate indifference to the plight of the person deprived.")

A plaintiff "can make out a supervisory liability claim by showing that 'the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries." Id. Moreover, supervisory liability may also exist where "there are situations in which the risk of constitutionally recognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." Beers-Capitol, 256 F.3d at 134. Therefore, "when dealing with supervisory defendants, as opposed to defendants who allegedly had direct knowledge of a serious threat to inmate safety, the standard for deliberate indifference is not the 'actual knowledge' standard required in Farmer," but rather, the four-prong test outlined in Beers-Capitol. Ward v. Taylor, Civ. A. No. 04-1391-KAJ, 2006 U.S. Dist. Lexis 14135, at *16 (D. Del. March 30, 2006). As an example, in Lambert v. Wolfe, the court noted that at SCI Cambridge Springs (a women's prison), "Throughout the time period encompassed by this action, male employees routinely had direct supervisory contact with the female prisoners and were permitted, as a matter of practice, to escort inmates across campus from building to building without the presence of a female officer," and then found that the

Superintendent's policy created an unreasonable risk of sexual assault of prisoners." Lambert, 2007 WL 1830714, at *10.

As the Executive Director of BCRC, Diane Edwards established, implemented and approved practices and policies that cultivated and sanctioned a laissez faire atmosphere where Sharkey could disappear for lengths of time, show favoritism towards a detainee, be seen alone with a detainee in a room without cameras without another staff member reporting him, where despite Sharkey's comments to two separate supervisors about a detainee flirting with him, the supervisors do not report it, and where supervisors spend most of their time in their office. Viewed in the light most favorable to Plaintiff, this atmosphere permitted joking at daily briefings where supervisors were present, staff members calling a detainee Sharkey's "girlfriend," holding trainings that entailed filling or signing forms and completing a quiz, and disciplining Sharkey about a racist comment yet providing no counseling for him. Given this atmosphere, another staff member could know about the "relationship" enough to text Sharkey a photo of E.D. in her bra and panties to him during Sharkey's vacation, and feel that it was fine not to report it. No wonder Sharkey felt bold enough to engage in sexual intercourse with a detainee not only in one of the dorm rooms (where multiple people live), but also in the women's bathroom that is off a main hallway leading to the entrance of the building.

Furthermore, many of the other detainees knew about what was going on, yet did not report it, for fear of retribution and that it would affect their immigration status. Until E.D. met with her immigration attorney, she had never been told that she would not be in trouble with the law or immigration authorities by reporting it. Similarly, after the young child reported it, her mother expressed fear that it would negatively affect them. (See Ex. 16: Email of Mosko, M. dated 8/18/14 (at Berks 02442). In fact, after E.D. reported it, she suffered greatly by the staff's

actions that targeted and isolated her. Edwards then approved, implemented, and instructed staff to carry out a stricter clothing policy that ended up targeting E.D. and causing the other detainees to shun Plaintiff.

Despite almost all of the detainees being only Spanish-speaking, only one staff member (Brittany Rothermel) spoke Spanish. As one person, she would generally only work on shift per day. Therefore, even when detainees attempted to tell a staff member, the staff member either did not understand or brushed it off, saying "No comprendo" and "No problema." (See Ex. 47: DHS Report of Investigation at 4-5).

Defendants present their sexual assault and abuse policy and the Code of Ethics to argue that they had adequate policies. However, policies on paper will not be an excuse if the procedures and practices do not match those policies. Merely adopting a policy is not sufficient to avoid liability where the policy is routinely disregarded. Beck v. City of Pittsburgh, 89 F.3d 966, 974 (3d Cir. 1996).[8] Even something as simple as a policy barring personal cell phones became toothless when Sharkey brought in his personal cell phone on a regular basis and faced no consequences. (See Ex. 41: Cell Phone Policy).

In terms of the personal involvement of the other individual Defendants,[9] several people testified that all people coming on to shift attended the briefings prior to the shift, and Sharkey testified that the jokes about Sharkey and E.D. occurred during the briefings where everyone heard about them. This is an enough of an inference that all individuals on the same shift as Sharkey were aware of the "relationship" between Sharkey and E.D. Additionally, Jamie

_____

[8] As the Third Circuit explained, "Formalism is often the last refuge of scoundrels; history teaches us that the most tyrannical regimes… are theoretically those with the most developed legal procedures." Beck v. City of Pittsburgh, 89 F.3d 966, 974 (3d Cir. 1996).

[9] Plaintiff does not oppose the dismissal of John Behm.

Himmelberger saw Sharkey and E.D. together alone in the laundry room, and Sharkey testified that Himmelberger told him to "Watch out." (See Ex. 3: Sharkey Dep. Tr. 218:14-15). A number of individuals participated in the adverse actions against E.D., including Erika Taylor who wrote an Informational Report. (See Ex. 26). Brittany Rothermel participated in confiscating clothing, told E.D. that she was on a restriction, and testified that she saw Sharkey with E.D. more than usual. (See Ex. 1: E.D. Decl. at ¶52; Ex. 19: Bern Township Police report at 12; Ex. 35: Room Inspections at 11/17/14; Ex. 5: Rothermel Dep. Tr. 155:24-10). These are genuine issues of material fact such that summary judgment should be denied.

E.      PLAINTIFF HAS SUFFICIENT EVIDENT OF MUNICIPAL LIABILITY TO PROCEED TO A JURY

Berks County is liable to Plaintiff E.D. under two theories of municipal liability. First, Plaintiff's injuries resulted from Berks County's knowing acquiescence in the unconstitutional custom and practice of Berks County BCRC staff, who as a matter of course turned a blind eye to an improper "relationship" and where joking about it was permitted. Second, Berks County failed to train, supervise, and discipline BCRC staff to prevent a staff member from the sexual abuse and sexual assault of E.D. that constituted deliberate indifference.

"Custom" can be established through evidence of an unconstitutional practice that Berks County acquiesced in, even if it was not formally approved. For example, a jury may find that Berks County acquiesced in an unconstitutional custom if the practice at issue was so widespread and well settled that the practice could be considered "standard operating procedure" and policymakers should have known of it. See Model Civ. Jury Instructions, § 4.6.6 (3d Cir. 2017); Baker v. Monroe Township, 50 F.3d 1186, 1191 (3d Cir. 1995). A jury can find a custom where there is proof that policymakers had actual knowledge of the unconstitutional practice and acquiesced in the practice—that is, where policymakers were aware of similar unlawful conduct

in the past, but failed to take adequate precautions against future violations. <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 851 (3d Cir. 1990).

In <u>Colburn v. Upper Darby Twp.</u>, 838 F.2d 663 (3d Cir. 1988), the plaintiff alleged that the township had a "custom of laxity" in jail supervision and searching inmates, and that this custom was the proximate cause of a detainee's suicide. Id. at 665, 672. Similarly here, Berks County has a "custom of laxity" in permitting staff members to do as they wished. Several notes further indicate that staff members did not feel comfortable coming forward in reporting violation of rules, feeling that these would be ignored by supervisors. (<u>See</u> Ex. 18: Smith Notes; <u>see also</u> Ex. 16: Email of Wetzel, A. dated 8/19/14 at 1:34 PM (Berks 02473); Email of Wetzel, A. dated 8/19/14 at 2:46PM (Berks 02475)).

It was not until after the incidents came to light did staff become disciplined for failing to follow the rules, rules designed to prevent the ability of a staff member to groom and convince a detainee into having sexual intercourse in a non-private bathroom. Furthermore, it was a custom to single out a detainee subjected to institutional sexual assault for greater scrutiny, rather than provide her much-needed emotional support. The clothing policy and its implementation furthered this victim blaming attitude among staff, which only caused E.D. to suffer more. E.D. explained that adverse actions against her by staff were pervasive, and the Informational Reports in fact show that multiple staff were involved.

The "failure-to-train" theory of liability does not require proof of such a widespread practice, but does require proof that Berks County policymakers (1) knew their staff would encounter the situation, (2) knew that their staff had a history of mishandling such situations, and (3) knew that their mistakes would likely lead to a violation of constitutional rights, yet failed to implement training or supervisory changes that would have reduced that risk. <u>See</u> Model Civ.

Jury Instructions, § 4.6.7 (3d Cir. 2017); Thomas v. Cumberland County, 749 F.3d 217, 223–24

(3d Cir. 2014); Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999). This "deliberate

indifference" is distinct from the "deliberate indifference" standard in prison cases, and it must

be shown is indifference as to the known or obvious consequences of failing to train or

supervise. As the Supreme Court has explained:

> [I]t may happen that . . . the need for more or different training is so
> obvious, and the inadequacy so likely to result in the violation of
> constitutional rights, that the policymakers of the city can
> reasonably be said to have been deliberately indifferent to the need.
> In that event, the failure to provide proper training may fairly be
> said to represent a policy for which the city is responsible, and for
> which the city may be liable if it actually causes injury.

City of Canton v. Harris, 489 U.S. 378, 390 (1989).

In the case here, training was on paper only. In fact, Sharkey testified that there was a

"binder" of material, supervisor Brandon Witmer testified that training consisted of a number

documents that the trainee was to review and sign, and Himmelberger stated that they got a

packet of information and took a quiz. (See Ex. 3: Sharkey Dep. Tr. 77:6-15; Ex. 4:

Himmelberger Dep. Tr. 70:4-11). There was no meaningful training on the dynamics of sexual

abuse, and there clearly was no meaningful training on how to identify and report other staff

members' actions that would demonstrate a risk of sexual abuse or sexual assault.

There were also serious gaps in the supervision of Sharkey and other staff. First, there is

evidence of joking and teasing Sharkey about his "relationship" with E.D. at the daily briefings,

yet the supervisors who ran the meetings did nothing to curb it, and in fact, participated in it.

Some supervisor appeared not to take rules seriously. Sharkey tells of an incident where a

supervisor shows him a security video (that only supervisors have access) of a staff member

falling, thinking that it is funny. In addition, as mentioned above, the supervisors spent a lot of

time in their office, which means they were not on the floor sufficiently to observe and supervise staff. Sharkey even went to the supervisors about allegations that E.D. was flirting with him. Only one of them reported it up the chain, and none did anything beyond talking to him about it. David Smith testified that had he received reports from all three supervisors, then he may have investigated further. Further, these were comments made by someone who had previously been disciplined at least twice in his employment with Berks County, with one time at BCRC warranting a 10-day suspension. (See Ex. 10: Edwards Dep. Tr. 122:3-23; 129: 9-12; Ex. 48). Therefore, summary judgment should be denied on municipal liability.

F.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants are not entitled to qualified immunity.[10] The right to be free of sexual assault while in custody, and the right to be protected from such sexual assault, has long been established. In examining qualified immunity, a court must analyze whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right and whether the right was "clearly established" at the time the violation occurred, in either order. Pearson v. Callahan, 555 U.S. 223, 231, 236 (2009). If both are true, then a defendant may not claim qualified immunity. A plaintiff need only show that in light of pre-existing law, the unlawfulness of the official's conduct was apparent. McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001). Whether qualified immunity should be invoked turns on the "objective legal reasonableness" of the official's acts. Abassi, 198 L. Ed. at 318 (citing Harlow v. Fitzgerald, 457 U.S. 800, 819).

---

[10] Municipalities do not have the available defense of qualified immunity. See Pembaur v. City of Cincinnati, 475 U.S. 469, 474 (1986); Owen v. City of Independence, 445 U.S. 622, 650 (1980).

Defendants argue that Plaintiff was a detainee and not a prisoner (D. Br. at 34), as if that should change or decrease her right to be free from sexual assault. As discussed above, detainees are entitled the same rights, if not more, than prisoners. "Pretrial detainees . . . are entitled to at least as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts." Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993); see also Hubbard v. Taylor, 399 F.3d 150, 165 (3d Cir. 2005); Adekoya v. Chertoff, 431 Fed. Appx. at 88 (holding that immigration detainee entitled to same constitutional protections as a pre-trial detainee).

It is clearly established that prisoners have the right to be free of assault, including sexual assault, established through both case law and statute. See Brooks v. Kyler, 204 F.3d 102 (3d Cir. 2000) (examining the extent of injuries as only one factor in excessive force cases); Hudson v. McMillian, 503 U.S. 1, 8-9 (1992) (holding that the Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency); see also Farmer v. Brennan, 511 U.S. at 831 (establishing deliberate indifference standard in a case involving physical and sexual assault of a transgender prisoner). Furthermore, there is clearly established case law that the U.S. Constitution protects detainees in jails, prisons, and detention centers. See, e.g., Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (holding the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner); Bell v. Wolfish, 441 U.S. 520 535 n.16, 545 (1979) ("[I]f a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees.").

There is longstanding case law that prison inmates have a constitutional right to be protected from assault and sexual assault by others, highlighted by the seminal case of <u>Farmer v. Brennan</u>, 511 US. 825 (1994) and recognized by this court.  See <u>E.D. v. Sharkey</u>, Civil Action No. 16-2750, 2017 U.S. Dist. LEXIS 74088, *24-25 ("[T]he right to have a custodial government officer protect an immigration detainee from sexual assault of which he is aware. That right is clearly established . . . ."); <u>see also</u> <u>Farmer</u>, 511 US. 825 (1994) (establishing a deliberate indifference standard for prison officials who failed to protect the safety of prisoners); <u>Ortiz v. Jordan</u>, 562 U.S. 180, 190 (U.S. 2011) (explaining that "the pre-existing law was not in controversy" regarding how a prison official can be held liable for the deliberate indifference to a prisoner's Eighth Amendment right to protection from safety and citing <u>Farmer v. Brennan</u>); <u>Mayberry v. Walters</u>, 862 F.2d 1040, 1041 (3d Cir. 1988) (affirming jury verdict for prisoner plaintiff in Eighth and Fourteenth Amendment claims that prison officials failed to protect him from assault); <u>Sutton v. Utah State School for Deaf and Blind</u>, 173 F.3d 1226, 1241 (10th Cir.1999) (finding that a state supervisor may be liable for failing to take appropriate steps to prevent sexual assaults by subordinates on persons where the state was responsible for their safety); <u>Butler v. Dowd</u>, 979 F.2d 661, 675 (8th Cir.1992) (en banc) (prisoners have a constitutional right to be free of sexual attacks).

It has also been established that "[p]olicymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." <u>A.M. v. Luzerne County Juvenile Det. Ctr.</u>, 372 F.3d 572, 586 (3d Cir.2004).  This includes supervisors who have policies, customs, or practices that failed to protect individuals in their custody from sexual abuse or assault.  See <u>Lambert v. Wolfe</u>, No. CIV.A. 96-247 ERIE, 2007 WL 1830714, at

*10 (W.D. Pa. June 25, 2007) (denying summary judgment for superintendent and other correctional staff for failing to have proper policies and practices to protect an inmate from sexual assault).

Even more specifically, the Third Circuit has long-established that individuals working in detention centers also have a duty to protect residents and detainees from sexual abuse.  See Beers-Capital, 256 F.3d at 130-33 (3d Cir. 2001).  A case need not be on "all fours" factually with a previous case for government officials to be on notice that their conduct was unlawful. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decision law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'") (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Defendants cite to White v. Pauly to support their proposition, yet White affirms that under the case law "do[es] not require a case directly on point."  White v. Pauly, 137 S. Ct. 548, 551 (2017).

The fact that this issue has been clearly established is further supported by statute and regulations.  With the passage of the Prison Rape Elimination Act (PREA) in 2003, the publication of its standards in 2009, with the final rules going into effect in 2012, there is a national recognition of the statutory right to be free from sexual assault while incarcerated or detained, and that the officials operating or working at the facility have certain obligations or duties.  Several ICE and/or Department of Homeland Security Directives or policies create reporting and notification requirements for allegations of sexual abuse or sexual assault.  See ICE Directive 11062.1: Sexual Abuse and Assault Prevention and Intervention, ¶ 5.3 (issued on and effective as of May 11, 2012) available at

https://www.ice.gov/doclib/foia/dro_policy_memos/sexual-abuse-assault-prevention-

intervention-policy.pdf ("All ICE employees shall immediately report any knowledge, suspicion, or information regarding an incident of sexual abuse or assault of an individual in ICE custody to a supervisor or a designated official."); 6 C.F.R. 115: Standards To Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities; Final Rule (March 7, 2014) available at https://www.gpo.gov/fdsys/pkg/FR-2014-03-07/pdf/2014-04675.pdf.  There, there is ample case law, supported by statutes, regulations, and policies that clearly establish a failure to protect claim by an immigration detainee against an individual who worked at the detention center.

Defendants also argue that BCRC is an "unsecured facility licensed facility pursuant to the Pennsylvania regulations applicable to child residential centers at 55 Pa. Code 3800 et. seq." (See D. Br. at 34).  How or whether or not BCRC is licensed does not change whether E.D. and the other detainees were "in custody."  The Intergovernmental Service Agreement (IGSA) between Berks County and the United States states, "The purpose of this [IGSA] is to establish an Agreement between ICE and the Service Provider for the **detention** and care of persons **detained** under the authority of the Immigration and Nationality Act . . . ."  (See Ex. 4: IGSA at 2 (emphasis added).  Further, the IGSA explains that while ICE residents/detainees are not charged with criminal violations, they are "**held in custody**" throughout the administrative hearing process and to assure their presence for removal . . . ."  (See id. at 2) (emphasis added). The contract refers to people as "residents/**detainees**."  (See id. at 2) (emphasis added).

Furthermore, the IGSA explicitly states that the "Service Provider shall not release residents/detainees from its physical custody to any persons other than those described in Paragraph A [Federal law enforcement officials with prior authorization from DHS/ICE] for any reason, except for medical, other emergency situations, or in response to a federal writ of habeas corpus."  (See Ex. 43: IGSA at 6).  The "Statement of Work" section of the IGSA states the

"purpose of the contract is to facility the provisions for the necessary physical structure, equipment, facilities, personnel and services, to provide a program of temporary shelter care in a staff **secure** environment . . . ." (See id. at 20) (emphasis added).  It also specified that "these individuals, although placed to the **physical custody of the Service Provider**, shall remain in the legal custody of the ICE." (See Ex. id. at 20) (emphasis added).

There are multiple references in the contract to the detainees being in custody.  For example: "If the Service Provider determines that ICE has deliver a person for **custody** to reside . . . ." (Ex. 43: IGSA at page 3) (emphasis added).  If a detainee was to leave the premises, an escort is required.  (See id. at 4) .  The Service Provider agrees to provide stationary guard services on demand by the COTR or Contracting Officer.  (See id. at 5).

The facts here also support that qualified immunity should not apply here.  The job description for BCRC "Shelter Care Counselors" states that the employee "Provides care for dependent children and families within a minimum **secure**, residential environment." (See Ex. 42: Shelter Care Counselor Position Description Form (Berks 02908)) (emphasis added).  BCRC staff emphasized that they had to follow the SAAPI regulations and rules, staff members testified that fraternization and being friends with detainees was not permitted, and that they should report any instances of sexual misconduct, and supervisors and management were to receive those reports of sexual abuse and act on them.  Based on the actual evidence in the record, it is undisputed that E.D. was in the custody of BCRC and that the individual BCRC had custodial responsibilities.

Defendants also argue that they are entitled to qualified immunity on an "immigration detainee's right to have a county employee protect her from a concealed consensual sexual relationship with another county employee." (D. Br. at 33).  As discussed above, the right to be

protected by sexual assault by a custodial staff person is clearly established. Furthermore, almost all sexual contact between custodial staff members and the person in custody is "concealed" until it is discovered or reported as it is a common problem in sexual abuse situations, and therefore this issue is also clearly established.[11] See, e.g., Lambert, 2007 WL 1830714 at *3 (denying summary judgment in a case where prisoner plaintiff initially denied having sexual contact with a correctional officer). Last, the issue of whether or not a constitutional violation arose if there is a "consensual relationship" is discussed further above. However, again, just because a prisoner does not say "no" does not mean the sexual contact was "consensual" for the purposes of a violation of the law or constitution, and again, many cases in the detention and prison context include a facet of power coercion where the victim does not say "no." See, e.g., Rosado v. Kissinger, No. 4:CV-03-0535, 2003 U.S. Dist. LEXIS 29374, *3 (M.D. Pa. Oct. 21, 2003), *surviving summary judgment on failure to protect claims at* Rosado v. Kissinger, 2007 U.S. Dist. LEXIS 5056, *29 (M.D. Pa. Jan. 24, 2007) (where prisoner plaintiffs agreed to perform sexual acts on each other due to threats by correctional officer). Qualified immunity should be denied.

G.      THE CLAIM FOR PUNITIVE DAMAGES SHOULD REMAIN FOR THE INDIVIDUAL DEFENDANTS

Punitive damages can be awarded against individual officials or employees when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Furthermore, the underlying standard of liability for compensatory damages

---

[11] See also United States Dep't of Justice, Regulatory Impact Assessment for PREA Final Rule, at 17-18 (May 17, 2012), available at http://www.ojp.usdoj.gov/programs/pdfs/prea_ria.pdf (analyzing a Bureau of Justice survey and concluding that between 69 percent and 82 percent of inmates who reported sexual abuse in response to the survey stated that they had never reported an incident to corrections staff.)

is one of recklessness.  Id.  Plaintiff concedes that punitive damages are not available to municipalities or governmental agencies.  See Newport v. Fact Concerts, Co., 453 U.S. 247 (1988).  However, punitive damages would be available against the individual defendants and is appropriately decided by the fact finder at trial.  See Yudenko v. Guarini, Civil Action No. 06-4161, 2008 U.S. Dist. LEXIS 67512, *33-34 (leaving question of punitive damages for trial); Karpiak v. Russo, 676 A.2d 270, 275 (Pa.  Super. 1996).  Therefore, it is premature to strike Plaintiff's claim for punitive damages.

IV.     **CONCLUSION**

For the reasons discussed above, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

/s/ Su Ming Yeh
Su Ming Yeh
I.D. No. 95111
Angus R. Love
Attorney # PA 22392
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304S
Philadelphia, PA 19106
(215) 925-2966
*Counsel for Plaintiff*

DATE:  October 26, 2017

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| E.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 16 Civ. 2750 |
| | : | |
| DANIEL SHARKEY et al., | : | Judge Edward G. Smith |
| Defendants | : | |
| | : | Filed via ECF |
| | : | |

## CERTIFICATE OF SERVICE

On this October 26, 2017, I, Su Ming Yeh, hereby certify that I caused a true and correct copy of Plaintiff's Response to Defendants' Motion for Summary Judgment, to be served electronically on counsel as follows:

Langdon Jones
U.S. Attorney's Office for the E.D. Pa.
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
landon.jones@usdoj.gov

Matthew J. Connell
Tricia M. Ambrose
MacMain Law Group
101 Lindenwood Drive, Suite 160
Malvern, PA 19355
mconnell@macmainlaw.com
tambrose@macmainlaw.com

A hard copy of the above document was mailed on October 27, 2017 to:
Daniel Sharkey
223 S. 7th Avenue
Reading, PA 19611

Respectfully submitted,

/s/ Su Ming Yeh
Su Ming Yeh
I.D. No. 95111
Pennsylvania Institutional Law Project