**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| E.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 16 Civ. 2750 |
| | : | |
| DANIEL SHARKEY et al., | : | Judge Edward G. Smith |
| Defendants | : | |
| | : | Filed via ECF |
| | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS
AND COUNTERSTATEMENT OF MATERIAL FACTS**

1.      Admitted.  By way of further response, the "inappropriate relationship" between Plaintiff E.D. and Daniel Sharkey resulted in a criminal conviction of institutional sexual assault for Defendant Sharkey.  (See Ex. 3: Sharkey Dep. Tr. 131:9-12).

2.      Admitted in part, denied in part.  The Third Amended Complaint outlines all of Plaintiff's claims.

3.      Admitted in part, denied in part.  It is admitted that there is an Inter-Governmental Service Agreement between the federal government and Berks County, but it is denied that it is to facilitate the family immigration program.

4.      Neither admitted nor denied, as Plaintiff does not know if the BCRC provides an avenue for residents to maintain family unity while DHS and ICE enforce immigration laws, but suggests that there may be better avenues for maintaining family unity while still enforcing immigration laws.

5.      Admitted.

6.	Admitted.  By way of further response, Shelter Care Counselors also have the responsibility to "[m]aintain peace and order" (See Ex. 6: Taylor Dep. Tr. 14:7-12), and "[m]aintain the care and custody of the residents."  (See Ex. 7: Malinowski Dep. Tr. 11:9-16).

7.	Admitted in part, denied in part.  It is admitted that the main areas of the building are on two floors, but there is also a basement where briefings (meetings) occur and where keys are kept.  Furthermore, several staff members referred to A Floor (the ground floor) as the "second floor," and the B Floor (upper floor) as the "third floor."  (See Ex. 3: Sharkey Dep. Tr. 41:20-42:8; See Ex. 4: Himmelberger Dep. Tr. 13:1-23).

8.	Admitted.  By way of further response, the A floor is the ground floor, although some refer to it as the 2nd floor, with the upper B floor as the 3rd floor.  (To avoid confusion, the brief will refer to the A floor as the lower floor and the B floor as the upper floor).  (See Ex. 4: Himmelberger Dep. Tr. 13:1-23).

9.	Admitted.

10.	Admitted.

11.	Admitted.

12.	Admitted.

13.	Admitted.

14.	Admitted.

15.	Admitted.

16.	Admitted in part, denied in part.  It is admitted that staff testified that they used Google Translate to communicate with the residents, but it is denied that it was used "often" by all staff.  (See Ex. 7: Malinowski Dep. Tr. 29:15-31:2 (testifying that he used "like little Iphones with a translator on it. I used it sometimes.")).

17.    Admitted.

18.    Admitted in part, denied in part.  It is admitted that it is not uncommon for staff to be interacting with detainees, but it was unusual for special attention to be paid by one staff to a specific detainee.  See below Counterstatement of Facts.

19.    Admitted in part, denied in part.  It is admitted that staff sit with residents in the cafeteria, but Plaintiff does not have information on whether it is "encouraged."

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.    Admitted in part, denied in part.  Plaintiff fled Honduras to seek asylum in the United States.

24.    Admitted.

25.    Admitted.

26.    Admitted in part, denied in part.  It is admitted that Plaintiff was detained at the border and processed by ICE, but does not have additional information on whether this process was in accordance with federal immigration laws.

27.    Admitted.

28.    Admitted.

29.    Admitted.

30.    Admitted in part, denied in part.  It is admitted that Plaintiff signed an acknowledgement form, but does not remember receiving any other information about sexual abuse and sexual assault.  (See Ex. 1:  E.D. Decl. at ¶2).  By way of further response, no other

documents that were allegedly given to the detainees, aside from the Resident Handbook, have been produced.

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Denied.  See Counterstatement of Facts below.

38.     Admitted.

39.     Admitted.

40.     Admitted.

41.     Admitted.

42.     Admitted.

43.     Admitted.

44.     Admitted.

45.     Admitted.

46.     Admitted.

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

52.     Admitted.

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Admitted in part, denied in part.  Behm also supervised residents who worked in
the kitchen as part of his duties.  (See Ex. 8: Behm Dep. Tr. 17:2-7; 23:22-24).

60.     Admitted.

61.     Admitted.

62.     Admitted.

**Policies and Training**

63.     Admitted.

64.     Admitted in part, denied in part.  It is admitted only that Jamie Himmelberger
testified, "I believe it's about 40 hours of training that we get per year."  (See Ex. 4:
Himmelberger Dep. Tr. 69:2-3; see also Counterstatementment of Facts below).

65.     Admitted.

66.     Admitted in part, denied in part.  It is admitted that staff are trained on the policies
but denies that they are trained on everything that encompasses that policy.  See
Counterstatement of Facts below.

67.     Admitted in part, denied in part.  It is admitted that the training includes a
powerpoint presentation that includes information from the federal standards only.

68.	Admitted in part, denied in part.  It is admitted that staff are given a test, but it is unclear if staff have to "pass" this test."

69.	Admitted in part, denied in part.  It is admitted only that David Smith testified to this, but it is denied that an instructor engages in a conversation with the employee being trained to ensure that the employee understands the policies.  (See, e.g., Ex. 3: Sharkey Dep. Tr. 74:11-23; 137:15-20).

70.	Admitted.

71.	Admitted.

72.	Admitted in part, denied in part.  It is admitted that Sharkey was aware of the Code of Ethics, and only that he received the Code of Ethics during training, but it is denied that he received training on the Code of Ethics.

73.	Admitted.

74.	Admitted.

75.	Denied.  Sharkey testified that he was "vaguely" aware of training on sexual abuse or sexual harassment and that his training consisted of being handed a binder of documents and his going through and signing the documents.  (See Ex. 3: Sharkey Dep. Tr. 74:11-23; 137:15-20).

76.	Admitted.

77.	Admitted.

78.	Admitted.

79.	Admitted.

80.     Admitted in part, denied in part.  It is admitted only that Diane Edwards testified this, and that Witmer testified he had "no idea" how long the policy was in progress before the incidents between Sharkey and E.D. came to light.  (See Ex. 12: Witmer Dep. Tr. 134:7-16).

81.     Denied.  See below Counterstatement of Facts.

82.     Admitted in part, denied in part.  It is admitted only that Diane Edwards stated this in her deposition, but otherwise denied.  See below Counterstatement of Facts.

83.     Admitted in part, denied in part.  It is admitted only that Diane Edwards stated this in her deposition, but otherwise denied.  See below Counterstatement of Facts.

84.     Admitted in part, denied in part.  It is admitted only that Diane Edwards stated this in her deposition, but otherwise denied.  See below Counterstatement of Facts.

85.     Admitted in part, denied in part.  It is admitted only that Diane Edwards stated this in her deposition, but otherwise denied.  See below Counterstatement of Facts.

86.     Admitted in part, denied in part.  It is admitted only that Diane Edwards stated this in her deposition, but otherwise denied.  See below Counterstatement of Facts.

87.     Admitted in part, denied in part.  It is admitted only that Diane Edwards stated this in her deposition, but otherwise denied.  See below Counterstatement of Facts.

88.     Admitted in part, denied in part.  It is admitted that staff conduct hygiene checks, and that they can identify items that are contraband, but deny that clothing was confiscated on a regular basis.  See below Counterstatement of Facts.

89.     Admitted.

90.     Admitted.

91.     Admitted.

92.     Admitted.

93.     Admitted.

94.     Admitted in part, denied in part.  Diane Edwards testified that they looked at "certain standards in the book" every month, but did not specify that it was random.  (See Ex, 19: Edwards Dep. Tr. 55:4-17).

95.     Admitted in part, denied in part.  It is admitted that the federal government hired Nakamoto who would perform audits inspections, but it is unclear whether this company is still hired to do so.

96.     Admitted.

97.     Admitted.

98.     Admitted.

99.     Admitted.

100.    Admitted in part, denied in part.  It is admitted that Diane Edwards testified to this, but no reports were produced to confirm this.  By way of further response, the state inspections do not relate to compliance with PREA and SAAPI and Edwards did not respond affirmatively to whether the state inspections relate to sexual assault, but 55 Pa. Code §3800 appears not to have a specific section on sexual abuse or assault training and the state inspections do not relate to sexual abuse or sexual assault.  (See Edwards Dep. Tr. 67:12-15; see also 55 Code §3800).

101.    Admitted in part, denied in part.  It is admitted that Diane Edwards testified to this, however, the correct title is the "Office of Civil Rights and Civil Liberties."  (See https://www.dhs.gov/office-civil-rights-and-civil-liberties).

102.    Denied.  (See Ex 44: 2008 Berks Family Residential Center Bi-Annual Compliance Review Report at 9-10, 15-16, Appx. Sexual Abuse and Assault Prevention and

Intervention at 1-5, *available at* https://www.ice.gov/doclib/foia/dfra-ice-dro/compliancereportberksfamilyresidentialcenter0714172008.pdf).

103.    Admitted in part, denied in part.  It is admitted only that there are signs posted now.

104.    Admitted.

105.    Admitted.

106.    Admitted.

107.    Admitted.

108.    Admitted.

109.    Admitted.

**Relationship between Plaintiff and Sharkey**

110.    Admitted.

111.    Denied.  This is a mischaracterization of the incidents.

112.    Denied.  This is a mischaracterization of the incidents.  Plaintiff stated in her deposition that she thought Sharkey was playing and joking until he kissed her.  (See Ex. 2: E.D. Dep. Tr. 76:5-24).

113.    Denied.  This is a mischaracterization of the incidents.

114.    Admitted.

115.    Admitted.

116.    Admitted.

117.    Admitted.

118.    Admitted.

119.    Admitted.

120. Admitted.

121. Admitted.

122. Admitted.

123. Denied. See below Counterstatement of Facts.

124. Denied. See below Counterstatement of Facts.

125. Admitted.

126. Admitted in part, denied in part. It is admitted that BCRC staff began a process of interviewing residents and staff, and admitted only that Smith reported that an officer from the Bern Township Police Department stated that "it would probably be best that we do not talk to our employees until he gets a chance to." (See Ex. 16: Smith Email to Edwards dated 8/20/2014 at 3:00 PM).

127. Admitted in part, denied in part. It is denied to the extent that this statement indicates that the Bern Township Police Department and Immigration and Customs Enforcement – Office of Professional Responsibility (ICE-OPR) had one investigation together.

128. Denied. See below Counterstatement of Facts. Once Plaintiff came forward, she fully participated in the investigation, including participating in three interviews with the Berns Township Police and/or DHS/ICE.

129. Admitted.

130. Admitted in part, denied in part. It is admitted that Plaintiff initially denied any relationship, but it is denied that she declined mental health therapy as the records show that she did attend meetings with the social worker. (See D. Motion for Summary Judgment Ex. 30)

131. Admitted.

132.　　Denied.　Plaintiff came forward about the incidents in mid- to late October 2014. (See below Counterstatement of Facts; <u>see also</u> Ex. 34).

133.　　Denied.　(See below Counterstatement of Facts; <u>see also</u> Ex. 13).

134.　　Denied.　Plaintiff was interviewed by Bern Township Police Detective Michael Hoffert on December 4, 2015, but had previously been in touch with the police through her immigration attorney.

135.　　Denied.　See below Counterstatement of Facts.

136.　　Admitted.

137.　　Admitted.

138.　　Admitted in part, denied in part.　Sharkey was sentenced to three to twenty-three months of incarceration, but did not serve the maximum sentence.　(<u>See</u> Sharkey Dep. Tr. 15:9-11).

139.　　Admitted in part, denied in part.　Plaintiff testified that "we were all in the same place and that it would have been impossible for him not to know what was happening."　(<u>See</u> Ex. 2: E.D. Dep. Tr. 117:4:10).

140.　　Admitted in part, denied in part.　It is admitted only that this is what Behm stated in his deposition.

141.　　Admitted in part, denied in part.　Plaintiff testified that "they could see us when we were together in any area."　(<u>See</u> Ex. 2: E.D. Dep. Tr. 118:16-21).

142.　　Denied.　See below Counterstatement of Facts.

143.　　Admitted in part, denied in part.　It is denied that Plaintiff testified that there was no evidence that Rothermel was aware of her and Sharkey's relationship.

144.     Admitted in part, denied in part.  It is admitted only that this is what Rothermel stated in her deposition.

145.     Denied.  (See below Counterstatement of Facts; <u>see also</u> Ex. 19).

146.     Admitted in part, denied in part.  It is denied that Plaintiff testified that there was no evidence that Taylor was aware of her and Sharkey's relationship.

147.     Admitted in part, denied in part.  It is admitted only that this is what Taylor stated in her deposition.

148.     Admitted in part, denied in part.  It is denied that Plaintiff testified that there was no evidence that Malonowski was aware of her and Sharkey's relationship.

149.     Denied.  See below Counterstatement of Facts.

150.     Admitted.

151.     Admitted in part, denied in part.  It is admitted only that this is what Edwards stated in her deposition.

152.     Admitted.

153.     Denied.  (<u>See</u> D. Ex. 35: E.D. Tr.).

154.     Denied.  E.D. testified that another detainee was aware.  (<u>See</u> D. Ex. 35: E.D. Tr.).

155.     Denied.  See below Counterstatement of Facts.

156.     Admitted in part, denied in part.  It is admitted only that Edwards stated this in her deposition.

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS

157.     Plaintiff E.D. fled Honduras and first entered the United States in April 2014. (<u>See</u> Ex. 2: E.D. Dep. Tr. 31:16-18; 32:4-6; 32:22-24).

158.    Plaintiff was deported immediately at that time.  (See Ex. 2: E.D. Dep. Tr. 32:9-12).

159.    After about a week in Honduras, E.D. returned again to the United States because she had suffered from domestic violence from the father of her son.  (See Ex. 2: E.D. Dep. Tr. 32:22-33:14).

160.    Plaintiff E.D. arrived to the United States with her son who was three years old at that time.  (See Ex. 2: E.D. Dep. Tr. 44:18-20).

161.    After Plaintiff E.D. arrived to BCRC, she lived "side by side" with all of the workers daily.  (See Ex. 2: E.D. Dep. Tr. 75:3-20).

162.    At BCRC, she also saw Daniel Sharkey daily.  (See Ex. 2: E.D. Dep. Tr. 75:3-20).

163.    One day Sharkey said to E.D. that he liked her and that she was pretty.  (See Ex. 2: E.D. Dep. Tr. 75:3-20).

164.    E.D. thought that Sharkey was playing and joking.  (See Ex. 2: E.D. Dep. Tr. 75:3-20; 76:5-8).

165.    Sharkey continued to tell E.D. that she was pretty and that he liked her.  (See Ex. 2: E.D. Dep. Tr. 75:3-20).

166.    Sharkey was nice to E.D. and her son, and spent time with her such as playing outside.  (See Ex. 2: E.D. Dep. Tr. 75:18-20).

167.    E.D. realized that Sharkey was not joking when he kissed her on the mouth while they were in the laundry room.  (See Ex. 2: E.D. Dep. Tr. 76:9-77:5).

168.    The laundry room has no cameras.  (See Ex. 4: Himmelberger Dep. Tr. 27:10-12).

169.    The laundry room is usually locked, and only staff members have keys.  (See Ex. 4: Himmelberger Dep. Tr. 23:1-27:4; Taylor Dep. Tr. 67:23-68:4).

170.    The kiss occurred approximately one week after Sharkey started telling her that he liked her.  (See Ex. 2: E.D. Dep. Tr. 82:5-12).

171.    Sharkey knew very little Spanish, but he had his phone which had a translator. (See Ex. 2: E.D. Dep. Tr. 80:10-81:3).

172.    Sometimes Sharkey used the cell phone translator to communicate with E.D.  (See Ex. 2: E.D. Dep. Tr. 80:10-81:3; Ex. 3: Sharkey Dep. Tr. 109:9-13; 175:20-23).

173.    Sharkey also used the computers in the library to translate.  (See Ex. 2: E.D. Dep. Tr. 81:20; Ex. 3: Sharkey Dep. Tr. 109:2-8).

174.    Sometime after Sharkey kissed E.D., he had words translated on his phone telling her that no one could know anything, otherwise E.D. would be in trouble with immigration and she would be deported.  (See Ex. 2: E.D. Dep. Tr. 85:7-19; 96:8-11).

175.    Sharkey told E.D. that he was friends with the immigration officer, Jeremiah Petrey (also known as "Josh").  (See Ex. 2: E.D. Dep. Tr. 149:3-9; 141:14-152:1).

176.    E.D. was scared that she would be deported if people found out.  (See Ex. 2: E.D. Dep. Tr. 85:7-19).

177.    E.D. did not have an attorney at that time.  (See Ex. 2: E.D. Dep. Tr. 85:20-22).

178.    For a long time, E.D. continued to believe that she would be deported if anyone found out.  (See Ex. 2: E.D. Dep. Tr. 96:12:19).

179.    After Sharkey showed E.D. the translation, E.D. did not know what to do.  (See Ex. 2: E.D. Dep. Tr. 88:1-10).

180.    During this time period, Sharkey was always near or next to E.D., and wherever E.D. was, he was close by.  (See Ex. 2: E.D. Dep. Tr. 88:1-1; 120:8-16; see, e.g., Ex. 20: Video Timeline Notes 8/12/14 at 5:54; Video Timeline Notes 8/15/14 at 9:45).

181.     If E.D. was in the dining room, Sharkey would sit with her at the same table, and other staff members did not do that.  (See Ex. 2: E.D. Dep. Tr. 120:8-16; see, e.g., Ex. 20: Video Timeline Notes 8/15/14 at 5:55 pm).

182.     If E.D. was outside, Sharkey would go outside and sit with her.  (See Ex. 2: E.D. Dep. Tr. 120:8-16; see also Ex. 20: Video Investigation Notes of 8/15/14 at 2:24-5:17; Ex. 15: Witmer Memo to Management dated 8/18/14 Re: Interviews of Carranza-Miranda, Quispe-Carranza).

183.     If E.D. was in the living room and watching TV, Sharkey would sit next to her. (See Ex. 2: E.D. Dep. Tr. 120:8-16).

184.     The instances described above where Sharkey was always near E.D. occurred on a daily basis and happened a lot.  (See Ex. 2: E.D. Dep. Tr. 120:18-24).

185.     There were many physical contacts where Sharkey would touch her hand or hug or kiss her.  (See Ex. 2: E.D. Dep. Tr. 88:1-11; see also Ex. 3: Sharkey Dep. Tr. 102:13-103:14).

186.     After it started, there was hugging and kissing every day.  (See Ex. 3: Sharkey Dep. Tr. 104:6-15).

187.     Sharkey gave E.D. a ring.  (See Ex. 2: E.D. Dep. Tr. 89:3-5).

188.     Sharkey gave E.D. music CDs.  (See Ex. 2: E.D. Dep. Tr. 89:9-11).

189.     Sharkey permitted E.D. to use his cell phone, such as to call her mother.  (See Ex. 2: E.D. Dep. Tr. 89:12-14; 102:6-8; Ex. 3: Sharkey Dep. Tr. 109:14-21; Ex. 15: Memo of Phillips, T. dated 8/17/14).

190.     Sharkey gave E.D. the password to his phone.  (See Ex. 2: E.D. Dep. Tr. 101:1-3).

191.     Sharkey brought different food for E.D. to eat.  (See Ex. 2: E.D. Dep. Tr. 121:18-122:1).

192.     Sharkey told E.D. that he was like her boyfriend and she was like his girlfriend. (See Ex. 2: E.D. Dep. Tr. 90:11-16).

193.     Sharkey had photos of E.D. on his phone wearing only undergarments.  (See Ex. 3: Sharkey Dep. Tr. 205:22-206:5).

194.     These photos were later deleted.  (See Ex. 3: Sharkey Dep. Tr. 205:22-206:5).

195.     Sharkey hugged and kissed E.D. in other areas of the building, including a room that was designated as the chapel.  (See Ex. 2: E.D. Dep. Tr. 93:21-94:1).

196.     Sharkey thought it was obvious that E.D. was by his side for an entire shift.  (See Ex. 3: Sharkey Dep. Tr. 81:3-20).

197.     In approximately July or August was the first time Sharkey had sexual intercourse with E.D.  (See Ex. 2: E.D. Dep. Tr. 90:1-6).

198.     One incident took place in the women's bathroom on the ground floor.  (See Ex. 2: E.D. Dep. Tr. 94:10-17; Ex. 3: Sharkey Dep. Tr. 102:13-103:14).

199.     E.D. testified that they had sexual intercourse twice on the same day in the women's bathroom.  (See Ex. 2: E.D. Dep. Tr. 94:10:12; see also D. Ex. 35: Tr. 12:23-13:10).

200.     The women's bathroom is located in the hallway that leads to the outside, and is marked as "292" and "WC" on the diagram of A Floor.  (See Ex. 2: E.D. Dep. Tr. 109:7-10; Ex. 5: Rothermel Dep. Tr. 57:2-12; see also Ex. 45: Map of A Floor (labeled at Berks 02970 and "Activities Floor").

201.     Another incident occurred when Sharkey had sexual intercourse with E.D. in one of the dorm rooms.  (See Ex. 2: E.D. Dep. Tr. 94:22-95:4; Ex. 3: Sharkey Dep. Tr. 102:13-103:14; see also Ex. 45: Map of B Floor (labeled as Berks 02971).

202.     Many of the other women detainees noticed something was happening between Sharkey and E.D.  (See Ex. 2: E.D. Dep. Tr. 100:3-13).

203.     During the criminal investigation, one detainee reported that she observed Sharkey and E.D. kissing in the entrance to one of the other detainee's bedroom, that she believed they saw her watching them kissing but did not do anything to hide it.  (See Ex. 46: Report No. 012 of Investigation: Interview of Rodriguez-Sutuc at Page 3 of 5 (OPR 0128).

204.     Sharkey was always near E.D. and close to her.  (See Ex. 2: E.D. Dep. Tr. 100:3-13).

205.     Sharkey often went to areas where men were not permitted, such as the laundry room or her room.  (See Ex. 2: E.D. Dep. Tr. 100:3-13).

206.     Patricia, who was a friend of E.D., reported in the criminal investigation that Sharkey told her not to say anything to anyone because they would be deported, that he was always repeating this, that she believed him, that she was scared that she could be deported, and she was intimidated by Sharkey telling her that she could be deported.  (See Ex. 46: Report of Investigation, Report No. 026 (OPR 0181)).

207.     Sharkey also acted jealous about E.D., such as with respect to other male staff members, or around the detainees who were 16 or 17 years old.  (See Ex. 2: E.D. Dep. Tr. 104:12-16).

208.     Sharkey told or implied to E.D. that he could watch the videos of the video surveillance system, and that he had access to the cameras.  (See Ex. 2: E.D. Dep. Tr. 152:6-23).

209.     E.D. believed Sharkey because if Sharkey was not at work one day and E.D. did something, Sharkey would tell her the next day what she had done.  (See Ex. 2: E.D. Dep. Tr. 166:11-167:3).

210.	Sharkey had given E.D. a music CD, and when E.D. was dancing to the music with a friend and other guys, Sharkey was very mad about it even though he had not been there. (See Ex. 2: E.D. Dep. Tr. 166:18-167:3).

211.	Sharkey admitted that had had viewed some surveillance videos.  (See Ex. 3: Sharkey Dep. Tr. 159:6-16).

212.	Sharkey gave an example where a supervisor called him into the video room to watch a video where someone who was mopping the floors lost his footing, and it was funny, like "America's Funniest Home Videos type thing."  (See Ex. 3: Sharkey Dep. Tr. 159:6-16).

213.	Videos show Sharkey entering female resident restrooms with E.D. on several occasions for extended periods of time (30 minutes).  (See Ex. 14: Affidavit of Probable Cause, filed Jan. 20, 2015 (at Berks 2932)).

214.	Videos show Sharkey entering female bedrooms several times in the hallway with E.D.  (See Ex. 14: Affidavit of Probable Cause, filed Jan. 20, 2015 (at Berks 2932); see also Ex. 20: Video Investigation Notes of 8/10/14, 8/12/14).

215.	Videos show Sharkey entering the chapel and laundry room with E.D., and eating dinner and watching TV with E.D. in the common area of BCRC.  (See Ex. 14: Affidavit of Probable Cause, filed Jan. 20, 2015 (at Berks 2932); see also Ex. 20: Video Timeline Notes of 8/10/14, 8/12/14, 8/15/14).

216.	In August 2014, one of the detainees went to talk to a supervisor to complain about what they saw, that Sharkey was always close to E.D. and that there was preferential treatment towards her.  (See Ex. 2: E.D. Dep. Tr. 100:23-101:4).

217.	E.D. felt obligated to have sexual intercourse with Sharkey, and felt that she had to, otherwise Sharkey would get annoyed with her, and if she did not consent to Sharkey's

18

requests there would be negative repercussions for her because Sharkey had told her if anyone found out about their relationship she would get deported. (See Ex. 14: Affidavit of Probable Cause, filed Jan. 20, 2015 (at Berks 2934); Ex. 1: E.D. Decl.).

218.    Through her immigration attorney, on October 30, 2014, E.D. reported that Sharkey had sexual intercourse with her through a letter to the ICE Philadelphia Field Office. (See Ex. 34: Letter to Philadelphia Field Office, Assistant Field Office Director: David O'Neil dated Oct. 30, 2014).

**After E.D.'s Report**

219.    On August 17, 2014, E.D. was written up for "Disobedience/Disrespect" for not doing enough when her son climbed on another child's walker.  (See Ex. 21: Informational Report 8/17/14 by Katie Reabold).

220.    On August 17, 2014, E.D. was written up for "Violation of Program Rules" for allegedly not supervising children.  (See Ex. 22: Informational Report 8/17/14 by Beth Hrezik).

221.    On August 18, 2014, E.D. was written up for "Violation of Program Rules" for allegedly not supervising children while they were on the toys in the outside recreation area. (See Ex. 23: Informational Report 8/18/14 by Sandra Kreager).

222.    On September 4, 2014, E.D. was written up for "Violation of Program Rules" for allegedly joking about suicide.  (See Ex. 24: Informational Report 9/4/14 by Katie Reabold).

223.    On September 11, 2014, E.D. was written up for "Violation of Program Rules" and "Contraband" for having lotion that contained alcohol, mirrored compact, domestic and foreign money, and a crushed up Dramamine pill in her closet.  (See Ex. 33: Informational Report 9/11/14 by Brittany Rothermel).

224.     On September 13, 2014, E.D. was written up for "Violation of Program Rules" and "Disobedience/Disrespect" and counseled for her son riding a bike that was too big.  (See Ex. 25: Informational Report 9/13/14 by Beth Hrezik).

225.     On September 19, 2014, E.D. was written up for "Violation of Program Rules" and counseled for allegedly dancing inappropriately.  (See Ex. 26: Informational Report 9/19/14 by Erika Taylor).

226.     On September 21, 2014, E.D. was written up for "Violation of Program Rules" and counseling E.D. for alleging kicking her son, and she was placed on mental health PCs.  (See Ex. 27: Informational Report 9/21/14 by Josiah Scott-Manga).

227.     After Plaintiff reported the incidents in mid to late October, the attitude and treatment towards Plaintiff worsened.  (See Ex. 1: E.D. Decl.).

228.     A new clothing policy dated November 1, 2014, was issued that prohibited clothing that was too tight, revealing, short, and no dresses or skirts were allowed at all unless for religious reasons.  (See Ex. 36: Resident Dress Code Policy of 11/1/14; see also Ex. 4: Himmelberger Dep. Tr. 114:24-115:12; Ex. 7: Malinowski Dep. Tr. 51:3-9).

229.     Plaintiff E.D. received a handbook when she arrived to BCRC.  (See Ex. 2: E.D. Dep. Tr. 61:9-16).

230.     After E.D. reported the incidents, BCRC revised the Handbook to add more rules to the previous one, specifically about the clothing policy.  (See Ex. 2: E.D. Dep. Tr. 133:6-10; 134:22-135:23; Ex. 1: E.D. Decl.; Ex. 37: Handbook at p.11 (copy that E.D. had that was changed); and Ex. 38: Handbook at 13; Ex. 39: Handbook at 12).

231.     Berks County staff requested for the Handbooks back, made revisions with respect to the dress code policy and a statement about the sexual abuse policy, and handed them

back to the detainees with the revisions.  (See Ex. 2: E.D. Dep. Tr. 134:22-135:23; Ex. 1: E.D.

Decl.).

232.    Staff became stricter with respect to the clothing that the detainees wore.  (See Ex.

2: E.D. Dep. Tr. 139:13-140:2).

233.    Staff came through and confiscated large numbers of clothing, in which Brittany

Rothermel participated.  (See Ex. 35: Room Inspections at 11/17/14; Ex. 5: Rothermel Dep. Tr.

155:24-10).

234.    If E.D. wore something that was deemed too tight, then the E.D. was told to

change.  (See Ex. 2: E.D. Dep. Tr. 139:__-140:2; Ex. 1: E.D Decl.).

235.    E.D. received write-ups for wearing inappropriate clothing.  (See Exs. 31, 32).

236.    There were also multiple times when E.D. was ordered to change clothing where

it was not written up.  (See Ex. 1:E.D. Decl.).

237.    E.D. was targeted under the clothing policy more than the other detainees.  (See

Ex. 2: E.D. Dep. Tr. 143:5-9; Ex. 1: E.D. Decl.).

238.    On December 15, 2014, E.D. received an Informational Report where she was

ordered to change out of a pair of black pants.  (See Ex. 31: Information Report of Josiah Scott-

Manga dated Dec. 15, 2014).

239.    Josiah Scott-Manga wrote that he would continue reinforcing the clothing rules

per instructions of management.  (See Ex. 31: Information Report of Josiah Scott-Manga dated

Dec. 15, 2014 at 2).

240.    The following day, E.D. was counseled by staff members Josiah Scott-Manga and

Brittany Rothermel on inappropriate dress, and was informed of the stages of discipline of

inappropriate dressing.  (See Ex. 32: Information Report of Josiah Scott-Manga dated Dec. 16, 2014).

241.	Brittany Rothermel and other staff members also went to E.D.'s room and took clothing from E.D.  (See Ex. 2: E.D. Dep. Tr. 139:24-140:24).

242.	This occurred after E.D. had met with her attorney and spoken to others about the incidents.  (See Ex. 2: E.D. Dep. Tr. 140:16-24).

243.	Scott-Manga still works at BCRC (as of the time of his deposition) and stated that they no longer have the clothing policy anymore.  (See Ex. 9: Scott-Manga Dep. Tr. 60:16-61:3).

244.	Rothermel informed E.D. that E.D. had a restriction order that prevented her from leaving the facility.  (See Ex. 2: E.D. Dep. Tr. 142:16-143:4; E.D. Decl.).

245.	A "restriction" is a method of discipline of the detainees, such that field trips could be taken away.  (See Ex. 12: Witmer Dep. Tr. 73:2-21).

246.	Plaintiff also continued to receive Informational Reports for minor matters.  (See Ex. 29: Informational Report 11/20/14: Plaintiff found a dime in couch; Ex. 30: Informational Report 12/9/14: staff member thought her son was being inappropriate, but he was fixing a zipper).

247.	As a result, E.D. and her son were denied privileges and programs that other detainees participated in.  (See Ex. 2: E.D. Dep. Tr. 142:14-144:5; Ex. 1: E.D. Decl.).

248.	These programs included haircuts for the children or going on a trip or to the park. (See Ex. 2: E.D. Dep. Tr. 143:23-144:5).

249.	Other detainees blamed E.D.  (See Ex. 16: Email of Mosko, M. to Allain, S and Clement, J., dated 8/18/14 (Berks 02442); Ex. 1: E.D. Decl.).

250. E.D. became even more depressed and isolated, and regretted coming forward about what happened. (See Ex. 1: E.D. Decl.).

251. Plaintiff was released from BCRC in December 2014. (See Ex. 2: E.D. Dep. Tr. 46:9-11).

**Other Staff**

252. Sharkey worked the second shift at BCRC, which was approximately from 2:15 pm to 10:15 or 10:30 pm. (See Ex. 3: Sharkey Dep. Tr. 18:4-10).

253. The staff had frequent interactions with each other. (See Ex. 3: Sharkey Dep. Tr. 59:10-13).

254. Many of the detainees were aware of the improper actions between Sharkey and E.D., including hugging, kissing, and observed E.D. in possession of Sharkey's cell phone. (See Ex. 16: Email from Phillips, T. to Smith, D and Edwards, D. of Aug. 17, 2014 (Berks 02428)).

255. Jamie Himmelberger worked the same shift as Sharkey. (See Ex. 2: E.D. Dep. Tr. 118:10-15).

256. E.D. saw Himmelberger see E.D. and Sharkey together. (See Ex. 2: E.D. Dep. Tr. 118:19-21).

257. Himmelberger testified that she saw Esmery and Sharkey in the laundry room together. (See Ex. 4: Himmelberger Dep. Tr. 110:9-111-3).

258. Himmelberger testified that it was unusual for a male staff member to be in there with a female detainee, and did not tell anyone. (See Ex. 4: Himmelberger Dep. Tr. 111:4-20).

259. Himmelberger saw Sharkey in the dining room with E.D, in the living room with E.D., in the laundry room with E.D., and outside with E.D. (See Ex. 2: E.D. Dep. Tr. 121:1-10).

260.     Sharkey and Himmelberger often worked in the same area of the living room (or common room) area.  (<u>See</u> Ex. 2: E.D. Dep. Tr. 123:1-6).

261.     If E.D. said she was going to the laundry room, Sharkey said he would accompany her, and Himmelberger could see that Sharkey went into the laundry room with her even though that was not permitted.  (<u>See</u> Ex. 2: E.D. Dep. Tr. 123:1-12).

262.     Sharkey testified that "Jamie told me to watch out for her so – at one point."  (<u>See</u> Ex. 3: Sharkey Dep. Tr. 218:14-15).

263.     E.D. felt that Himmelberger had a bad attitude towards her.  (<u>See</u> Ex. 2: E.D. Dep. Tr. 124:22-24).

264.     For example, Himmelberger would set her aside and put her on different activities in the center.  (<u>See</u> Ex. 2: E.D. Dep. Tr. 125:1-7).

265.     The staff, including Himmelberger, Taylor, Rothermel, and Malinowski, spoke to E.D. differently than to other detainees.  (<u>See</u> Ex. 2: E.D. Dep. Tr. 125:1-13).

266.     E.D. often felt that Brittany Rothermel had a "bad attitude" towards her.  (<u>See</u> Ex. 2: E.D. Dep. Tr. 125:24-126:7).

267.     Brittany Rothermel worked from 12:30 pm to 8:30 pm (<u>See</u> Ex. 5: Rothermel Dep. Tr. 49:6-10).

268.     In the Bern Township Police Department Incident Report Form that includes an interview with Brittany Rothermel, Rothermel is reported to have said, "Dan would talk to E.D. more than usual, more than anyone else.  I noticed that E.D. would dress nice and do her hair when Dan was working.  I was told by other residents that Dan and E.D. were seen kissing after Dan was told he was suspended.  That they were alone together in rooms.  That she was using his cell phone.  That Dan sent her a package here with a false return address after he was suspended.

After Dan was suspended they told me that they knew what was going on between Dan and E.D. but, were afraid to say anything because of getting in trouble, or that Dan would treat them differently." (<u>See</u> Ex. 19: Bern Township Police Dept. Incident Report Form at p.12).

269.     Erica Taylor worked the second shift, which was from 2:15 pm to 10:30 pm. (<u>See</u> Ex. 6: Taylor Dep. Tr. 23:10-17).

270.     Erica Taylor was often in the same place as Sharkey and E.D. (<u>See</u> Ex. 2: E.D. Dep. Tr. 127:22-128:1).

271.     Matthew Malinowski had the same or similar schedule as Daniel Sharkey, and also worked the second shift. (<u>See</u> Ex. 2: E.D. Dep. Tr. 128:5-10; Ex. 7: Malinowski Dep. Tr. 46:17-20).

272.     The ring that Sharkey gave to E.D. was found during a search by Brittany Rothermel. (<u>See</u> Ex. 2: E.D. Dep. Tr. 141:6-142:1).

273.     Brittany Rothermel also found a piece of paper with Sharkey's cell phone passcode on it during the search. (<u>See</u> Ex. 2: E.D. Dep. Tr. 142:2-8).

274.     On August 14, 2017, Sharkey and E.D. were together in Room 13 when Darrius Palmer was conducting a sweep where he looked into Room 13, and then continued the sweep even though Sharkey and E.D. were in the room together. (<u>See</u> Ex. 20: Video Timeline Notes (Berks 2417)).

275.     At the time Darrius Palmer looked into Room 13, Sharkey and E.D. were in the room for approximately 15 minutes (from 3:31:38 to 3:46:25). (<u>See</u> Ex. 20: Video Timeline Notes (Berks 2417)).

276.     Afterwards, Sharkey and E.D. remained in the room together for another seven or eight minutes (from 3:46:25 to 3:54:13). (<u>See Ex. 20:</u> Video Timeline Notes (Berks 2417)).

277.     Sharkey testified that many staff at BCRC were aware, and that "It was a facility joke that she [E.D.] was my girlfriend."  (See Ex. 3: Sharkey Dep. Tr. 80:17-18).

278.     Sharkey testified that, "It was guys that thought this was funny."  (See Ex. 3: Sharkey Dep. Tr. 212:9-16).

279.     Sharkey testified that **"people just knew"** that E.D. was getting dressed up and putting on makeup for him and that she stayed at his post or followed him around.  (See Ex. 3: Sharkey Dep. Tr. 81:4-82:20).

280.     Sharkey testified, "[T]here was [*sic*] staff members that told me themselves that they would send [her] to me."  (See Ex. 3: Sharkey Dep. Tr. 212:9-11).

281.     Briefings were conducted daily prior to staff members' shifts, and they are meetings where management and supervisors can describe how the next shift will work.  (See Ex. 3: Sharkey Dep. Tr. 253:11-24; Ex. 5: Rothermel Dep. Tr. 162:6-15).

282.     For those on the second shift, everyone who would be starting the second shift would attend the briefing.  (See Ex. 3: Sharkey Dep. Tr. 254:18-22).

283.     The supervisors attended the briefings.  (See Ex. 3: Sharkey Dep. Tr. 253:19-24; 255:4-256:8).

284.     Jason Mills and Len Kopetsky were Sharkey's "everyday" supervisors and were present at the briefings.  (See Ex. 3: Sharkey Dep. Tr. 255:14-256:8).

285.     Sharkey testified that staff members joked about Sharkey and E.D. "every day at briefing.  It was every fricking day."  (See Ex. 3: Sharkey Dep. Tr. 214:11-19).

286.     Sharkey testified that the supervisors knew about it, specifically Jason Mills and Len Kopetsky.  (See Ex. 3: Sharkey Dep. Tr. 214:11-19).

287. Sharkey explained, "[T]hey knew, because the one comment that Jason Mills made was we got a bunch of John Reiches working here, and that was in front of everybody." (See Ex. 3: Sharkey Dep. Tr. 214:5-11).

288. Sharkey explained that John Reich was a former employee "that had a similar situation to mine. Not so extreme . . ." but who was "hitting on females and some run-ins with female residents." (See Ex. 3: Sharkey Dep. Tr. 214:5-20).

289. Sharkey testified that when laundry was stopped on the second shift because it was too much, E.D. was permitted to do her on the second shift, so it became, "oh, that's for Dan" and it turned into a joke. (See Ex. 3: Sharkey Dep. Tr. 257:3-12; see also id. at 214:20-24 ("Oh, she waited to do her laundry on second shift. That must be for Sharkey. It was a daily – a daily thing after awhile, after a certain period of time")).

290. In July 2014, Sharkey approached three supervisors about E.D. over the course of approximately ten days. (See Ex. 3: Sharkey Dep. Tr. 88:13-22).

291. On July 12, 2014, Sharkey approached Witmer regarding E.D., claiming that E.D. was smiling at him and following him around. (See Ex 17 : Witmer Memo to Management dated 7/12/14; Ex. 16: Email to Smith, D. dated 7/12/14 at 4:27 pm).

292. Witmer spoke with Sharkey and informed him to immediately speak to a supervisor if anything else should transpire. (See Ex. 17: Witmer Memo to Management dated 7/12/14; Ex. 16: Email to Smith, D. dated 7/12/14 at 4:27 pm).

293. Witmer wrote an email and memo regarding the incident. (See Ex. 17: Witmer Memo to Management dated 7/12/14; Ex. 16: Email to Smith, D. dated 7/12/14 at 4:27 pm).

294.   In mid-July, Witmer informed Jason Mills that Sharkey had approached him about E.D. "following him around" and making kissing faces at him.  (See Ex. 17 : Mills Memo of 8/21/14).

295.   During that week, possibly the next day, Sharkey approached Mills and told him that E.D. tried to follow him into the cleaning closet.  (See Ex. 17 : Mills Memo of 8/21/14).

296.   Mills did not report this incident until August 21, 2014.  (See Ex. 17 : Mills Memo of 8/21/14).

297.   According to Sharkey, when he told Jason Mills about an incident involving Patricia and E.D., Jason Mills "laughed, chuck[l]ed."  (See Ex. 3: Sharkey Dep. Tr. 85:8-86:24).

298.   Sharkey approached Len Kopetsky joking about E.D. following him outside when Sharkey has the post, and stating that she would sit near him.  (See Ex. 17 : Kopetsky Memo dated 8/19/14 (Berks 02528)).

299.   According to Sharkey, Sharkey told Kopetsky about "other stuff" and "pointed her out to him that she was following [him] around the facility," and his reaction was "kind of like a whatever type of remark."  (See Ex. 3: Sharkey Dep. Tr. 85:1-10).

300.   Kopetsky did not report the conversation with Sharkey until August 19, 2014.  (See Ex. 17 : Kopetsky Memo dated 8/19/14 (Berks 02528)).

301.   Len Kopetsky and Jason Mills were the supervisors on second shift (Sharkey's shift).  (See Ex. 4: Himmelberger Dep. Tr. 8:20; 49:5)

302.   David Smith is part of management at BCRC.  (See Ex. 11: Smith Dep. Tr.188:17-19).

303.     Program Director David Smith testified that if he had received these other two, he would conducted a more in-depth investigation at that time.  (See Ex. 11: Smith Dep. Tr. 247:4-14).

304.     The two incidents of sexual intercourse happened after Sharkey had spoken with his supervisors, and no one followed up with him after he spoke with them.  (See Ex. 3: Sharkey Dep. Tr. 107:21-108:4).

305.     Sharkey told a BCRC staff member, Darrius Palmer, about what was going on with Sharkey and E.D.  (See Ex. 3: Sharkey Dep. Tr. 107:21-108:4).

306.     Sharkey testified that he told Palmer that Sharkey and E.D. had "hugged, kissed or engaged in sexual intercourse."  (See Ex. 3: Sharkey Dep. Tr. 198:21-200:2).

307.     Sharkey testified that Darrius Palmer knew about their relationship since Palmer sent Sharkey a picture of E.D. in her bra and panties from Palmer's phone while Sharkey was on vacation in the Outer Banks.  (See Ex. 3: Sharkey Dep. Tr. 198:21-200:2).

308.     Palmer sent this text prior to when Sharkey had sexual intercourse with E.D.  (See Ex. 3: Sharkey Dep. Tr. 201:21-202:7; 229:6-8).

309.     Initially, Sharkey stated he went on vacation to the Outer Banks in August 2014, but later stated he went in June 2014.  (See Ex. 3: Sharkey Dep. Tr. 198:21-200:2; 228:17-229:2).

310.     Sharkey testified that he had sexual intercourse with E.D. after his August 2014 vacation.  (See Ex. 3: Sharkey Dep. Tr. 229:6-8).

311.     Sharkey stated that Darrius Palmer was his "inside man."  (See Ex. 3: Sharkey Dep. Tr. 9-13).

312.    Most of the time supervisors were in their office.  (<u>See</u> Ex. 3: Sharkey Dep. Tr. 60:22-6; <u>see also</u> Ex. 4: Himmelberger Dep. Tr. 49:22-50:7).

313.    Some staff stated that supervisors could be out on the floor more.  (<u>See</u> Ex. 4: Himmelberger Dep. Tr. 109:9-22; <u>see also</u> Ex. 18: Smith Interview Notes at Berks 2613)

314.    There was some variation in how much time a supervisor was "on the floor" and Sharkey testified that some "just showed their face for ten minutes in an eight-hour period." (<u>See</u> Ex. 3: Sharkey Dep. Tr. 60:19-61:6).

315.    A video shows that one staff member, Jillian Noll, was conducting room checks while Sharkey was still in the detainee's room and that he did not leave after Noll conducted the check, and that Sharkey was in the room for an extended period of time.  (<u>See</u> Ex. 16: Email of Wetzel, Al to Edwards, D. dated 8/19/14 at 1:34 PM (Berks 02473); Email of Wetzel, A. to Edwards, D. dated 8/19/14 at 2:46PM (Berks 02475)).

316.    One detainee reported that she saw E.D. and Sharkey on the playground outside talking, and when the detainee wanted to re-enter the building, she called to Sharkey four times but he did not reply because he was in a conversation with E.D.  (<u>See</u> Ex. 15: Witmer Memo to Management dated 8/18/14 Re: Interview Carranza-Miranda, Quispe-Carranza).

317.    This detainee reported that another staff member that had exited the building, Jillian Noll, had to let the residents back inside.  (<u>See</u> Ex. 15: Witmer Memo to Management dated 8/18/14 Re: Interview Carranza-Miranda, Quispe-Carranza).

318.    Several staff were disciplined as a result of the incidents relating to Sharkey and E.D.  (<u>See</u> Ex. 10: Edwards Dep. Tr. 188:2-8)

319.    Diane Edwards was responsibility for oversight of BCRC.  (<u>See</u> Ex. 10: Edwards Dep. Tr. 16:8-10).

320. Diane Edwards has oversight over everything in the program for BCRC, including training. (See Ex.10: Edwards Dep. Tr. 19: 6-9).

321. Edwards is overall responsible for supervising everybody at the residential center. (See Ex. 10: Edwards Dep. Tr. 101:23-102:4).

322. Edwards reviews the performance reviews of staff.  . (See Ex. 10: Edwards Dep. Tr. 101:23-102:4).

### Training

323. Sharkey stated that his daily interactions with his supervisors were "minimal." (See Ex. 3: Sharkey Dep. Tr. 59:3-9).

324. Sharkey did not remember receiving any training on the code of ethics. (See Ex. 3: Sharkey Dep. Tr. 69:16-22; 73:24-74:2).

325. Although Sharkey acknowledged that he signed the Code of Ethics document, but didn't think that "it signifies [he] received it." (See Ex. 3: Sharkey Dep. Tr. 73:6-13).

326. Sharkey testified in his deposition, "[M]y training consisted of them handing me a binder with all these documents in it and me going through them and signing them." (See Ex. 3: Sharkey Dep. Tr. 75:21-23; see also Ex. 3: Sharkey Dep. Tr. 137:9-20 ("So, a lot of times they would just – I would sit there at a table and the supervisor would leave and I would sign.")).

327. With regard to policies, Sharkey testified, "[S]ome of them I just would flip through them and just sign them." (See Ex. 3: Sharkey Dep. Tr. 76:3-8).

328. With regard to Sharkey's training upon his return to BCRC, he testified, "When I got hired back there, it was just me and a supervisor going over these documents, you know, this binder . . ." and that "[t]here was a bit of time where I was in that room by myself just signing papers." (See Ex. 3: Sharkey Dep. Tr. 77:6-15).

329.     Sharkey disputed the number of hours of training that he received, testifying, "There's no way I have 50.5 hours of training. I'm sorry. That's not the way it works." (See Ex. 3: Sharkey Dep. Tr. 240:19-21).

330.     Sharkey further testified, "This might be required by the Department of Public Welfare for them to put this on this computer . . . . But this is not what happens at the Berks County Residential Center when I was there." (See Ex. 3: Sharkey Dep. Tr. 240:24-241:6.)

331.     With respect to the sexual abuse and sexual harassment training, Himmelberger testified, "We got a packet of information and then we had basically what was sort of like a test to test our knowledge on it." (See Ex. 4: Himmelberger Dep. Tr. 70:4-11.)

332.     Staff are required to report warning signs where there might be sexual abuse or assault. (See Ex. 4: Himmelberger Dep. Tr. 77:9-14.)

333.     Witmer was involved in developing the training for sexual abuse and sexual assault. (See Ex. 12: Witmer Dep. Tr. 36:22-37:9.)

334.     Supervisor Brandon Witmer testified that sexual abuse/sexual assault training consists of a PowerPoint being printed out and the employee going to a private area, reading it, and taking a quiz. (See Ex. 12: Witmer Dep. Tr. 45:3-11.)

335.     A staff member, Rothermel, did not recall examples of favoritism that she learned in training. (See Ex. 5: Rothermel Dep. Tr. 100:23-101:2.)

336.     Edwards approves of the training curriculum, all the subjects under training. (See Ex. 10: Edwards Dep. Tr. 174:22-23).

**Sharkey**

337.     Witmer stated that there was an incident before Sharkey started working at BCRC where Sharkey was cursing and being disrespectful and had to be spoken to.  .  (See Ex. 12: Witmer Dep. Tr. 77:13-78:4).

338.     Edwards was aware the Sharkey had an incident during his employment as a Juvenile Correction Counselor with Berks County at the youth center, where he was out on break with other employees and was loud and used vulgarity with words, and was disciplined.  .  (See Ex. 10: Edwards Dep. Tr. 122:3-23).

339.     Sharkey had previously been disciplined before.  (See Ex. 3: Sharkey Dep. Tr. 123:20-13).

340.     Sharkey was disciplined for telling another staff member to wash his hands with Clorox and turning his skin white.  (See Ex. 3: Sharkey Dep. Tr. 123:4-10).

341.     Sharkey received a suspension as part of the discipline.  (See Ex. 3: Sharkey Dep. Tr. 123:4-10).

342.     When Sharkey returned, he came back to work and did not receive any retraining. (See Ex. 3: Sharkey Dep. Tr. 127:16-5).

343.     David Smith participated with Diane Edwards and a Human Resources representative in interviewing staff relating to the incidents between Sharkey and E.D.  (See Ex. 11: Smith Dep. Tr.199:16-18).

344.     David Smith took notes at these meetings.  (See .  (See Ex. 11: Smith Dep. Tr. 202:18:5; referring to Ex. 18); Ex. 18: Smith Notes; Ex. 11: Smith Dep. Tr.)

345.     Smith's notes indicate that staff member Rebecca Hillbert stated something like:

a.   "I noticed Dan S hanging w/E.D./Patricia a lot."

b.   "Dan S doesn't sit w/Residents to eat.  He sat w/her a lot that week."

c. She saw Dan in the laundry room and E.D. was outside room. Rebecca felt like she interrupted something.

(See Ex. 18: Smith Notes at Berks 02611).

346. Smith's notes indicate that staff member Sandy Kreager stated something like:

a. The week before [she was out] Sharkey was hanging out in the bedroom wings w/ a bunch of women.

b. She tried not be around Dan because he is an "ass."

(See Ex. 18: Smith Notes at Berks 02611).

347. From an interview with Jill Noll, Smith's notes state:

a. "On the 16th, I knew something wasn't right. We were really short staffed that night."

b. "Beth and I were on floor by ourselves Dan S. disappeared a lot. He was @ the end of the hall. He had to of [*sic*] been in one of the room."

c. "Why didn't you take it to a sup[ervisor]? Our sups are shit, we can never find them."

d. "She stated my checks suck."

(See Ex. 18: Smith Notes at Berks 02614).

348. From an interview with Beth Hrezik, Smith's notes state:

a. "We were short staffed → Did you call a sup[ervisor] about being short staffed? ★No."

b. "They always claim they are short staffed."

c. SUP[ervisor]S → Mills + Len → in general they have been around more now but all shifts are in the office a lot."

(See Ex. 18: Smith Notes at Berks 02617).

349. From an interview with Jim Stedrick:

    a. "I saw Dan and E.D. around each other."

    b. "I saw – Dan and E.D. on CPU in library on google translator."

    (See Ex. 18: Smith Notes at Berks 02616).

350. From an interview with Josiah Scott-Manga:

    a. "Have you noticed any inappropriate relationship?  Yes what flags – some people make poor judgment:  Dan is hardly on the floor, he finds himself handy when he belongs, trying to delegate his work to others."

    b. "Dan spent a lot of time w/E.D. + Patricia."

    c. "If I tell Sup[ervisors] I felt it wouldn't have been handled.  And cause more anemonsity [*sic*] between Dan + Josiah.  Thinks Sups may not have enough time to address it."

    (See Ex. 18: Smith Notes at Berks 02612).

351. Himmelberger stated that Sharkey was manipulative, did not have the nicest demeanor, and created a lot of stirs between staff.  (See Ex. 4: Himmelberger Dep. Tr. 91:10-14).

352. Himmelberger stated that Sharkey sometimes congregated with other staff members in the parking lot taking long breaks and other staff would complain and wonder why they weren't on the floor.  (See Ex. 4: Himmelberger Dep. Tr. 92:9-24).

353. Himmelberger reported that Brittany had said Sharkey would disappear, such as abandoning his post.  (See Ex. 4: Himmelberger Dep. Tr. 114:2-11; see also Ex. 18: Smith Notes at Berks 02613).

354.    Josiah Scott-Manga stated that Sharkey was a "laid back guy" . . . "[t]owards his duty" and "You have to instruct him.  You tell him, he get angry."  (See Ex. 9: Scott-Manga Dep. Tr. 31:23-32:2; 46:7-10).

355.    Scott-Manga saw Sharkey give E.D.'s son a toy.  (See Ex. 9: Scott-Manga Dep. Tr. 33:24-34:5).

356.    Scott-Manga saw Sharkey and E.D. sitting in chairs next to each other in front of the computer.  (See Ex. 9: Scott-Manga Dep. Tr. 41:19-42:3).

357.    Himmelberger stated that Sharkey made sexist comments.  (See Ex. 4: Himmelberger Dep. Tr. 93:8-12; 94:17-24).

358.    Himmelberger also heard Sharkey make racist comments.  (See Ex. 4: Himmelberger Dep. Tr. 93:10-94:9).

359.    Himmelberger also heard Sharkey make vulgar comments, which usually were in front of a group of people so other people were aware of it.  (See Ex. 4: Himmelberger Dep. Tr. 97:1-14).

360.    Himmelberger reported the sexist comment and vulgar comments to her supervisors and Diane Edwards.  (See Ex. 4: Himmelberger Dep. Tr. 97:15-21).

361.    In David Smith's notes in the interview with Erika Taylor, it reads, "talked to E.D./Patricia a lot but it was always in public" and "He pursued them in seemed in hindsight." (See Ex. 18: Smith Notes at Berks 02613).

362.    Taylor recalls making these statements.  (See Ex. 6: Taylor Dep. Tr. 125:11-127:6).

363. BCRC has a policy that forbids the use of personal phones and devices within the program space, which constitutes where the detainees live. (<u>See</u> Ex. 41: Policy: Chapter: Training; Subject: Personal Phones/Devices, Effective date 12/10/13, Revised date 12/10/13).

364. Sharkey frequently had his personal cell phone with him that he let E.D. use.

365. Sharkey sometimes took out his cell phone in the common areas. (<u>See</u> Ex. 20: Video Timeline Notes dated August 12, 2014 (at 7:15)).

**<u>Policies and Practices</u>**

366. Edwards is sometimes in charge of developing new policies for BCRC. (<u>See</u> Ex. 10: Edwards Dep. Tr. 143:1-7).

367. Edwards has the ability to propose new policies if those policies are warranted. (<u>See</u> Ex. 10: Edwards Dep. Tr. 143:19-22).

368. Edwards signs off if a policy goes into the SOP. (<u>See</u> Ex. 10: Edwards Dep. Tr. 146:2-5).

369. Diane Edwards name is on the clothing policy. (<u>See</u> Ex. 36).

370. BCRC staff supervise the detainees during the meals and must eat in the dining room. (<u>See</u> Ex. 4: Himmelberger Dep. Tr. 37:12-37:22).

371. BCRC does a count or census of the detainees three times a day. (<u>See</u> Ex. 1: E.D. Decl. at ¶9; Ex. 4: Himmelberger Dep. Tr. 38:18-39:9; Ex. 6: Taylor Dep. Tr. 50:18-22).

372. Staff were permitted to search the detainees. (<u>See</u>, <u>e.g.</u> Ex. 5: Rothermel Dep. Tr. 143:7-10).

373. All the BCRC entrances and exits were guarded, there was an office with a staff member near the main entrance, and staff members were always watching the detainees. (<u>See</u> Ex. 1: E.D. Decl. at ¶5; Ex. 4: Himmelberger Dep. Tr. 39:13-24).

374. Detainees could not go outside to the recreation area without permission of a staff member, and a staff member would have to escort detainees outside. (See Ex. 1: E.D. Decl. at ¶6; Ex. 4: Himmelberger Dep. Tr. 47:13-24; Ex. 5: Rothermel Dep. Tr. 70:4-6).

375. The only way to open the front entrance was with an access pass that only staff had. (See Ex. 1: E.D. Decl. at ¶4).

376. At night, the detainees were not allowed the leave the upper floor (where the dorm rooms were) after 8:00 pm. (See Ex. 1: E.D. Decl. at ¶8; Ex. 4: Himmelberger Dep. Tr. 56:13-15).

377. The detainees slept in dorm rooms which had six as the maximum number in each room. (See Ex. 4: Himmelberger Dep. Tr. 57:1-4).

378. Staff who were posted on the ground floor (A Floor) often had one person assigned to the desk while the other person walked around the halls on that same floor. (See Ex. 6: Taylor Dep. Tr. 38:7-15; see also Ex. 7: Malinowski Dep. Tr. 16:22-17:22).

379. Staff who were posted on the upper floor (B floor) often had the staff member who had the B1 post sit at the desk and the other staff member, who would be B2, would assist the B1 post. (See Ex. 6: Taylor Dep. Tr. 35:3-36:21; see also Ex. 7: Malinowski Dep. Tr. 16:7-14).

380. One detainee expressed concern that she would be in trouble because her daughter had informed staff of what she had witnessed between Sharkey and E.D. (See Ex. 16: Email of Mosko, M. to Allain, S and Clement, J., dated 8/18/14 (Berks 02442)).

381. Staff members are not permitted to supervise detainees of the opposite gender in areas that do not have cameras. (See Ex. 4: Himmelberger Dep. Tr. 85:1-22; Ex. 9: Scott-Manga

Dep. Tr. 22:6-23:7; Ex. 6: Taylor Dep. Tr. 102:12-103:14; Ex. 7: Malinowski Dep. Tr. 22:16-24:24; Ex. 5: Rothermel Dep. Tr. 112:12-15).

382.     Among the staff members, only Brittany Rothermel spoke Spanish with fluency. (See Ex. 3: Sharkey 65:4-19; Ex. 4: Himmelberger Dep. Tr. 63:18-24).

383.     Before Brittany Rothermel started working there, no other staff were fluent in Spanish.  (See Ex. 4: Himmelberger Dep. Tr. 63:18-24).

384.     Staff had access to language services which entailed going to the phone in a specific room.  (See Ex. 6: Taylor Dep. Tr. 72:8-73:18).

385.     Sometimes staff would communicate through other detainees who could speak some English.  (See Ex. 5: Rothermel Dep. Tr. 84:8-13).

386.     Taylor testified that she did not speak Spanish fluently, and didn't communicate with the detainees a whole lot.  (See Ex. 6: Taylor Dep. Tr. 72:8-73:18).

387.     During the investigation by Bern Township police and DHS/ICE, a detainee (Miranda-Morales) reported that she observed another detainee (Dubon-Chicas) talking to a staff member, Ryan Reabold), explaining that Sharkey and E.D. were kissing.  Reabold stated, "No comprendo" [I don't understand].  The detainee observed Dubon-Chicass put her hands tougher by the fingertips and turned them in opposite directions in an attempt to explain to Reabold that they were kissing.  The detainee heard Reabold respond by stating "No problema."  [No problem].  The detainee reported that she heard Dubon-Chicas explain to Reabold in Spanish tha the other BCRC staff members needed to know that they were kissing, and that Reabold did not respond and left the area.  (See Ex. 47: DHS Report of Investigation, Report No. 018 at p. 4-5).

388.     Several staff members could not identify who the SAAPI program coordinator

was.  (See, e.g., Ex. 6: Taylor Dep. Tr. 85:1-11; Ex. 8: Behm Dep. Tr. 36:22-37:3; Ex. 7:

Malinowski Dep. Tr. 37:18-22; Ex. 5: Rothermel Dep. Tr. 104:7-107:17).


                                        Respectfully submitted,

                                         /s/ Su Ming Yeh
                                        Su Ming Yeh
                                        I.D. No. 95111
                                        Angus R. Love
                                        Attorney # PA 22392
                                        Pennsylvania Institutional Law Project
                                        718 Arch Street, Suite 304S
                                        Philadelphia, PA 19106
                                        (215) 925-2966
                                        *Counsel for Plaintiff*


DATE:  October 26, 2017

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| E.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 16 Civ. 2750 |
| | : | |
| DANIEL SHARKEY et al., | : | Judge Edward G. Smith |
| Defendants | : | |
| | : | Filed via ECF |
| | : | |

## CERTIFICATE OF SERVICE

On this October 26, 2017, I, Su Ming Yeh, hereby certify that I caused a true and correct copy of the above document, to be served electronically on counsel as follows:

Langdon Jones
U.S. Attorney's Office for the E.D. Pa.
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
landon.jones@usdoj.gov

Matthew J. Connell
Tricia M. Ambrose
MacMain Law Group
101 Lindenwood Drive, Suite 160
Malvern, PA 19355
mconnell@macmainlaw.com
tambrose@macmainlaw.com

A hard copy of the above document was mailed on October 27, 2017:
Daniel Sharkey
223 S. 7th Avenue
Reading, PA 19611

Respectfully submitted,

/s/ Su Ming Yeh
Su Ming Yeh
I.D. No. 95111
Pennsylvania Institutional Law Project