# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| E.D., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 16 Civ. 2750 |
| | : | |
| DANIEL SHARKEY et al., | : | Judge Edward G. Smith |
| Defendants | : | |
| | : | |
| | : | |

## DECLARATION OF E.D.

I, E.D., hereby declare as follows:

1.      From May to December 2014, I was detained at the Berks County Residential Center (BCRC) as an immigration detainee with my son, who was three years old at that time.

2.      When I entered BCRC, I remembered signing a number of forms, but I do not remember receiving specific information about what sexual abuse is, or how to report sexual abuse, sexual assault or other improper behavior by staff members.

3.      While detained at BCRC, I was not free to leave the facility.

4.      The only way to open the front entrance was with an access pass that only staff had.

5.      All the entrances and exits were guarded, there was an office with a staff member near the main entrance, and staff members were always watching, and I never tried to leave the BCRC facility.

6.      I could not go outside to the recreation area without permission of a staff member, and a staff member would have to escort me outside.

7.     Once I was outside in the recreation area, I asked a staff member what would happen if I (or another detainee) tried to leave the facility, and I was told that the police would be called with the radio and that the police would came after us.

8.     At night, the detainees were not allowed the leave the upper floor (where the dorm rooms were) after 8:00 pm.

9.     BCRC had "count" three times a day, where they counted the number of detainees in the facility.

10.    After I arrived to BCRC, a staff member named Daniel Sharkey began to befriend me, by giving me and my son treats, such as chocolate and extra portions of food.

11.    He provided me favors, such as he let me use of his cell phone, which I could use to call my mother.

12.    He also gave me toys and clothes from outside the facility to me and my son.

13.    He made promises to me to helping me with my immigration issues.

14.    He told me he liked me and that I was pretty, but I thought he was just joking or playing around.

15.    One day he kissed me, and I realized he was not joking around.

16.    He kissed me in the laundry room, which is a room that has no cameras.

17.    A day or a few days after Sharkey kissed me, he came to me with a translation on his cell phone that I should not tell anyone about what happened, and if anyone found out, I would be deported, which I believed.

18.    I feared from Sharkey retaliation if I protested.

19.    If I refused to touch Sharkey, this angered him and he would insult me.

20.     Sharkey was also jealous, for example if I interacted with other male staff members or the older teen male detainees.

21.     Eventually Sharkey was hugging and kissing me on a daily basis.

22.     Sharkey also touched my breasts and buttocks while we were alone in my dorm room or other detainees' dorm rooms.

23.     Sharkey asked me to take pictures of myself in my bra and underwear with his cell phone.

24.     I agreed to have pictures taken of me while I was in my bra and underwear with Sharkey's cell phone.

25.     Sometime in late July or August 2014, Sharkey wanted to have sexual intercourse with me.

26.     We did have sexual intercourse three times, two times in the women's bathroom in the hallway to the facility entrance on the same day, and one time in my friend's dorm room.

27.     I felt obligated to have sex with him.

28.     A few days after the first time we had sexual intercourse, Sharkey approached me while I was in the outdoor recreation area and tried to pull my pants down but I refused to agree because there were children present.

29.     Sharkey told me numerous time that if I told anyone of the nature of our relationship that I would be deported back to Honduras.

30.     I felt that Sharkey was always near or next to me, so if I sat down in the common area, he would sit down, or if I went to the outside recreation area, then he would go outside.

31.     In mid-August 2014, a young child had witnessed Sharkey and my when we were having sex in the bathroom, and she told her mother, and one of them reported it sometime after.

32.     Until this point, I had not been informed, either by BCRC staff or any U.S. Immigration and Customs Enforcement (ICE) or Department of Homeland Security (DHS) officers, that I had not broken any state or federal laws, or that the incidents would not affect my immigration status.

33.     I continued to believe that I could be deported for what had happened.

34.     After the investigation started, the BCRC began to treat me very poorly.

35.     I received a number of write-ups which I had not received before.

36.     I felt very isolated, upset, and depressed.

37.     In mid-September, some pro bono lawyers met with me.

38.     In mid- to late- October, I met my current immigration attorney for the first time.

39.     I broke down and revealed the relationship to him and/or his paralegal during a legal visit.

40.     My immigration attorney then faxed, emailed, and wrote to various ICE employees and offices and to report the incidents.

41.     After I reported the incidents through my attorney, the attitude and treatment to me by BCRC staff worsened.

42.     I was denied certain privileges, such as my son being denied a haircut, even though other children were permitted haircuts.

43.     I was told by staff member Brittany Rothermel that I was on a restriction.

44.     If I talked to any other detainee, staff members would the go to that detainee and question them.

45.     This caused other detainees to not want to talk to me.

46.     In or around November 2014, BCRC staff, under the direction of Diane Edwards, took many of the women's and girls' clothing, placed them in garbage bags, and gave the detainees other clothing that they claimed were more appropriate.

47.     In or around November 2014, BCRC and Diane Edwards began prohibiting women detainees from wearing any tight clothing, clothing that revealed any cleavage, or skirts and dresses, and the other BCRC-IFC detainees blamed me for this policy and isolated me.

48.     BCRC staff also took our Handbooks, made changes to them, and gave them back.

49.     The changes they made related to the clothing restrictions.

50.     I felt that BCRC staff specifically targeted me with my clothing, and I was ordered to change out of certain clothes several times because BCRC thought my clothing was inappropriate.

51.     I also received a write-up or more about my clothing, which upset me greatly.

52.     There were also many times when I was ordered to change an article of clothing were they did not write it up.

53.     I saw other women detainees who wore the same or similar things as I was, but the staff members did not say anything to them.

54.     After this happened so many times, I went to a medical staff person to help me translate so I could tell the staff that I was upset and that I felt that I was being singled out.

55.     I became even more depressed and isolated, and regretted coming forward about what happened.

Pursuant to 28 U.S.C § 1746, I, E D , declare under penalty of perjury that the foregoing is true and correct. Executed this 26 day of October, 2017.

E. L.D