# EXHIBIT 2

# Transcript of the Testimony of:

**E.D.**

**Date:** June 19, 2017

**Case:** E.D. v. DANIEL SHARKEY et. al.

DIAMOND COURT REPORTING
Phone: 856-589-1107
Fax: 856-589-4741
Email: dcr.diamond@comcast.net

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------
E.D.,                    : CIVIL ACTION
                         : NO. 16-02750
        Plaintiff,  :
                         :
  vs.              :
                         :
DANIEL SHARKEY, et. al.,  :
                         :
        Defendants. :
------------------------
- - -
June 19, 2017
- - -
        Oral Deposition of ███ E.D. ███, taken
at the Law Offices of the Pennsylvania
Institutional Law Project, 718 Arch Street, Suite
304S, Philadelphia, Pennsylvania 19106, on the
above date, beginning at approximately 10:25 a.m.,
before Douglas S. Diamond, Certified Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania, there being present.

- - -

DIAMOND COURT REPORTING
4 Emerson Lane
Sewell, New Jersey 08080
(856) 589-1107
FAX  (856) 589-4741

---

Page 2

```
 1   A P P E A R A N C E S:
 2   THE PENNSYLVANIA INSTITUTIONAL LAW
     PROJECT
 3   BY: SU MING YEH, ESQUIRE
     and
 4   MATTHEW J. ARCHAMBEAULT, ESQUIRE
     718 WALNUT STREET - SUITE 304S
 5   PHILADELPHIA, PENNSYLVANIA 19106
     Counsel for the Plaintiff
 6   Tel. (215) 925-2966
 7        * * * * *
 8   THE MACMAIN LAW GROUP, LLC
     BY: MATTHEW J. CONNELL, ESQUIRE
 9   And
     TRICIA M. AMBROSE, ESQUIRE
10   101 LINDENWOOD DRIVE - SUITE 160
     MALVERN, PENNSYLVANIA 19355
11   Counsel for the Defendants, COUNTY
     OF BERKS
12   Tel. (484) 318-7106
13        * * * * *
14   U.S. DEPARTMENT OF JUSTICE
     UNITED STATES ATTORNEY'S OFFICE
15   BY: LANDON Y. JONES, ESQUIRE
     615 CHESTNUT STREET - SUITE 1250
16   PHILADELPHIA, PENNSYLVANIA 19106
     Counsel for the Defendant,
17   JEREMIAH/JOSH PETREY
     Tel. (215) 861-8323
18   E-mail: landon.jones@usdoj.gov
19        * * * * *
20   ALSO PRESENT:
     CHRISTINE ROMERO
21   DAVID SMITH
     VIVIANA GARLAND - THE INTERPRETER
22        * * * * *
     MARKED QUESTIONS
23         PAGE  LINE
24   *      15   14
```

---

Page 3

```
 1                    I N D E X
 2   WITNESS                           PAGE
 3   ███ E.D. ███
 4   Examination by Mr. Connell:      14, 167
 5   Examination by Mr. Landon:       145
 6   Examination by Ms. Yeh:          160
 7             EXHIBITS
     NO.        DESCRIPTION           PAGE
 8
     BC-1    Resident Manual in Spanish      5
 9
     BC-2    Notice of Deposition            7
10
     BC-3    Color Document with Writing    47
11
     BC-4    Color Document with Writing    49
12
     BC-5    Sexual Abuse Acknowledgment    67
13
     BC-6    Orientation Acknowledgment     70
14
     BC-7    Grievance Procedure            73
15
     BC-8    Resident Handbook Acknowledgment  73
16
     BC-9    Interview                     104
17
     BC-10   Handwritten Statement         108
18
     BC-11   Map of Second Floor           110
19
     BC-12   Handwritten Statement         112
20
     BC-13   Hand-Drawn Diagram            112
21
     BC-14   Resident Manual in Spanish    129
22
     BC-15   Resident Manual in English    130
23
     BC-16   Map of Third Floor            164
24
```

---

Page 4

```
 1                   - - -
 2         (It was hereby stipulated by and
 3   among counsel that, sealing,
 4   certification and filing be waived; and
 5   that all objections, except as to the
 6   form of the question, be reserved until
 7   the time of trial.)
 8                   - - -
 9         VIVIANA GARLAND,
10   was duly sworn to translate ENGLISH
11   into SPANISH and SPANISH into
12   ENGLISH in the following deposition:
13         ███ E.D. ███,
14   having been first duly sworn, was
15   examined and testified through the
16   interpreter as follows:
17                   - - -
18         MR. CONNELL:  Before we get into
19   questioning I have a couple of things
20   that I think we spoke off the record
21   about that I would like to get on the
22   record.  First, we received an e-mail
23   this morning from Landon Jones, counsel
24   for, I think, the only party that he is
```

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 5

1  representing remaining in this
2  litigation identified on the Third
3  Amended Complaint as Jeremiah slash Josh
4  Petrey, P-e-t-r-e-y.  Mr. Jones sent an
5  e-mail to counsel this morning
6  indicating that he had a family
7  emergency this morning and that we
8  should proceed with the deposition
9  without him and he expects to be here at
10  some point.
11      The second statement on the record
12  is at about 6:40 last night we received
13  a Supplemental Document Production by
14  the counsel for plaintiffs with a
15  Written Supplemental Response to
16  Defendants' Request for Production of
17  Documents along with a document
18  identified as Berks Family Residential
19  Center, which is the resident manual, in
20  the Spanish language.  I'm going to have
21  that document that was produced marked
22  as Berks County-1.
23              - - -
24      (Whereupon, Exhibit Berks County-1

Page 6

1  was marked for identification.)
2              - - -
3      MR. CONNELL:  So the exhibit that's
4  been marked as Berks County-1 is the
5  manual that was produced last night at
6  about 6:40 p.m., and we will address
7  this with the witness.  But if I can
8  indulge everybody in the room, before we
9  -- well, I'm going to set that aside for
10  a minute because there's something else
11  I should state on the record before we
12  go any further.  And we will have that
13  marked as Berks County-1.  There is an
14  unrepresented party in this litigation.
15  As it stands as we sit here today, I
16  don't know if that individual has been
17  served or not served with this lawsuit.
18  His name is Daniel Sharkey.  He is a
19  defendant that is unrepresented.  He is
20  a former employee of Berks County.  And
21  my office does not represent Mr.
22  Sharkey.
23      We will have marked as Berks
24  County-2 the Deposition Notice and

Page 7

1  correspondence that went to Mr. Sharkey
2  advising him of today's deposition.
3              - - -
4      (Whereupon, Exhibit Berks County-2
5  was marked for identification.)
6              - - -
7      MR. CONNELL:  We will have that
8  appended to this deposition so it is
9  clear for the record that Mr. Sharkey
10  was invited to attend and participate.
11  And as it stands, the deposition was
12  scheduled for 10:00 a.m. on today's
13  date.  It is now approaching 10:30 a.m.
14  and Mr. Sharkey is not present.
15      Lastly, now back to Berks County-1,
16  if everybody in the room can indulge me,
17  but given the late production of this
18  and that I had not seen until I walked
19  in this morning the document that was
20  produced and identified as Berks
21  County-1 I am requesting that the
22  interpreter read certain portions of
23  that document for the record that were
24  identified to me this morning by counsel

Page 8

1  for plaintiff as being differences in
2  the document that we produced
3  previously.
4      And if we can go off the record for
5  a second just so I can be clear about
6  that.
7              - - -
8      (Whereupon, a discussion took place
9  off the stenographic record.)
10              - - -
11      MR. CONNELL:  So in furtherance of
12  that discussion, we're back on the
13  record, I would ask Madam Interpreter to
14  read the following sections.  And if I
15  can point that to you rather than try
16  and read it.
17      THE INTERPRETER:  Yes.
18      MR. CONNELL:  And actually what
19  I'll do is maybe we ought to use a
20  version we marked.  And I will just put
21  in red Sharpie lines parallel to those
22  sections in the margin just there to
23  there.
24      MS. YEH:  Can we just have her read

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 9

1  that?
2        MR. CONNELL:  Sure.  So I'm going
3  to hand you what's been marked as Berks
4  County-1.  And on Page 11 of that
5  document read the sections that are with
6  the subsection noted with the red mark
7  down to the bottom of the subsection
8  noted with the red mark, for the record.
9        THE INTERPRETER:  If I can just
10  have a minute to read it for myself and
11  translate it.
12        MR. CONNELL:  Of course.
13        THE INTERPRETER:  All right.
14  Subsection titled Clothing for Residents
15  Without Resources, the center will
16  provide clothing for residents without
17  resources that have reached the center
18  without the adequate number of clothing
19  for the station, for the place.  If you
20  need clothing, talk to a social
21  assistant or someone or present a
22  program request form.  These forms are
23  found in the resident information
24  center.  The forms, the completed forms,

Page 10

1  must be a placed in the mailbox with the
2  tag request.
3        Residents dress codes, residents
4  five years of age.  Residents must use
5  shirt that will cover shoulders, chest,
6  stomach and low back.  You may not use
7  tops that will show cleavage.  Clothing
8  that is very thin and that shows body
9  parts is not allowed, thin clothing.
10  All types of underwear are permitted as
11  long as they are not visible in any area
12  at any time.  Tight clothing is not
13  allowed.
14        Shirts, pants or shorts.  Shorts
15  shall not be used that are higher than
16  the midthigh.  Dresses and skirts are
17  not allowed unless they are approved by
18  religious reasons.  Shoes or sandals
19  must be used at all times.  If a
20  clothing -- piece of clothing is
21  considered inadequate during the day it
22  is still inadequate during night hours
23  or for sleeping.
24        Earrings, necklaces and bracelets

Page 11

1  of marriage based on religious reasons
2  are the only articles allowed, the only
3  jewelry articles allowed.
4        Bedding, at the moment that you
5  enter, that you are admitted to the
6  center, every resident will receive the
7  following bedding items, two sheets, one
8  pillow cover, one blanket, one bag for
9  dirty clothing.  This bedding can be
10  used -- can be exchanged for clean
11  clothing once a week or with more
12  frequency if it were necessary.  Talk to
13  someone in personnel -- talk to a staff
14  member if you need clean bedding on a
15  day outside of the sixth day to exchange
16  it.
17        That was Page 11.
18        MR. CONNELL:  Thank you.  If I can
19  ask you, Madam Interpreter, to then turn
20  to Page 19.  In the margins of Page 19
21  on Exhibit Berks County-1 I again with a
22  red Sharpie marked out the sections I
23  would ask you to read.
24        THE INTERPRETER:  All right.  If I

Page 12

1  can have a few minutes to read it to
2  myself?
3        MR. CONNELL:  Of course.  Thank
4  you.
5        THE INTERPRETER:  Okay.  I'm ready.
6        MR. CONNELL:  Thank you.  If you
7  can proceed.
8        THE INTERPRETER:  Sub-Section
9  Prevention and Intervention for Sexual
10  Abuse Cases and Sexual Attack Cases.
11  The center counts with a program called
12  sexual abuse and assault prevention and
13  intervention program to protect
14  residents and staff members.  If you
15  feel in danger or insecure at any time
16  during your residence in the center due
17  to threats or sexual abuse or assault or
18  if you suffer from sexual abuse and
19  assault, you must immediately inform any
20  member of the staff and request for
21  help.  The department's doctor will give
22  you treatment and the appropriate
23  orientation if you suffer from sexual
24  abuse and assault.  There is also

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 13

1    information about sexual abuse and
2    assault in the resident information
3    center.  The social assistants, social
4    workers, of the division denominated
5    called Immigration Health Services Corps
6    offer orientation and assistance by
7    request to the residents.  Also,
8    residents that feel that they are in
9    danger can follow one of the following
10   steps or all of them:  Inform about your
11   concern to any member, to any staff
12   members, present a complaint, an
13   emergency complaint where the nature of
14   the problem is established and the
15   necessities.  For more information see
16   the section about complaints.
17        How to get in contact with the
18   Immigration and Custom Enforcement, also
19   known as ICE, for that you must fill out
20   a form, ICE Communication Form.  These
21   forms are in the resident information
22   center.  The completed forms must be
23   placed in the mailbox with the tag ICE.
24        How to present a complaint directly

Page 14

1    to the Department of Homeland Security,
2    how to communicate with the Office of
3    the Inspector General through the free
4    call system or one of the following
5    ways:  Write to DHS OIG Hotline, 245
6    Murray Drive, S.E. Building 410,
7    Washington, D.C. 20538; send an e-mail
8    to DHSOIGHOTLINE@DHS.GOV; call by phone
9    at 1-800-323-8603; tell a family member
10   or friend or your attorney and request
11   for them to get in touch with ICE or OIG
12   for you.  ICE has a zero tolerance
13   policy against sexual assault and abuse.
14        End.
15        MR. CONNELL:  That completes that
16   section?
17        THE INTERPRETER:  Yes.
18        MR. CONNELL:  Thank you very much.
19             - - -
20            EXAMINATION
21             - - -
22   BY MR. CONNELL:
23        Q.    Madam, can you please state your
24   name for the record?

Page 15

1    A.    ████ E.D. ████.
2    Q.    Is it okay with you if I call you
3    ████ E.D. ████?
4    A.    Yes.
5    Q.    ████ E.D. ████, we are here this morning
6    for your deposition.
7         MR. CONNELL:  Can we go off the
8    record again for a second.
9             - - -
10       (Whereupon, a discussion took place
11   off the stenographic record.)
12            - - -
13       MR. CONNELL:  Back on the record.
14   BY MR. CONNELL:
15       Q.    ████ E.D. ████, as I mentioned, we are
16   here for your deposition today.  This is an
17   opportunity for me on behalf of my clients to ask
18   questions about the lawsuit that you have brought.
19   I represent the defendants in this litigation that
20   are not federal employees and are not Daniel
21   Sharkey.  And that would be the County of Berks, a
22   party identified as a Berks County Residential
23   Center and Immigration Family Center, Diane
24   Edwards, Jamie Himmelberger, Brittany Rothermill,

Page 16

1    Erika Taylor and Matthew Malinowski.
2         Before we get started on the
3    substantive questions I would like to go through
4    some instructions with you.  My first -- well, my
5    first instruction is it's very important that you
6    understand the questions that are being asked of
7    you today and the interpretation that you're
8    receiving through the interpreter.  As it stands
9    now, are you having any difficulty with the
10   translation you're receiving from the interpreter?
11       A.    No.  Well, I would prefer that you
12   speak -- the interpreter does not speak at the
13   same time as you because it confuses me a little.
14   *    Q.    Okay.  I don't want any confusion,
15   so we will, to the best to our ability, do that.
16       A.    Okay.
17       MR. CONNELL:  I would ask the court
18   reporter to mark that page.
19       And I would ask the interpreter if
20   that is a problem for her?
21       THE INTERPRETER:  The interpreter
22   doesn't find any problem.  We will do
23   the consecutive now that we've started
24   with the question-and-answer session.

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 17

```
 1    BY MR. CONNELL:
 2        Q.    So it's important that you
 3    understand the question that I ask.  And I would
 4    ask you to let us know if for any reason you don't
 5    understand that question.
 6            MR. CONNELL:  I'm sure the
 7        interpreter understands that she needs
 8        to understand my question as well?  I'm
 9        sorry, I had to ask you a question.
10            THE INTERPRETER:  Yes, the
11        interpreter does understand.
12    BY MR. CONNELL:
13        Q.    If at any point you don't
14    understand the question, either because of the
15    language that I use or the interpreter doesn't
16    understand a question because of the way I speak,
17    it is vital that you both let me know.
18        A.    Okay.  Yes.
19        Q.    If at any time during this
20    deposition you need to take a break, please let us
21    know and we'll be happy to oblige.
22        A.    Yes.
23        Q.    However, consistent with the Rules
24    of Civil Procedure if I ask a question and you
```

Page 18

```
 1    need to take a break I would ask that you give me
 2    an answer to that question before we take the
 3    break.
 4        A.    Okay.
 5        Q.    Is there anything today preventing
 6    you from giving truthful and accurate testimony
 7    and answers to my questions?
 8        A.    No.
 9        Q.    We're looking for your best answers
10    to the questions that I ask.  I do not want you to
11    guess at an answer.  I don't want you to speculate
12    as to what an answer may be.  I want only the best
13    answer to the question that I ask even if that
14    answer is I don't know or I don't remember.
15            Is that fair?
16        A.    Yes.
17        Q.    I may ask you at times to estimate
18    either time or measurements.  Generally sometimes
19    estimates can be the best answer, and that's a
20    fair answer to ask so long as you're comfortable
21    giving an estimate.
22        A.    Okay.
23        Q.    If that's the case I'd just ask
24    that you let us know that it is an estimate.
```

Page 19

```
 1        A.    Yes.
 2        Q.    If -- strike that.
 3            I mentioned if you don't understand
 4    a question that I ask, let us know.  And if your
 5    best answer is you don't know or you don't
 6    remember, that's a perfectly fine answer.
 7            Do you understand the instructions
 8    that I just discussed?
 9        A.    Yes.
10        Q.    One other point, and it shouldn't
11    be much of an issue in the realm of an
12    interpreter, but I need your answers to be verbal.
13    Okay?
14        A.    Okay.
15        Q.    So the court reporter cannot
16    interpret your body language.  So if you shrug
17    your shoulders or nod your head, that's not a
18    sufficient answer.  We will need it to actually be
19    verbal through the interpreter.  Okay?
20        A.    Yes.
21        Q.    Do you have any questions at all
22    about those instructions?
23        A.    No.
24        Q.    ████ E.D. ████, upon your entry to Berks
```

Page 20

```
 1    County Residential Center you signed up for a work
 2    program; correct?
 3        A.    Yes.
 4        Q.    And why did you sign up for a work
 5    program?
 6        A.    When -- always when someone goes in
 7    they're offered to go in to work and that they
 8    will be paid one dollar a day.  And even if they
 9    don't sign up for the work program there are daily
10    things, daily chores that we have to do.  And
11    that's a reason that most women prefer to sign up,
12    to receive payment.
13        Q.    And is that the reason why you
14    signed up?
15        A.    Yeah, because I was going to do it
16    anyway.  If they were going to pay me or not, I
17    was going to work daily.
18            THE INTERPRETER:  I'm sorry.
19            MR. CONNELL:  Off the record.
20                  - - -
21            (Whereupon, a discussion took place
22        off the stenographic record.)
23                  - - -
24    BY MR. CONNELL:
```

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 21

1      Q.    Can you tell me how it was that you
2  found out about the work program?
3      A.    When you go into the Detention
4  Center they give you a welcome -- and one moment.
5  Let me try to remember.  No, when we got there I
6  think other women mentioned it.  And they said
7  that we had to talk to some kind of social workers
8  to sign up for this work.
9      Q.    What were the names of the other
10  women that mentioned it?
11      A.    No.  There were many, and they all
12  talked about it.  They were women that were there
13  before me.
14      Q.    Is it fair to say that these women
15  were not the ones who signed you up for the work
16  program?
17      A.    No.  They just like, how can I say
18  it, they just mentioned that there was a work plan
19  and that it was better to go sign up because it
20  was better to get paid for it.
21      Q.    Okay.  What type of work did you do
22  -- or strike that.  I'm sorry.
23          What type of work did you sign up
24  to do?

Page 22

1      A.    It wasn't the same every day.  It
2  would change every week.  Some weeks it was in the
3  kitchen washing dishes.  Other times it was
4  cleaning bathrooms or cleaning the living room or
5  some other activity area.
6      Q.    Describe for me how it was that you
7  actually went and advised somebody that you wanted
8  to be part of the work program.
9      A.    There was the social workers were
10  there.  So I went there and talked to them.  And I
11  told them that I wanted to work.  And I wrote my
12  name down on a piece of paper.
13      Q.    Identify for me all persons that
14  you spoke with at any time about your relationship
15  with Defendant Sharkey.
16      A.    The people that I talked to, what
17  do you mean, the people in the center or whom?
18      Q.    Yes.  Anybody at any time that you
19  spoke with about your relationship with Sharkey
20  from the minute that it started until we sit here
21  today.
22      A.    Okay.  With Patricia, my attorneys
23  and a psychologist and with the other people that
24  interviewed me, the case investigators.

Page 23

1      Q.    Do you recall Patricia's last name?
2      A.    Patricia, can I write it down,
3  please?
4          MR. CONNELL:  I will also like to
5      see it.
6          MS. YEH:  Yes.  Take a look.
7          MR. CONNELL:  I'm going to ask the
8      interpreter to read it, but I will spell
9      the word that was written by the
10      deponent.  It is spelled C-o-e-l-l-a-r.
11      And I would ask the interpreter to read
12      that.
13          THE INTERPRETER:  Coellar.
14  BY MR. CONNELL:
15      Q.    And who was Patricia or is
16  Patricia?
17      A.    She was my friend in that place.
18      Q.    Do you maintain any contact with
19  Patricia today?
20      A.    Very little.
21      Q.    How do you have contact with her?
22      A.    I have her telephone number.
23      Q.    Do you have that telephone number
24  with you?

Page 24

1      A.    Yes.
2          MR. CONNELL:  Off the record for a
3      second.
4              - - -
5          (Whereupon, a discussion took place
6      off the stenographic record.)
7              - - -
8          MR. CONNELL:  We'll go back on the
9      record.  Off the record we discussed
10      Patricia's telephone number.  At some
11      break during the deposition we will off
12      the record assuming we'll provide a copy
13      of that or provide me that telephone
14      number at some point during the break.
15      Thank you.
16          THE WITNESS:  Okay.
17  BY MR. CONNELL:
18      Q.    When was the last time you had any
19  contact with Patricia?
20      A.    About a month maybe.  Because of
21  work we can't really talk a lot.  And she lives in
22  a different state.  We're in different states, so
23  we can't really talk all the time.
24      Q.    Can you tell me the last -- or

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 25

1    strike that.
2          Have you ever talked with her about
3    the fact that you have a lawsuit against -- or
4    have this lawsuit?
5          A.    No.
6          Q.    Were you and Patricia roommates at
7    the Berks County Residential Center?
8          A.    No, but we were in different
9    aisles, but close, almost across from each other.
10   Well, not different aisles, the same aisle, just
11   one side from the other.
12         Q.    Your rooms were across from each
13   other?
14         A.    Yes, almost, yes.
15         Q.    You also mentioned your attorneys.
16   And I'm not going to ask you any follow-up
17   questions about that.
18         A.    Yes.
19         Q.    You mentioned a psychologist.
20         Can you tell me the name of the
21   psychologist you spoke with?
22         A.    I don't remember her name.  Gina,
23   Gina, I think.
24         Q.    If you hear the name, do you think

Page 26

1    you would remember it?
2          A.    Yes.
3          Q.    Does the name Gina Westner sound
4    familiar?
5          A.    Yes, she was the psychologist.
6          Q.    Other than Ms. Westner, have you
7    ever talked to any other mental health
8    professional?
9          A.    No.
10         Q.    And just so that I can be clear
11   about that, since your release from the Berks
12   County Residential Center you have not had any
13   conversations with any mental health
14   professionals?
15         A.    No.
16         Q.    And that's one of those that are
17   going to show up poorly on the record.  I'll ask
18   it this way.  Is it true that since you left Berks
19   County Residential Center you've had no
20   conversations or treatment with any mental health
21   professionals?
22         A.    No.
23         Q.    So that's not true, you have?
24         A.    Well, no, I have not spoken to

Page 27

1    anyone or any other psychologist or something like
2    that.
3          Q.    Okay.
4          MS. YEH:  If we could take five.
5          ---
6          (Whereupon, a discussion took place
7    off the stenographic record.)
8          ---
9          MR. CONNELL:  Back on the record.
10   BY MR. CONNELL:
11         Q.    Thank you for your patience with
12   that line of questioning.  The other category of
13   folks that you spoke with is you mentioned the
14   investigators.
15         A.    Yes.
16         Q.    As you can see, in front of us
17   there are a lot of documents associated with this
18   case.  Do you have specific recollection of the
19   names of any specific investigators you spoke
20   with?
21         A.    No.
22         Q.    Okay.  We have documents that
23   reflect that you spoke with a couple of
24   investigators that were employed with the Berks

Page 28

1    County Residential Center.
2          Do you recall speaking with anybody
3    at the Residential Center that were employees
4    there?
5          A.    Can you repeat the question,
6    please?
7          MR. CONNELL:  Can you read it back,
8    please?
9          ---
10         (Whereupon, a pertinent portion of
11   the record was read back by the court
12   reporter.)
13         ---
14         THE WITNESS:  No.
15   BY MR. CONNELL:
16         Q.    Records also reflect that you spoke
17   with investigators from the Federal Government,
18   the Department of Homeland Security.
19         Do you recall speaking to anybody
20   with that agency?
21         A.    Yes.
22         Q.    Records also reflect that you spoke
23   with a local police department, the Bern Township
24   Police Department, a Detective Michael Hoffert.

949df393-37ee-4bd5-ad9a-33c5dade589c

1         Do you recall that?
2     A.    Yes.
3     Q.    Records also indicate that you were
4  at the Berks County District Attorney's Office and
5  spoke with an Assistant District Attorney.
6         Do you recall that?
7     A.    Yes.
8     Q.    Do you recall that that time you
9  spoke at the District Attorney's office the
10  conversation was video recorded; did you know
11  that?
12     A.    Yes.
13     Q.    At all times when you spoke with
14  the investigators and the psychologist, were you
15  truthful?
16     A.    With the investigators, yes.  And
17  with the psychologist I spoke very little.
18     Q.    Okay.  When you say you spoke very
19  little with the psychologist, do you mean you
20  rarely spoke with the psychologist or you told
21  very little truth?  I don't understand.
22     A.    No, I always told the truth, but I
23  spoke a little about the case with the
24  psychologist.

1     Q.    Okay.  Is it fair to say that you
2  spoke to the psychologist about the relationship
3  with Sharkey?
4     A.    Yes.
5     Q.    When you spoke with the
6  psychologist about the relationship with Sharkey,
7  were you truthful?
8     A.    Yes.
9     Q.    Thank you.  By the way, if I call
10  it the Berks County Residential Center, we are on
11  the same page as to what I'm talking about; is
12  that fair?
13     A.    Yes.
14     Q.    As opposed to the psychologist, Ms.
15  Westner, did you ever speak to any medical staff
16  about the relationship with Sharkey?
17     A.    No.
18     Q.    ██ E.D. ██, what is your date of
19  birth?
20     A.    November 2nd of '94.
21     Q.    What's the highest level of
22  education you obtained?
23     A.    Ninth grade, nine years.  That
24  would be like high school.

1     Q.    Did you complete a high school
2  level education?
3     A.    Yes.
4     Q.    Since you got exited the Berks
5  County Residential Center, have you sought any
6  other sort of educational training?
7         THE INTERPRETER:  Since you left,
8     you said?
9         MR. CONNELL:  I'll rephrase if it's
10     difficult.
11  BY MR. CONNELL:
12     Q.    After your release from the Berks
13  County Residential Center, have you sought any
14  other sort of education or training?
15     A.    No.
16     Q.    Your country of origin is Honduras;
17  yes?
18     A.    Yes.
19     Q.    And I understand from the record
20  review that you have a son.  What's his name?
21     A.    Joshua.
22     Q.    How old is Joshua?
23     A.    Six.
24     Q.    Do you have any other children?

1     A.    Yes, one girl.
2     Q.    And how old is the girl?
3     A.    One year old.
4     Q.    When did you first enter the United
5  States?
6     A.    April 2014.
7     Q.    And why did you leave Honduras?
8     A.    Because I came, but I was deported.
9     Q.    So the first time that you entered
10  the United States in April of 2014 you were
11  deported immediately?
12     A.    Yes.
13     Q.    And then you returned another time?
14     A.    Yes.
15     Q.    How long from the time that you
16  were deported was it that you returned?
17     A.    I got to Honduras after I was
18  deported.  And then I was there for about a week
19  before I came back.
20     Q.    Okay.  And why did you come back
21  the second time?
22     A.    Because I had -- I was running away
23  from my country, and I didn't care that I was
24  deported once, so I came back again.

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 33

1    Q.    Whatever reason it was that you
2  left your country, Honduras, to come to the United
3  States that caused you to run away, was it
4  something that caused you any sort of emotional
5  worry?
6    A.    Yes.
7    Q.    Okay.  What was that?
8    A.    I was running away from my country
9  because I was suffering from the domestic violence
10  from the father of my son, Joshua.  And that was
11  the reason why I came here the first time and why
12  after I was deported I decided to come back, to
13  get a better life for my son and for myself and so
14  both of us could be safe.
15    Q.    And just so that the record is
16  clear, talking about that clearly upsets you.  And
17  I don't mean to try and upset you.  I hope you
18  understand that.
19    A.    Okay.
20    Q.    And I'm not going to explore that
21  very deeply, but I do have a few questions that I
22  need to follow up.  If you need to take a break,
23  feel free to do so.
24    A.    Okay.

Page 34

1         MS. YEH:  And just for the record,
2  I'm going to allow the questions to
3  proceed, but some of the topics may also
4  be related to some immigration documents
5  that we had placed on the record as an
6  objection, but I will allow you to ask
7  those questions.
8         MR. CONNELL:  Well, if you want to
9  withdraw any claim for emotional harm in
10  this case right now we don't have to go
11  here at all.  I'm not interested in the
12  immigration case, but I have a right and
13  duty to defend any claim for emotional
14  harm in this case.  And if that is, I
15  can dig deep into what the emotional
16  harm history is.  And if we're going to
17  continue to dispute that issue, then we
18  might as well just resolve it as we go
19  along.
20         MS. YEH:  It is our position at the
21  current time that the specific asylum
22  petition is not relevant and protected.
23  However, I do understand your position,
24  which is we will permit the questions to

Page 35

1  be asked.
2         MR. CONNELL:  And we are going to
3  follow up with The Court on the asylum
4  issue.
5         MS. YEH:  And that's fine.  And
6  obviously The Court very well may agree
7  with you in which case we would, of
8  course, have to comply with that.
9         MR. CONNELL:  Well, you can state
10  your objections as we go along.  If at
11  some point we hit a roadblock and we
12  can't go any further we'll call a Judge
13  and see if we can get it resolved.
14         MS. YEH:  Sure, absolutely.
15         MR. CONNELL:  If not obviously we
16  have to run the risk of bringing ██████
17  ██████ back.
18         MS. YEH:  No, and I understand
19  that.  I do feel that at this current
20  time you may ask the questions.
21         MR. CONNELL:  Okay.
22         THE INTERPRETER:  Could I ask a
23  question off the record?
24              - - -

Page 36

1         (Whereupon, a discussion took place
2  off the stenographic record.)
3              - - -
4         MR. CONNELL:  Back on the record.
5  BY MR. CONNELL:
6    Q.    So am I right you've decided not to
7  take a break at the moment and to continue on?
8    A.    Continue, yes.
9    Q.    Okay.  You described that you do
10  experience emotional concern or emotional worry as
11  a result of the domestic violence that you
12  experienced that caused you to leave your home
13  country.  Describe for me, if you can, how that --
14  what you mean by the emotional concern and worry.
15    A.    Can you repeat the question again?
16              - - -
17         (Whereupon, a pertinent portion of
18  the record was read back by the court
19  reporter.)
20              - - -
21         THE WITNESS:  Okay.  I just don't
22  know how -- well, I just don't
23  understand the question.  I'm sorry.
24  BY MR. CONNELL:

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 37

1    Q.    Okay.  As a result of the domestic
2  violence that you explained earlier, do you
3  experience crying fits, anxiety, depression,
4  sleepless nights, nightmares, anything if you can
5  describe how it exhibits itself?
6    A.    Now at this time or are you
7  referring to before?
8    Q.    For now I'll ask you about -- well,
9  strike that.
10        Do you experience both, did you
11  experience it then and do you still experience it
12  now?
13    A.    Well, when I arrived here I had
14  only one preoccupation about what was happening in
15  my country.  But then what happened here happened.
16  And now it's just not only one thing, but it's the
17  two things that I am afraid of, so it's a lot.
18    Q.    From that answer I hear that there
19  was one thing from your own country and something
20  else, so that means there's two things.  Let's
21  talk first about the one thing from your country.
22        What is the one thing from your
23  country that -- is that the domestic violence that
24  you were referring to earlier?

Page 38

1    A.    Yes.
2    Q.    And was there anything other than
3  the domestic violence which caused you to want to
4  leave Honduras and come to the United States?
5    A.    Yes, yes, the father of Joshua
6  mistreated me a lot.  He was violent both
7  physically and psychologically.  That's why I
8  didn't want to be there any more.  I wanted to
9  come here.  And my mother lives here.  I didn't
10  want to be there anymore because I was in danger.
11    Q.    As we sit here today, do you still
12  have concerns that you will have to go back to
13  Honduras?
14    A.    Yes.
15    Q.    And that is if you are not
16  successful in whatever immigration proceedings you
17  have ongoing?
18    A.    Yes.
19    Q.    And you said that they were
20  concerns that you had before you left Honduras;
21  correct?
22    A.    Yes.
23    Q.    Do you have concerns that if you
24  were to return to Honduras you would again be

Page 39

1  subjected to domestic violence at the hands of
2  Joshua's father?
3    A.    Yes.
4    Q.    And does that worry you now?
5    A.    Yes.
6    Q.    Does that cause you to lose sleep
7  at night?
8    A.    Yes.
9    Q.    Does that cause you to cry?
10    A.    Yes.
11    Q.    Are there any other physical
12  manifestations of that concern that you can tell
13  us about?
14    A.    No.
15    Q.    Now, you also mentioned that there
16  is something from this country that causes you to
17  have emotional worry.  Can you describe for me
18  what that is?
19    A.    When I arrived here I went to the
20  Berks Center as a prisoner there.  And in that
21  place -- well, I don't know how to say it.  Okay.
22  When I arrived here in the U.S., the U.S. is a
23  country where the laws are good.  It's not like
24  our country.  Then I went to that center.  I

Page 40

1  couldn't find someone -- well, I came here for
2  protection.  And I couldn't find protection.  I
3  was abused while I was at that place.
4    Q.    Describe for me what you mean by
5  you were abused at that place.
6    A.    One of the workers there, he -- do
7  you want me to be specific?
8    Q.    I am going to need specifics, but
9  if it's easier for you to answer questions I will
10  ask you the questions.  So first I will ask you
11  what worker are you referring to?
12    A.    To Daniel, Daniel Sharkey.
13    Q.    And you just used the word abuse.
14        With your definition of the word
15  abuse, did anybody else at the Berks County
16  Residential Center abuse you?
17    A.    Yes.
18    Q.    Okay.  Who?
19    A.    Daniel Sharkey.
20    Q.    We obviously missed a beat there.
21        Other than Daniel Sharkey, did any
22  other employee at the Berks County Residential
23  Center abuse you?
24    A.    When I talk about Daniel Sharkey,

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 41

1    that he abused me, I mean that he sexually abused
2    me, but also other residents at the center
3    mistreated me.  The residents are the workers
4    there.
5        Q.    Okay.  Describe for me what you did
6    how to get from Honduras to the United States.
7        A.    What did I do?
8        Q.    Yes.  Did you drive a car?  Did you
9    walk?  Did you fly?  However it was that you got
10   from Point A to Point B when you crossed into the
11   United States.
12       A.    I took a bus and I entered
13   illegally.
14       Q.    And forgive me, I just don't
15   understand the travel between Honduras and the
16   United States.  So I'm going to ask you to give me
17   a little bit of leeway with asking you questions
18   that may sound obvious.  Did you get on one bus in
19   Honduras and get off that bus in the United
20   States, a single bus ride?
21       A.    No.  There's people that bring
22   people from Honduras to the border with the U.S.,
23   get you in a bus, a car.  You have to walk
24   sometimes hours or days.  And then there's the

Page 42

1    river at the border.
2        Q.    Okay.  Do these people that help --
3    or strike that.
4            Did you have people who had helped
5    you make that journey?
6        A.    Yes.
7        Q.    Did those people cause you any
8    worry?
9        A.    Yes.
10       Q.    How so?
11       A.    Because the way to the United
12   States from Honduras, it's not easy, you are
13   running a lot of risks.  And there's also people
14   that want to abuse, take advantage of women.
15       Q.    Okay.  Did you experience that,
16   someone abusing you or taking advantage of you
17   during your journey?
18       A.    Yes.
19       Q.    How so?
20       A.    They are men.  And men sometimes
21   want to abuse women, like I said before.  And
22   there was one man that wanted to do that, but
23   nothing happened, but I was still worried about
24   it.

Page 43

1        Q.    Does that experience cause you
2    stress or anxiety or worry today?
3        A.    No.  I know that I won't go through
4    that again.  So I feel better knowing that I won't
5    see those people again.  Because if I knew I would
6    have to do that again from to come here from over
7    there, I know that I wouldn't do it again because
8    I don't want to go through that again.
9        Q.    Did you experience that both times
10   that you came from Honduras to the United States?
11       A.    The first time I came it was with
12   different people.  And I didn't go through what I
13   went through the second time.
14       Q.    Now, you had said that when you are
15   making that journey from Honduras to the United
16   States that you are, quote, "running risks,"
17   closed quote.  Are there other risks besides the
18   risk that you already described about men taking
19   advantage of women?
20       A.    Well, there's also that you walk
21   through the desert and you can run risks there
22   because you don't have water or food.
23       Q.    How long -- or strike that.
24            You had indicated you take a bus, a

Page 44

1    car, you walk for hours and then you have a river.
2            How long did you walk and did you
3    walk through the desert?
4        A.    Yes, I was in the desert for about
5    two days.
6        Q.    Was that two days without food and
7    water?
8        A.    Yes.
9        Q.    And what do you mean by there's the
10   river?
11       A.    The river that divides Mexico and
12   the U.S., the border.
13       Q.    Did you have to cross that river to
14   enter the United States?
15       A.    Yes.
16       Q.    How did you do that?
17       A.    In a boat.
18       Q.    How old was Joshua when you made
19   this journey?
20       A.    Three.
21       Q.    Did the fact that on two occasions
22   you made this journey with these risks, as you
23   described, with your three-year-old son cause you
24   stress and anxiety?

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 45

1     A.     Yes.  Or can you explain the
2  question better?
3     Q.     You described for us on two
4  occasions you made a journey involving a bus,
5  cars, walking through deserts, on one occasion
6  having to worry of a man taking advantage of you
7  and crossing a river all with a three-year-old son
8  on two separate occasions.
9            After all of that, do you have any
10 emotional worry about that experience?
11    A.     So it's like if after everything
12 that I have been through if it damaged me; is that
13 your question?
14    Q.     Emotionally, yes.
15    A.     Yes, it was very difficult.  But
16 always I wanted to reach this country to be
17 protected from my country.  So I was trying to --
18 I'm sorry, I don't understand the question.
19    Q.     A few moments ago you said that you
20 would never do it again, right, if you got
21 deported again, you wouldn't go through it again.
22           Do you recall that testimony?
23    A.     Yes.
24    Q.     Why would you not do it again?

Page 46

1     A.     Because it's not something easy.
2  It's very hard to go through that, to come here
3  from my country, to go through all of that.  And I
4  would not like to go through all of that again.
5     Q.     Is that because it would scare you?
6     A.     Yes.
7     Q.     Do you recall when it was that you
8  left the Berks County Residential Center?
9     A.     When I left, in December.
10    Q.     That was December 2014?
11    A.     Yes.
12    Q.     And you now live in Georgia?
13    A.     Yes.
14    Q.     Who do you live in Georgia with?
15    A.     With my mother.
16    Q.     Anybody else?
17    A.     No.
18    Q.     Your children?
19    A.     Yes.
20    Q.     So it's you, your mother and your
21 two children that live in a residence in Georgia?
22    A.     Yes.
23    Q.     Do you work in any fashion?
24    A.     At this time, no, because my child

Page 47

1  is out of school now and I'm taking care of him.
2     Q.     At any point since going to live
3  with your mother in Georgia, have you been
4  employed in any way?
5     A.     Yes.
6     Q.     Okay.  What was your last job?
7     A.     It's like factories.
8     Q.     What is the name of your employer?
9     A.     Can I write it down?
10    Q.     Sure.
11    A.     Let me see if I remember.  Victory
12 Processing.
13    Q.     Let me see that.
14    A.     (Witness complies.)
15    Q.     Written out in English, at least I
16 can read it anyway.  What I'm going to do is can
17 you rewrite that on this piece of paper?
18    A.     (Witness complies.)
19           MR. CONNELL:  We're going to have
20    that marked as Berks County-3.
21           - - -
22           (Whereupon, Exhibit Berks County-3
23    was marked for identification.)
24           - - -

Page 48

1  BY MR. CONNELL:
2     Q.     Other than Victory Processing, have
3  you had any other employers since you moved to
4  Georgia to live with your mother?
5     A.     No.
6     Q.     Do you happen to know the address
7  of Victory Processing or a telephone number?
8     A.     No.  Well, I don't know it.
9     Q.     What kind of work do you do there?
10    A.     I was -- it's like a meat company
11 of chicken.  And I worked in quality control.
12    Q.     What was the name of your
13 supervisor there?
14    A.     Amber.
15    Q.     Did Amber have a last name that you
16 know?
17    A.     No, I don't know it.
18    Q.     How did you get there?
19    A.     In Gainesville where I live there's
20 a lot of those plants there.  So I went to one of
21 those plants to work.
22    Q.     Are you capable -- or strike that.
23           Can you spell the name of the town
24 you just told us?

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 49

1          MR. CONNELL:  Hold on a second.
2      I'm going to ask any time she writes it
3      down we use a separate piece of paper.
4  BY MR. CONNELL:
5      Q.     I'll put a stack of paper in front
6  of you that you can use at your leisure.
7      A.     (Witness complies.)
8      Q.     And I'm reading that as
9  Gainesville?
10     A.     Gainesville.
11         MR. CONNELL:  Mark this as 4.
12             - - -
13         (Whereupon, Exhibit Berks County-4
14     was marked for identification.)
15             - - -
16  BY MR. CONNELL:
17     Q.     So this is a food plant in
18  Gainesville, Georgia and you can't tell me where
19  in Gainesville, Georgia it is, an address or the
20  telephone number or the last name of your
21  supervisor?
22     A.     No.  I don't have any paper right
23  now with me, but it's on the Internet if you want.
24     Q.     How long did you work there?

Page 50

1      A.     About a year and a half, year, year
2  and a half.
3      Q.     And when did your employment end?
4      A.     I worked there until December.
5      Q.     December of what year?
6      A.     2016.
7      Q.     And how did that employment come to
8  an end?
9      A.     Because I have a baby and that's
10  why I was taking care of her.
11     Q.     Are you in a relationship with the
12  father of your baby, of your daughter?
13     A.     No.
14     Q.     Does the father provide any sort of
15  support for your baby?
16     A.     No.
17     Q.     Does that cause you stress or
18  anxiety or worry?
19     A.     No.
20     Q.     Do you recognize the name Eric
21  Salvati?
22     A.     Eric?
23     Q.     Eric.
24     A.     I think -- is it one of the people

Page 51

1  that work in Berks?
2      Q.     Does that sound familiar to you as
3  somebody who works at Berks?
4      A.     Well, I don't know his last name,
5  but it could be one of the -- that worked there,
6  one of the social workers.
7      Q.     Tell me who you understand Eric to
8  be, even if you don't know his last name.
9      A.     It's the only person that -- it's
10  just that there's a lot of people that I don't
11  know the names of, that we only know as staff.
12  And I think he worked at the office of the social
13  workers, social services.
14     Q.     Do you remember an Eric who worked
15  as a social worker?
16     A.     Yes.
17     Q.     And is this someone that you spoke
18  with more than once?
19     A.     Yes.
20     Q.     And, by the way, when you say
21  Berks, are you referring to the Berks County
22  Residential Center?
23     A.     Yes.
24     Q.     So at Berks there was a social

Page 52

1  worker named Eric that you interacted with on more
2  than one occasion?
3      A.     Yes, there was Eric and another
4  lady named Linda, yes, they were both always at
5  the office.
6      Q.     On any occasion where you
7  interacted with Eric, were you truthful?
8      A.     Yes.
9      Q.     And did you find that Eric was fair
10  to you in anything he worked with you on?
11     A.     Eric was if we needed something, if
12  we needed something, a phone call or at the store,
13  Eric was the person that we talked to, Eric or
14  Linda.
15     Q.     Okay.  So my question is at any
16  time you interacted with Eric, did you find him to
17  interact with you fairly?
18     A.     Like the workers there, I imagine.
19  He wasn't my friend.  I would only talk to him
20  with the things that I needed that was necessary.
21     Q.     Did you ever believe he mistreated
22  you in any way?
23     A.     No.  I don't know.  No, just
24  normal.

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 53

1    Q.    Do you remember talking to Eric
2  about signing up for the work program that you
3  described earlier?
4    A.    For the work, I think it was with
5  Linda, the other one that's there.  I honestly
6  don't remember if it was with her or him.
7    Q.    Is it fair to say that you don't
8  remember the details of when you first walked into
9  the program at the BCRC, at the Berks County
10  Residential Center?
11    A.    That I don't remember what?  I'm
12  sorry.
13    Q.    Your interactions with staff when
14  you first got to Berks County Residential Center.
15    A.    No.  Some things, yes.  Other
16  things, no.
17    MR. CONNELL:  Could we take five
18    minutes?
19    ---
20    (Whereupon, a discussion took place
21    off the stenographic record.)
22    ---
23  BY MR. CONNELL:
24    Q.    ▇▇E.D.▇▇, as you might have heard

Page 54

1  me say at the beginning of the deposition, we
2  received a document from your attorney last night.
3  That document has been marked as Berks County-1.
4  I'm going to hand that to you and I have a few
5  questions for you about that.
6    A.    (Witness complies.)
7    Q.    My question is have you seen that
8  document before?
9    A.    Yes.
10    Q.    Is that the document you gave to
11  your attorney yesterday?
12    A.    Yes, yesterday I saw it with her.
13    Q.    And I'm not -- don't interpret any
14  questions that I ask you as to ask you anything
15  that you've spoke with your attorneys about.
16  Okay?  I'm not going to ask you any questions
17  about that.  Okay?
18    A.    Okay.
19    Q.    But just so that I can clarify, did
20  you give that document to your attorney yesterday?
21    A.    No.  They already had it from
22  before.  I gave it to them from when I was in the
23  Detention Center.
24    Q.    Okay.  And that document has a name

Page 55

1  at the top on the front page.  Can you tell me
2  what that name says?
3    A.    I don't know.  I don't know.  Each
4  manual, I mean, each person get a manual, but I
5  had to return it when I left the center.  So this
6  person had written their name because she had it
7  before I did.
8    Q.    Okay.  Did you know this person?
9    A.    No.  I know it reads Maria, but I
10  don't know.  I had a roommate that was named
11  Maria, but I don't know -- it wasn't hers.  It was
12  mine.  But I don't know if it was hers before
13  because I don't know her last name.
14    Q.    Okay.  How many roommates did you
15  have at the Berks County Residential Center?
16    A.    The first room I had I had two.
17  Then I was changed to another room and I also had
18  two roommates.
19    Q.    Did you have more than one roommate
20  whose name was Maria?
21    A.    Yes.
22    Q.    Do you know the last name of any of
23  them?
24    A.    No.

Page 56

1    Q.    How many different rooms were you
2  in at the Berks County Residential Center after
3  your admission until you left?
4    A.    Two.
5    Q.    And how did you get this document?
6    A.    They were handed out when you got
7  to the center.
8    Q.    You told me earlier that the one
9  that you were given at the center you had to turn
10  back in when you left?
11    A.    Yes.
12    Q.    Okay.  So this one you walked out
13  of the center with; correct?
14    A.    No.  While I was at the Detention
15  Center I gave this to my attorney, Matthew.  And
16  he made copies and returned it to me.  And I
17  returned it to the center when I left.
18    Q.    So your attorney shows up without
19  one of these, you give it to him, he leaves the
20  center with it and then returns at some point
21  later with it again to give back to you?
22    A.    Yes.
23    Q.    And when was that?
24    A.    After they did some changes.  And I

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 57

1      told him that they had asked for the manuals.  And
2    I told him that they had made some changes.  Then
3    I showed it to him.
4       Q.   And when was this?
5       A.   I think it was around November,
6    October, November.
7       Q.   Of 2014?
8       A.   Yes.
9        MR. CONNELL:  And it's represented
10    to me today that you guys got this
11    yesterday?  Are you kidding?
12        MS. YEH:  On the record I will say
13    that we thought it was the same handbook
14    and we didn't notice the discrepancy
15    until yesterday.  And I will say that I
16    only received the handbook very
17    recently.  As you know, Matthew, was not
18    counsel to the case.
19        MR. CONNELL:  You have an
20    obligation to seek out documents,
21    counselor.
22        MS. YEH:  And I did fulfill that
23    obligation.  And once I noticed it was a
24    different document I immediately turned

Page 58

1      it over.  If you review it it is very
2    similar and I did not know there was a
3    difference.
4        MR. CONNELL:  I get that and I can
5    appreciate that, but at the same point
6    it couldn't have been the same.  It has
7    a name written at the top.  She just
8    said that the name is written at the
9    top.  And when she gave it to Mr.
10    Archambeault that document should have
11    been produced in your Discovery.  But
12    instead I get Discovery Responses, and
13    I'm going to read this for the record
14    because this is what started yesterday
15    for me.  And we're going to spend a lot
16    of time going through these today
17    because of these nonsense responses I
18    get.  State the names addresses, both of
19    residences and businesses addresses and
20    business job titles of all persons known
21    to you or anyone acting on your behalf
22    you intend to rely to establish the
23    allegations in your complaint.
24        Objection as overbroad and seeks

Page 59

1      information protected by attorney/client
2    privilege.
3        I'm asking for witnesses.  These
4    should be disclosed in the initial
5    disclosures in this case.  This is
6    almost sanctionable Responses to
7    Discovery.
8        MS. YEH:  We did disclose the
9    witnesses.  I would suggest that if we
10    have further issues that we take it not
11    during the deposition or perhaps at the
12    end.
13        MR. CONNELL:  But the point is that
14    we're going to be here an excessive
15    amount of time because of these
16    Discovery Responses and the fact that
17    you don't produce documents that you
18    clearly have in your possession that you
19    admit to having in your possession until
20    7:00 last night.  I'm sorry, that is
21    inappropriate.
22        MS. YEH:  Mr. Connell, I dispute
23    and I disagree with that.  And I once
24    again said that I did not have it in my

Page 60

1      possession until very recently.
2        MR. CONNELL:  I think the record is
3    amply clear that the document was in the
4    possession of her attorney of record as
5    it stands today.  And it still stands
6    that the document was not produced until
7    7:00 last night, the day before the
8    deposition.
9        MS. YEH:  I noticed that as soon as
10    the error was made immediately I
11    produced the document.
12    BY MR. CONNELL:
13       Q.   [ E.D. ], just so that we're clear
14    here, this is a document that you don't know how
15    you got it and you gave it to your attorney, Mr.
16    Archambeault?
17       A.   What do you mean by I don't know
18    how I got it?
19       Q.   Well, I'll go back and rephrase the
20    question.  Do you know how you got this document?
21       A.   Yes.
22       Q.   And can you enlighten us as to how
23    you got this document?
24       A.   When you go into the Detention

949df393-37ee-4bd5-ad9a-33c5dade589c

1    Center you receive this form, this booklet, I'm
2    sorry.
3         Q.    Let's step back a little bit
4    because a few minutes ago you told me twice that
5    the document that you were given when you entered
6    the facility you returned.  Is that not true now?
7         A.    I did return it.  When I left the
8    Detention Center I returned it.
9         Q.    The document that is in front of
10   you marked Berks County-1 that has the name Maria
11   something at the top of it, is it your testimony
12   that that is the document that was handed to you,
13   specifically that was the document that was handed
14   to you when you entered the Berks County
15   Residential Center?
16        A.    Yes.
17        Q.    Okay.  With the name on it?
18        A.    Yes, it was like that already.  I
19   didn't write it in.
20        Q.    And who from the Berks County
21   Residential Center handed that to you?
22        A.    The staff.
23        Q.    Who from the staff, can you
24   identify the person who handed it to you?

1         A.    No.  That was the first day that we
2    arrived there.  And there were a lot of people
3    there that welcome you.  I don't know who gave it
4    to me, specifically.
5         Q.    Okay.  And the day that it was
6    handed to you you remembered seeing the name Maria
7    at the top of it?
8         A.    Yes.
9         Q.    Okay.  And did you ask anybody
10   about why you got one with somebody else's name on
11   it?
12        A.    No.  Besides, we already knew it
13   was from somebody else that had been there.  And I
14   didn't think it was very important that it had a
15   name already.  Plus if it was given to me, I just
16   took it.
17        Q.    When you took it, did you read it?
18        A.    No.
19        Q.    You would agree that you were
20   advised to read it, yes?
21        A.    Yes.
22        Q.    And you were advised of the rules
23   of the facility; yes?
24        A.    Yes.

1         Q.    And you were told about the
2    different programming available at the facility;
3    yes?
4         A.    Yes.
5         Q.    And that's when you learned about
6    the work program and you signed up for the work
7    program; right?
8         A.    Yes, they did mention it, but it
9    was because of the women there that I went into
10   that program there.
11        Q.    And after receiving this document
12   you held onto that document; right, you kept it
13   with you during your time at the facility?
14        A.    Yes.
15        Q.    And you agree that you entered the
16   facility in May of 2014; yes?
17        A.    Yes.
18        Q.    Do you understand what the word
19   orientation means?
20        A.    Yes.
21        Q.    What does it mean to you?
22        A.    It's like they're giving you
23   orientation or teaching you, something like that.
24        Q.    Do you recall undergoing

1    orientation at the Berks County Residential
2    Center?
3         A.    Yes.
4         Q.    And you remember signing a document
5    saying that you underwent orientation when you
6    entered the Berks County Residential Center; yes?
7         A.    No.
8         Q.    No, okay.  So if there's somebody
9    who signed a document that said you did, that
10   person would be lying?
11        A.    I wouldn't say it's a lie because
12   when we got there we signed so many papers I
13   really don't know what I signed.
14        Q.    Well, if somebody else signed a
15   document that said that you underwent the
16   orientation program, would they be lying?
17        A.    I don't know.
18        Q.    Okay.  So do you recall receiving
19   information regarding sexual abuse and assault
20   prevention and intervention upon your entry into
21   Berks County Residential Center?
22        A.    I don't recall having taken any
23   orientation about that.
24        Q.    Okay.  So it's possible that you

Page 65

1    did, but you just don't recall it?
2        A.    I don't remember.
3        Q.    Do you remember looking at the
4    lawsuit in this case before it was filed with The
5    Court?
6        A.    What do you mean?  I don't
7    understand.
8        Q.    Okay.  The lawsuit that was filed
9    in this court is a piece of paper that sets forth
10   allegations against my clients and others stating
11   why you believe they violated your civil rights.
12   It's a piece of paper approximately 14 pages long.
13           Do you recall looking at that
14   before it was filed with The Court?
15       A.    I don't understand what you are
16   trying to ask me or trying to make me understand.
17       Q.    What about that question don't you
18   understand?
19       A.    Are you asking if I saw these 14
20   pages before?
21       Q.    Yes.
22       A.    No, I don't know.
23       Q.    You don't know.  You don't know if
24   you reviewed the allegations that you put in

Page 66

1    Federal Court against my clients, you don't know
2    if you reviewed them before they were filed with
3    The Court, that's your testimony today?
4        A.    I don't know.
5        Q.    I'm handing you what's been filed
6    as a Third Amended Complaint, Document 58 dash 1
7    filed on May 30th of 2017, 14 pages.  **E.D.**,
8    I'm handing you that document for you to take a
9    look at.  Take your time please and look at that
10   document, if you can.
11       A.    But it's in English.  So I can't
12   understand everything that is said here.
13           MS. YEH:  Mr. Connell, may I
14       interject here?  It may be that the
15       prior versions did have her signature.
16           MR. CONNELL:  No, we can discuss
17       that after this line of questioning.
18   BY MR. CONNELL:
19       Q.    So I understand that there was a
20   language barrier with you reading that document.
21       Okay?
22       A.    Okay.
23       Q.    If you just look at what the
24   document looks like, have you seen anything that

Page 67

1    looks like that in Spanish ever?
2        A.    Yes.
3            MR. CONNELL:  Okay.  Madam
4        Interpreter, I would ask you to read
5        paragraph 55 to the witness.
6            THE INTERPRETER:  Okay.
7    BY MR. CONNELL:
8        Q.    **E.D.**, did you know that
9    allegation was in this lawsuit?
10       A.    Yes.
11       Q.    Was that a truthful statement, as
12   you sit here today?
13       A.    Yes.
14       Q.    Okay.  Can you read for me, **E.D.**
15   **E.D.**, from Exhibit Berks County-1 Page 19?  You
16   can read it to yourself, if you'd like, but I want
17   to make sure that you read that page.
18       A.    All right.  (Witness complies.)
19       Q.    Is there anything in that section
20   of the resident handbook that you don't
21   understand?
22       A.    No.
23           MR. CONNELL:  Mark this as 5,
24       please.

Page 68

1            - - -
2            (Whereupon, Exhibit Berks County-5
3        was marked for identification.)
4            - - -
5    BY MR. CONNELL:
6        Q.    **E.D.**, I'm handing you what's
7    been marked as Berks County-5.  Can you take a
8    moment and look at that for me?
9        A.    (Witness complies.)
10       Q.    **E.D.**, at the bottom of that
11   page there is a line that says, resident name.
12           Do you see that?
13       A.    Yes.
14       Q.    And there is a line that says,
15   resident signature, and then a date.
16           Do you see that?
17       A.    Yes.
18       Q.    And do you recall signing that
19   document?
20       A.    Yes, it's my signature, but I don't
21   remember having read this.
22       Q.    Did you have any occasion of
23   anybody else signing your name to any documents at
24   the Berks County Residential Center that you're

949df393-37ee-4bd5-ad9a-33c5dade589c

1    aware of?
2         A.    No.
3         Q.    Is it your belief that somebody
4    forged your name to this document and that Mr.
5    Salvati was wrong when he signs off that you
6    signed it?
7         A.    No.  Like I said before, I do
8    recognize it's my signature, it's my name.  But,
9    like I said before, I don't remember having read
10   it.  I signed so many papers that day I don't
11   remember.  I don't even know what I signed.
12        Q.    Do you recall watching a video
13   during orientation about your rights at the
14   facility?
15        A.    No.
16        Q.    You don't recall that?
17        A.    No, I don't recall.
18        Q.    Did you know how to get food at the
19   Residential Center?
20        A.    Yes.
21        Q.    How did you know that?
22        A.    The social workers told us how to
23   do it.  And also the other girls that were there
24   that had been there before told us what we could

1    do.
2              MR. CONNELL:  Mark this as 6,
3         please.
4                       - - -
5              (Whereupon, Exhibit Berks County-6
6         was marked for identification.)
7                       - - -
8    BY MR. CONNELL:
9         Q.    ████ E.D. ████, I'm handing you a
10   document that's been marked as Berks County-6.
11   Can you take a moment to look at
12   that?
13        A.    (Witness complies.)
14        Q.    The same questions as before, at
15   the bottom -- I'm sorry.
16        A.    Yes.
17        Q.    Have you had a moment to look at
18   that document?
19        A.    I don't remember it.
20        Q.    Okay.  Will you agree with me
21   there's a name at the bottom next to the word
22   signature or firma and your name is there?
23        A.    Yes.
24        Q.    And just above that about half way

1    through the page is a signature with your name in
2    it?
3         A.    Yes.
4         Q.    Can you read that sentence that has
5    your signature in it for me, please?
6         A.    Read it out loud?
7         Q.    Yes, please, for the record.
8         A.    (Witness complies.)
9              THE INTERPRETER:  Interpreter,
10        there is a typo on the word notified.
11        Otherwise it reads, I, ████ E.D. ████
12        ████ E.D. ████ acknowledge that I was
13        notified and I understand the following
14        information that I am responsible for
15        informing my family the same
16        information.
17   BY MR. CONNELL:
18        Q.    Okay.  And you'll agree -- and what
19   are the three things underneath that says that
20   you're acknowledging receipt of this?
21        A.    I don't know.
22        Q.    You can't read those things?
23        A.    The emergency evacuation
24   orientation, general information orientation, I

1    don't know that.  And the video, I don't remember
2    that.
3         Q.    Okay.  But you'll agree that this
4    document says you are acknowledging that you have
5    been notified of this information and you're
6    responsible for informing your family of that,
7    that's what you signed off on this document,
8    you'll agree with that?
9         A.    Well, this I'm sure of.  But this I
10   don't remember if I signed that or maybe I did.  I
11   don't know.  (Witness indicating.)
12        Q.    Okay.  Again, my question for you
13   then is do you know any circumstances under which
14   anybody else signed your name to another document?
15        A.    No.
16        Q.    Do you believe that that's what
17   happened here, somebody else signed your name to
18   this document?
19        A.    I don't know.
20        Q.    So you think that's a possibility?
21        A.    Yes.
22        Q.    Okay.  And is there any reason --
23   what is your basis of thinking that somebody else
24   signed your name to this document?

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 73

```
 1          A.    No, I couldn't say.
 2               MR. CONNELL:  Mark this as Berks
 3     County-7, please.
 4                    - - -
 5               (Whereupon, Exhibit Berks County-7
 6          was marked for identification.)
 7                    - - -
 8     BY MR. CONNELL:
 9          Q.    [E.D.], I'm handing you what's
10     been marked as Berks County-7.
11          A.    (Witness complies.)
12          Q.    If you can let us know when you've
13     had an opportunity to review that document?
14          A.    This one is in English.
15          Q.    Okay.  Well, I am going to ask you
16     if you recognize your name anywhere on that
17     document?
18          A.    Yes, here.  (Witness indicating.)
19          Q.    And do you remember signing your
20     name on that document?
21          A.    I don't know.  My name is there, so
22     I did sign it.
23               MR. CONNELL:  Mark this as Berks
24     County-8, please.
```

Page 74

```
 1                    - - -
 2               (Whereupon, Exhibit Berks County-8
 3          was marked for identification.)
 4                    - - -
 5     BY MR. CONNELL:
 6          Q.    [E.D.], I'm going to hand you
 7     what's been marked as Berks County-8.
 8          A.    (Witness complies.)
 9          Q.    Can you let us know when you've had
10     an opportunity to review that document?
11          A.    (Witness complies.)
12          Q.    Do you remember signing that
13     document?
14          A.    I don't remember if I read it, but
15     it has my signature, my name.
16          Q.    So if I go back to Paragraph 55 of
17     the Third Amended Complaint, that allegation
18     states, when plaintiff first entered the facility
19     she did not receive any information during
20     orientation about sexual abuse, sexual assault or
21     how to report sexual abuse, comma, sexual assault
22     or other improper behavior by staff members,
23     comma, nor did she receive this information at any
24     other time.  Do you still believe that statement
```

Page 75

```
 1     is truthful?
 2          A.    Yes.
 3          Q.    Well, now that we got that out of
 4     the way let's start talking about what your
 5     allegations are all about.  When did your
 6     relationship with Sharkey start?
 7          A.    When I arrived at the Detention
 8     Center we started to -- well, with the whole staff
 9     we started to get to know people.  We lived side
10     by side with all of the workers daily, including
11     him, Dan, I saw him daily.  And as time went by,
12     about a month, month and a half, one day he said
13     that he liked me or that I was very pretty and
14     that he liked me.  But it's like I thought he was
15     playing.  He said that that time.  And then other
16     days passed by and he continued telling me that.
17     He was nice with me and my son.  It was like,
18     well, we had a lot of time there.  So we went
19     outside.  We spent time outside playing, things
20     like that.
21          Q.    So you said that after about a
22     month and a half is when Mr. Sharkey first said
23     something to you about liking you; yes?
24          A.    Yes.
```

Page 76

```
 1          Q.    That would have been somewhere in
 2     June or July of 2014 then; correct?
 3          A.    In June, like around or the
 4     beginning of July, yes.
 5          Q.    And what was your response when he
 6     first started telling you that he liked you?
 7          A.    Nothing.  I thought he was playing,
 8     like playing, just joking.
 9          Q.    How long -- at some point you
10     realized that he was not joking; yes?
11          A.    Yes.
12          Q.    And how long was it after he first
13     said that he liked you that you realized he was
14     not joking?
15          A.    When he -- after that time that he
16     told me he would always tell me that he liked me.
17     When I realized that he wasn't joking around was
18     when he kissed me, he kissed me in the mouth.
19          Q.    So the first time you realized you
20     wasn't joking was when he kissed you, you didn't
21     realize it before that or at any other time?
22          A.    Yes, he said that he liked me, but
23     I didn't think that he was going to do what
24     happened.
```

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 77

1      Q.     So tell me about the time when he
2  first kissed you.  Where were you?
3      A.     In the laundry room, yes.
4      Q.     What laundry room?  Where was the
5  laundry room?
6      A.     In the dorms.
7      Q.     Was this on the same floor where
8  your room was or on another floor?
9      A.     Yes.
10      Q.     And do you recall suggesting to him
11  that you and he kiss?
12      A.     No.
13      Q.     Okay.  So if somebody said that you
14  said that you suggested to Sharkey that you're
15  boyfriend/girlfriend, you should kiss, that would
16  be inaccurate or a lie?
17      A.     I'm sorry, did you say someone?
18           MR. CONNELL:  Can you read that
19      back?
20                    - - -
21           (Whereupon, a pertinent portion of
22           the record was read back by the court
23           reporter.)
24                    - - -

Page 78

1           THE WITNESS:  Well, he would say
2           that we were girlfriend and boyfriend,
3           but not at that time when the first kiss
4           happened.  That happened afterwards.
5  BY MR. CONNELL:
6      Q.     Okay.  But if -- I'm going to ask
7  my question again.  If someone were to have said
8  or reported that you told them that you suggested
9  to Sharkey that you should kiss, you and he, then
10  that would be a misstatement or a lie; yes?
11      A.     He's the one that kissed me.  I
12  didn't ask him to kiss me.  I didn't ask him to
13  kiss me when it happened.
14      Q.     So my question is if somebody
15  reported that you told them that you did that,
16  that would be a lie?
17      A.     At one point, yes, I might have
18  said it.  I said it at one point.
19      Q.     So you said it at one point and now
20  you're saying now that's not the way it happened,
21  is that what you're saying today in your
22  testimony?
23      A.     No.
24      Q.     Did you suggest to Mr. Sharkey that

Page 79

1  you and he should kiss before you ever kissed?
2      A.     No.
3      Q.     So but you think you may have told
4  somebody at some point that you did suggest to Mr.
5  Sharkey that you and he kiss; correct?
6           MS. YEH:  Objection.  Can you
7      clarify at what point?  This is the
8      first kiss, second kiss or further on?
9      That might help.
10           MR. CONNELL:  I mean, I'll rephrase
11      that, but that doesn't make sense
12      because the question is at any time
13      before he kissed did she suggest, but
14      whatever.  That's fine.  If you want to
15      ask that question, I'd be happy to go
16      along with that one.
17  BY MR. CONNELL:
18      Q.     At any time ever in the history of
19  your life, did you ever suggest to Mr. Sharkey
20  that you and he should kiss?
21      A.     I don't know.
22      Q.     So it's possible that you did and
23  you just don't recall?
24      A.     Possibly.

Page 80

1      Q.     Okay.  And it's, therefore, also
2  possible that it was the first time that you and
3  Sharkey kissed that you suggested to him that you
4  and he should kiss; yes?
5      A.     No.
6      Q.     Okay.  So it's possible that you
7  said it at some point, but it's not possible that
8  it's the first time; that's your testimony today?
9      A.     Yes.
10      Q.     How did you and he communicate?
11      A.     He knew very little.  He knew some
12  words.  But he always had his phone, his
13  translator.
14      Q.     And did he have that translator
15  when you were both inside and outside the
16  facility?
17      A.     Yes.
18      Q.     What do you mean by his phone, his
19  translator; what are you talking about?
20      A.     The application, the translation
21  application on his phone.
22      Q.     Is this something you spoke into it
23  and it translated or you had to type something
24  into it and you both had to look into it to figure

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 81

1    out who's saying what?
2        A.    Yes, he would type it and I would
3    look at it, something like that.
4        Q.    Is there any other way that the two
5    of you communicated during your relationship?
6        A.    No.  Maybe he would have a note or
7    some piece of paper.  And also the computers in
8    the center, there were computers could also be
9    used as a translator in the computer.
10       Q.    Those computers are in a library
11   type area at the facility; right?
12       A.    There's a room with computers and
13   then there's also the library that has computers.
14       Q.    And which room did you use, the
15   library or the other room when you communicated
16   with Sharkey?
17       A.    The library.
18       Q.    And the library is open to other
19   people when you're in there; yes?
20       A.    Yes.
21       Q.    And how long -- strike that.
22             Just so I can get an idea of timing
23   here, it was about a month or a month and a half
24   after you were in the facility that Sharkey first

Page 82

1    told you he liked you and that it was some period
2    of time after that that you and he first kissed;
3    is that right?
4        A.    Yes.
5        Q.    How long was it between when he
6    first told you he liked you and the first time you
7    and he kissed?
8        A.    About a week, days, a week.
9        Q.    Okay.  And when that first kiss
10   occurred, that's when you said you realized that
11   he wasn't joking around; yes?
12       A.    Yes.
13       Q.    Did you think it was unusual at
14   that point that he kissed you?
15       A.    I did know that it couldn't happen,
16   that it shouldn't happen, that it wasn't correct.
17       Q.    What was your reaction, physically
18   what was your reaction when you and he kissed?
19       A.    I didn't say anything, and I left
20   the laundry.  I didn't know what to do or say.  I
21   left.
22       Q.    Was there anybody else around?
23       A.    No.
24       Q.    At that point did you report Mr.

Page 83

1    Sharkey's behavior to any other member of staff?
2        A.    No.
3        Q.    Did you file a grievance with the
4    Berks County Residential Center?
5        A.    No.
6        Q.    Did you contact Immigration and
7    Customs Enforcement in any way to tell them about
8    your kiss with Mr. Sharkey?
9        A.    No.
10       Q.    Did you file a complaint with the
11   Department of Homeland Security?
12       A.    No.
13       Q.    I just have a couple of more
14   questions and we can take a break along these
15   lines.  Did you contact the Office of the
16   Inspector General through the free phone call
17   center available to you at the Berks County
18   Residential Center?
19       A.    No.
20       Q.    Did you write to the Department of
21   Homeland Security Hotline as set forth in the
22   resident handbook that you acknowledged receiving?
23       A.    No.
24       Q.    Did you notify a relative, friend

Page 84

1    or your attorney at that point of you and Sharkey
2    kissing?
3        A.    Just to my friend, Patricia.
4        Q.    And this is the same Patricia that
5    you mentioned at the outset of the deposition as
6    one of the people you talked to about this
7    relationship?
8        A.    Yes.
9        Q.    Would you like to take a break?
10             MS. YEH:  We'll take a short break.
11       Take a break?
12             THE WITNESS:  Yes.
13             MS. YEH:  Just a two-minute break.
14             THE WITNESS:  Okay.
15                        - - -
16             (Whereupon, a discussion took place
17       off the stenographic record.)
18                        - - -
19             MR. CONNELL:  Back on the record.
20   BY MR. CONNELL:
21       Q.    All right.  ███ E.D. ███, we've been
22   just talking about the first time that you and
23   Sharkey kissed.  After that first time, what was
24   the next time you and Sharkey had any contact?

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 85

1      A.     The next day.  Contact that I saw
2   him or are you referring to contact more intimate?
3      Q.     Well, let's talk about the next
4   time you saw him.  The next day was the next time
5   you saw him?
6      A.     Yes.
7      Q.     Did you interact with him that day?
8      A.     I saw him, but I wasn't with him.
9   I wasn't close to him or anything, because I
10  really didn't know how to act after that had
11  happened.
12     Q.     Did he say anything to you the next
13  day?
14     A.     No, I don't remember if the next
15  day, but, no, nothing.  But then he did have
16  translated on his phone already that no one could
17  know anything, otherwise I would be in trouble and
18  if immigration found out I would be deported, and
19  that scared me.
20     Q.     Did you have an attorney at this
21  time?
22     A.     No.
23     Q.     So you were -- it's your testimony
24  that more than a month and a half after you're at

Page 86

1   the facility you did not have an attorney?
2      A.     Yes.
3      Q.     That's your testimony?
4      A.     Yes.
5      Q.     This is going to be a difficult
6   question to ask, so it might be a difficult
7   question to understand.  So you don't understand
8   I'll circle back.  Okay?
9      A.     Okay.
10     Q.     From the time that you and Sharkey
11  first kissed until the time that you first talked
12  to an investigator about it, what period of time
13  is that?
14     A.     That I spoke with the
15  investigators?
16     Q.     Yes.
17     A.     I spoke with the investigators
18  around September.
19     Q.     So from the time you first kissed
20  until then, two weeks, four weeks, six weeks,
21  eight weeks, somewhere in between?
22     A.     About two months.
23     Q.     And during that period of time, did
24  you have an attorney?

Page 87

1      A.     I think it was August when I got my
2   attorney, Matthew, August or September, beginning
3   of September.  I'm not sure if it was the end of
4   August or the beginning of September, sometime
5   around there.
6      Q.     Did you have any communications
7   with your mother during the time that you were at
8   the Berks County Residential Center?
9      A.     Yes.
10     Q.     How did you communicate with your
11  mother?
12     A.     I could call her from the center.
13  There were phones there.
14     Q.     And did you do that while you were
15  there, call and speak with your mother?
16     A.     Yes.
17     Q.     And from the time that Sharkey and
18  you first kissed until the time you spoke with
19  investigators, did you have conversations with
20  your mother during that period of time?
21     A.     Yes.
22     Q.     And did you tell your mother about
23  your relationship with Sharkey?
24     A.     No.

Page 88

1      Q.     After the first time you and
2   Sharkey kissed, when was the next time you and
3   Sharkey had physical contact?  And describe that
4   contact.
5      A.     A few days.  Well, then he showed
6   me the translation.  And I didn't know what to do.
7   He was always near me.  Wherever I was he was
8   close by.  So the contacts were many.  He would
9   maybe touch my hand or a hug or a kiss, something
10  like that.
11     Q.     Did you kiss him?
12     A.     He would kiss me.  I mean, yes, I
13  would kiss back.
14     Q.     Is Patricia Ms. Rivera, is that her
15  last name?
16     A.     Oh, I think so, I think it's
17  Patricia Rivera and then the other last name that
18  I wrote down.
19     Q.     Do you recall telling investigators
20  that she would act as a lookout when you and
21  Sharkey were together?
22     A.     No.
23     Q.     You don't remember telling anybody
24  that?

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 89

1      A.    No.  She was always with me, but I
2    don't remember having said that.
3      Q.    And do you remember Sharkey giving
4    you a ring?
5      A.    Yes.
6      Q.    Do you remember Sharkey giving you
7    shirts?
8      A.    Yes.
9      Q.    Do you remember Sharkey giving you
10   music CDs?
11     A.    Yes.
12     Q.    Do you remember Sharkey letting you
13   use his telephone?
14     A.    Yes.
15     Q.    Do you remember telling all of the
16   investigators all of those things; right?
17     A.    Yes.
18     Q.    Do you remember telling the
19   investigators that you and Sharkey engaged in
20   sexual intercourse?
21     A.    Yes.
22     Q.    When was the first time you and
23   Sharkey engaged in sexual intercourse?
24     A.    In the women's bathroom.

Page 90

1            Or do you mean the time?
2      Q.    Well, let's ask first, when was it,
3    when was the first time in time that you and
4    Sharkey engaged in sexual intercourse?
5      A.    Around July.  No, August, maybe the
6    beginning of August.
7      Q.    How long was it after the first
8    time you and Sharkey kissed that you had sexual
9    intercourse?
10     A.    A couple weeks, two or three weeks.
11     Q.    Is it true that you told
12   investigators that you and Sharkey kissed and
13   hugged like you were boyfriend and girlfriend?
14     A.    That's what he would always tell
15   me, that he was like my boyfriend and I was like
16   his girlfriend.
17     Q.    And is it true that you told
18   investigators that you believed you were his
19   girlfriend and he was your boyfriend?
20     A.    I don't know how I told them, but
21   maybe I told them like I am telling you now.
22     Q.    So if they testified that --
23   investigators testified that you told them that
24   you and he acted like boyfriend and girlfriend,

Page 91

1    that would be mistaken or a lie?
2      A.    Well, maybe no because he was -- he
3    really was always close to me.  So he was behaving
4    that way.
5      Q.    Did you develop feelings for Mr.
6    Sharkey?
7      A.    Yes.
8      Q.    And it's true that when you and he
9    engaged in sexual relations you knew to do it
10   somewhere were cameras were not; correct?
11     A.    Yes.
12     Q.    And, I'm sorry, that was a terrible
13   question.  I just want to make sure I'm clear.
14           You knew that there were cameras
15   located throughout the building in certain areas;
16   yes?
17     A.    Yes.
18     Q.    And you also knew that there were
19   areas in the facility where there were no cameras;
20   correct?
21     A.    Yes.
22     Q.    And when you and Mr. Sharkey
23   engaged in sexual relations you did it in places
24   where you knew there would be no cameras; correct?

Page 92

1      A.    Yes.
2      Q.    And you did it in areas, you and he
3    -- strike that.
4            When you engaged in sexual
5    interactions with Mr. Sharkey in areas where there
6    were no cameras, you did it so that you could
7    conceal what you were doing; correct?
8      A.    Yes.
9      Q.    And you did that because you didn't
10   want anybody else to know what was going on;
11   correct?
12     A.    Yes.
13     Q.    What was that?
14     A.    Yes.
15           MR. CONNELL:  I thought I heard,
16       no, si.
17   BY MR. CONNELL:
18     Q.    Now, you had told investigators
19   that you and Mr. Sharkey engaged in sexual
20   intercourse on three occasions; is that accurate?
21     A.    Yes.
22     Q.    But there were other occasions
23   where Mr. Sharkey and you would engage in other
24   things like kissing and hugging; correct?

23  (Pages 89 to 92)

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 93

1    A.    Yes.
2    Q.    Would you -- strike that.
3          Is it correct that you and he would
4  also when you engaged in just hugging and kissing
5  also did that in areas where there were no
6  cameras?
7    A.    Yes.
8    Q.    There were three areas where you
9  and Mr. Sharkey engaged in sexual intercourse in
10 the building; correct?
11   A.    Yes.
12   Q.    One of them was in an area of the
13 chapel on the second floor; yes?
14   A.    Yes.
15   Q.    One of them was in a first-floor
16 bathroom that was off of a hallway; yes?
17   A.    In the chapel you're talking about
18 kisses and hugs and things like that, is that what
19 we're talking about now or are you talking about
20 sexual intercourse?
21   Q.    I'm sorry, I was talking about
22 sexual intercourse, but I'll leave you to clarify
23 if that's what did happen in the chapel, in the
24 area of the chapel.

Page 94

1    A.    There it was like hugs and kiss.
2    Q.    Okay.  Can you describe for -- can
3  you state the locations at the facility where you
4  had sexual intercourse with Mr. Sharkey each time?
5    A.    In the women's bathroom, and in the
6  room in the dorm.
7    Q.    Was the room, the dorm room you
8  had, was it your room or Patricia's room?
9    A.    Patricia's.
10   Q.    And was it two times in the female
11 bathroom or two times in the dorm room?
12   A.    Two times in the women's bathroom.
13   Q.    And is it my understanding from
14 reading the investigation reports that the two
15 times in the women's bathroom were on the same
16 day?
17   A.    Yes.
18   Q.    And was that the first time that
19 you and Mr. Sharkey engaged in sexual relations,
20 sexual intercourse?
21   A.    Yes.
22   Q.    How long after that first day where
23 you and Mr. Sharkey engaged in sexual intercourse
24 in the female bathroom, how long after that was it

Page 95

1  that you engaged in sexual intercourse in
2  Patricia's room?
3    A.    Days after, days after, I think, or
4  a week.
5    Q.    If I can direct your attention back
6  to Berks County-1?
7    A.    (Witness complies.)
8    Q.    On Page 19 that I have previously
9  identified next to these bullet points are various
10 sentences.  Can you tell me whether you did any of
11 those things after the first time you and Mr.
12 Sharkey engaged in sexual relations?  And let me
13 know if you don't understand my question.  I'd be
14 happy to rephrase it for you.
15   A.    No, I didn't do anything.
16   Q.    You didn't advise anybody of what
17 had happened; correct?
18   A.    No.
19   Q.    At the time where you and Mr.
20 Sharkey engaged in sexual relations in Patricia's
21 room, was Patricia there?
22   A.    No.
23   Q.    Was she outside the room, to your
24 knowledge?

Page 96

1    A.    No.  She was in the living room.
2    Q.    The living room is at the end of
3  the hallway where the TV, et cetera, TV are?
4    A.    Yes.
5    Q.    Did you ever talk about these
6  interactions with Mr. Sharkey with your roommates?
7    A.    No.
8    Q.    Sharkey told you that you would be
9  deported if anybody found out about your
10 relationship; correct?
11   A.    Yes.
12   Q.    And you later found out that that
13 wasn't true, that you were not going to be
14 deported if anybody found out about your
15 relationship; correct?
16   A.    But that wasn't until I spoke with
17 my attorneys and they made me understand that that
18 wasn't going to happen.  For a very long time I
19 continued to think that it was going to happen.
20   Q.    But you did find out that that
21 wasn't something that was going to happen as a
22 result of your relationship, it may have been
23 because of something unknown, but it wasn't going
24 to be because of your relationship with Sharkey at

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 97

1    that point?
2         A.    Yes.
3         Q.    In fact, you talked to your
4    psychologist at the facility about that, you
5    started talking to your psychologist about the
6    relationship and you realized then that you were
7    not going to be deported because of the
8    relationship; right?
9              MS. YEH:  Objection just to the
10             extent of the portrayal as a
11             psychologist.
12             MR. CONNELL:  And she was referring
13             to it as a psychologist.  I recognize
14             it's just a licensed social worker.
15             THE WITNESS:  Yes, I told the
16             psychologist that, about it.
17   BY MR. CONNELL:
18        Q.    Okay.  And when we refer to the
19   psychologist we're referring to Gina Westner?
20        A.    Yes.
21        Q.    Is it fair to say that you never --
22   strike that.
23             Do you know who Diane Edwards is?
24        A.    Yes.  I think she was a manager

Page 98

1    there, supervisor or something there.
2         Q.    Would you have known who she was at
3    the time while you were there?
4         A.    Yes.
5         Q.    Okay.  She walks the halls freely,
6    you see her walking around the hallways; correct?
7         A.    No, never really.
8         Q.    How would you know her at the time
9    then?
10        A.    Well, I knew about her after this
11   thing with Dan happened she was the one
12   that I'd go to that would show me to other people
13   or that would take me to be taken to other
14   facilities to talk to people.
15        Q.    Okay.  So prior to -- strike that.
16             While you and Mr. Sharkey's
17   relationship was ongoing you did not know who
18   Diane Edwards was; is that what I'm hearing?
19        A.    Yes, because you would never see
20   her in places where we were or that she would talk
21   to us, no.
22        Q.    So it's fair to say that during
23   your relationship with Mr. Sharkey you never
24   talked to Ms. Edwards about the fact that you were

Page 99

1    having a relationship with Mr. Sharkey; is that
2    fair to say?
3         A.    Yes.
4         Q.    And this may have been a question I
5    asked before, so I apologize.  You never filed any
6    sort of grievance at the Berks County Residential
7    Center about any interactions that you had with
8    Sharkey, either sexual or otherwise?
9         A.    No.
10        Q.    When did you first learn that
11   somebody was aware of your relationship with
12   Sharkey?
13        A.    How is that?  I don't understand.
14             MR. CONNELL:  Can you read the
15             question back?
16                      - - -
17             (Whereupon, a pertinent portion of
18             the record was read back by the court
19             reporter.)
20                      - - -
21             MR. CONNELL:  I'll rephrase the
22             question.  It's a terrible question.
23   BY MR. CONNELL:
24        Q.    How did you come to know that the

Page 100

1    officials at the Berks County Residential Center
2    became aware of your relationship with Sharkey?
3         A.    Just like many of the women
4    detained there that noticed that something was
5    happening because he was always near me, he was
6    always close to me.  If I was outside he went to
7    my room.  When men were not supposed to go in
8    there he would go in there.  The same thing in the
9    laundry room, he would go in when men were not
10   supposed to be there.  And no one ever said
11   anything.  I suppose just like the people there
12   noticed and the staff there would have noticed
13   what was happening.
14        Q.    Okay.  But my question is when did
15   you first find out that people actually knew?
16        A.    No, I don't have a specific time.
17   I don't know.  I can't really say.
18        Q.    At some point you realized that
19   Sharkey wasn't working there anymore; right?
20        A.    Yes.
21        Q.    And how did you come to find that
22   out?
23        A.    In August I knew that some of the
24   detainees went to talk to a supervisor and then

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 101

1   went to talk to a supervisor to complain of what
2   they saw, they saw that Dan was always close to me
3   and they saw some kind of preference and they went
4   to talk.  And then after that he did not return to
5   work.
6       Q.      And is it your understanding that
7   that was the first time anybody went to
8   supervisors and told them of what was going on?
9       A.      Maybe so.
10      Q.      Do you have anything indicating
11  that they went to supervisors at any time before
12  that?
13      A.      No.
14      Q.      What was your first reaction when
15  you found out that Sharkey wasn't working there
16  anymore?
17      A.      I was scared.  Well, because he had
18  already showed me the thing that said that if
19  someone found out that I was going to be deported.
20  So that made me afraid.
21      Q.      At some point you had access to Mr.
22  Sharkey's phone including the combination to enter
23  his phone; correct?
24      A.      Yes.

Page 102

1       Q.      How did you get the combination to
2   enter his phone?
3       A.      He gave it to me.
4       Q.      And would you use that phone to
5   call family or for what?
6       A.      Yes, I used it to call my mother.
7   He would always -- he sometimes would lend me his
8   phone.
9       Q.      Did you ask him for the phone in
10  which he responded by lending it to you and giving
11  you the combination?
12      A.      Yes.
13      Q.      I previously asked you that on
14  several occasions you spoke with Detective Michael
15  Hoffert and Special Agent Michael Fischgrund,
16  F-i-s-c-h-g-r-u--n-d, and that those conversations
17  with them was videotaped.
18          Do you recall that testimony?
19      A.      Yes.
20      Q.      And you knew that it was being
21  videotaped; correct?
22      A.      Yes.
23      Q.      And you knew the reason talking to
24  them was part of the criminal investigation which

Page 103

1   might have led to criminal charges against Mr.
2   Sharkey; correct?
3       A.      Yes.
4       Q.      And you knew going into those
5   conversations that if you lied to the
6   investigators you might be guilty of a crime;
7   correct?
8       A.      Yes.
9       Q.      And, therefore, and you told the
10  truth during those interviews; correct?
11      A.      Yes.
12      Q.      Do you remember how many times it
13  was that you were interviewed by them on
14  videotape?
15      A.      One time, I think.
16      Q.      The criminal investigation records
17  reflect that they interviewed you on three
18  occasions; December 4th of 2014, December 12th of
19  2014 and December 18th of 2014.
20          Does that sound right?
21      A.      Well, I don't know how many times
22  it was, but I remember that I talked to them a lot
23  of times.
24      Q.      When you told them that the sexual

Page 104

1   intercourse that you had with Mr. Sharkey was
2   consensual, were you being truthful then?
3       A.      Well, yes, I know that at certain
4   points I was consensual about what was happening,
5   but then I didn't know what to do, and at what
6   point I felt obligated to do what was happening
7   because of the behavior, of his behavior towards
8   me.
9       Q.      When you say because of his
10  behavior towards you, are you referring to -- what
11  are you referring to?
12      A.      Because he was a jealous man.  He
13  acted jealous when from other male staff he would
14  act as a jealous boyfriend.  And there were also
15  kids that were 16 or 17 years old, and he acted
16  jealous around them, I couldn't be around them.
17          MR. CONNELL:  Mark this as Berks
18          County-9, please.
19          - - -
20          (Whereupon, Exhibit Berks County-9
21          was marked for identification.)
22          - - -
23  BY MR. CONNELL:
24      Q.      ██E.D.██, I'm handing you what's

26 (Pages 101 to 104)

949df393-37ee-4bd5-ad9a-33c5dade589c

1    been marked Berks County-9.  Can you take a moment
2    and look at that, please?
3         A.    (Witness complies.)
4         Q.    I recognize that it's not in
5    Spanish.  Have you ever seen that document before?
6         A.    Yes.
7         Q.    When did you see it before?
8         A.    For the interviews that I had with
9    the investigators.
10        Q.    Did the investigator show you this
11   document?
12        A.    No.  But, well, they were there
13   while they were writing down, they were writing it
14   in.
15        Q.    So is it -- just so that I can try
16   to clarify, this document was with the
17   investigators when they were interviewing you;
18   yes?
19        A.    Yes.
20        Q.    They would ask you the question and
21   you would give the answer and then they would
22   write it down; is that how it would work?
23        A.    Yes.
24        Q.    And did they after they asked you

1    the questions, did they give you the opportunity
2    to review your answers, did they review your
3    answers with you?
4         A.    No.
5         Q.    Were they working -- or strike
6    that.
7               Was there an interpreter in the
8    room?
9         A.    Yes.
10        Q.    Did you have any trouble
11   understanding what they were asking you?
12        A.    Maybe a little.
13        Q.    Did you tell them that?
14        A.    I don't remember.  Or maybe it was
15   like how we are now.
16        Q.    At the end of that interview with
17   those police officers, were you confident that you
18   told them the truth on everything and they
19   understood you were telling them the truth?
20        A.    Yes.
21        Q.    ███ E.D. ███, I'm going to ask you to
22   bear with me.  I'm going to read this document.
23   And I'm trying to figure out what it is.  It's
24   related to the investigation of the criminal

1    investigation.  And I'll try to go slow.  I'm
2    going to read this straight through.  It's only a
3    half a page, two sentences.  Sexual intercourse
4    twice in one day in first-floor bathroom.
5               Second time prearranged because he
6    said he wanted to do it again when we were going
7    into dining room for dinner.  Did he tell you a
8    time?  Yes, at 6:30 when we were allowed to go
9    outside.
10              Third time -- or strike that.
11              Third time had sex in Patricia's
12   room one week after first time, comma, last week
13   he wanted --
14              MS. YEH:  Counsel, if I may, do you
15         have the page?
16              MR. CONNELL:  I'm sorry, I'll give
17         you the page.  My apologies.  I'm going
18         to have it marked because I figured
19         because she's not going to be able to
20         identify the document.
21              MS. YEH:  All right.
22              MR. CONNELL:  So I want to read the
23         statement in.
24   BY MR. CONNELL:

1         Q.    So I'm going to go back and start
2    that last sentence again.  Third time had sex in
3    Patricia's room one week after first time, comma,
4    last week he watched -- worked, though, before
5    dinner.  States Patricia didn't know.
6               I'll stop there.
7               And then the last two sentences,
8    performed oral sex on him the third time in
9    Patricia's room.  Dan performed oral sex on her on
10   all three occasions.
11              Do you recall that conversation
12   with an investigator?
13        A.    Yes.
14              MR. CONNELL:  We'll have that
15         marked as the next exhibit.
16              ---
17              (Whereupon, Exhibit Berks County-10
18         was marked for identification.)
19              ---
20   BY MR. CONNELL:
21        Q.    Going back to the beginning of it
22   it says, second time prearranged because he wanted
23   to do it again.  What do you mean by prearranged?
24        A.    That like we agreed to it, that it

Page 109

```
 1      was dinnertime and he said that he wanted to do it
 2      again.  And we said that we could do it after
 3      dinner time.  That was around 6:30, which is when
 4      we can go outside.  So that we could go outside
 5      and then we could do it again in the bathroom
 6      where we had done it before.
 7           Q.     And that the bathroom is not
 8      outside; correct?
 9           A.     No, it's in the hallway that goes
10      outside.
11           Q.     So you passed that female bathroom
12      when you're walking from the dining hall to the
13      outside?
14           A.     No.  Do we have a map of it --
15           Q.     Not readily available.
16           A.     -- so I can show you?
17           Q.     It's a good idea, though.  I wish I
18      did.
19                MS. YEH:  We do have them.
20                MR. CONNELL:  I know it's been
21           produced, but I just don't know -- do
22           you have it readily available?
23                MS. YEH:  Yes.  There's two because
24           there's two floors.
```

Page 110

```
 1                MR. CONNELL:  Do you want to go off
 2           the record for a second?
 3                       - - -
 4                (Whereupon, a discussion took place
 5           off the stenographic record.)
 6                       - - -
 7                MR. CONNELL:  Why don't we have
 8           that marked as Berks County-11.
 9                       - - -
10                (Whereupon, Exhibit Berks County-11
11           was marked for identification.)
12                       - - -
13      BY MR. CONNELL:
14           Q.     [E.D.], I'm going to hand you
15      what's marked as Berks County-11.
16                On that document, can you identify
17      the first-floor bathroom where it was that you and
18      Mr. Sharkey engaged in sexual relations twice?
19           A.     Here.  (Witness indicating.)
20           Q.     What I'm going to do is I'm going
21      to hand you a highlighter.  If you can highlight
22      that area that you just pointed to?
23           A.     (Witness complies.)
24                MS. YEH:  For the record, it's also
```

Page 111

```
 1           Number-292.
 2      BY MR. CONNELL:
 3           Q.     Now, [E.D.], you also before we
 4      got out the map, you also identified that it was
 5      nearby the exit to the building; yes?
 6           A.     Yes.
 7           Q.     And is that exit to the building
 8      also depicted on that map that you have in front
 9      of you?
10           A.     Yes.  It would be like around here.
11      (Witness indicating.)
12           Q.     Can you highlight that area as
13      well, please?
14           A.     (Witness complies.)
15                MS. YEH:  For the record, she
16           highlighted 291.
17                MR. CONNELL:  And it's right below
18           the word residential outdoor access.
19      BY MR. CONNELL:
20           Q.     By the way, did you ever walk out
21      those doors?
22           A.     Yes.
23           Q.     And you'll agree with me that you
24      can walk out those doors without setting off any
```

Page 112

```
 1      alarms or walking through any bars?
 2           A.     Yes.
 3           Q.     Thank you.
 4                MR. CONNELL:  Mark this as the next
 5           one, please.
 6                       - - -
 7                (Whereupon, Exhibit Berks County-12
 8           was marked for identification.)
 9                       - - -
10      BY MR. CONNELL:
11           Q.     [E.D.], I'm going to hand you
12      what we've marked as Berks County-12.
13           A.     (Witness complies.)
14           Q.     [E.D.], do you remember seeing
15      that document before today?
16           A.     No.
17           Q.     Is that your signature on the
18      bottom of that -- strike that.
19                Is that your signature next to the
20      X depicted on that page?
21           A.     Yes.
22           Q.     But you don't remember signing it?
23           A.     No, I don't remember.
24           Q.     Okay.
```

949df393-37ee-4bd5-ad9a-33c5dade589c

1        MR. CONNELL:  Mark this as the next
2    exhibit, please.
3        - - -
4        (Whereupon, Exhibit Berks County-13
5    was marked for identification.)
6        - - -
7    BY MR. CONNELL:
8        Q.    ▮▮E.D.▮▮, I'm going to hand you
9    what's marked as Berks County-13.  Can you take a
10   moment to look at that?
11       A.    (Witness complies.)
12       Q.    Have you ever seen that document
13   before?
14       A.    Yes.
15       Q.    And do you have any idea of what
16   that -- or strike that.
17            When did you see that document
18   before?
19       A.    When I spoke to the investigators
20   to give them an idea of where my room was and
21   where was Patricia's room.
22       Q.    Okay.  And did you draw this for
23   the investigators?
24       A.    Yes.

1        A.    Yes.
2        Q.    Do you know John Behm?
3        A.    I don't know who that is.  I don't
4    remember very well.
5        Q.    Do you know Jamie Himmelberger?
6        A.    Yes.
7        Q.    Do you know Brittany Rothermill?
8        A.    Yes.
9        Q.    Do you know Erika Taylor?
10       A.    Yes.
11       Q.    Do you know Matthew Malinowski?
12       A.    Yes.
13       Q.    You have John Behm listed as a
14   defendant in this lawsuit.  Do you know why?
15       A.    Yes.
16       Q.    Why is it, why is he listed if you
17   don't know who he is?
18       A.    Well, he's one of the staff members
19   there.  And I really I didn't know the name of all
20   of them.  But if I knew the name of all of the
21   staff members there I would put them all as
22   defendants, but I don't know.
23       Q.    You would put them all as
24   defendants because they're staff there?

1        Q.    Okay.  On that page there is a
2    block with an E on it.  What does that depict?
3        A.    For my name, ▮▮E.D.▮▮.
4        Q.    And does that depict where your
5    room was located?
6        A.    Yes.
7        Q.    And then there's another block on
8    that page with other letters in it.
9            Is that intended to identify where
10   Patricia's room was located?
11       A.    Yes.
12       Q.    You had previously mentioned that
13   you moved rooms at some point during your stay at
14   the Berks County Residential Center; correct?
15       A.    Yes.
16       Q.    Did your room move before or after
17   the first time you and Mr. Sharkey kissed?
18       A.    My room was changed after.  He
19   wasn't working there anymore.  I mean, after the
20   people from the center knew what was happening.
21       Q.    Okay.  And what's depicted there in
22   Berks County-13, your diagram, is that the room
23   arrangement while your relationship with Mr.
24   Sharkey was ongoing?

1        A.    Yes, because all of them saw what
2    was happening and they didn't do anything to
3    protect me.  They only judged me and didn't do
4    anything to help me.
5        Q.    Tell me everything you believe John
6    Behm saw.
7        A.    I don't know of something specific,
8    but he had to see me with Dan sometimes like the
9    others did.
10       Q.    Describe John Behm for me.
11   Describe what he looks like.
12       A.    What he looks like?
13       Q.    Yes.
14       A.    He's tall, white.  He has some
15   beard here.  And that's all I can say.
16   (Witness indicating.)
17       Q.    Glasses or no glasses?
18       A.    Yes.
19       Q.    That is, yes, glasses?
20       A.    Yes.
21       Q.    Color hair?
22       A.    Black.
23       Q.    Did you ever talk with John Behm?
24       A.    Yes.

949df393-37ee-4bd5-ad9a-33c5dade589c

1    Q.    Did you ever talk with him about
2  your relationship with Mr. Sharkey?
3    A.    No.
4    Q.    What evidence do you have that John
5  Behm knew that you were having a relationship with
6  Mr. Sharkey?
7    A.    No, I don't have any evidence, but
8  I can say that we were all in the same place and
9  that it would have been impossible for him not to
10  know what was happening.
11    Q.    Now, you told me that you do know
12  Jamie Himmelberger; yes?
13    A.    Jamie or Jimmy?
14    Q.    Jamie Himmelberger.
15    A.    Yes.
16    Q.    Can you describe Ms. Himmelberger
17  for me?
18    A.    Is it a woman?
19    Q.    Yes.
20    A.    She is thin.  She's about my height
21  more or less.  Her hair is coffee color.  I don't
22  know what else to say.
23    Q.    Glasses, no glasses?
24    A.    No.

1    Q.    And is Ms. Himmelberger, did you
2  include her as a defendant in this lawsuit for the
3  same reasons that you said you would throw them
4  all in as defendants in the lawsuit or do you have
5  specific evidence of her knowledge of your
6  relationship with Mr. Sharkey?
7    A.    Well, her because I think that she
8  was the one from the staff that did know what was
9  happening.
10    Q.    Okay.  What makes you think that
11  she knew what was happening?
12    A.    Because they had the same work
13  schedule, they were evenings, they worked
14  together.  So there were times when she could have
15  seen us.
16    Q.    Are there any times where you know
17  she saw you and Mr. Sharkey engaged in any sexual
18  relations, hugging or kissing?
19    A.    No, but I saw her that she saw us,
20  no.  But they could see us when we were together
21  in any area.
22    Q.    So if you and Mr. Sharkey are
23  walking down the hallway other people could see
24  you; yes?

1    A.    Yes.
2    Q.    And you only concealed -- or strike
3  that.
4         You concealed certain behavior with
5  Mr. Sharkey by avoiding cameras; correct?
6    A.    Yes.
7    Q.    And when you went to those areas
8  you also knew that there was nobody else who could
9  see you; correct?
10    A.    Yes.
11    Q.    And you told investigators that you
12  actually used lookouts to watch out for anybody
13  else coming so when you and Sharkey were together
14  nobody would walk in on you; correct?
15    A.    Yes.
16    Q.    So it's the times where you were in
17  the common general area that you believe that
18  everybody else that worked there should have been
19  able to see you and Sharkey engaged in an
20  inappropriate relationship; is that your
21  testimony?
22    A.    No.
23    Q.    Okay.  What is incorrect about that
24  statement?

1    A.    Or can you repeat the question?
2         MR. CONNELL:  Please.
3              - - -
4         (Whereupon, a pertinent portion of
5    the record was read back by the court
6    reporter.)
7              - - -
8         THE WITNESS:  Yes, because, like I
9    said before, he was always with me, he
10    was always next to me.  Whenever I was
11    eating in the dining room he would sit
12    with me in the same table and no one
13    else did that.  If I was outside he
14    would sit outside with me, or in the
15    living room I was watching TV he would
16    sit right next to me.
17  BY MR. CONNELL:
18    Q.    So tell me the times where Jamie
19  Himmelberger saw you sitting eating with Mr.
20  Sharkey beside you, the times Jamie Himmelberger
21  saw you outside with Mr. Sharkey.
22    A.    I can't say how many times that
23  happened because that was a daily thing.  So it
24  happened a lot.

1      Q.     Can you say any time that Jamie
2 Himmelberger specifically saw you doing anything
3 at all with Mr. Sharkey; sitting with him, talking
4 with him, eating with him, dancing with him or
5 making love to him, was there any time that you
6 could say Jamie Himmelberger saw you?
7      A.     She saw me in the dining room with
8 him, in the living room with him.  She also saw me
9 with going to the laundry room with him and being
10 outside with him.
11     Q.     Okay.  I'm going to ask you about
12 each one of those.
13          THE INTERPRETER:  I'm sorry?
14 BY MR. CONNELL:
15     Q.     I'm going to ask you about each one
16 of those.
17     A.     Okay.
18     Q.     When Ms. Himmelberger saw you going
19 to the dining room with Mr. Sharkey, what was
20 inappropriate going on that Ms. Himmelberger
21 should have known that you and he were having an
22 inappropriate relationship?
23     A.     The fact that he was always with
24 me, and in the food, that he would bring something

1 different for me with him to eat.
2      Q.     Tell me what inappropriate thing
3 you were doing in the dining room that should have
4 caused Ms. Himmelberger to determine that you and
5 Mr. Sharkey were having an inappropriate
6 relationship.
7      A.     That we were closer than we should
8 have been as the staff member and other prisoners
9 would have been.
10     Q.     By the way, did you wear a jump
11 suit or orange jump suit or anything with stripes
12 while you were there?
13     A.     No.
14     Q.     When -- so you state that Jamie
15 Himmelberger should have identified that you and
16 Mr. Sharkey were closer than any other residents
17 and staff, that's the basis of you including her
18 as a defendant in this case related to
19 inappropriate behavior in the living room; is that
20 your testimony?
21     A.     Yes.
22     Q.     You also said that Ms. Himmelberger
23 is a defendant in this case because of your
24 interactions with Mr. Sharkey in the laundry room.

1           So what did Ms. Himmelberger see in
2 the laundry room that should tell us that you and
3 Mr. Sharkey were having an inappropriate
4 relationship?
5      A.     Well, like I said, they always saw
6 us together.  And in the living room there would
7 always be two, Dan and Jamie.  And if I said that
8 I was going to the laundry room, if Dan said he
9 would accompany me, she could see that he went
10 into the laundry room and he shouldn't have.  And
11 she never said anything that it was wrong for us
12 to spend so much time close to each other.
13     Q.     Did you ever see Jamie Himmelberger
14 see you go in the laundry room with Dan Sharkey?
15     A.     Well, like I said, if they were
16 both in the same place it would have been
17 impossible for her not to see me and him going in
18 after me.
19     Q.     Is that the best answer you're
20 going to be able to give no matter how many times
21 I ask the question?  Did you ever see her watch
22 you and Dan Sharkey go into the laundry room; yes
23 or no?
24     A.     Yes.  But I can't really tell you

1 that she saw -- that I saw her watching me going
2 into the laundry room with him, because I'm not
3 looking around to see who sees me going in.  What
4 I can say is that they were in the same place and
5 for obvious reasons she should have seen it.
6 There's no way she did not see it.
7      Q.     Did Jamie Himmelberger and you ever
8 have -- did she ever write you up for anything?
9      A.     No, I don't recall.
10     Q.     Did you have any disagreements with
11 her?
12     A.     Like with the others?
13     Q.     Did you have disagreements with
14 others?
15     A.     Yes.
16     Q.     Which of the named defendants did
17 you have disagreements with?
18     A.     Like with all of the others that
19 are named there and others that are not named
20 there.  Well, this happened after Dan because they
21 had a bad attitude towards me.
22     Q.     Did Jamie Himmelberger have a bad
23 attitude towards you?
24     A.     Yes.

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 125

1      Q.      Describe what you mean by bad
2  attitude.
3      A.      Like they would set me aside, I
4  guess you could say.  They would put me aside on
5  the different activities in the center.  Or how
6  they talked to me, they didn't talk to me the same
7  way that they talked to the other residents.
8      Q.      Anything else?
9      A.      No.
10     Q.      And is that the same with each of
11 these individual defendants or is that just Ms.
12 Himmelberger?
13     A.      With all of them.
14     Q.      Why do you believe Brittany
15 Rothermill was aware that you and Dan Sharkey were
16 engaged in an inappropriate sexual relationship?
17     A.      Well, because she saw us together a
18 lot.  And besides Brittany spoke a lot of Spanish
19 and she understood a lot.  So the women in the
20 center would go to her either with a complaint.
21 And if they went to her they might have gone to
22 her to tell her what was happening and she didn't
23 do anything.
24     Q.      Other than that, is there anything

Page 126

1  else why you named Ms. Rothman as a defendant in
2  this case?
3      A.      Because and also because they
4  always had a bad attitude towards me.  She was the
5  one that would go into my room to check my room,
6  to check my clothing to see if I could wear
7  something or not.
8      Q.      Any other reasons why Brittany
9  Rothermill was named as a defendant other than
10 what you said?
11     A.      No.  Those are the reasons.
12     Q.      Can you describe Brittany
13 Rothermill?
14     A.      She is white.  Her hair is long,
15 it's blonde or -- and I think she has colored
16 eyes.  I don't remember if she had different color
17 eyes or not.  I don't remember.
18     Q.      Different colored eyes?
19     A.      No, I don't remember.
20     Q.      Taller or shorter than you?
21     A.      It's about the same.
22     Q.      Glasses or no glasses?
23     A.      Sometimes she did use them and
24 sometimes not, like that.

Page 127

1      Q.      Can you describe all of the reasons
2  why you named -- strike that -- why you believe
3  Erika Taylor was aware of your inappropriate
4  relationship with Mr. Sharkey?
5      A.      It's the same like the other ones,
6  we were always in the same places.
7      Q.      Did you ever talk to Erika Taylor,
8  speak with her?
9      A.      Yes.
10     Q.      And how often would you speak with
11 Erika Taylor during the course of a week during
12 your stay at the Berks County Residential Center?
13     A.      Well, I spoke to her as needed.  As
14 another member of the staff she was there and if I
15 needed anything I would have to talk to her and
16 she would talk to me.  If she needed to tell me
17 something we would communicate that way.
18     Q.      So can you give me any specific
19 evidence or reasons why you believe Ms. Taylor had
20 knowledge that you had an inappropriate
21 relationship with Mr. Sharkey?
22     A.      It's like the other ones, they were
23 always in the same place and they must have seen
24 what was happening, they must have seen us, and

Page 128

1  she never said anything.
2      Q.      Matthew Malinowski, do you know
3  Matthew Malinowski?  I'm sorry, you already said
4  yes to that question I'll strike that.
5              What evidence do you have that
6  Matthew Malinowski was aware that you were having
7  an inappropriate relationship with Daniel Sharkey?
8      A.      He was always there in the same
9  place, too.  He had the same schedule as Dan.  He
10 had to see me and him doing something.
11     Q.      And Mr. Malinowski, did you ever
12 speak with Mr. Malinowski during your time there?
13     A.      Yes.
14     Q.      Similar to your conversations with
15 Ms. Taylor asking her when you needed things or
16 you needed direction on items you would talk to
17 Mr. Malinowski?
18     A.      Yes.
19     Q.      Any other conversations that you
20 had with Mr. Malinowski other than that type of
21 conversation?
22     A.      I'm sorry, could you repeat the
23 last part?
24              - - -

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 129

1      (Whereupon, a pertinent portion of
2 the record was read back by the court
3 reporter.)
4         - - -
5      THE WITNESS: No.
6 BY MR. CONNELL:
7     Q.    Can you describe Mr. Malinowski
8 physically?
9     A.    He is white, tall. I don't know
10 what else to say.
11     Q.    Glasses? No glasses? Facial hair?
12 Hand hair? Head hair? Any kind of hair?
13     A.    No facial hair. He doesn't use
14 glasses. And he has short hair.
15     Q.    What color of the hair?
16     A.    I think it's similar to his, I'm
17 sorry, the color. (Witness indicating.)
18      MR. CONNELL: Him being who is she
19 referring to, Mr. Jones?
20      THE WITNESS: Yes.
21 BY MR. CONNELL:
22     Q.    Other than what you described here
23 in answering to my questions, is there anything
24 else you have to believe as to why Mr. Malinowski

Page 130

1 is a defendant in this case?
2     A.    No. I already explained the
3 reasons of why I believe that he should be in
4 there.
5      MR. CONNELL: We'll have this one
6 marked as Berks County-14.
7        - - -
8      (Whereupon, Exhibit Berks County-14
9 was marked for identification.)
10        - - -
11      MR. CONNELL: We might as well mark
12 this, too, Doug.
13        - - -
14      (Whereupon, Exhibit Berks County-15
15 was marked for identification.)
16        - - -
17      MR. CONNELL: Can we go off the
18 record for a second.
19      MS. YEH: Is it okay if we take
20 just a five-minute break?
21      MR. CONNELL: Absolutely.
22        - - -
23      (Whereupon, a discussion took place
24 off the stenographic record.)

Page 131

1        - - -
2      MR. CONNELL: Back on the record.
3 BY MR. CONNELL:
4     Q.    ████ E.D. ████, just a quick question
5 about Patricia who we identified early on. Off
6 the record you just gave me the phone number.
7      Do you understand if Patricia is
8 currently in the United States or if she's back in
9 her home country?
10     A.    No, she's here, too, in the United
11 States.
12     Q.    Do you know what state she's in?
13     A.    North Carolina, something like
14 that.
15     Q.    Thank you very much. ████ E.D. ████,
16 I'm going to hand you a document we've just had
17 marked as Berks County-14. And I'll represent to
18 you that this is the Berks County, another version
19 other than Berks County-1, of the resident
20 handbook at the Berks County Residential Center.
21 It is our understanding that this is the version
22 that was in place in May of 2014. So and this was
23 the subject of the conversation earlier today with
24 your attorneys that we had. But what I would ask

Page 132

1 you to do is turn to Page 13.
2     A.    (Witness complies.)
3     Q.    Similar to Berks County-1 in the
4 margin on the right-hand side I drew parallel
5 lines of the sections that your attorney
6 represented to me earlier might have been
7 different than what you had.
8      My question for you is at the time
9 you entered the facility, is the document that's
10 in front of you right now the same as what you
11 received upon entering the facility in May of 2013
12 -- I'm sorry -- May of 2014?
13     A.    Yes. What happens is that this
14 one, this is the one that they gave me; right?
15      MR. CONNELL: And she's referring
16 to Berks County-1.
17      THE WITNESS: And one day at the
18 facility they asked us for this booklet,
19 booklet you call it that they gave us.
20 And then they changed this page and the
21 other page that's marked and gave us
22 this. (Witness indicating.)
23 BY MR. CONNELL:
24     Q.    And when you say gave us this

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 133

1  you're referring to this one here that we've
2  marked as Berks County-14?
3       A.    That they gave us when?
4       Q.    After you were already at the
5  facility.
6       A.    Well, they're almost similar,
7  right, but this one has more rules than the other
8  one.  And that's what they did, they changed it
9  and they added more rules and gave us this one
10  about the clothing and sexual abuse and things.
11       MR. CONNELL:  What I would ask is
12       because it's going to take a magician to
13       figure out this testimony, but I think
14       we're right there, with the one that
15       they changed and added rules, can you
16       ask her to point to that one?
17       THE WITNESS:  (Witness complies.)
18  BY MR. CONNELL:
19       Q.    Just the document, not the page.
20       A.    This one.  (Witness indicating.)
21       MR. CONNELL:  Was that a fair
22       question, Su Ming?  If you think you can
23       do better --
24       THE INTERPRETER:  What was the

Page 134

1  first one?
2       MR. CONNELL:  Off the record.
3                - - -
4       (Whereupon, a discussion took place
5  off the stenographic record.)
6                - - -
7       MS. YEH:  So, █████ , which
8  handbook came first?
9       THE WITNESS:  Okay.  It was this
10  one.  (Witness indicating.)
11       MR. CONNELL:  Referring to Berks
12  County-1.  I'm sorry, I had to say
13  referring to Berks County-1 when you
14  pointed your hand on it as she did.
15       THE WITNESS:  It was this one with
16  this information.  (Witness indicating.)
17  BY MR. CONNELL:
18       Q.    So you're referring to Berks
19  County-1, and it was that one with the information
20  contained in Berks County-14?
21       A.    Yes.
22       MS. YEH:  So regarding -- can we
23  just turn to the page regarding the
24  clothing policy?

Page 135

1       THE WITNESS:  (Witness complies.)
2       MS. YEH:  Just to confirm, this is
3  Number-1.  Did you receive this one
4  first or --
5       MS. ROMERO:  Just ask her to
6  identify it by number.  Did you receive
7  Berks County-1 first or Berks County-14
8  first?
9       MS. YEH:  Did you get Berks
10  County-1 first or Berks County-14 first?
11       THE WITNESS:  Well, I don't know.
12  They don't understand me.  But it was
13  this one with this information here.
14  And then when they asked for it back and
15  changed it they gave us this one with
16  this information.  Because, for example,
17  the one that we could say was given out
18  first, this one talks about residents
19  starting at age 12.  And in this other
20  one it talks about residents starting at
21  age five.  And you can see that there
22  are less rules here and there are more
23  in the one.  (Witness indicating.)
24  BY MR. CONNELL:

Page 136

1       Q.    So the one that you just referred
2  to as having less rules is Berks County-14 and the
3  one indicating more rules is Berks County-1?
4       A.    Yes.
5       Q.    I'm going to take them back before
6  we have to ask any more questions.
7       A.    (Witness complies.)
8       Q.    Thank you.  And then I'm just going
9  to mark, and I know she's not going to be able to
10  identify it, but I think it's important to be made
11  part of the record at this moment, and that is the
12  English version of Berks County-14, and this is
13  Berks County-15.  I'm going to mark it at this
14  deposition just so that I show it to you.
15       █████ , this is the English
16  version of what we just showed you as being Berks
17  County-14.
18       A.    Okay.
19       Q.    Have you ever seen the English
20  version before?
21       A.    No.
22       Q.    Other than the typewritten language
23  being English as opposed to typewritten language
24  being Spanish, have you ever heard anybody

1 complain that this English version was different
2 than the Spanish version?
3      A.   No.
4      Q.   I'm going to refer you back to the
5 Third Amended Complaint.  It's a document I showed
6 you early on in the deposition.
7      A.   (Witness complies.)
8           MS. YEH:  Counsel, do you happen to
9      have copies of that?
10          MR. CONNELL:  Of the English
11     version?
12          MS. YEH:  Yes.
13          MR. CONNELL:  Yes, I do actually.
14          MS. YEH:  The complaint.
15          MR. ARCHAMBEAULT:  We have that.
16          MS. YEH:  We do have it.
17 BY MR. CONNELL:
18     Q.   I'm going to refer to Paragraph 58
19 of the Third Amended Complaint on Page 7 of 14.
20     A.   (Witness complies.)
21     Q.   ███E.D.███, I'm going to read
22 Paragraph 58 so that the interpreter can identify
23 it for you and then I'll ask a question.  In
24 Paragraph 58 you allege that several residents who

1 witnessed their intimacy complained to the staff
2 about the relationship.
3           My question is when -- strike that.
4           Is it your understanding that they
5 complained to the staff about the relationship
6 right before Sharkey's employment stopped?  That
7 was a terrible question.
8      A.   No.
9      Q.   Okay.  Earlier you had said that
10 you learned that other residents complained to
11 staff and that shortly after that Sharkey's
12 employment was ended and you never saw him again.
13          Do you recall that testimony?
14     A.   Yes.
15     Q.   Okay.  Is that what you're
16 referring to in this particular paragraph of the
17 complaint?
18     A.   Well, like I said before, I think
19 that Brittany, Brittany, she was the one that
20 spoke mostly with the residents.  And I think that
21 someone mentioned it to her, but she didn't do
22 anything.  And when they did this was during the
23 days that Dan had the days off, so that when he
24 was supposed to come back he didn't.

1      Q.   It's your understanding that he was
2 suspended and then fired, that's what you're
3 referring to?
4      A.   Yes.
5      Q.   Okay.  Now, you also assert that
6 policies were changed as a result of this
7 relationship; is that right, dress code policies?
8      A.   Yes.
9      Q.   Okay.  And you allege in your
10 complaint that privileges were denied because of
11 this relationship?
12     A.   Yes.
13     Q.   Which policies do you believe
14 changed as a result of this relationship?
15     A.   For example, in the rooms they said
16 that you couldn't have anyone that was not in that
17 room.  For example, I could be in Patricia's room
18 or Patricia could be in my room.  But after that
19 they said that no one that wasn't in that room
20 could be there.  They forbid anyone else on going
21 into another room.  Or with the clothing they got
22 to be more strict.  If you had something that was
23 a little too tight then they would make you
24 change.  And they went to my room, Brittany and

1 other staff, went to my room and took everything
2 that they thought I couldn't use.
3      Q.   All right.  Who told you that the
4 more strict clothing rule was as a result of your
5 relationship with Sharkey?
6      A.   Well, they didn't tell me, but it
7 was right after this happened that things happened
8 in the center.  And that was the reason.  There
9 wasn't any other reason.  But because there were a
10 lot of women in that center they perhaps didn't
11 want woman's body to show through -- that you
12 could see the silhouette of the woman's body
13 through clothing.  Because they had men working
14 there perhaps they didn't want something else to
15 happen.
16     Q.   When you said that Brittany and
17 others went to your room to remove things,
18 describe when that happened, who was there and
19 what she removed.
20     A.   I don't know when it happened, but
21 it was after I spoke to the attorney and others,
22 and I think they went into my room and they
23 started taking out the clothing and seeing which
24 clothes I could use and which I shouldn't use.

Page 141

```
 1        Q.    Do you have an understanding that
 2   during the criminal investigation they were
 3   searching for evidence of Sharkey's crime; do you
 4   have that understanding?
 5        A.    Yes.
 6        Q.    And, in fact, they found the ring
 7   on you, yes, Brittany Rothermill found a ring on
 8   you?
 9        A.    Yes.
10        Q.    And you were trying to conceal that
11   ring and not have it be found; correct?
12        A.    Yes.
13        Q.    And that was a ring that Mr.
14   Sharkey gave you; correct?
15        A.    Yes.
16        Q.    And you didn't want to give it
17   away; correct?
18        A.    By then I had not spoken to anyone
19   yet and I denied everything.  And that was a
20   reason that I didn't want anyone to know.  And I
21   didn't want them to find the ring for them to know
22   what happened.
23        Q.    And Ms. Rothermill is the one who
24   found the ring on you; right?
```

Page 142

```
 1        A.    Yes.
 2        Q.    She also found a note in your
 3   belongings whereby you kept Sharkey's cellphone
 4   pass code; correct?
 5        A.    Yes.
 6        Q.    And she removed those two items
 7   from you and from your possession; correct?
 8        A.    Yes.
 9        Q.    And that was after Sharkey's
10   employment already ended -- or strike that.
11        That was after you last saw Mr.
12   Sharkey at the Berks County Residential Center?
13        A.    Yes.
14        Q.    What privileges do you believe --
15   strike that.
16        Do you believe that it was just
17   privileges that you and your son were being denied
18   privileges or all residents were being denied
19   privileges after the relationship you had with
20   Sharkey came to light?
21        A.    They said that the rules applied to
22   everyone, but they were more strict with me.  They
23   told me that I had a restriction order.  For
24   example, they wouldn't take my son to get a
```

Page 143

```
 1   haircut or out on trips.  Brittany told me that I
 2   had a restriction order and that's why I couldn't
 3   leave the place.
 4        Q.    Okay.
 5        A.    Or with the clothing they were less
 6   -- they were more concerned with me.  They always
 7   saw me what I was wearing and tell me if I
 8   shouldn't wear something, I think more to me than
 9   with other women.
10        Q.    Okay.  Brittany told you there was
11   a restriction order.  Did she give you any further
12   description as to what that meant?
13        A.    No.  She just told me that.
14        Q.    Did you ask what the restriction
15   order meant?
16        A.    That I couldn't leave the center.
17        Q.    Did you ask her why?
18        A.    They had that whole attitude after
19   all this happened.  There was no reason for me to
20   ask.  They allowed all of the other women to
21   leave, but they didn't allow me to leave because
22   of it.
23        Q.    What do you mean by leave the
24   center?
```

Page 144

```
 1        A.    There were like programs, programs
 2   for kids where they could be taken to get a
 3   haircut or go outside, go on a trip or to the
 4   park.  And but me and my son, we weren't allowed
 5   to go while other kids and their mothers would go.
 6        Q.    And who told you that it was
 7   because of your relationship with Sharkey?
 8        A.    Because since the time that I
 9   started -- well, when they knew about my
10   relationship everything changed, their attitudes
11   towards me changed.  And that's why I say that
12   there's no other reason of why they behaved like
13   that because it all happened afterwards.
14        Q.    Do you have anything more to add as
15   to why these individually named defendants -- why
16   you believe they retaliated against you or denied
17   you privileges other than what you've just
18   testified about?
19        A.    No.
20        MR. CONNELL:  I'm prepared to turn
21        things over to Landon.
22        Trisha, do you mind stepping out to
23        take a break?  But you guys keep going.
24              - - -
```

949df393-37ee-4bd5-ad9a-33c5dade589c

1          EXAMINATION
2             - - -
3   BY MR. JONES:
4        Q.    Good afternoon, [E.D.]. My name
5   is Landon Jones.  I'm an Assistant United States
6   Attorney.  I work for the United States Department
7   of Justice, but I'm here today as a lawyer for
8   Josh Petrey.  Do you understand?
9        A.    Yes.
10        Q.    I want to say a few things now that
11   are less directed to you and more towards the
12   lawyers and the transcript.  So I apologize in
13   advance, but I want to put these things on the
14   record.
15             MR. JONES:  The first is that I'm
16        here today on behalf of Mr. Petrey, that
17        waiver of his qualified immunity
18        defense, which we intend to continue to
19        press.
20             The second is by appearing today
21        I'm not consenting to Discovery being
22        taken of Mr. Petrey as is his right to
23        resist such Discovery under the
24        Qualified Immunity Doctrine.

1             The third is I'm aware that [E.D.]
2        [E.D.] is in the process of filing a
3        complaint against the United States.  In
4        my other hat I do represent the United
5        States.  And I'm not waiving any rights
6        the United States may have to pursue
7        further Discovery with respect to [E.D.]
8        [E.D.] or any other witness or any other
9        means of Discovery in this case.  And we
10        can specifically discuss this, but we
11        don't disagree on the parameters of my
12        appearance here today; do we.
13             MS. YEH:  There's no disagreement.
14             MR. JONES:  Okay.  Thank you.
15   BY MR. JONES:
16        Q.    [E.D.], do you remember Josh
17   Petrey from your time at the Berks County Center?
18        A.    Yes.
19        Q.    Do you have an understanding of
20   what his role was there?
21        A.    Yes.  He was like the immigration
22   officer that was there at the Detention Center.
23        Q.    Did you understand that he worked
24   for ICE at the time?

1        A.    Yes, yes.
2        Q.    And did you understand that the
3   staff we've been talking about today for the most
4   part, Mr. Sharkey and the various defendants
5   represented by Mr. Connell, worked for Berks
6   County?
7        A.    Yes.
8        Q.    Could you describe the nature of
9   your interactions with Mr. Petrey while you were
10   at the Berks County facility?
11        A.    Few.
12        Q.    And actually let me back up one
13   moment.  Did you have any understanding that Mr.
14   Petrey was a supervisor for the staff at the Berks
15   County facility such as Mr. Sharkey?
16        A.    Well, I understood that he was an
17   ICE officer and that is different from a
18   supervisor.  For example, if it was about your
19   immigration case he would be the one that could
20   help us the most that had to do with immigration.
21   And that the staff from the County were different.
22        Q.    Okay.  And you mentioned that your
23   interactions with Mr. Petrey were few; is that
24   right?

1        A.    Yes.
2        Q.    Do you remember how many times you
3   met with Mr. Petrey?
4        A.    Well, when I first arrived he kind
5   of calls everyone to give you the papers to sign
6   and asks what our process we're doing or if we
7   want to apply for asylum, that was one.  And then
8   if you want an interview, that's another.  And
9   then another for the answer if you get an
10   interview or not.  Then if your case is approved
11   he just kind of gives you the information.  I
12   think the only times we spoke was about
13   immigration -- were about immigration.
14        Q.    So the only times you spoke with
15   Mr. Petrey were about your immigration
16   proceedings; is that correct?
17        A.    Yes.
18        Q.    Okay.  Did you ever discuss with
19   Mr. Petrey your relationship with Mr. Sharkey?
20        A.    No.
21        Q.    Did you ever discuss Mr. Sharkey in
22   any respect with Mr. Petrey?
23        A.    No.
24        Q.    Did Mr. Petrey ever say anything to

1   you about Mr. Sharkey?
2       A.    No.
3       Q.    Did you ever see Mr. Petrey and Mr.
4   Sharkey together?
5       A.    Well, Dan always said that he was
6   friends with him, with Josh.  And Josh, you could
7   see him mostly in the mornings.  And, yes, I saw
8   them that they greeted each other, but that was
9   it.
10      Q.    So just to get back specifically to
11  my question, I asked you if you had seen Mr.
12  Petrey and Mr. Sharkey together, and I think your
13  answer is you would see them greet each other in
14  the morning; is that correct?
15      A.    Well, no.  Yes, I saw them greet
16  each other a few times.  But Josh would initially
17  be there in the morning, sometimes in the evening,
18  but that was it.  He didn't have a fixed schedule.
19      Q.    Okay.  Aside from the times when
20  you viewed Mr. Petrey and Mr. Sharkey greeting
21  each other in the morning, did you ever see the
22  two of them together?
23      A.    No, it wasn't during the morning
24  time.  It was in the afternoon because Dan works

1   in the afternoon and Josh comes in in the morning.
2   So they would greet in the afternoon, morning and
3   afternoon.
4       Q.    I'm sorry, I misunderstood you.
5            Aside from the times when you
6   observed Mr. Petrey and Mr. Sharkey greeting each
7   other, did you ever see them talking with each
8   other?
9       A.    No.
10      Q.    And when they were greeting each
11  other, was that a very brief exchange of hellos or
12  good afternoons?
13      A.    Yes.
14      Q.    You mentioned that Mr. Sharkey said
15  that he was friends with Mr. Petrey; is that
16  right?
17      A.    Yes.
18      Q.    What exactly did he tell you about
19  his friendship with Mr. Petrey?
20      A.    He always said that he was very
21  good friends with Josh.
22      Q.    Okay.  Did Mr. Petrey ever say that
23  he was friends Mr. Sharkey?
24      A.    No, because I never spoke with him

1   about other things that were not about
2   immigration.  So he never said anything like that
3   to me.
4       Q.    Okay.  So it's correct that Mr.
5   Sharkey -- excuse me.  Strike that.
6            It's correct that Mr. Petrey never
7   said that he was friends with Mr. Sharkey; true?
8       A.    Correct.
9       Q.    Do you know at what point in your
10  relationship Mr. Sharkey told you that he was a
11  friend of Mr. Petrey's?
12      A.    No.  He just made the comments to
13  me, that's it.
14      Q.    How many times did he make the
15  comment to you?
16      A.    Many times.  He said Josh is my
17  friend and Josh is my friend.  I mean, he always
18  said kind of like nothing would happen to him
19  because Josh was his friend, or he would always
20  say that he had contact with the cameras so that
21  nothing would happen to him.
22      Q.    So Mr. Sharkey told you that
23  nothing would happen to him because he was friends
24  with Mr. Petrey; is that right?

1       A.    Yes.
2       Q.    When you say nothing would happen
3   to him, nothing would happen to him as a result of
4   your relationship?
5       A.    Yes.
6       Q.    Okay.  You also said that Mr.
7   Sharkey told you that he had contact with the
8   cameras; is that right?
9       A.    Yes.  He was kind of like he could
10  see the videos and that he could supervise the
11  cameras, something like that.
12      Q.    Okay.  So Mr. Sharkey was telling
13  you that Mr. Petrey could supervise the cameras
14  inside the Berks County Center; is that right?
15      A.    No.  Could you explain your
16  question?
17      Q.    Okay.  I'm trying to understand
18  what Mr. Sharkey told you about the cameras.
19      A.    He tried to imply that he could see
20  me through the cameras, what I was doing, Sharkey.
21  If there was a camera in the hallway near the
22  laundry room he would say that, don't worry about
23  it, I have access to the cameras.
24      Q.    And when Mr. Sharkey told you that

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 153

1    he had access to the cameras, are you saying that
2    Mr. Sharkey was suggesting to you that he had
3    access to the cameras through Mr. Petrey somehow?
4         A.    No, I don't know.  I wouldn't say
5    it that way, no.
6         Q.    Does Mr. Petrey have anything to do
7    with what Mr. Sharkey was telling you about the
8    cameras?
9         A.    No.
10        Q.    Okay.  Did there come a time when
11   you believed that Mr. Petrey was aware of your
12   relationship with Mr. Sharkey?
13        A.    Yes.
14        Q.    When was that?
15        A.    Well, I believe so because he was
16   always in the center, he was always talking to the
17   other staff.  And if he was the ICE representative
18   there, then it would have been impossible for him
19   not to know what was happening.
20        Q.    During your relationship with Mr.
21   Sharkey, did you believe that Mr. Petrey was aware
22   of your relationship with Mr. Sharkey?
23        A.    No.  I wouldn't know what to say.
24        Q.    Well, did you -- I don't know how

Page 154

1    to ask it any differently.  But during the course
2    of your relationship with Mr. Sharkey, did you
3    believe that Mr. Petrey was aware of that
4    relationship while it was happening?
5         A.    I don't know.  I don't know.  But
6    he was always in the center.  He was always
7    walking the hallways.  I don't know if he saw us
8    and didn't do anything.  I don't know.  But I
9    don't know if he found out afterwards or before.
10        Q.    Okay.  But you believe -- all
11   right.  Do you recall any times when Mr. Petrey
12   saw you with Mr. Sharkey?
13        A.    No.  No, I don't recall.
14        Q.    And was it your testimony that you
15   recall Mr. Petrey and Mr. Sharkey working
16   different shifts during the day?
17        A.    Yes.
18        Q.    You recall Mr. Sharkey working in
19   the morning and Mr. Petrey working in the later
20   hours?
21        A.    Well, but like I said before, Josh
22   didn't have a set schedule whereas Dan always
23   worked in the afternoon.  Josh could be there in
24   the morning or the afternoon.  He really didn't

Page 155

1    have a fixed schedule, set schedule.
2         Q.    Okay.  Let me -- I think I have may
3    have misspoken earlier.
4              MR. ARCHAMBEAULT:  I think you may
5         have transposed the times.
6              MS. ROMERO:  She translated it
7         wrong.
8    BY MR. JONES:
9         Q.    What time of day do you recall Mr.
10   Sharkey working?
11        A.    Like from 2:00 in the afternoon
12   until 9:00 or 10:00 at night.
13        Q.    Okay.  And what time of day do you
14   recall Mr. Petrey working?
15        A.    For him I can't say one schedule.
16   He would come in in the morning or in the
17   afternoon.
18        Q.    Do you know where Mr. Petrey worked
19   for the bulk of his day?
20        A.    Well, I do know where his office
21   was or the office where he could meet with us.
22   But sometimes I would see him coming out of other
23   doors or places that we didn't know.
24              MR. JONES:  Can you pull out

Page 156

1    Exhibit-11, please, just a map?
2              MS. YEH:  Can we use the one that's
3         part of the record?
4              THE WITNESS:  I'm sorry, I have to
5         take this call.
6                      - - -
7              (Whereupon, a discussion took place
8         off the stenographic record.)
9                      - - -
10   BY MR. JONES:
11        Q.    [E.D.], you have before you
12   Berks Exhibit-11, which is the map of the
13   facility.  And do you see on there the room where
14   you would meet --
15              MR. JONES:  Off the record.
16                      - - -
17              (Whereupon, a discussion took place
18         off the stenographic record.)
19                      - - -
20              MR. JONES:  Back on the record.
21   BY MR. JONES:
22        Q.    [E.D.], you have Exhibit
23   Berks-11 in front of you, I think under your
24   yellow piece of paper?

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 157

1     A.     Yes.
2     Q.     Do you see on here the room where
3  you would sometimes meet with Mr. Petrey?
4     A.     Yes.
5     Q.     And can you identify it by room
6  number?
7     A.     This one, 222.
8  (Witness indicating.)
9     Q.     And you don't know where Mr. Petrey
10  spent his time when he wasn't meeting with
11  residents in that room; do you?
12     A.     No.
13     Q.     And I want to just circle back to
14  something you said earlier and make sure I
15  understand your testimony.
16          You said before that at the time of
17  your relationship with Mr. Sharkey you did not
18  know whether or not Mr. Petrey was aware of the
19  relationship; is that correct?
20     A.     Yes.
21     Q.     Do you now believe that Mr. Petrey
22  was aware of your relationship with Mr. Sharkey
23  during your relationship or not?
24     A.     No, I don't know.

Page 158

1     Q.     Okay.
2     A.     But what I do think is that because
3  he was the immigration officer I don't know if he
4  saw us or not, but anyone could have told him
5  about what was happening.
6          MR. JONES:  Can I take just a
7          couple of minutes off the record?  I
8          just want to page through the complaint
9          and see if there's anything that I want
10          to follow up on.
11          MS. YEH:  Sure.
12          MR. JONES:  Thank you.
13          ---
14          (Whereupon, a discussion took place
15          off the stenographic record.)
16          ---
17          MR. JONES:  Just a couple of more
18          questions.
19  BY MR. JONES:
20     Q.     Did you have a way to distinguish
21  between the people who were working at the
22  facility as counselors, as Berks County employees,
23  from the ICE employees who were there?
24     A.     Yes.

Page 159

1     Q.     How did you do that?
2     A.     The staff had different clothing in
3  comparison to Josh who was the immigration
4  officer.
5     Q.     And what kind of clothing did Mr.
6  Petrey wear?
7     A.     He always had like a khaki or
8  coffee colored pants and a black shirt.
9     Q.     Was it a uniform?
10     A.     It wasn't.  Well, maybe it was his
11  uniform, but it was not a uniform or he dressed
12  like that.  But the staff dressed a different way.
13  So there was a way to differentiate them.
14     Q.     Okay.  It looked like regular
15  clothes; correct?
16     A.     Yes, something like that, something
17  like that.
18     Q.     Okay.  Were there any other
19  immigration officers that you had interactions
20  with at your time at Berks County aside from the
21  investigators at the end?
22     A.     There were a few times that there
23  was another officer there, but you would see him
24  just very few times.  I don't even know his name.

Page 160

1  But he would also dress like Josh.  I never spoke
2  with him.
3     Q.     This other immigration officer, you
4  don't have any reason to believe that he was aware
5  of your relationship with Mr. Sharkey during that
6  relationship; do you?
7     A.     No, because he was never there.
8  Maybe during that whole time that I was there I
9  saw him maybe two times.  And he would only go
10  when he was -- maybe when someone was allowed to
11  be released and he would go there.
12     Q.     You never had any interactions with
13  Mr. Decker, the field office director for the
14  region for ICE; did you?
15     A.     I don't know.  I don't recognize
16  that name.
17          MR. JONES:  Okay.  I don't think I
18          have any further questions at this time.
19          MS. YEH:  I just have a few
20          follow-up questions.
21          ---
22          EXAMINATION
23          ---
24  BY MS. YEH:

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 161

```
 1        Q.    [E.D.], you were previously
 2   shown Berks County Exhibit-11.  That's the map in
 3   front of you.  I'm just going to ask you to
 4   identify a few other locations.  Earlier you had
 5   testified that sometimes you and Daniel Sharkey
 6   were on the computer in the library.
 7             Can you show where that location
 8   is?
 9        A.    Here in 202.  (Witness indicating.)
10        Q.    Where were other -- you had also
11   noted that you and Daniel Sharkey often were in
12   the living area.  Is that area on this map?
13        A.    Here.  (Witness indicating.)
14             MS. YEH:  She's pointing to, for
15        the record, where it says dayroom and TV
16        room.
17   BY MS. YEH:
18        Q.    Well, actually maybe you can circle
19   that and this copy will be kept with the
20   transcript.
21        A.    (Witness complies.)
22        Q.    And did the two of you spend a lot
23   of time there?
24        A.    Yes.
```

Page 162

```
 1        Q.    Was there anywhere else on this map
 2   that the two of you spent time?
 3        A.    Yes.
 4        Q.    Can you describe what those
 5   locations or points -- excuse me.
 6             Can you point to those locations on
 7   the map?
 8        A.    Like at the chapel?
 9        Q.    And that's marked 207?
10        A.    Yes.  And in this room, 209.  And
11   here, this is a laundry that was downstairs, 225.
12   Or in the room where they were -- the exercise
13   room, 201.  Well, and the library, right, I said
14   that.  And here, I don't know, maybe in the room
15   for adult education.  (Witness indicating.)
16        Q.    214?
17        A.    Yes.
18        Q.    If you were to identify the
19   location where you spent more time, can you
20   identify that, with Daniel Sharkey?
21        A.    It would be here in Room 209, which
22   is where we watched movies, and here in the
23   chapel, and also here in the library, 202, which
24   is where we used the computer, and in the laundry
```

Page 163

```
 1   that was downstairs, also.  (Witness indicating.)
 2        Q.    And earlier you had testified that
 3   Josh Petrey had an office in what's marked 222?
 4             MR. JONES:  I'm going to object.  I
 5        think that's mischaracterizes her
 6        testimony.  I don't think that she
 7        testified that it was his office, that
 8        she met with him in that room.
 9   BY MS. YEH:
10        Q.    [E.D.], you had earlier
11   identified 222 as a location where you met Mr.
12   Petrey; is that correct?
13        A.    Yes.
14        Q.    And was that also his office?
15             MR. JONES:  Object to the form.
16             THE WITNESS:  That's the only
17        place, I believe, that we saw his office
18        that we could meet with him or that we
19        could go search for him.  If we had any
20        questions he would be there.
21   BY MS. YEH:
22        Q.    And from what you remember, was he
23   there regularly?
24        A.    Yes.
```

Page 164

```
 1        Q.    From that office, did he have a
 2   view of the living area that you had previously
 3   described?
 4             MR. JONES:  Objection, leading.
 5             THE WITNESS:  Well, yes, the office
 6        is here and the living room is here, so
 7        you could see.  It's in front of it.
 8        (Witness indicating.)
 9   BY MS. YEH:
10        Q.    I'm going to show you another map
11   to identify.
12             MS. YEH:  And we'll mark this as
13        Berks County-16.
14             - - -
15             (Whereupon, Exhibit Berks County-16
16        was marked for identification.)
17             - - -
18   BY MS. YEH:
19        Q.    If you can remember, where was your
20   room, the first room that you stayed in?
21        A.    Here.  (Witness indicating.)
22             MS. YEH:  And she's pointing to
23        what's marked 304, and it also says
24        Bedroom Number 11.
```

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 165

BY MS. YEH:
 2       Q.     And then later you had -- you had
 3   testified earlier that you had changed rooms.
 4              Do you remember where that second
 5   room was?
 6       A.     On the other hallway.  That was
 7   this one, Number 4.  (Witness indicating.)
 8       Q.     And that's also marked 305.
 9              And just for clarification, how
10   many floors was this building?
11       A.     The only ones that we had access to
12   were only this one, the first one and the second.
13   (Witness indicating.)
14       Q.     So this map, is it the first or the
15   second floor?
16       A.     Second.
17       Q.     Okay.  And you had earlier
18   testified that sometimes you and Daniel Sharkey
19   were in the laundry.  Can you identify that
20   location?
21       A.     Here.  That would be 318.
22   (Witness indicating.)
23       Q.     You earlier testified that there
24   were other staff members who had the same --

Page 166

 1   worked at the same time as Daniel Sharkey, and
 2   that there were times when the staff members
 3   worked in the same location as Daniel Sharkey.
 4              Were there times when he was the
 5   only staff member on duty in the area in which you
 6   were in?
 7       A.     Yes.
 8       Q.     And how often did that happen; if
 9   you remember?
10       A.     Often, frequently.
11       Q.     You had also testified earlier that
12   Daniel Sharkey had made some comments that he had
13   access to the cameras.
14       A.     Yes.
15       Q.     Did you believe his statements?
16       A.     Yes.
17       Q.     And can you explain why?
18       A.     Because, for example, if he wasn't
19   at work one day and I did something he would then
20   tell me what I had done that day, the day after.
21   And then one day after he gave me the music CD we
22   were in this room, in Room 209, and I was with
23   Patricia and other guys and we were listening to
24   the music and we were kind of started dancing and

Page 167

 1   he came in very mad about it and he had not been
 2   there.  It's like he had seen the camera and what
 3   was happening.
 4              MS. YEH:  I don't have any more
 5       questions.
 6              MR. CONNELL:  I have some
 7       follow-up.
 8              ---
 9              EXAMINATION
10              ---
11   BY MR. CONNELL:
12       Q.     So because he had told you what you
13   had done on a particular day you believe he had
14   access to the cameras, that's your testimony
15   today?
16       A.     Yes.
17       Q.     So it's not possible it could have
18   been because he was talking to other residents
19   such as Patricia about what you may have done?
20       A.     No.
21       Q.     That's not possible?
22       A.     No.
23       Q.     He never talked with Patricia?
24       A.     Yes, he spoke with Patricia.  But I

Page 168

 1   don't think it was because he spoke to any
 2   residents that he knew.  And, also, when we were
 3   dancing here in this room I believe that he was
 4   looking at the cameras.  (Witness indicating.)
 5       Q.     I'm not going to talk about -- I'm
 6   not asking you about the question when you were
 7   dancing in the room.  I'm asking about because you
 8   say he knew what you did on a day he wasn't there.
 9   That's my focus of my questions right now.  We'll
10   talk about the dancing in a minute.
11       A.     Okay.
12       Q.     When you spoke to the investigators
13   back in 2014, okay, and you told them what Mr.
14   Sharkey said about access to the cameras, were you
15   being truthful?
16       A.     Yes.
17       Q.     Okay.  So if that's different than
18   what your testimony is here today, is that because
19   you've talked to how many attorneys between since
20   then and now, is that why your testimony has
21   changed or is it because has your memory changed?
22       A.     No, I don't know what has changed,
23   but these are the reasons.  This is what I
24   remember.

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 169

1    Q.    Is it your understanding that
2  because you were the unfortunate victim of Mr.
3  Sharkey's crime that you're more likely to gain
4  the asylum you are seeking in the United States?
5    A.    How's that?  I don't understand.
6    Q.    Do I have to rephrase the question?
7    A.    Yes, please.
8        MR. CONNELL: Okay. Mr. Diamond,
9     can you please restate the question so
10    that I can rephrase it?
11       - - -
12       (Whereupon, a pertinent portion of
13    the record was read back by the court
14    reporter.)
15       - - -
16  BY MR. CONNELL:
17    Q.    Do you still need me to rephrase
18  that question?
19    A.    The question is fine, but I don't
20  know how to answer your question.  This case, I'm
21  doing this case to bring justice, not to do
22  anything else.  Because just like it happened to
23  me it could happen to another person.  And I don't
24  think that it should end up in nothing just

Page 170

1  because I'm an illegal.
2    Q.    My question is with regards to your
3  -- the criminal case against Mr. Sharkey, and you
4  were interviewed in that and you were the primary
5  witness and the primary -- and the victim in the
6  criminal case against Mr. Sharkey.
7        My question for you is do you
8  believe that you are more likely to gain asylum
9  because you were the victim of that crime?
10       MS. YEH: Objection, asked and
11    answered.
12       MR. CONNELL: She didn't answer it.
13    She said I don't know how to answer it.
14    She didn't answer it.
15  BY MR. CONNELL:
16    Q.    So you can answer over the
17  objection anyway.
18       MS. YEH: You may answer.
19       THE WITNESS: No, I don't know.  I
20    don't know how to answer this question.
21  BY MR. CONNELL:
22    Q.    Okay.  If you can direct your
23  attention to Exhibit-11.
24    A.    (Witness complies.)

Page 171

1    Q.    Now, you've identified several
2  areas on this exhibit as to various locations
3  where you were with Mr. Sharkey; right?
4    A.    Yes.
5    Q.    You'll agree with me that there are
6  cameras covering 209?
7    A.    Yes.
8    Q.    And you'll agree with me that there
9  are cameras covering 205?
10    A.    Oh, yes, 205, oh, yes.
11    Q.    And you agree with me there are
12  cameras covering 201?
13    A.    Yes.
14    Q.    And you'll agree with me that there
15  are cameras covering 214?
16    A.    Yes.
17    Q.    And there are cameras covering the
18  adult education room and cameras covering the
19  library?
20    A.    Yes.
21    Q.    And you know that there are cameras
22  covering the chapel except for the one little area
23  where you and Mr. Sharkey willingly went in and
24  kissed; right?

Page 172

1    A.    Yes.
2    Q.    And you know that there are no
3  cameras covering the laundry room; correct?
4    A.    Yes.
5    Q.    All of these areas that you
6  described as you and Sharkey being together are
7  also areas where all residents have access to;
8  correct?
9    A.    Yes.
10    Q.    So this is areas where throughout
11  the entirety of the day residents are walking
12  about, milling about and gathering; correct?
13    A.    Yes.
14    Q.    And these are also areas where
15  staff walk around on a regular basis and interact
16  with the residents on a regular basis; correct?
17    A.    Yes.
18    Q.    And staff on a regular basis played
19  games with residents; correct?
20    A.    Yes, some of them.
21    Q.    Okay.  And staff on occasion will
22  watch movies on movie night with the residents;
23  correct?
24    A.    Yes.

949df393-37ee-4bd5-ad9a-33c5dade589c

Page 173

1      Q.     And staff go outside with residents
2   when they go outside; yes?
3      A.     Yes.
4      Q.     And you would agree with me that
5   it's not unusual for staff and residents to be
6   interacting with each other throughout the common
7   areas of the Berks County Residential Center?
8      A.     Yes, but it's not always the same
9   person that will be in that place.
10     Q.     But it is not unusual that at any
11  time of the day to see staff walking around in the
12  facility interacting with residents; correct?
13     A.     No.
14     Q.     And, in fact, during the period of
15  time where you first kissed Mr. Sharkey and you
16  learned that Mr. Sharkey was no longer employed
17  there you interacted with other staff members,
18  also; right?
19     A.     I didn't hear the question well.
20            Could you repeat the question
21  please?
22            - - -
23            (Whereupon, a pertinent portion of
24            the record was read back by the court

Page 174

1   reporter.)
2            - - -
3            THE WITNESS:  Yes.
4            MR. CONNELL:  I don't have any
5   other questions.
6            MR. JONES:  Nothing further from
7   me.
8            MS. YEH:  We're done.  Nothing from
9   me.
10           - - -
11           (Whereupon, the deposition
12  concluded at 5:43 p.m.)
13           - - -
14
15
16
17
18
19
20
21
22
23
24

Page 175

1
2
3            CERTIFICATION
4
5            I, DOUGLAS S. DIAMOND, hereby
6   certify that the foregoing is a true and correct
7   transcript transcribed from the stenographic notes
8   taken by me on Monday, June 19, 2017.
9
10
11
              DOUGLAS S. DIAMOND
12            Court Reporter - Notary Public
13            (This certification does not apply
14  to any reproduction of this transcript, unless
15  under the direct supervision of the certifying
16  reporter.)
17
18
19
20
21
22
23
24

Page 176

1            ACKNOWLEDGEMENT OF DEPONENT
2            I, ██████E.D.██████, do hereby
3   certify that I have read the foregoing pages,
4   _____, and that the same is a correct
5   transcript of the answers given by me to the
6   questions therein propounded, except for the
7   corrections or changes in form or substance, if
8   any, noted in the attached Errata Sheet.
9   _____   _____
10  DATE               SIGNATURE
11           - - - - - - - -
              E R R A T A
12           - - - - - - - -
13  PAGE   LINE      CHANGE
14
15
16
17
18
19
20  SUBSCRIBED AND SWORN TO BEFORE ME THIS
21  _____DAY OF _____, 2017.
22  My Commission expires:_____
              Notary Public
23
24

949df393-37ee-4bd5-ad9a-33c5dade589c