# EXHIBIT 3

```
 1            UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    -  -  -
    E.D.                    :
 4                          :
         v.                 :
 5                          :
    DANIEL SHARKEY, et al.  :  NO. 16 CIV. 2750
 6
                    -  -  -
 7            July 12, 2017
                    -  -  -
 8
 9            Oral deposition of DANIEL WILLIAM
10  SHARKEY, taken pursuant to notice, was held at
11  the Berks County Government Offices, 633 Court
12  Street, 14th Floor, Reading, Pennsylvania,
13  commencing at 9:48 a.m., on the above date,
14  before Sherry L. Stills, Court Reporter and
15  Notary Public for the Commonwealth of
16  Pennsylvania.
17                    -  -  -
18
19
20
21
22        ESQUIRE DEPOSITION SOLUTIONS
             1835 Market Street
                Suite 2600
23        Philadelphia, Pennsylvania 19103
               (215) 988-9191
24
```

```
 1  APPEARANCES:
 2
        PENNSYLVANIA INSTITUTIONAL LAW PROJECT
 3      BY:  SU MING YEH, ESQUIRE
             MATTHEW ARCHAMBEAULT, ESQUIRE
 4      718 Arch Street
        Suite 304S
 5      Philadelphia, Pennsylvania  19106
        (215) 925-2966
 6      smyeh@pailp.org
        Representing the Plaintiff
 7
 8
        THE MacMAIN LAW GROUP LLC
 9      BY:  MATTHEW J. CONNELL, ESQUIRE
             TRICIA M. AMBROSE, ESQUIRE
10      101 Lindenwood Drive
        Suite 160
11      Malvern, Pennsylvania  19355
        (484) 318-7803
12      MConnell@macmainlaw.com
        TAmbrose@macmainlaw.com
13      Representing all Berks County defendants
        except Daniel Sharkey
14
15
        U.S. DEPARTMENT OF JUSTICE
16      UNITED STATES ATTORNEY'S OFFICE
        BY:  LANDON Y. JONES, ESQUIRE
17      615 Chestnut Street
        Suite 1250
18      Philadelphia, Pennsylvania  19106
        (215) 861-8323
19      landon.jones@usdoj.gov
        Representing the Defendant,
20      Jeremiah Petrey
21
    ALSO PRESENT:
22      Liam Thomas, Intern
        Diane Edwards
23      David Smith
        Jamie Himmelberger
24
```

```
 1
 2                    -  -  -
                    I N D E X
 3                    -  -  -
 4  Testimony of:  DANIEL WILLIAM SHARKEY
 5    BY MS. YEH          6, 253
      BY MR. JONES        248
 6    BY MR. CONNELL      132, 256
 7
                    -  -  -
 8            E X H I B I T S
                    -  -  -
 9
10  NO.           DESCRIPTION        PAGE
11  Berks County 50  Document Bates
                     stamped Berks
12                   02007 - 78        70
    Berks County 51  Map               93
                     Berks County 52  Map               93
13  Berks County 53  Disciplinary action
                     report Bates
14                   stamped Berks
                     02071 - 72       124
15  Berks County 54  Disciplinary action
                     report Bates
16                   stamped Berks
                     02068- 70        128
17  Berks County 55  SAAPI documents
                     Bates stamped
18                   Berks 02381 - 88  236
    Berks County 56  Document Bates
19                   stamped Berks
                     02205            237
20  Berks County 57  Document Bates
                     stamped Berks
21                   02159            238
    Berks County 58  Document Bates
22                   stamped Berks
                     02135            243
23  Berks County 59  Documents Bates
                     stamped Berks
24                   02406 - 02411    243
```

```
 1                    -  -  -
          E X H I B I T S (Continued)
 2                    -  -  -
 3  NO.           DESCRIPTION        PAGE
 4  Berks County 60  Full-time new
                     hire outline     245
 5  Berks County 61  ChildLine and
                     mandated reporting
 6                   training test    246
    Berks County 62  Identification and
 7                   report abuse
                     skillout         246
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 5

```
1   - - -
              DEPOSITION SUPPORT INDEX
2                   - - -
3   Direction to Witness Not to Answer
4   Page Line  Page Line        Page Line
5   None
6
7
8   Request for Production of Documents
9   Page Line  Page Line        Page Line
10  None
11
12
13  Stipulations
14  Page Line  Page Line        Page Line
15  6   2-6
16
17
18  Question Marked
19  Page Line  Page Line        Page Line
20  None
21
22
23
24
```

Page 6

1                       - - -
2           (It is hereby stipulated and agreed by
3   and among counsel that sealing, filing and
4   certification are waived; and that all
5   objections, except as to the form of questions,
6   be reserved until the time of trial.)
7                       - - -
8           DANIEL WILLIAM SHARKEY, after having
9   been duly sworn, was examined and testified as
10  follows:
11                      - - -
12                  EXAMINATION
13                      - - -
14  BY MS. YEH:
15      Q.    Mr. Sharkey, just to explain what
16  she means by usual stipulations is that
17  afterwards there's going to be a transcript
18  produced from this deposition, and you have the
19  opportunity to read the transcript and review
20  it.  You know, if there are certain errors in
21  it, you would be able to make notations of those
22  errors.  Would you like to do that or would you
23  prefer to waive that right?
24      A.    No, I would like to review it.

Page 7

1       Q.    Okay.  So, that's called read and
2   sign.  So, he'd like to do that.
3           MR. JONES:  Are we agreed that if
4   there is an objection raised by one defendant it
5   will apply for all defendants or do you want me
6   to chime in, you know, serially for all
7   objections that Mr. Connell may raise?
8           MS. YEH:  That's fine if we can --
9           MR. JONES:  An objection for one
10  is an objection for all?
11          MS. YEH:  For all.
12          MR. JONES:  Thank you.
13          MR. CONNELL:  Also, I think it
14  would be incumbent upon us to state for the
15  record that otherwise the deposition --
16  inclusive of reading and signing as the witness
17  has indicated he wishes to do, that otherwise
18  the deposition will go forward in accordance
19  with the rules of civil procedure.
20          MS. YEH:  Okay.  And perhaps I
21  should further explain that objections will just
22  generally be not made here except for the form
23  of the question or if it relates to a matter of
24  attorney/client privilege that may be raised.

Page 8

1   Otherwise, objections are still preserved for
2   the court to be able to rule on later.
3   BY MS. YEH:
4       Q.    Okay.  Good morning.
5       A.    Good morning.
6       Q.    My name is Su Ming Yeh, and I'm an
7   attorney who represents the plaintiff in this
8   case, **E.D.** .  I'll be taking your
9   deposition today.
10          Have you ever been deposed before?
11      A.    No.
12      Q.    So, I'm going to just explain a
13  few ground rules.  So, in this deposition I'll
14  be asking you questions and you'll respond.
15  After I ask you questions, there are two other
16  attorneys in this room who have the opportunity
17  to also ask you questions, and they can
18  introduce themselves more later, but one of them
19  is Mr. Landon Jones who represents one of the
20  defendants who works for the United States
21  government, and Matthew Connell represents a
22  number of the individuals who work for Berks
23  County as well as Berks County and the facility
24  itself.



1        So, in terms of ground rules,
2   everything that I say, you say or what other
3   people say in the room will be taken down by the
4   court reporter.  So, therefore, it is important
5   that you make all your answers verbal in nature.
6   So, for example, the court reporter cannot write
7   down a shake of the head or a nod of the head.
8   So, I'm going to ask you to say yes or no or
9   some other response verbally.  Do you
10  understand?
11      A.    I do.
12      Q.    And do you understand that you are
13  under oath today?
14      A.    I do.
15      Q.    Do you understand that this means
16  that you are swearing that all your answers to
17  my questions are true and correct?
18      A.    I do.
19      Q.    If at any point you need a break,
20  feel free to let me know and we can take that
21  break.  The only requirement is that if I have a
22  question that I have already asked, that you
23  first respond to that question and then we can
24  take that break.  Do you understand?

1       A.    I do.
2       Q.    If at any time you do not
3   understand a question that I ask you will you
4   let me know?
5       A.    Yes.
6       Q.    Okay.  And if at any point through
7   this deposition you realize that an answer that
8   you gave earlier is not correct or not complete
9   can you let me know?
10      A.    Yes.
11      Q.    Is there any reason at all today
12  why you would not be able to give full and
13  complete testimony?
14      A.    No.
15      Q.    And are you taking any medications
16  at all that would prevent you from testifying
17  truthfully or completely today?
18      A.    No.
19      Q.    And, Mr. Sharkey, I just want to
20  note, you do understand that you had the right
21  to bring an attorney to this proceeding or to
22  this deposition?
23      A.    Yes.
24      Q.    And currently is there anyone in

1   the room who is your attorney?
2       A.    No.
3       Q.    I'm first going to ask you some
4   background questions.  Can you please tell me
5   your date of birth?
6       A.    ▮▮▮▮▮▮▮
7       Q.    And what is your -- where do you
8   currently live?  You can give me the city and
9   the state.
10      A.    Reading, PA.
11      Q.    Can you describe your educational
12  background for me?
13      A.    And I have a Bachelor's degree.
14      Q.    Did where you get the Bachelor's
15  degree from?
16      A.    Alvernia University.
17      Q.    And when did you graduate?
18      A.    2006.
19      Q.    And what was your degree in?
20      A.    Criminal justice.
21      Q.    Can you describe whether or not
22  you have ever been in the armed forces?
23      A.    Yes, I have.
24      Q.    And what was your what branch and

1   what did you do?
2       A.    I was in the United States Coast
3   Guard for five years and I was a machinery
4   technician third class petty officer.
5       Q.    And when did you -- when were you
6   with the U.S. Coast Guard?
7       A.    '96 to 2000 -- no.  Sorry.  '97 to
8   2002.
9       Q.    Okay.  And with the Coast Guard,
10  I'm not sure if it's like with other military,
11  were you discharged from there?
12      A.    Honorable discharge.
13      Q.    Okay.  And what is your -- do you
14  have a current job or vocation?
15      A.    I do not.  I stay home with my
16  kids.
17      Q.    Okay.  So, what I'm going to ask
18  you to do is just to go through briefly your
19  work history starting basically from the time
20  when you graduated from college moving forward.
21  Okay.  So, 2006?
22      A.    Okay.
23      Q.    So, when you finished your degree,
24  what job did you have, if any?



1    A.    I was employed by Berks County.
2    Q.    And what was your -- what agency
3 or facility did you work for?
4    A.    I worked at the juvenile detention
5 center.
6    Q.    And what was your position?
7    A.    A juvenile corrections counselor.
8    Q.    And how long did you have that
9 position for?
10    A.    Roughly, six years.
11    Q.    Was that till about 2012, then?
12    A.    Yes.  Then I was laid off.
13    Q.    Okay.  And then you said you were
14 laid off?
15    A.    Yes.
16    Q.    And when did you next find
17 employment?
18    A.    I worked for Unisource Management
19 Corporation out of Vermont.
20    Q.    And were you living in Vermont at
21 that time?
22    A.    I was not.  Still living here.
23    Q.    Okay.  And how long did you have
24 that?

1    A.    That was about a year, a year and
2 a half.
3    Q.    And what was your position?
4    A.    I was a field auditor for
5 commercial properties.
6    Q.    Okay.  And what did you do after
7 that?
8    A.    I went back to the -- working for
9 the county at the Berks County Residential
10 Center.
11    Q.    And what was your position there?
12    A.    Shelter care counselor.
13    Q.    And how long did you work there
14 till?
15    A.    Till 2014.
16    Q.    And then after that employment did
17 you have other employment?
18    A.    I worked for Tap Pro Tavern
19 Services.
20    Q.    And what was your position?
21    A.    I installed -- I didn't really
22 have -- I would install beer systems.
23    Q.    What do you mean, machinery or was
24 it --

1    A.    Like taps in bars and restaurants
2 and stuff.
3    Q.    Oh, okay.  And how long did you
4 have that position for?
5    A.    Probably about six months.
6    Q.    Okay.  And what did you do after
7 that, if anything?
8    A.    Nothing.  Went to jail.
9    Q.    Okay.  And how long did you end up
10 serving in jail?
11    A.    152 days.
12    Q.    And when were you released?
13    A.    September 11th of last year.
14    Q.    2016?
15    A.    2016.
16    Q.    And have you had any employment
17 since then?
18    A.    I've done construction work but
19 nothing -- you know, not full time.
20    Q.    Okay.  And when you did
21 construction work was it for a particular
22 company at all?
23    A.    No.  It was just subcontractor
24 work.

1    Q.    Okay.  And as a subcontractor were
2 you working sort of as an independent person or
3 did you go through some type of company or
4 agency or a union?
5    A.    An independent person.
6    Q.    Okay.  So, I'm going to --
7 actually, do you have any other work experience
8 aside from what you have listed to me?
9    A.    Not since the time you said.
10    Q.    Okay.  So, I'm going to focus my
11 questions more on your time at the Berks County
12 Residential Center.  So, you had stated you
13 started working at the Berks County Center in
14 2012?
15    A.    Yeah.  I don't have the exact
16 date, but it's somewhere around then.
17    Q.    I'm sorry.  That's -- actually,
18 you didn't say.  You said that you worked at the
19 juvenile detention center 2006 through 2012.
20 Then you worked for another about year, year and
21 a half.  When did you start working at the Berks
22 County --
23    A.    I don't know what the date is.  I
24 don't know what the time was.



1    Q.    Was it roughly 2013?
2    A.    I was there for I think like 13,
3    14 months. I don't know.
4    Q.    Okay. While you were employed at
5    the Berks County Residential Center you had
6    stated you were a shelter care counselor?
7    A.    Yes.
8    Q.    Did you hold any other positions
9    there?
10    A.    No.
11    Q.    So, I'm going to ask you during
12    your time there what your job duties and
13    responsibilities were?
14    A.    Okay.
15    Q.    So, can you first describe to me
16    what your responsibilities were as a shelter
17    care counselor?
18    A.    Maintain the safety and security
19    of all the residents that were there. I mean,
20    there was collateral duties that were there, to
21    get people to appointments and emergencies or if
22    stuff had to get done, you know, you were just
23    asked by supervisors to do collateral stuff
24    around the facility.

1    Q.    Okay.
2    A.    But the main thing was to be with
3    the residents.
4    Q.    And while you were there what
5    shift did you work?
6    A.    Second shift.
7    Q.    And what time did you have for
8    your shift?
9    A.    I believe it was 2:15 to 10:15,
10    10:30, somewhere in there.
11    Q.    Okay. And while you were there
12    what we learned from other individuals who
13    testified in depositions was that there were
14    various posts that you could work?
15    A.    Yes.
16    Q.    Is that correct?
17    A.    Yes, there is.
18    Q.    While you were there did you work
19    a variety of posts?
20    A.    Yes.
21    Q.    And were you rotated through
22    different posts on a day-to-day basis?
23    A.    Sometimes.
24    Q.    Okay. And so did the job duties

1    slightly vary from post to post?
2    A.    Yes.
3    Q.    Okay. So, I'm going to ask you to
4    talk about those different job duties, and what
5    I'll do is I'm going to first -- there's a pile
6    of documents right here, and I'm going to pull
7    up Berks County 19. So, I just placed in front
8    of you Berks County 19 which on the very top
9    says Second Shift Unit and Duty Assignments.
10    This document was produced to us through the
11    discovery and litigation process. We understand
12    it's from the year 2014. It doesn't say that,
13    but that's what we were informed of.
14         Have you seen a document like this
15    before?
16    A.    Yes.
17    Q.    And when would you have seen it?
18    A.    They are posted on the board down
19    in the briefing room.
20    Q.    And what type of document is it?
21    A.    Second shift unit and duty
22    assignments.
23    Q.    And what does it tell you?
24    A.    You look on here and find out

1    where you're going to be at for the day.
2    Q.    Okay. So, looking at this
3    document, looking just at the date, Thursday,
4    July 31st going across the fifth box there's the
5    name Dan S listed in there.
6    A.    Uh-huh.
7    Q.    Would that be you?
8    A.    Yes, it is.
9    Q.    Okay. So, then does that mean
10    that on that day, on July 31st it's listed under
11    the column M1, you would have been assigned to
12    the M1 post?
13    A.    Yes.
14    Q.    Okay. So, what I'm going to do is
15    I'm going to go through each of these posts and
16    ask you what you remember to be your job duties
17    and responsibilities and what you would have
18    done in that position.
19    A.    Okay.
20    Q.    So, the first position is listed
21    B1, and under there is written logbook. Can you
22    tell me during your employment at the Berks
23    County Residential Center what were your job
24    duties if you were assigned to B1 post?



1    A.    B1 post was probably the most
2  important post there because you were in charge
3  of logging everything.  You know, doing counts
4  of all the residents, making sure everybody was
5  there as well patrolling that floor, that B1
6  floor.  And anybody that came in and out of the
7  building you were to log that in, their enter
8  and exit.
9    Q.    And while you were in that post
10  did you tend to stay in a certain location?
11    A.    Yeah.  You are on that -- on the B
12  floor, yeah.
13    Q.    And, just to clarify for the
14  record, B floor, is that the third floor of the
15  facility?
16    A.    Are you counting the basement,
17  too?
18    Q.    Well, I guess some people refer to
19  it as the third floor.  Perhaps there is the one
20  floor where you enter --
21    A.    Uh-huh.
22    Q.    -- more of like a ground floor.
23  Some people were referring to that as a second
24  floor.

1    A.    Okay.
2    Q.    Unless you refer to it as the
3  first floor.  I don't want to put words in your
4  mouth.
5    A.    I don't know.  That's fine.  Yeah,
6  third floor, I guess, if you include the
7  basement.
8    Q.    Or if you want to call it the
9  upper floor we could do that.
10    A.    Upper floor, yeah.
11    Q.    So, B1 would be the upper floor;
12  is that correct?
13    A.    Yes.
14    Q.    And that floor also has the dining
15  room?
16    A.    Yes, the cafeteria.
17    Q.    Cafeteria?
18    A.    Medical.
19    Q.    Medical.  And what else was on
20  that floor?
21    A.    There's bathrooms, the residents'
22  rooms, a common area for the residents.  That's
23  about it.
24    Q.    Anything else?

1    A.    The storage.  Storage.  I mean,
2  like all the way back in the medical wing
3  it's -- the food stuff was back there.  There's
4  a clothing closet.  There's -- that's all I
5  remember.  I don't know.
6    Q.    That's fine.  Okay.  All right.
7  So, while you were on B1 post was there a
8  particular area or location that you were
9  required to be in?
10    A.    I don't know if you are required
11  to be in there, but you were supposed -- you
12  were generally around the desk there, but, I
13  mean, you could -- you know, you could be
14  relieved of that post.  You know, someone would
15  just take over the book.  I mean, it's not like
16  you were required to be there.
17    Q.    And how would you be relived from
18  the post?
19    A.    Another staff member would come.
20    Q.    Okay.  And did you have any other
21  duties as -- on the B1 post?
22    A.    Not -- usually the logbook was
23  pretty much you were -- oh, you had to make sure
24  the counts were all correct and stuff like that,

1  but usually the B1 was like the logbook and the
2  counts and stuff were pretty much here and the
3  residents.
4    Q.    When you say the residents, what
5  were your responsibilities towards the residents
6  on B1 post?
7    A.    There was counts during certain
8  times of the day.
9    Q.    Anything else?
10    A.    Unh-unh.
11    Q.    Is that a no?
12    A.    No.  Sorry.
13    Q.    Okay.  Okay.  So, let's move to
14  the next one, B2 and it also says kitchen
15  cleanup.  What were your responsibilities during
16  your employment at the Berks County Residential
17  Center of B2 post?
18    A.    B2 was kind of like the back part
19  near medical.  You were supposed to be stationed
20  back there.  And then the kitchen cleanup part
21  was at the end of the mealtime you were supposed
22  to assist in the cleanup.  Help with the
23  cleanup.  There's residents that had, you know,
24  certain job duties there and you just kind of



1  helped them out or, you know, kind of get them
2  to help clean up the kitchen when dinner was
3  done.
4       Q.    Okay.  And so during your post the
5  main meal that would have been done was the
6  dinner meal?
7       A.    Uh-huh.  Yes.
8       Q.    Okay.  And aside from the kitchen
9  cleanup what were your other responsibilities?
10 You said you were located more near the medical
11 area?
12      A.    Yes.
13      Q.    Okay.  And if you were assigned to
14 that post what else did you do, if anything?
15      A.    Well, you were to monitor the
16 residents that were in that back part as opposed
17 to where the B1 desk would be.
18      Q.    And did you also go to the other
19 parts on that floor as part of your B2 post
20 responsibilities?
21      A.    Did I personally?
22      Q.    Yes.
23      A.    Yeah.
24      Q.    Okay.

1       A.    Yes.
2       Q.    Okay.  And what would you do when
3  you went to the other locations on that floor?
4       A.    You know, just move about.  You
5  know, make sure everything is okay and then go
6  back to your post and just keep checking, make
7  sure everything is all right.
8       Q.    Okay.  And did you have any
9  requirements to check certain locations at
10 certain times?
11      A.    Requirements by like the county,
12 by policy or --
13      Q.    As part of your job duties from
14 what you understood your job duties to be at
15 that time?
16      A.    For the B2 post?
17      Q.    Yes.
18      A.    I mean, I used to check -- check
19 areas, but I don't know if everybody was
20 required to do it.
21      Q.    Okay.
22      A.    I mean, if there was an unlocked
23 door, I mean, you don't want the door to be
24 unlocked or stuff like that.  It's a safety --

1  security issue.  So, I mean, I guess it -- I
2  think you are required to do it.
3       Q.    Okay.  All right.  So, let's just
4  move on and get a description of each of these
5  different posts.  What about the A1 post?
6       A.    I believe that's downstairs or the
7  first floor, I guess, or lower floor.
8       Q.    Okay.
9       A.    And I believe that's at the desk
10 down -- the desk common area there.
11      Q.    Is that the desk in sort of the
12 dayroom area or closer to the entrance?
13      A.    I believe that's the A1 post.
14      Q.    And what were your
15 responsibilities if you had A1 post?
16      A.    You know, monitoring the
17 residents.  You know, there was activities that
18 were done there and safety and security of the
19 residents while they were playing the games or
20 just watching TV, and just make sure nothing was
21 going awry.
22      Q.    When you say monitor residents,
23 how closely were you expected to monitor the
24 residents?

1       A.    I don't understand.  What do you
2  mean by how closely?
3       Q.    Well, were there certain
4  expectations in terms of making observations of
5  certain numbers of residents or certain areas or
6  like, when you were there, what would you do if
7  you were on A1 post?
8            MR. CONNELL:  I'm going to object
9  to the form of the question.
10 BY MS. YEH:
11      Q.    Yes.  It was actually kind of a
12 long question.  Let me try to tighten that up
13 for you.  You had mentioned as part of your
14 duties that you were -- part of your duties were
15 to monitor residents.  Why don't you explain to
16 me what you mean by monitoring residents.
17      A.    A lot a times in that area you get
18 a lot of juveniles down in that area to play
19 sports or the sporting activities that were down
20 there.  So, you know, you would interact with
21 them or you would -- you know, if they were
22 playing, you just want to make sure they are all
23 getting along and everybody is doing what they
24 are supposed to be doing.  I mean, sometimes you



1  would take a head count and stuff like that or
2  everybody would have radios, you would radio,
3  you know, two coming up or -- you know, to let
4  the top floor know what was going on.
5      Q.   Okay.  Anything else with respect
6  to monitoring the residents on A1 post?
7      A.   No.
8      Q.   Okay.  And any other
9  responsibilities that you remember from A1 post?
10     A.   I mean, you are responsible for
11 the cleaning aspect of it.
12     Q.   Okay.  And what was that?
13     A.   Same thing as -- I mean, there's
14 cleaning had to get done throughout the
15 facility.  So, there was residents and staff,
16 they would assist in mopping the floors and
17 vacuuming and wiping stuff down, just making
18 sure it was all clean.
19     Q.   Okay.  Any other responsibilities?
20     A.   No.
21     Q.   Okay.  What about A2 and A3?  And
22 I say them together because they were listed
23 together here on this chart.  If for some reason
24 they are different, feel free to tell me.

1      A.   Are they different?
2      Q.   Well, why don't you tell me the
3  job responsibilities you had if you were on A2
4  and A3 -- or A3 post?
5      A.   I believe A2 and A3 were similar
6  to B2 on the top floor.  They were more towards
7  the -- I guess like the front part of the
8  facility, and that job was similar.  There was,
9  you know, activities going on.  There was a
10 computer room there and your job was to
11 maintain, you know, safety and security of the
12 residents while you were in -- at those posts.
13     Q.   Okay.  And why don't you describe
14 for me what else was on that -- the A floor just
15 in terms of the physical structures.  What
16 other -- you mentioned -- well, why don't you
17 just tell me what else is on that floor?
18     A.   Physical structures?
19     Q.   Uh-huh.
20     A.   What, tables and couches and
21 chairs?
22     Q.   What rooms were there?
23     A.   Oh, what rooms were there?
24     Q.   Yes.  What else was there?

1      A.   There was the supervisors' office,
2  there was another common room down there.  There
3  was an arts and crafts room.  There was like a
4  spot where we kept all the, you know, chemicals
5  and stuff for cleaning.  There was a church
6  area.  There was a school.  There was a couple
7  other various rooms that were used for other
8  activities that just had tables in them.  There
9  were staff bathrooms, residents bathrooms, there
10 was a computer room.  There was the doors to --
11 to the management.  There was door to
12 immigration and customs.  There was like a gym
13 area where they had box hockey and kind of an
14 open floor in there with gym equipment in.  And
15 then there was another supervisors' office down
16 towards the end.
17     Q.   Okay.  And when you mention
18 school, were those classrooms or was there
19 actually like a physical school in there?
20     A.   They are classrooms.
21     Q.   Okay.  Okay.  So, you had
22 described that on A2 and A3 post was like
23 similar to B2 in that generally you were more
24 towards the front of the facility.  You just

1  described a number of different rooms.  What do
2  you mean by you were more towards the front of
3  the facility?  What was on that end?
4      A.   I think that's more of like --
5  it's more of like a coverage issue than it is --
6  'cause, if you're B1, you are kind of up in that
7  part of the building and there was other posts
8  to kind of cover the stuff that they couldn't
9  see.  So, you would be in back towards the
10 front, the entrance of the building.
11     Q.   Okay.  So, the A2 and A3 posts
12 might be more towards the front, the entrance of
13 the building?
14     A.   Entrance of the building.
15     Q.   Okay.  Anything else with respect
16 to your duties for A2 and A3 post?
17     A.   No.
18     Q.   All right.  So, the next one on
19 the list is M1.  Can you describe while you were
20 employed there what were your job
21 responsibilities?
22     A.   That's the medical post.  That's
23 on the top floor.
24     Q.   Okay.  And what were your job



1  responsibilities?
2      A.    Your job responsibilities were to,
3  if there was any appointments that need to be
4  taken care of, you were given a list of those
5  medical appointments, and your job was to take
6  those residents to their -- you know, their
7  appointment.  Or if there was any kind of injury
8  or something like that outside, you know, or
9  anywhere in the facility, your job was to, you
10  know, let the nurse or, you know, the doctor
11  there know what was going on and escort them up
12  there, you know, be part of that.
13      Q.    Uh-huh.
14      A.    And then clothing closet and
15  trash.  There was a clothing closet that people
16  donated clothes to, and that was for the
17  residents to -- if they asked to go back there,
18  you would go back there.
19      Q.    Okay.  You had said you got a list
20  of individuals, and would you have to go and
21  inform those individuals they had a medical
22  appointment?
23      A.    Yes.
24      Q.    And how would you go about doing

1  that?  How would you inform the residents or the
2  detainee that they had a medical appointment?
3      A.    I don't understand.  How would I
4  inform them?
5      Q.    Yes.
6      A.    Well, a lot of times they knew
7  they had an appointment, because it would be a
8  repetitive thing.  I mean, if you have diabetes,
9  it's a repetitive thing.  So, a lot of them know
10  or they would even come to you and say I need to
11  go at 2:00 and 4:00, but you would just go and
12  tell them they had an appointment or show them a
13  name on a piece of paper.
14      Q.    Okay.  All right.  And the next
15  position listed is floater.
16      A.    Uh-huh.
17      Q.    Can you describe what that
18  position is?
19      A.    The floater is for kind of like
20  the extras on the shift.  You know, they are
21  either assisting outside, you know, if there was
22  too many people outside or if there was, you
23  know, anything that had to get done.  They were
24  kind of like the extras on the shift.  So, if

1  they needed -- they would do breaks if you
2  needed.  You know, if you were on the logbook
3  and you needed somebody, you would called a
4  floater on the radio and they would come relieve
5  you of your post and saw everything was -- so
6  you didn't abandon your post.  So, that was kind
7  of the floater's role.
8      Q.    All right.  And what about --
9  anything else?  Before I move on, anything else
10  for the floater's role?
11          MR. CONNELL:  Object to the form
12  of the question.
13  BY MS. YEH:
14      Q.    You can answer.
15      A.    Well, it says school.  So, the
16  floaters would be at school, too, because you
17  always had a staff member in the classrooms,
18  too, as well.  So -- no, that's it for that one,
19  I guess.
20      Q.    Okay.  And then the next post
21  listed is outside.  Can you describe what that
22  post is?
23      A.    Any -- you were posted outside by
24  the fenced-in area where there is volleyball and

1  soccer and all the activities outside.  Kids
2  could ride their bikes and play.  Your job was
3  just to kind of rove out there and make sure
4  everything -- everybody was safe and, you know,
5  nothing was going on.
6      Q.    Okay.  And if your post was
7  outside were you typically outside with the
8  individuals there or like do you mean that you
9  were actually physically outside?
10      A.    Yeah.  As long as it's residents
11  out there, yes.
12      Q.    And if there were no residents
13  there then where would you be?
14      A.    You were inside the double doors
15  there right by the other supervisors' office
16  there by the entrance door.  Entrance of the
17  facility.
18      Q.    Okay.  So, were the doors to the
19  outside also close to the entrance to the
20  facility?
21      A.    Yes.
22      Q.    Okay.  But they were separate
23  doors?
24      A.    Yes.



1    Q.    Okay.  And as the -- when you were
2  posted on the outside post did you have any
3  responsibilities towards that front entrance?
4    A.    I mean, you -- you could, but a
5  floater would have to come down there because
6  there was -- you know, there was -- you had to
7  log them in and give them a pass and stuff like
8  that.  So, you really couldn't leave, because
9  you couldn't see if you went there and if
10  somebody went outside you couldn't see.  So, I
11  would call a floater or supervisor to come down
12  there.
13    Q.    Okay.  So, when you were on the
14  outside post your focus was more on the door to
15  that outside area where the residents were
16  permitted?
17    A.    Right.
18    Q.    As opposed to the other door that
19  led to the exit to the facility?
20    A.    Right.  That was a secure door on
21  both sides, so there was no really -- residents
22  didn't go through that door.  That was more if
23  there was a visitor or if there was somebody
24  here that was there to visit in the facility.

1  Otherwise, you were stationed by that and I
2  believe A1 or A2 or A3 would let you know if --
3  you know, they would tell you on the radio if
4  there was residents coming outside and then you
5  would go outside.
6    Q.    And did you say that both doors
7  were secure?
8    A.    What both doors?
9    Q.    Sorry if I misunderstood you.  I
10  thought you said both doors were secured.  So,
11  maybe I should back up.  The door to --
12    A.    The door that goes to the front of
13  the building you can't access.  You can't access
14  that door.  Well, they can't access any of the
15  doors.  We had to open -- I think that first set
16  of doors they can open.  No, the first one they
17  can't, but the second one they could open.  You
18  had to have a key or whatever to open those
19  doors.  You couldn't just --
20    Q.    That would exit the whole
21  facility?
22    A.    Right.
23    Q.    What about the other --
24        MR. CONNELL:  I object to the form

1  of that question, but you can answer.  Just so
2  we're clear, sir, and in case it wasn't clearly
3  stated at the outset, at various times the
4  attorneys may object.  That doesn't prevent you
5  from answering.  It's just a matter of --
6        THE WITNESS:  Okay.  I'm just
7  pausing because I don't know what's going on.
8        MR. CONNELL:  No, appreciate that.
9  Just so you understand, it's not like in a
10  courtroom where somebody objects and then you
11  wait to hear what the judge says about that.
12        THE WITNESS:  Okay.
13        MR. CONNELL:  We object doing our
14  jobs as attorneys for purposes of the entirety
15  of the record.
16        THE WITNESS:  Okay.
17        MR. CONNELL:  But it doesn't
18  prevent you from answering.
19        THE WITNESS:  So, just keep going?
20  BY MS. YEH:
21    Q.    Yes.
22    A.    Okay.  What was that again?  The
23  doors.  The doors are all secure there.  I mean,
24  you need I think it's a magnetic key or whatever

1  to unlock the doors.  There was one door that
2  went out to the front of the building and then
3  there was a double set of double doors that went
4  out to the outside area.
5    Q.    Okay.  So --
6    A.    Which one you would need that key to
7  unlock any of those doors.
8    Q.    Okay.  All right.  So, if a
9  resident wanted to go to the outside area where
10  they were permitted, a staff member would have
11  to also key that door open?
12    A.    As far as I knew, yes.
13    Q.    Okay.  All right.  And then, in
14  general, were the residents -- could they choose
15  to go to the outside area or were there
16  scheduled times for them to go outside?
17    A.    On my shift?
18    Q.    Correct.
19    A.    No.  They were free to go out.  I
20  mean, obviously, if it was dinner time you
21  couldn't be outside or there was certain stuff
22  going on inside the facility there was times
23  where you weren't allowed to do it, but, other
24  than that, if it was the normal 2:00 to 10:00 so



1  to say shift, they were free to go out there.
2  We had somebody posted there.  So, as long as
3  there was somebody posted there, they were free
4  to go out there.
5      Q.    Okay.  So, even though the door to
6  the outside like yard area, if you will,
7  required like a magnetic key to open, they could
8  still choose to go to, and they would just need
9  to have a staff member open the door for them?
10     A.    The staff member would be posted
11 down there to go out there.
12     Q.    Okay.  So, what I wanted to do was
13 just ask a little bit more about like, if there
14 is such a thing, a typical day in terms of being
15 a shelter care counselor.  And it might be
16 that -- I understand that each day is never
17 going to be the same, but generally like you
18 arrive on shift, what do you do?  What's your
19 first responsibility?
20     A.    To get keys to the facility.
21 Well, punch -- punch in, make sure you are on
22 time, of course, and then you want to get keys.
23 So, there is a pegboard for keys.  Depending on
24 your post, you know, you would -- if you were B1

1  you would get the B1 keys.
2      Q.    You said there's a pegboard?
3      A.    Well, it's like a locked like
4  cabinet with the keys that are attached to it
5  for the facility.
6      Q.    And where was that located?
7      A.    In the briefing room on the -- in
8  the basement.
9      Q.    Okay.  And it sounds like there
10 were different sets of keys for different
11 locations or different areas of the facility or
12 did you get a set of keys that -- there was just
13 one type of set of keys?
14     A.    No, I believe there were
15 certain -- I mean, most of the keys were -- you
16 had pretty much access to a lot of the areas
17 but, I mean, I think some of the keys varied.  I
18 don't recall which key had which, but I know
19 some of the keys -- there's certain numbers on
20 the keys or they were labeled somehow, you know,
21 certain keys go in certain areas, and some
22 people have those keys and some people don't.
23     Q.    When you say keys, because earlier
24 you referenced like a magnetic --

1      A.    That's attached to it.
2      Q.    And, when you mention keys, are
3  they actual physical keys or they are just more
4  magnetic card keys?
5      A.    There's a card on there and
6  there's also physical keys.
7      Q.    Okay.  So, you would punch in, you
8  go to the pegboard, you get your keys.  What do
9  you do next?
10     A.    We have briefing.
11     Q.    Okay.
12     A.    The supervisors come down and tell
13 us what's going to be going on during our shift
14 or anything that was passed down to them that
15 has to get done.
16     Q.    And what would you do after that?
17     A.    Once we were relieved by the
18 supervisors we would go to our posts.
19     Q.    Okay.  And then once you are on
20 your post --
21     A.    Oh, no.  You had to sign a book
22 and then you go to your post.
23     Q.    Was the book signing different
24 from the punching in?

1      A.    Yes.
2      Q.    So, what was the signing in the
3  book for, if you know?
4      A.    I don't know.  Everybody just was
5  told to sign this book.
6      Q.    Okay.  All right.  So, then when
7  you went to your post and then typically did you
8  have the same post for the entire shift?
9      A.    Typically, yes.
10     Q.    Okay.  And so I just had a few
11 other questions related to job responsibilities.
12 So, if you were on B1 or B2 post, generally did
13 you stay on the B floor for your shift?
14     A.    If that was your post, that's
15 where -- yeah, I mean, unless, you know, you
16 were relieved or like I said before.
17     Q.    And if you were on A1, A2 or A3
18 post were you typically on A floor or that lower
19 floor?
20     A.    You keep saying typically.  What
21 do you mean by typically?  Like if you show up
22 for the day here, this is where everybody is
23 supposed to be that's --
24     Q.    Maybe I'll ask the question a



1 different way. If you were on B1 or B2 post the
2 focus of the job duties is that floor as opposed
3 to going in between the floors?
4     A.    Yes.
5     Q.    Okay.
6     A.    Unless, you know, a supervisor
7 came and told you unless there was an
8 extenuating circumstance where somebody would be
9 relieving you at that post.
10     Q.    Sure. Sure. Okay. And when you
11 are on -- actually, hold on. When you were on
12 the A floor I think you had mentioned that for
13 both when you were on B floor and A floor you
14 had the job responsibility of monitoring the
15 individuals who are there or the residents or
16 the detainees there; is that right?
17     A.    Yes.
18     Q.    Did you also have job
19 responsibilities if you were on A floor in terms
20 of supervising any of the activities that took
21 place on that floor?
22     A.    Yes. I mean, that was based on,
23 you know, if there was enough staff to do that
24 stuff or they would move it out to the common

1 area where there was -- you know, there was --
2 it was more of a staff thing, but, yeah, there
3 was activities that were done by staff members.
4 Arts and crafts and --
5     Q.    What do you mean by staff? Do you
6 mean the actual -- yeah. What do you mean by
7 that?
8     A.    Well, you have to have staff to
9 cover all these positions. I mean, if you see
10 up here there's two for outside and two
11 floaters. So, obviously, that's four people.
12 If it's in the middle of the winter you don't
13 need all those people. So, they would actually
14 be able to do something else above and beyond
15 that would need to be done. You know, arts and
16 crafts or anything in the facility.
17     Q.    Okay. I understand that.
18     And while you were there did you
19 ever, you know, supervise any of those
20 activities?
21     A.    Yeah. Yes.
22     Q.    Okay. And then turning to the
23 positions on the B floor, you had mentioned
24 earlier that you -- hold on -- your

1 responsibilities were to monitor the residents
2 more in the back part; is that correct?
3     A.    What post was that?
4     Q.    I believe the B2 post?
5     A.    Yeah, because there was a TV area
6 back there and the cafeteria was back there and
7 it was just like a whole other room back there.
8     Q.    I just wanted to clarify a little
9 bit what you meant by back part. When you said
10 back part were you including like the dayroom
11 area as part of the back part?
12     A.    Well, if there is nobody in
13 that -- no. No, I'm not including that dayroom
14 area.
15     Q.    What about the areas where the
16 residents' rooms were?
17     A.    What about them?
18     Q.    When you said the back part, for
19 your B2 post, did your job responsibilities also
20 include the hallways or that area where --
21     A.    If there was nobody back in that
22 area, I mean, you would be up at the -- you
23 know, you want to be where the residents are.
24 You don't want to be -- you are not going to sit

1 back there and watch TV when all the residents
2 are all up in the front. So, I mean, yeah, you
3 would be monitoring the hallways and monitoring
4 the common area. That's where everybody is at.
5 That's where you want to be. That's what your
6 job is.
7     Q.    So, it sounds like you just said
8 where the residents were would be the area where
9 you should be focusing your attention in terms
10 of your job duties?
11     A.    Right, but then as soon as one
12 person goes back to B2, then you would have to
13 go back, you know, and you can see visually
14 everything. I mean, it's not like you are in a
15 dark room. You can see down to the common area.
16 You can see -- you can see both areas clearly.
17     Q.    And you said if one person -- I
18 think you started to say when one person would
19 go somewhere what was your responsibility?
20     A.    For B2 or what was my -- for B2?
21     Q.    Yes, when you worked B2.
22     A.    If somebody would go back in that
23 back area, if residents would go back in that
24 back area and sit down and watch TV, the



1  responsibility of the staff was to go back and
2  monitor those residents.  I mean, not like be on
3  top of them, but you want to sit there so you
4  can visually see them.
5      Q.    Okay.
6            - - -
7            (Whereupon, there was an
8  off-the-record discussion.)
9            - - -
10  BY MS. YEH:
11      Q.    I apologize.
12      A.    Okay.
13      Q.    When you were working at the Berks
14  County residential facility you had mentioned
15  earlier that there would be mealtimes.  What
16  were your job responsibilities during the times
17  when the residents were eating meals?
18      A.    Monitor the residents.
19      Q.    Okay.  And did the residents all
20  meet in the cafeteria for mealtime?
21      A.    Yes, unless there was some kind of
22  medical issue or something like that but, I
23  mean, yeah.  Yes.
24      Q.    And when the residents or the

1  detainees had their meals, did you also -- or
2  did staff also eat their meals at that same
3  time?
4      A.    Yes.
5      Q.    Okay.  And how about you?  Did you
6  also eat your meals when the residents ate their
7  meals?
8      A.    Yes.
9      Q.    And where did you eat your meals
10  in terms of the physical location?
11      A.    In the cafeteria area.
12      Q.    Okay.  As opposed to like some
13  facilities have separate staff rooms for staff
14  to eat.  So, that's why I'm asking you.
15      A.    Oh, no.  Our job is to monitor the
16  residents.  So, if we were in a different room
17  we wouldn't be able to do that.  So, we kind of
18  had chairs and stuff like that or we would sit
19  at the tables with the residents.
20      Q.    Okay.  And during that time how
21  would the staff be seated?  For example, would
22  they all be in one specific area eating together
23  or would you be spread out through the
24  cafeteria?

1      A.    Usually spread out.
2      Q.    Okay.  You had mentioned that you
3  would get a set of keys.
4      A.    Uh-huh.
5      Q.    Generally, I assume that means
6  that some doors could be locked and some doors
7  were not locked in the facility?
8      A.    I don't understand.
9      Q.    What were the keys for?
10      A.    For doors.
11      Q.    Yes.  And doors at the facility,
12  at the Berks County Residential Center?
13      A.    Yes.
14      Q.    Okay.  What areas were locked?
15  What areas required those keys that you received
16  at the start of your shift?
17      A.    The laundry area, anything where
18  there was like hazardous chemicals, the staff
19  bathrooms, the cafeteria door.  I'm not -- it's
20  been awhile since -- I mean, that's some of the
21  areas.  I'm not sure what else.
22      Q.    Okay.
23      A.    That's mainly what I used them
24  for.  I don't know what else.  The laundry and

1  chemicals and I'm not sure.
2      Q.    So, you mentioned the laundry had
3  a key.  The laundry room had a key or --
4      A.    I mean, some of the keys were
5  universal.  It wasn't like a laundry key.  It
6  didn't say laundry on it, if it was like the,
7  you know, the 72 key.  The 72 key might open up
8  three door knobs in the facility.
9      Q.    Okay.
10      A.    It might open up that one as well
11  as one downstairs.  So, it's not like -- you
12  know, if you were outside, I guess you
13  wouldn't -- sometimes -- some of the sets of
14  keys didn't have all the same keys on them, but
15  I don't know.  It could have changed ten times
16  since I was there, so I don't know.
17      Q.    No, I understand.  So, what you
18  are saying some keys could open different,
19  multiple doors?
20      A.    Right.  Not every door had its own
21  lock -- or its own key to the door.
22      Q.    And you had also mentioned the
23  hazardous chemicals.  Where were those located?
24      A.    They were located in the laundry



1 area and in the -- where the cleaning stuff was.
2      Q.      And you also mentioned the staff
3 bathrooms required a key and the cafeteria door
4 had a key?
5      A.      Yes.
6      Q.      Anything else that had a key, if
7 you remember?
8      A.      No, I don't.
9      Q.      Okay.  That's fine.
10            And did the Berks County
11 Residential Center also have cameras located
12 through the facility?
13      A.      Yes.
14      Q.      Okay.  And where were those
15 cameras located?
16      A.      All over the place.
17      Q.      Can you describe what locations
18 the cameras were located in, if you remember?
19      A.      I don't know exactly where they
20 are at but, I mean, I've never been in the
21 camera room or anything like that.  So, I mean,
22 I know there's -- they got to be in the hallways
23 and the common areas.
24      Q.      Okay.  What about the dayrooms,

1 did those have cameras?
2      A.      That's what I mean by common
3 areas.  Those are like the common areas.
4      Q.      Okay.  And what about the
5 cafeteria?
6      A.      I don't recall.  Oh, yeah, it did.
7 Yes.
8      Q.      Okay.  What about the different
9 activity rooms that were there?
10      A.      I don't know.
11      Q.      Okay.  Were there areas that did
12 not have cameras?
13      A.      I think the medical area didn't
14 have cameras.
15      Q.      Okay.  And where else?
16      A.      You mean like a specific room or
17 like an area?
18      Q.      Yes, either.
19      A.      I don't know.  I don't know
20 exactly where all the cameras were.  I can't
21 recall that.  I never --
22      Q.      Okay.  For example, did the
23 bathrooms have cameras?
24      A.      No, I don't think you are allowed

1 to do that.
2      Q.      Okay.  What about the residents'
3 rooms, did those have cameras?
4      A.      No.
5      Q.      And what about the laundry room,
6 did that have a camera?
7      A.      No.
8      Q.      And what about the administrative
9 areas, if you know, did those areas have
10 cameras?
11      A.      I don't know if there's cameras
12 down there or not.
13      Q.      Okay.  And what about the showers,
14 did those areas have cameras?
15      A.      The showers, you mean like the
16 staff -- the resident bathrooms?
17      Q.      Why don't you describe to me in
18 terms of bathroom facilities, were there
19 bathrooms in the residents' rooms?
20      A.      Yes.
21      Q.      And what was included in that
22 bathroom?
23      A.      Toilet, a sink.
24      Q.      Was there a shower in that room?

1      A.      There was not.
2      Q.      So, where were the showers
3 located?
4      A.      I believe there is some on both.
5 No, they are downstairs on the bottom floor.
6 Are we going bottom/top?  Bottom floor, A1 area.
7      Q.      And were there cameras in those
8 areas, the showers, where the showers were
9 located?
10      A.      You mean inside or outside?  I
11 don't know.  I would assume there is one
12 pointing -- I know there has to be one pointing
13 down the hallway.  I'm sure there is.  I don't
14 think there is one inside the bathroom, no.
15      Q.      Okay.  All right.
16      A.      We weren't responsible for showers
17 on my shift, so I'm not real -- too keen on how
18 that process works.
19      Q.      That's fine.  What shift would
20 that have occurred?
21      A.      I think it happens on first shift
22 unless there's like intakes or stuff like that
23 where we have to do showers, then it was an
24 ordeal or if there was some kind of water



1  problem or something like that, but for the most
2  part -- or if they asked to get a shower.  If I
3  recall like from playing soccer outside or
4  something like that, they were allowed to clean
5  up.
6      Q.     Okay.  And while you were there
7  who were your supervisors?
8      A.     Just on my shift?
9      Q.     Sure.
10     A.     Well, I mean, they kind of rotated
11  around, so it was -- there's quite a few of
12  them.
13     Q.     Okay.
14     A.     My main ones were Jason Mills and
15  Len Kopetsky.
16     Q.     And did you also have other
17  supervisors?
18     A.     I did.
19     Q.     And who were they?
20     A.     Jason Corby, Brandon Witmer, Sandy
21  Schlessman.  I don't remember all their names.
22  Tom Moyer.  I'm forgetting like two or three of
23  them, but --
24     Q.     Okay.  That's fine.  And did you

1  supervise anyone while you were there?
2      A.     Was I a supervisor?
3      Q.     In your capacity as a shelter care
4  counselor did you supervise any other staff
5  members?
6      A.     No.
7      Q.     Okay.  And what was your
8  relationship with the supervisors I should say
9  in terms of your duties?  Like you mentioned
10  earlier in the briefing room when you started
11  the supervisors would kind of tell you what you
12  need to do.  What other things were communicated
13  between you and the supervisors during the day?
14     A.     I mean, if they needed help with
15  something, you know, I would -- you know, if
16  there was stuff on the outside of the facility
17  that had to get done, you know, we would help
18  out.  And, I mean, it was more of a facility
19  need or something like that.  You know, if we
20  were mulching or picking up sticks or raking
21  leaves, you know, we would ask for volunteers
22  and, you know, if they wanted me to help, I
23  would go outside and help.  A supervisor would
24  ask you if it would be something you would be

1  interested in doing.  You know, I would usually
2  volunteer.
3      Q.     And how much contact did you have
4  with the supervisors during the day?
5      A.     All of them as a whole or just
6  individually which ones?  Or you just mean like
7  in general?
8      Q.     Yes.
9      A.     Minimal.
10     Q.     And what about interactions with
11  other staff members?  How often did you interact
12  with them while you were working your job post?
13     A.     A lot.
14     Q.     Okay.  Can you describe when you
15  would need to interact with other staff members?
16     A.     Well, you are with each other for
17  eight hours.  So, it's -- you know, sometimes
18  it's you are talking about the job, sometimes
19  you are just talking about -- just interacting
20  with them.  So --
21     Q.     Okay.  You said you are there for
22  eight hours and sometimes you are interacting
23  with them.  What types of interactions would you
24  have to have during the day?

1      A.     You don't have to have any of
2  them, I guess.  I mean -- I don't understand the
3  question.
4      Q.     Just trying to get a sense because
5  sometimes you had -- there were two -- at least
6  here it says B1, B2, it would be two people on
7  the same floor.
8      A.     Right.
9      Q.     So, for example, let's say you
10  were on the same floor, how often would you need
11  to interact with your staff members to insure
12  that your job would get done?
13     A.     You would probably interact with
14  that person the most about your eight-hour shift
15  just so you are on the same page with them.
16     Q.     Okay.  And just going back to the
17  supervisors, where were the supervisors usually
18  located during the day?
19     A.     Where was their office at or where
20  would they be at?
21     Q.     Where would they be?
22     A.     To be honest, most of the time
23  they are in their office, you know, and then
24  they would come out and -- you know, depending



1  on which supervisor it was.  Some were a little
2  more on the floor or, you know, on the floor, so
3  to speak, than others.
4       Q.    Okay.
5       A.    Some just showed their face for
6  ten minutes in an eight-hour period.
7       Q.    Okay.
8       A.    Depends on which supervisor it
9  was.
10      Q.    Sure.  And do you recall which
11 supervisors tended to be more on the floor and
12 which ones less so?
13      A.    Yeah.
14      Q.    Okay.  So, can you tell me?
15      A.    Tell you which ones were more on
16 the floor?
17      Q.    Yes.
18      A.    Our supervisors were pretty good,
19 but some of the other ones -- you know --
20 actually, you know what, I don't -- I don't
21 understand that question.  I don't really want
22 to answer that question.
23      Q.    Okay.  Were there ever times when
24 the residential center was short staffed?

1       A.    I'm not -- I don't get that
2  information, so I don't know.  I'm assuming as
3  long as these -- as long as these are all filled
4  out, I always assume that we were -- we were
5  staffed.
6       Q.    Okay.  And what if someone --
7             MR. CONNELL:  Sorry.  Can we --
8  just for the record, when you say these, what
9  are you referring to?
10            THE WITNESS:  Oh, this docket --
11 the second shift assignment sheet.
12            MR. CONNELL:  He's referring to
13 Berks County 19.  I just want to make sure the
14 record is clear when he says these.  Thank you,
15 sir.
16 BY MS. YEH:
17      Q.    And if someone called out sick do
18 you know how that was handled?
19      A.    I don't.  That's the supervisor's
20 job to figure all that stuff out.  That's not
21 mine.  They would come down here and cross off
22 and, you know, just like there is a name here
23 crossed off on here on the assignment sheet.
24 You know, they would adjust it as needed.

1  That's not my -- that wasn't my job.
2       Q.    Sure.  That's fine.
3             While you were there, you know the
4  detainees who live there came from other
5  countries; is that right?
6       A.    Yes.
7       Q.    And generally what language -- if
8  there was one, was there individuals that
9  spoke -- were there most people who spoke a
10 particular language?
11            MR. CONNELL:  Object to the form
12 of the question.
13 BY MS. YEH:
14      Q.    Maybe I will just make a -- did
15 most of the residents when you were there speak
16 Spanish?
17      A.    98 percent would speak some
18 dialect of Spanish, yes.
19      Q.    And did they also speak English?
20      A.    Yes.
21      Q.    Were you able to communicate or
22 kind of have conversations with them in English?
23      A.    Some more than others.
24      Q.    And so you say some more than

1  others.  In terms of you said 98 percent of
2  those individuals speak Spanish.  If you know,
3  how many of those were you able to have
4  conversations with them in English?
5       A.    I don't know, because I didn't
6  speak to everybody that was there.  So, I don't
7  know the answer to that question.
8       Q.    Okay.
9       A.    I know being in a classroom I know
10 a lot of them spoke English, but I never had
11 personal conversations with everybody in the
12 facility.
13      Q.    Sure.  Sure.
14            And do you speak Spanish?
15      A.    No, I don't.
16      Q.    And so did you have individuals
17 who did not speak English that you had to
18 monitor or supervise?
19      A.    Yes.
20      Q.    And so, for those individuals, how
21 did you communicate with them?
22      A.    We had people that are on staff
23 that spoke Spanish.  I mean, I knew -- I know
24 some Spanish, but some people know more than



1  other people.  Some are fluent, some -- some are
2  just better at speaking it than others or, you
3  know, understanding what they are trying to say.
4      Q.    And do you remember how many other
5  staff members spoke Spanish?
6      A.    The only way -- I know Brittany
7  spoke fluent.  She was one of the go-tos.
8      Q.    Any other names on that -- and
9  we're referring to Berks County 19.  Any other
10  staff there that were fluent in Spanish?
11     A.    That were fluent in Spanish?
12     Q.    Yes.
13     A.    The only one that I recall that
14  were fluent would be -- is Brittany.  The rest
15  of them -- I'm looking at some of the names, and
16  some of them were better than me and, you know,
17  could get the job done or understand what they
18  were saying, and some of them on the list I
19  don't think knew any Spanish.
20     Q.    Okay.  And you say Brittany was a
21  go-to.  Were there any other staff that you
22  could go to to help with any translation or
23  interpretation to Spanish?
24     A.    Yeah.  There was some other --

1  most of the females spoke -- I think this is
2  Jen, Jen Ermler, she could speak it.  Not
3  fluent, but -- I mean, most of the females on
4  this, Jen, Erika, Jamie, Lacy knew some.  I
5  mean, there was random -- there was always
6  somebody on the shift that you could direct them
7  to or ask for help, you know.
8      Q.    Okay.  And if those individuals
9  were not -- so, did you ever rely on them to
10  help interpret or translate for you to
11  communicate with a resident?
12     A.    Yeah.
13     Q.    Okay.  And if those individuals
14  were not available and you needed to communicate
15  with a resident, what would you do?
16     A.    Well, we had -- we had a
17  translator, you know, phone numbers we could
18  call or we would ask another resident, you know,
19  what are they saying or what do they need or
20  whatever -- whatever the case may be, instead of
21  going, you know, doing the whole, you know, the
22  translator, you know, on the phone.
23     Q.    And when you say the phone, was
24  that a physical phone or was that like a

1  portable cell phone?
2      A.    It was a physical phone.
3      Q.    And where is that phone located?
4      A.    Downstairs on the A -- A floor or
5  the lower floor.
6      Q.    Okay.  And were there any other
7  ways that you would use to communicate with the
8  residents who spoke Spanish?
9      A.    Yeah.  In the computer room there
10  was a translator program on there you could use
11  or --
12     Q.    And where was the computer room
13  located?
14     A.    At the time it was -- it was on A
15  floor.
16     Q.    Okay.
17     A.    Or the lower floor.
18     Q.    Okay.  The lower floor.  And was
19  that room just computers or was that a room also
20  used for other activities?
21     A.    I believe there was books in
22  there, as well.  It was kind of a library type
23  area.
24     Q.    Okay.  And was there any other

1  location where there were computers where you
2  could utilize this program from what you
3  remember?
4      A.    No.  I didn't -- I didn't
5  really -- that was the only computers we would
6  have access to, so it wasn't -- they were in --
7  they were in that area.
8      Q.    Okay.  I'm going to ask you about
9  the training that you received.
10     A.    Okay.
11     Q.    When you started specifically at
12  the Berks County Residential Center did you
13  receive training?
14     A.    Yes.
15     Q.    Okay.  And, just to clarify, when
16  you started at the -- let's see what you called
17  it, I believe the juvenile detention center, is
18  that what you called it?
19     A.    Berks County, yeah.
20     Q.    Juvenile detention center?  Did
21  you also receive training when you started that
22  position?
23     A.    Yes.
24     Q.    So, when you started at the



1  juvenile detention center you received training
2  and then, just to clarify, when you started at
3  the Berks County Residential Center you also
4  received training at that point in time?
5     A.    Yes.
6     Q.    Okay.  Do you recall what training
7  you received?
8     A.    I mean, it was over the course of,
9  I believe, three days -- three to four days.
10 It's a lot of stuff.  I mean, I don't recall
11 every -- I could tell you little bits and pieces
12 of it, but, I mean, there's a lot.  I mean, the
13 books are like -- they are pretty thick.
14    Q.    I understand it was awhile ago and
15 you might not remember all the details.
16          Do you remember receiving any
17 training on the code of ethics?
18    A.    I don't, no.
19    Q.    Okay.  Do you know if -- do you
20 remember ever receiving a copy of the code of
21 ethics?
22    A.    I don't remember, no.
23              - - -
24          (Whereupon, a short recess

1  occurred.)
2              - - -
3          (Whereupon, the document was marked
4  as Berks County 50 for identification.)
5              - - -
6  BY MS. YEH:
7     Q.    Mr. Sharkey --
8     A.    Yes.
9     Q.    -- I believe you made a request to
10 the other attorneys whether or not your wife
11 could you present during the deposition, and for
12 the rules of the deposition under the Federal
13 Rules of Civil Procedure people who are parties
14 in the case are permitted to sit in, as people
15 who are either the plaintiff or the defendant,
16 people bringing a lawsuit or people defending a
17 lawsuit.
18    A.    Uh-huh.
19    Q.    But people who are witnesses or
20 otherwise outside those parties are generally
21 not permitted, and so my preference is that we
22 keep the deposition to the individuals who are
23 parties to the lawsuit.
24    A.    Okay.  Let me just text her no.

1          MR. CONNELL:  I'm sorry.  Can we
2  stay off the record for a second.
3              - - -
4          (Whereupon, there was an
5  off-the-record discussion.)
6              - - -
7  BY MS. YEH:
8     Q.    Mr. Sharkey, we're just going to
9  proceed on, and before I get to this exhibit, I
10 just had a couple follow-up questions from some
11 earlier testimony you had given.  You had noted
12 that after your work or that from your work at
13 the juvenile detention center I believe you had
14 used the terms that you were laid off?
15    A.    Well, their facility closed.
16    Q.    So, I just wanted to clarify that
17 point.  Were you laid off because there were no
18 more positions available?
19    A.    The facility closed.
20    Q.    Okay.  So, the facility closed?
21    A.    Like they stopped funding the
22 facility.
23    Q.    I understand.  So, therefore,
24 there were no more juvenile --

1     A.    Everybody lost their job.  Well,
2  not everybody, but there was no more employment
3  in that building.
4          MR. CONNELL:  I'm sorry.  That was
5  with regards to the youth center?
6          MS. YEH:  Yes.  Correct.
7          MR. CONNELL:  Thank you.
8  BY MS. YEH:
9     Q.    Okay.  Okay.  So, I'm now going to
10 ask you to look at the document that is in front
11 of you.
12    A.    Uh-huh.
13    Q.    And we have marked that Berks
14 County 50.  Just the top line, for the record,
15 it says Topic Area:  Code of Ethics.  And you
16 can take some time to review the document.
17 Would you like to look at it?
18    A.    Not really.
19    Q.    And have you seen this document
20 before?
21    A.    I mean, not -- not specific.  No,
22 I haven't.  I mean, not since I was probably
23 working there and read it or whatever.
24    Q.    And did you see this document when



1 you were working there, if you remember?
2    A.    I don't remember.
3    Q.    Okay.  If you could turn to the
4 second page.  There are two signatures on the
5 bottom.  Are either of those your signature?
6    A.    Yes.  The employee's signature is
7 mine.
8    Q.    Okay.  If you signed that does it
9 indicate that at some point you received a copy
10 of this document?
11    A.    I don't think it signifies I
12 received it.  I think it just signifies that I
13 signed it.
14    Q.    Okay.  And you -- and when you
15 signed it, can I say that you at least signed
16 that signature on that page would have had the
17 other paragraphs on that page?
18    A.    I'm not sure if I quite understand
19 that question, either.
20    Q.    So, you signed this document?
21    A.    Yes.
22    Q.    And that is your signature?
23    A.    Yes, it is.
24    Q.    Okay.  And do you recall receiving

1 any training regarding this document?
2    A.    I don't, no.
3    Q.    Okay.  Do you recall receiving
4 training with regards to who you would talk to
5 or report to if something occurred on your
6 shift?  Like who would you need to go to?
7    A.    Did you mean like -- you mean was
8 I trained on that?  I don't think I -- I mean,
9 you knew you would go to a supervisor.  I think
10 that's a known.  I don't know if that's a formal
11 training for that.
12    Q.    Okay.  So, whether you received
13 formal training on it or not, you knew if there
14 was an issue you would go to your supervisor?
15    A.    Yes.
16    Q.    You had mentioned a number of
17 supervisors.  So, I just wanted to see was there
18 a particular supervisor you went to?
19    A.    The ones that were working on my
20 shift usually.
21    Q.    Okay.  And did it matter which one
22 you could go to?
23    A.    No.
24    Q.    You could report or talk to either

1 supervisor or any supervisor?
2    A.    I mean, that's -- if it was
3 outside of my scope of what I'm responsible for,
4 then I would go to the next -- to the
5 supervisor.
6    Q.    And you said typically you would
7 go to the supervisor on your shift?
8    A.    Right, depending on if -- you
9 know, they rotated weekends and stuff like.  So,
10 depending on, you know, who was there.
11    Q.    Okay.  All right.  Do you remember
12 during your training process whether you
13 received any training on sexual abuse or sexual
14 harassment?
15    A.    Vaguely.
16    Q.    Okay.  And do you recall if -- you
17 said vaguely.  Did you receive that training at
18 the start of your employment at the Berks County
19 Residential Center?
20    A.    When they -- when they give you --
21 my training consisted of them handing me a
22 binder with all these documents in it and me
23 going through them and signing them.
24    Q.    Okay.

1    A.    So, I'm not sure if this one or
2 the sexual harassment one or, you know, the
3 other ones are in that binder.  I mean, some of
4 them I just would flip through them and just
5 sign them.
6    Q.    Okay.
7    A.    It wasn't a formal -- they didn't
8 go through each and every single topic area.
9    Q.    Okay.  Do you remember if you
10 attended any workshops or panels during your
11 training period?
12    A.    Workshops, you mean like above and
13 beyond type training?
14    Q.    Well, during the training when you
15 first started did you have any training where
16 someone was like in a room and spoke to you?
17    A.    Yeah.  It would be my supervisors.
18    Q.    Okay.  Do you remember if you
19 received any training relating to reporting of
20 any sexual abuse or sexual harassment, if you
21 remember?
22    A.    I don't remember.
23    Q.    Okay.  Do you remember if you
24 received any classroom training on sexual abuse



1 or sexual harassment?
2     A.    What do you mean by classroom?
3     Q.    Where people would be -- where you
4 might be in a room and someone was at the room
5 teaching a class?
6     A.    When I got hired back there it was
7 just me and a supervisor going over these
8 documents, you know, this binder, the training
9 that's --
10     Q.    Okay.
11     A.    I don't know if -- you know, which
12 one was -- you know, which ones they went over.
13 Like I said, a lot of times -- not a lot. There
14 was a bit of time where I was in that room by
15 myself just signing papers --
16     Q.    Okay.
17     A.    -- and memos and that kind of
18 stuff because it was -- it was a lengthy
19 process.
20     Q.    And you said you were in a room
21 with a supervisor.  Do you happen to remember
22 who that was?
23     A.    Jason Mills and Len and Corby.
24     Q.    Okay.

1     A.    Those are the three I remember.
2     Q.    Okay.  And were all three of those
3 in the room with you when you did this process?
4     A.    No.  It was usually just
5 one-on-one.
6     Q.    And do you remember which one was
7 there, if you remember?
8     A.    All three of them.
9     Q.    All three of them were there?
10     A.    But like different days.  Like if
11 I was training on such like one -- I don't know.
12     Q.    One at a time, but it was --
13     A.    They would just take turns.
14     Q.    I understand.  They take turns?
15     So, you said Jason Mills, Jason
16 Corby?
17     A.    Jason Corby and Len Kopetsky.
18     Q.    Okay.  All right.  So, I'm now
19 going to ask you some questions relating to
20     █████ E.D. █████.  And do you remember who
21     █████ E.D. █████ is?
22     A.    Yes, I do.
23     Q.    And do you remember when you first
24 met her?

1     A.    I don't know the exact day, no.
2     Q.    And, as you know, this lawsuit
3 relates to interactions that you may have had
4 with her while you were working there at the
5 Berks County Residential Center; is that
6 correct?
7     A.    Yes.
8     Q.    Okay.  Can you describe to me if
9 you remember what interactions you had with her
10 earlier on when you first remember her?
11     MR. CONNELL:  Object to the form
12 of that question.  You can answer.
13     THE WITNESS:  I don't really
14 recall.  I don't know.  Like you mean like how
15 we were introduced to each other or how like --
16 BY MS. YEH:
17     Q.    Uh-huh.
18     A.    I don't -- I don't recall.
19     Q.    Okay.  Well --
20     A.    I mean, obviously, I was a staff
21 member and, you know, I believe her and Patricia
22 and Maria, they came to me at one point during
23 the early time they were there and began
24 speaking with me.

1     Q.    Okay.  Why don't you describe
2 that.  Do you remember that?
3     A.    I don't -- I don't remember that
4 incident, no.
5     Q.    Okay.  Well, what else do you
6 remember about   █████ E.D. █████?
7     A.    Meaning?
8     Q.    From your time as a staff member
9 when she was a resident or detainee there?
10     A.    What else do I remember about her?
11     Q.    Yes.
12     A.    You just mean like with my
13 interactions?
14     Q.    Sure.
15     A.    I guess we first started talking
16 and then, obviously, the whole thing snowballed
17 out of control, but, you know, it was -- it was
18 a facility joke that she was my girlfriend.  She
19 used to get herself done up on first shift by
20 doing her hair and putting on special clothes,
21 and she would come to my post where I was and
22 stay by my side for hours at a time, and -- and
23 it wasn't -- it was a cordial -- it wasn't a
24 relationship.  You know, it wasn't -- it



1  wasn't -- and we got along.
2      Q.    Okay.  When you said facility
3  joke, what do you mean by that?
4      A.    I think people just knew that she
5  was -- what she was doing.  I think that she
6  knew that -- you know, like, I mean, when I
7  would come in on second shift, I mean, it would
8  smell like perfume and she was straightening her
9  hair and so I think the residents and the staff
10  and -- I think they knew that she was doing that
11  all for -- for me.  Ended up, you know, over the
12  course of a couple weeks that eventually they
13  were like, oh, well, that's for Dan.  She is
14  getting dressed up for Dan.  She is putting
15  makeup on for Dan.  She would look totally
16  different.
17      Q.    From the time in the morning until
18  the time you arrived on shift?
19      A.    That's what I was told, because
20  I'm not there on first shift.  I just know when
21  I would get there she would be -- and then
22  people would say -- the residents would tell me
23  that she looks totally different in the morning
24  hours or whatever.

1      Q.    Okay.  And you had said that she
2  would frequently stay by your side?
3      A.    She would come to my post wherever
4  I was at.
5      Q.    Okay.  And how long would she stay
6  there for?
7      A.    Sometimes it was the whole shift.
8      Q.    And was it fairly obvious that she
9  stayed by your side for the whole shift?
10            MR. CONNELL:  Object to that
11  question, form of the question.
12            THE WITNESS:  Was it fairly
13  obvious?  I think it was obvious that she was in
14  the same room or same area because she never
15  would leave B floor, the upper floor until our
16  relationship became, you know, bigger, and then
17  she started following me downstairs, then she
18  would come outside, which she was never really
19  known for doing.  She kind of kept to herself up
20  on the top floor, up on the B floor.
21  BY MS. YEH:
22      Q.    You said that -- it sounds like
23  initially she would just stay on the B floor.
24  Is that what you said?

1      A.    When she was first there I think
2  that's where she -- that's where she was, but I
3  think, you know, of course, over time, you know,
4  she got comfortable moving around the facility.
5  But she would definitely come to where I was at.
6  So, it wasn't -- you know, it wasn't a secret to
7  that.
8      Q.    Okay.  What other interactions did
9  you have with her?  Specifically you mention
10  that during your shift she would often come and
11  sit by your side.  What else, if anything?
12      A.    When I say sit by my side, we're
13  not sitting right next to each other.  She would
14  just be in the room area.  Sometimes we would,
15  but I don't know what you mean by other
16  interactions.  Can you be more specific with
17  that?
18      Q.    Well, were there any other
19  interactions?
20      A.    Do you mean like hugging and
21  kissing and that kind of stuff or do you just
22  mean like talking on --
23      Q.    Well, why don't we start with
24  earlier on what types of interactions did you

1  have with her?
2      A.    I don't know.  It was more like --
3  it was like a friend.  It was like a friendship
4  thing, and we would joke around about stuff,
5  because one of people that she hung out with she
6  would -- was one -- she could speak fluent
7  English.  So, it was -- you know, it was easier
8  to talk to that group of people.  So, that's the
9  way it started off as.
10      Q.    And which person was that who
11  spoke fluent English?
12      A.    Her name was Maria.  I don't know
13  her last name.
14      Q.    But do you remember her first name
15  was Maria?
16      A.    Maria, yep.
17      Q.    Did you spend more time with
18  E.D. than with other residents there?
19      A.    As time went on, yes.  I really
20  didn't have a choice if she is following me
21  around the facility.
22      Q.    So, why don't you describe as time
23  went on what happened?
24      A.    I don't -- I don't -- like do you



1  want me to break it all down like when I went to
2  the supervisor and said something --
3       Q.   Sure.
4       A.   -- or when I --
5       Q.   Sure.
6       A.   I don't know the specific dates
7  and stuff.  You know, I said something to --
8  there was one incident where I went down to --
9  Patricia, I believe, told me that they needed
10 soap in their -- in her room of her bathroom, in
11 her bathroom, and so I went because I had the
12 keys to that area to get soap and went down
13 there.  Patricia left the area, which I thought.
14 I went into the room and went to replace the
15 soap and  was hiding in the corner of
16 bathroom.  She grabbed my arm.  Patricia put her
17 weight on the door.  I couldn't get out the
18 door.  I eventually got out and went and told
19 Jason Mills, the supervisor.
20      Q.   And what did you tell him, if you
21 remember?
22      A.   I told him that they tried to hold
23 me in that room.  I couldn't get out of the
24 room.  I mean, Patricia was not a small girl,

1  neither was .  So, I mean, I just
2  couldn't.  It was just me.  So, eventually, I
3  did, but, you know, that was -- I told him what
4  happened, what I just told you.
5       Q.   And what room was that?
6       A.   It was -- I don't know the number
7  of the room.  It was the last room on the left
8  if you are facing out.
9       Q.   Was it like one of the dorm rooms
10 or resident rooms?
11      A.   Yes.
12      Q.   Was it Patricia's room?
13      A.   Yes, it was at that time.  I don't
14 know if she was moved then.
15      Q.   Sure, I understand, but at that
16 time it was Patricia's?
17      A.   At that time, yeah.
18      Q.   Okay.  After you told Jason Mills,
19 do you remember his response to you?
20      A.   Yeah.  I believe he -- I think he
21 laughed, chucked.  There was nothing really
22 after that.
23      Q.   Okay.  Did you tell any other
24 supervisors?

1       A.   I told Len Kopetsky.  Not about
2  that incident, but, I mean, I told him other
3  stuff, I told him another time.  A separate
4  incident -- not an incident, but I pointed her
5  out to him that she was following me around the
6  facility.
7       Q.   And what was his reaction?
8       A.   I don't think -- I don't really
9  recall.  He didn't really say too much.  He was
10 just kind of like a whatever type of remark.
11      Q.   And did you tell any other
12 supervisors?
13      A.   Brandon Witmer.
14      Q.   Okay.  And do you remember his
15 response?
16      A.   Yeah.  He's really probably the
17 only one who really cared, but he said that --
18 he went through a whole protocol, you know, if
19 something happens, you know, this is what you
20 should do.  And, if it happens again we're going
21 to have to take her into the translator room or
22 have, you know, a staff member speak with her
23 about the staff/resident relationship thing.
24 And I believe he said he was going to send an

1  e-mail out to the management, upper management.
2       Q.   Okay.  Now, you had just stated
3  that you told Jason Mills, Len Kopetsky and
4  Brandon Witmer.  Did you write any reports or
5  informational reports about the incident?
6       A.   I don't recall.
7       Q.   Do you remember what order you
8  told them in?  Like who you told first and then
9  next?
10      A.   Len, Jason -- Len Kopetsky, Jason
11 Mills and then I think Brandon.  I think.  I'm
12 not sure if that's --
13      Q.   Do you remember if they were -- in
14 terms of timing, were they the same day or over
15 the course of time?
16      A.   It wasn't the same day.
17      Q.   Do you remember if it was close
18 together in time the days that you told them?
19      A.   Yeah, I think they were close.  It
20 wasn't like over the course of, you know, two
21 plus weeks.  It was maybe ten, 14 days at the
22 max.
23      Q.   Did you tell Brandon that you had
24 also spoken to Jason and Len?

1    A.    I don't recall.

2    Q.    So, after this incident where you

3  were in the resident's room and you said that

4  Patricia was holding the door --

5    A.    Uh-huh.

6    Q.    -- can you describe any other

7  incidents that happened, if any, after that

8  between you and ▮E.D.▮?

9    A.    Incidents similar to that?

10    Q.    Yes.

11    A.    The only one I really recall is

12  when I was entering the staff bathroom upstairs

13  back by the cafeteria she had pushed the door

14  behind me.

15    Q.    And she is which person?

16    A.    ▮E.D.▮, and came into the

17  bathroom. And Patricia and Maria were on the

18  outside.

19    Q.    And what occurred inside the staff

20  bathroom?

21    A.    This was like early on, so she was

22  just -- she always would say me besos, me besos.

23  So, she would always want me to kiss her. She

24  said it almost every day. So, that didn't

1  happen at that time. You know, eventually it

2  did happen, but not at that time from what I

3  recall. But they were the lookouts. Maria and

4  Patricia were her lookouts for anything that was

5  going on. So, if I entered a room, laundry

6  room, chemical room, she would come in, slam the

7  door behind and then they would knock on the

8  door or come in and say get out if a staff

9  member or supervisor or something was going to

10  go -- you know.

11    Q.    Okay. And you had said eventually

12  it happened. What do you mean by that?

13    A.    We had kissed and hugged as time

14  went on, you know, off camera.

15    Q.    And when you say off camera, what

16  do you mean by that?

17    A.    Wherever the cameras weren't.

18    Q.    What were some of those locations?

19    A.    The resident rooms, the laundry

20  rooms, the chemical rooms.

21    Q.    And where were the chemical rooms?

22  Are they separate from the laundry room?

23    A.    Yeah. The laundry room is

24  upstairs. The chemical room I'm speaking about

1  is downstairs. You know, on A floor, the bottom

2  floor. And the laundry room is up on B floor.

3    Q.    Okay. And roughly, approximately,

4  where was that chemical room located?

5    A.    Down by the supervisors' office.

6  Near it on A floor, on the bottom floor.

7    Q.    Was it close to where the

8  administration offices are?

9    A.    No.

10    Q.    Okay. Where was the supervisors'

11  office?

12    A.    I don't understand.

13    Q.    You just said the chemical room

14  was near the supervisors' office.

15    A.    Right, right.

16    Q.    So --

17    A.    I mean, I can give you directions

18  how to get there. I don't know if it's on like

19  the west wing, east wing, whatever. I don't

20  know the direction, but I could tell you

21  that's -- I mean, it's a separate wing. So,

22  it's all the way down the end of one of the

23  wings.

24    Q.    Okay. And what rooms were close

1  to that? For example, was it on the same

2  hallway as the church or --

3    A.    I think it was right across --

4  right across the hall was the church.

5    Q.    Okay.

6    MR. CONNELL: Can we clarify

7  what's across the hall from the church?

8  BY MS. YEH:

9    Q.    Was it the chemical room that was

10  across?

11    A.    No. The supervisors' office was

12  across. The chemical room was up maybe about

13  halfway up.

14    Q.    Okay. I'm going to -- actually,

15  going to try to show you a map, but I realize

16  the one we have is marked. So, what we will do

17  is, unfortunately, counsel, I don't have extra

18  copies.

19    MR. CONNELL: That's fine.

20    MS. YEH: But I want to give him

21  clean copies. Is that okay?

22    MR. CONNELL: That's fine. As

23  long as whatever he is going to -- if you are

24  going to have him mark it, that that's the one



1 that gets attached to the transcript.
2     MS. YEH: Yes, exactly.
3     MR. CONNELL: So we can retain it
4 that way.
5     MS. YEH: So, we're going to mark
6 these two -- there are two maps, one for each
7 floor, and we are going to mark them with new
8 numbers.
9     - - -
10     (Whereupon, the maps were marked as
11 Berks County 51 and 52 for identification.)
12     - - -
13 BY MS. YEH:
14     Q. So, we are marking 51 as A floor
15 and 52 is B floor. And let's just circulate
16 this to counsel so you can see that --
17     MR. ARCHAMBEAULT: It's the same
18 map.
19     MR. JONES: I'm sorry. 51 is B
20 floor?
21     MS. YEH: 51 is A floor.
22     MR. JONES: A floor.
23     MS. YEH: Thank you.
24     MR. CONNELL: I just want to match

1 up what has already been marked as an exhibit
2 yesterday so I can have at least something in
3 front of me. Thank you.
4     MR. ARCHAMBEAULT: They are 33 and
5 32.
6     MR. CONNELL: Yes. Thank you.
7 BY MS. YEH:
8     Q. So, I'm going to show you what's
9 been marked as Berks County 51. Have you ever
10 seen this before?
11     A. This map?
12     Q. Yes.
13     A. Unless it's posted in the -- it
14 might be in the facility. I don't know. It
15 looks like -- I remember maybe a fire exit map
16 on the wall or something like that in the
17 facility.
18     Q. By looking that this map do you
19 recognize the facility, Berks County Residential
20 Center from this map?
21     A. I do.
22     Q. So, does it reflect at least from
23 your memory the layout of the Berks County
24 Residential Center from when you worked there

1 generally? It might be that certain details may
2 be different.
3     A. Yeah. I mean, the layout looks
4 the same. I don't know if any of the rooms have
5 changed.
6     Q. Okay. Give me one minute. I'm
7 just going to get a red pen. So, I was just
8 asking you the location of the chemical closet.
9     A. Uh-huh.
10     Q. And also the supervisors' office.
11     A. Uh-huh.
12     Q. So, can you please mark from your
13 memory when you were working there where the
14 supervisors' office was.
15     A. How do you want me to mark it?
16 Just circle it?
17     Q. You can circle it, yes.
18     A. (Witness complies).
19     Q. So, for the record, he just
20 circled 205.
21     A. I don't know if this is it or not,
22 but I believe that's -- it's a small closet,
23 so --
24     Q. And then he also circled 225. So,

1 when you circled 225, what room is that, at
2 least from your memory?
3     A. I believe that's the area where
4 the chemicals and the cleaning products were
5 kept.
6     Q. Okay. And then the 205 you were
7 circling was the supervisors' office?
8     A. Yes.
9     Q. Okay. I'm also going to ask you
10 to look at Berks County 52. It's noted floor B,
11 bedrooms, room numbers, assignments. And it's
12 also a map. Had you seen this before?
13     A. Same thing. Fire exits, fire plan
14 stuff. I have never -- that's the only time I
15 would have seen it, if it's posted. I think
16 it's posted up there, but I don't know.
17 Vaguely.
18     Q. Does it look like a representation
19 of the Berks County Residential Center?
20     A. It does.
21     Q. So, you had mentioned a room
22 previously about an incident where Patricia had
23 kept the door closed?
24     A. Uh-huh. Yes.



1    Q.    Can you identify that room?

2    A.    (Witness complies).

3    Q.    He just circled, it's marked 308

4    and also said bedroom number 13.

5    Okay.  Thank you.

6    MR. CONNELL:  Do you mind if I

7    just take a quick look at what he has marked?

8    MS. YEH:  Sure.

9    MR. CONNELL:  Okay.  Thank you.

10   I'm just going to look over his shoulder there

11   for a second.  Thank you.

12   BY MS. YEH:

13   Q.    Do you remember at the time that

14   you worked there where ███ **E.D.** ███ room was on this

15   map?

16   A.    I would be guessing if I picked a

17   room out.  I know it's on the top.  I know it's

18   on B floor.  I would say -- I would be guessing

19   if I did.  I don't know.

20   Q.    That's fine.  Do you remember if

21   it was close to Patricia's room?

22   A.    It is.  I'm not sure if it's --

23   it's definitely on this other side.  I'm not

24   sure which one it is on that side.  I mean, 304

1    would be my guess, but I don't know.

2    Q.    That's fine.

3    All right.  So, you mention that

4    you had -- I believe this is what you said and,

5    if I'm wrong, feel free to correct me.  That you

6    had kissed in the laundry room and the chemical

7    room.  And were there any other rooms that

8    occurred?

9    A.    The resident -- her room, the

10   resident's room.

11   Q.    Was that Patricia's room?

12   A.    No, no.

13   Q.    ███ **E.D.** ███ room?

14   A.    Whatever room hers was on that

15   side.

16   Q.    Can you -- and did anything ever

17   happen in the staff bathroom?

18   A.    Upstairs or downstairs?

19   Q.    Either one?

20   A.    Well, I told you about the

21   incident with the upstairs one.  And then the

22   downstairs one, that's where we had sexual

23   intercourse.

24   Q.    Was that a staff bathroom or was

1    that a resident bathroom?

2    A.    That was a resident bathroom.

3    Q.    And can you mark that with a pen,

4    please.  If you are not sure, its also fine for

5    you to tell me you are not sure.  If you're able

6    to identify.

7    A.    I think it's just not labeled.

8    It's in that -- it's in that area.  It's not

9    labeled, though.  I don't remember there being a

10   telephone.  I guess that's a telephone room

11   or -- I don't know.  I'm assuming this is

12   administration here.  Internet bank.  I don't

13   know what that would be.  I don't know.  This

14   doesn't look right to me, so I don't know.

15   MR. CONNELL:  He just crossed an X

16   over the first circle that he drew over number

17   53.  Or, no, I can't tell if that's an S or --

18   do you mind if I --

19   THE WITNESS:  It's an S and three.

20   Yeah, go ahead.

21   MR. CONNELL:  It's an S and then

22   three with a circle originally drawn around that

23   he crossed out.  Do you mind if I jump in just

24   for a second since I'm here on that issue?

1    MR. ARCHAMBEAULT:  Yes.

2    MR. CONNELL:  When you crossed out

3    your originally drawn circle are you taking back

4    the testimony that that's the location of the

5    bathroom?  Is that the purpose?

6    THE WITNESS:  I am taking it back

7    because it doesn't look like the way it was when

8    I was there.  Some of the other rooms look

9    different to me for some reason.  They look

10   different.  The bathroom is in that hallway.

11   It's just not labeled on here.

12   BY MS. YEH:

13   Q.    Why don't I just get a

14   description, then, instead of identifying,

15   because I understand it was a little while ago.

16   Can you tell me where the bathroom was located?

17   A.    The bathroom --

18   Q.    Not specifically.  You said it was

19   in a hallway?

20   A.    Right, right.

21   Q.    Where did that hallway lead to?

22   What was the hallway between?

23   A.    It connected the lower dayroom

24   common area to the hallway that goes to where

ESQUIRE
DEPOSITION SOLUTIONS

1   management office is and to go to the outside.
2       Q.    Okay.  And who was permitted in
3   that hallway?
4       A.    Everybody.
5       Q.    Okay.  And did people walk down
6   that hallway?
7       A.    Yes.
8       Q.    For example, did residents walk up
9   and down that hallway?
10      A.    Yes.  Everybody walked.  Some
11  people ran.
12      Q.    And did staff also walk down the
13  hallway?
14      A.    Yes.
15      Q.    So, can you describe -- you had
16  mentioned that there were incidents of kissing
17  and then you also now described an incident of
18  sexual intercourse in the bathroom.  How many
19  times was there sexual intercourse?
20      A.    Twice.
21      Q.    And where was the second time
22  located?  Or, actually, where were those two
23  incidents of sexual intercourse located, in the
24  same room or different rooms?

1       A.    Am I doing maps or am I telling
2   you?  What am I doing?
3       Q.    Just tell me verbally.
4       A.    It's upstairs on B floor.
5       Q.    And where --
6       A.    In one of the resident rooms.
7       Q.    Okay.  Do you remember which room?
8       A.    Patricia's.
9       Q.    So, there was one incident in the
10  resident bathroom on A floor?
11      A.    That would be in the first.
12      Q.    That was the first time?
13      A.    No.  The first would be B in the
14  upper floor, and the second time was on the
15  lower floor.
16      Q.    Were there any other incidents of
17  sexual intercourse?
18      A.    No.
19      Q.    Okay.  You had originally
20  described times of when you hugged and kissed.
21  Did anything -- what were the interactions that
22  you had with ▮E.D.▮ between the times when you
23  initially kissed to the time that you had sexual
24  intercourse?

1       A.    Can you say that again?  I'm not
2   sure.
3       Q.    Yeah.  So, from the time you
4   initially started kissing --
5       A.    Yes.
6       Q.    -- I guess how much time was there
7   between the first time that the two of you
8   kissed to the point of sexual intercourse?
9       A.    I don't know.  I don't know when
10  the first -- you know, I don't know when she got
11  there.  So, I don't know the days.  I would be
12  guessing if I said any of that.
13      Q.    Okay.  That's fine.
14            Were there any other interactions
15  that you had with ▮E.D.▮ before you had sexual
16  intercourse?
17      A.    Besides the ones I said?
18      Q.    Yes.
19      A.    What do you mean?  Like -- I mean,
20  I told you we were kissing and hugging.  I mean,
21  I don't understand where you're going.
22      Q.    You said you were kissing and
23  hugging.  Did that happen more than once?
24      A.    Yeah.  It happened a lot.

1       Q.    Okay.  So, do you remember how
2   long was that period of time were you hugging
3   and kissing before you had sexual intercourse?
4       A.    I don't know what that period of
5   time is.
6       Q.    Okay.  Do you remember if it was,
7   you know, for example, like a week between
8   hugging/kissing to sexual intercourse or --
9       A.    No.  It was probably a day.
10      Q.    Okay.
11      A.    I mean, it was every day.
12      Q.    Okay.
13      A.    I mean, it went on every day
14  pretty much.
15      Q.    All right.  And when you had
16  sexual intercourse in the bathroom on A floor,
17  do you recall if there was a staff member
18  stationed in the area where the door to the
19  outside is?
20      A.    No, because there was -- residents
21  were outside, so that staff member was probably
22  outside.
23      Q.    Were there any other staff members
24  at that end of the hallway inside the building?



1    A.    Not that I'm aware of, no.
2    Q.    Were there any staff members on
3  the other end of the hallway that was closer to
4  the common area or the dayroom?
5         MR. CONNELL:  Are you asking him
6  where staff members were when he was inside the
7  bathroom engaged in sexual intercourse?
8         MS. YEH:  If he knows.
9         MR. CONNELL:  All right.  I think
10  it's clear or rather obvious but I'm going to
11  state the obvious objection that it calls for
12  speculation.
13         MS. YEH:  Sure.
14  BY MS. YEH:
15    Q.    So, right before you went into the
16  bathroom, if you remember, were there staff
17  members stationed or in that area, maybe not
18  stationed, anywhere else in the hallway?
19    A.    In the hallway?
20    Q.    Correct.
21    A.    No.
22    Q.    If you remember, just before you
23  went into the bathroom were there any staff at
24  the end of the hallway at all?

1    A.    Which end of the hallway?
2    Q.    The end of the hallway that's
3  closer to the common area or dayroom?
4    A.    I don't remember seeing anybody
5  there, no.  That doesn't mean they're not down
6  here --
7    Q.    Okay.
8    A.    -- in the common area on A floor.
9    Q.    Sure.
10         Did you know if any staff members
11  were aware that you went into the bathroom at
12  that time, if you know?
13    A.    No.
14    Q.    After the incidents of -- let me
15  back up.  What was the period of time between
16  the two times that you had sexual intercourse,
17  if you remember?
18    A.    Days.  Three, four days, maybe.
19    Q.    Do you recall those dates when
20  those happened?
21    A.    No.
22    Q.    Do you remember if it was in July
23  of 2014?
24    A.    No.

1    Q.    So, let me just clarify.  Perhaps
2  my question was also a little unclear.  Did it
3  happen in July of 2014?
4    A.    I don't know.  I don't know what
5  the dates were.
6    Q.    So, your no is you don't remember?
7    A.    I don't know what the dates were.
8  I don't want to say yes and then -- I don't know
9  what the dates were.
10    Q.    So, I'm going to ask you also, did
11  it happen in August of 2014?
12    A.    Yes.  I know the one time happened
13  in August.
14    Q.    Do you remember the date of when
15  it happened?
16    A.    I don't know the date.
17    Q.    Do you remember was it very early
18  in August?
19    A.    It was in the middle.
20    Q.    Middle of August.  Okay.  So,
21  this -- did this -- did both incidents of sexual
22  intercourse happen after you had spoken to your
23  supervisors?
24    A.    Yes.

1    Q.    After you spoke to your
2  supervisors did any of them follow-up with you
3  afterwards?
4    A.    No.
5    Q.    After the second time that you had
6  sexual intercourse do you remember what
7  interactions you had with , if there were
8  any?
9    A.    I never was in the facility again
10  after that, so I didn't have any interaction
11  with her at all.
12    Q.    Okay.  So, after the second time
13  of sexual intercourse you were no longer at the
14  facility, is that what you just said?
15    A.    I mean, after that day, once I
16  left, you know, at 10:30 at night I never went
17  back to the facility.
18    Q.    Okay.  Did  E.D.  speak English?
19    A.    She spoke a little bit of English,
20  yes.
21    Q.    How did you communicate with her?
22    A.    Most of the time was with Maria,
23  one of her friends there.
24    Q.    And would Maria help translate?

1    A.    On occasions, yeah.

2    Q.    Did you ever use -- you had

3  mentioned earlier there might be some computer

4  that had a translation program?

5    A.    Uh-huh.

6    Q.    Did you ever use those computers

7  to communicate with [E.D.]?

8    A.    Yes.

9    Q.    Did you ever use like a cell phone

10  to help translate and communicate with [E.D.]?

11    A.    Yes.

12    Q.    And whose cell phone was that?

13    A.    Mine.

14    Q.    And did [E.D.] ever use your cell

15  phone at other points in time?

16    A.    Yes.

17    Q.    And do you know what she used it

18  for?

19    A.    She called her mom.

20    Q.    And did she use the phone for

21  anything else?

22    A.    Yeah.  The one time she took my

23  phone and she went into her -- her or Patricia's

24  room and took photographs of herself.  They are

1  on my phone.

2    Q.    Okay.  And did you make that

3  request that she do that?

4    A.    No.

5    Q.    Did she communicate to you that

6  she was going to do that?

7    A.    No.

8    Q.    How long did she have the phone

9  for?

10    A.    I don't recall.  I got it back

11  before I left.

12    Q.    So, it was during the time period

13  on your shift?

14    A.    I don't know how long it was, but

15  I got it back.

16    Q.    Sure.  So, you had it before you

17  left the facility?

18    A.    Yes.

19    Q.    Were there any other times that

20  she used your cell phone?

21    A.    No.

22    Q.    Did you use any other means to

23  communicate with her?

24    A.    No.

1    Q.    Did you ever give any gifts to her

2  son?

3    A.    For him personally?

4    Q.    Yes.

5    A.    No.

6    Q.    Did you give any gifts to her?

7    A.    No.

8    Q.    Did you ever give her any

9  photographs?

10    A.    Not that I recall, no.

11    Q.    Did you ever give her a ring?

12    A.    I showed her the ring and Patricia

13  took it out of my hand.

14    Q.    And what happened after that?

15    A.    I don't know.  Never saw it again.

16    Q.    I'm just going to turn your

17  attention to Berks County 43.  You just talked

18  about a ring, and before you is a picture Berks

19  County 43 which is a picture of a ring.

20    A.    Uh-huh.

21    Q.    Do you recognize this ring in the

22  photo and what is it?

23    A.    It's a ring.

24    Q.    And how do you recognize the ring?

1    A.    It's mine.

2    Q.    Was this the ring you were talking

3  about before?

4    A.    Right.

5         MR. CONNELL:  Is that a yes?  I'm

6  sorry.

7         THE WITNESS:  Yes.  I'm sorry.

8         MR. CONNELL:  Just make sure the

9  record is clear.

10  BY MS. YEH:

11    Q.    So, that was a ring that was yours

12  while you were employed at the Berks County

13  Residential Center?

14    A.    Well, I had it before that, but,

15  yeah.  I mean, yeah.  Yes.

16    Q.    And on it is an inscription.  I

17  don't know if you can tell, but you might

18  remember.  Do you remember what was inscribed on

19  that ring?

20    A.    It's Gallic.

21    Q.    And what does it say?

22    A.    I don't know.  I forget what it

23  said.

24    Q.    Do you know the meaning of the



1 words?
2    A.    I don't.  I don't know if it was
3 inscribed in there or not.  I forget.  That's
4 why they wanted to see it.
5    Q.    What's that?
6    A.    That's why her and Patricia wanted
7 to see it, to see the writing on it.
8    Q.    And you just said that Patricia
9 took the ring and took it from you?
10    A.    Well, I handed it to her to look
11 at.  She didn't like rip it out of my hands.
12 She wanted to look at the writing on it.
13    Q.    And then did you ask for it back?
14    A.    I did.
15    Q.    And what happened?
16    A.    I didn't get it back.
17    Q.    And did she tell you she wasn't
18 going to give it back?
19    A.    I don't recall.
20    Q.    Did you do anything when you did
21 not get the ring back?
22    A.    I asked for it back numerous
23 times.
24    Q.    Okay.  And did you ever write a

1 report that you did not get your ring back?
2    A.    No.
3    Q.    Did you ever give E.D. the code,
4 the password to your phone?
5    A.    I don't think so.  She might have
6 been standing there when I did it, but I don't
7 think I remember -- I don't recall, no.
8    Q.    Okay.  What was your relationship
9 like with the other staff members at the Berks
10 County Residential Center?
11    A.    Meaning what?
12    Q.    Did you get along or did you have
13 conflicts with other staff?
14    A.    No, I got along with most of them.
15    Q.    Okay.  Earlier you had made a
16 comment that it was a facility joke that E.D.
17 was your girlfriend.  Were there ever instances
18 where other staff would sort of send E.D. to
19 you?
20    A.    Yes.
21    Q.    And can you describe that for me?
22    A.    If I was at the outside post and
23 she was up on B floor, they would ask the staff
24 member where I was and, you know, there she

1 would appear.
2    Q.    So, I'm sorry.  Who would ask
3 where you were?  Was it the staff members would
4 ask or was it --
5    A.    No.  E.D. would ask the staff
6 member.
7    Q.    Okay.  Did -- were there any other
8 instances of staff members sending E.D. to
9 you?
10    A.    I have no idea.  I mean, it
11 happened numerous times.  It didn't happen one
12 time, so --
13    Q.    Did any staff members make jokes
14 about you and E.D. ?
15    A.    Not that I recall, no.  Or not to
16 my face.
17    Q.    You had noted earlier that you
18 testified that either E.D. and I believe you
19 had said Patricia and Maria would ask for besos.
20 Did I get that correct?
21    A.    Just E.D. would.
22    Q.    Oh, just E.D. .
23        Do you know if any other residents
24 asked you -- do you remember if any other

1 residents asked you for besos?
2    A.    Not that I recall, no.
3    Q.    Okay.  And do you know what besos
4 means?
5    A.    It means kiss.
6    Q.    Okay.  Do you know if any
7 residents asked any other staff members for
8 besos?
9    A.    I don't know.
10    Q.    Did you socialize with any other
11 staff members outside of the work context?
12    A.    On occasion.
13    Q.    And would you consider any of them
14 your friends?
15    A.    No.  They were more like
16 acquaintances, I guess.  I didn't really talk to
17 them leading up to me getting employed there.
18 So, once I started working there we started
19 doing stuff, but --
20    Q.    Okay.  And who are the individuals
21 that you did socialize with outside of the work
22 context?
23    A.    Pretty much almost everybody on
24 second shift.  We would go out to have a few



1  drinks or something.  It would be Matt and
2  Darrius and Jamie and sometimes a few other
3  people.  I mean, depending.  It was varied.
4      Q.    And do you recall how often that
5  occurred?
6      A.    Not very.
7      MR. CONNELL:  I'm sorry.  I didn't
8  catch what you said there.
9      THE WITNESS:  She asked me how
10 often, and I said not very.  Not very often.
11     MR. CONNELL:  Okay.  Thank you.
12 BY MS. YEH:
13     Q.    And did you know any of the
14 immigration staff workers who worked there?
15     A.    No.
16     Q.    Did you know an individual named
17 Josh Petrey or Petrey?
18     A.    I know of him.  I never really --
19 I don't know.  I don't know him, no.
20     Q.    And did you interact with him at
21 all at the Berks County Residential Center?
22     A.    I don't even know what he looks
23 like.  I mean, I don't even know.  I couldn't
24 put a face to a name.  If he walked in this room

1  I wouldn't know if that was him or not.
2      Q.    Okay.  After the time that you
3  reported you had spoken to your supervisors did
4  you make any changes or adjustments to your work
5  there at the Berks County Residential Center?
6      A.    I don't understand that question.
7      Q.    So, after you reported -- you had
8  reported that -- you know, the one particular
9  incident that involved you being in the room
10 with  and Patricia closing the door on
11 you.  You testified earlier you had reported
12 that particular incident to at least one of the
13 supervisors.
14     A.    Uh-huh.  Just one of them.
15     Q.    Okay.  Now, do you remember -- and
16 I'm sorry if I don't remember and you did say
17 this, that particular incident who did you tell?
18     A.    Jason Mills.
19     Q.    Okay.  What -- what did you report
20 to the other supervisors?  Was it other
21 incidents that you reported or something else?
22     A.    I already stated that.  Do you
23 want me to say it again?
24     Q.    Just to be clear, so you reported

1  other instances or other interactions with you
2  and  E.D.  to the other supervisors as opposed
3  to that particular incident?
4      A.    I don't understand what that --
5      Q.    Perhaps that was a confusing
6  question.
7      A.    No, because I already stated
8  what -- because you asked me before what I went
9  to all the supervisors for and I told you that.
10 And now you are asking me I guess the same
11 question again?
12     Q.    So, let's move on, then.  After
13 that did you have any changes to your work
14 duties, posts, anything like that?
15     A.    Oh, you mean from supervisors and
16 management?
17     Q.    Yes.
18     A.    After I --
19     Q.    Yes.
20     A.    -- told -- spoke with the
21 supervisors?
22     Q.    Yes.
23     A.    No.  It was -- you know, you were
24 given your -- on the assignment sheet you were

1  given your post.
2      Q.    Okay.  You had testified earlier
3  that you along with other staff would eat in the
4  cafeteria during the mealtime.
5      A.    Uh-huh.  Yes.
6      Q.    And specifically on your shift it
7  would be dinner.  When you ate in the cafeteria
8  did you sit with  E.D.  in the cafeteria?
9      A.    Every day?  Maybe a handful of
10 occasions.  Maybe like three to four times,
11 maybe.
12     Q.    In total?
13     A.    I don't know.  I don't know.  I
14 don't know exact number.  I remember sitting
15 with her sitting across from -- the table from
16 her, but I sat across from a lot of other
17 residents, too, you know, or I sat next to staff
18 or -- you could sit wherever you wanted to in
19 the cafeteria.
20     Q.    So, there weren't assigned seats?
21     A.    For the residents?
22     Q.    Correct.
23     A.    No, there wasn't assigned seats,
24 but we were just told to -- there was always a

1 staff member in the back -- the back area.
2     Q.     And did the staff members have
3 assigned seats at all in the cafeteria?
4     A.     No. We just made sure that there
5 was at least one person, usually the outside --
6 I think it was the outside post. Whoever was
7 the server. There was always one server, and
8 then the other person would sit back towards
9 where the bathrooms were, from what I recall.
10     Q.     And did you eat the food that was
11 made in the cafeteria?
12     A.     Sometimes.
13     Q.     And were there times when you
14 brought your own food from the outside?
15     A.     Rarely.
16     Q.     Were there ever times when the
17 kitchen made specific food or different food for
18 the staff members?
19     A.     I don't recall. Not on my shift.
20 I don't think so.
21     Q.     Okay.
22     A.     I was never given that food.
23     Q.     Okay. Did you ever share your
24 food with ██E.D.██ ?

1     A.     No. No. They would ask me if --
2 or other residents would ask me, too, if they
3 didn't like the meal -- sometimes they didn't
4 like the meal, and if they wanted a banana or an
5 apple or something like that, I would go back
6 and -- if that wasn't on the menu, I would go
7 back and provide them with that, but that was
8 out of, you know, just so they would eat
9 something.
10     Q.     Okay. You had noted that after
11 the second incident of sexual intercourse you
12 were no longer working at the Berks County
13 Residential Center?
14     A.     Yes.
15     Q.     Can you describe what happened?
16 Why did you no longer work there?
17     A.     They called me and told me.
18     Q.     And who called you?
19     A.     I forget her name. Somebody in
20 human resources.
21     Q.     And what were you informed?
22     A.     That they were doing an
23 investigation about an incident, and that I was
24 not to report to work.

1     Q.     At that point in time were you put
2 on leave, were you terminated? Do you recall
3 what your status was at that time?
4     A.     I think it was administrative
5 leave. I think.
6     Q.     Okay. And then do you recall how
7 long were you on administrative leave?
8     A.     I don't really know. Till -- no,
9 till September 11th. That's when I officially
10 got fired.
11     Q.     All right. And after you were
12 fired I don't know if in your position did you
13 have the ability to appeal that decision at all?
14     A.     I didn't even go there. I mean, I
15 knew I did something wrong, so I didn't even go
16 that route. So, I'm not going to put everybody
17 through that when it's not going to -- it wasn't
18 very advantageous for me to go ahead and do
19 that.
20     Q.     Okay. After -- actually, hold on
21 a minute. Before the -- before you were placed
22 on administrative leave and then terminated was
23 there any other time where you were disciplined
24 at work at the Berks County Residential Center?

1     A.     Yes.
2     Q.     And can you describe what led to
3 that?
4     A.     Yes. I told Gary Wright to wash
5 his hands with Clorox, I believe, and then I
6 said something to the fact of something about
7 your skin turning white or something like that,
8 and he took that as a racial comment. So, I was
9 suspended for making that comment or something
10 there.
11     Q.     And do you recall how long you
12 were suspended for?
13     A.     I don't.
14          - - -
15          (Whereupon, the document was marked
16 as Berks County 53 for identification.)
17          - - -
18 BY MS. YEH:
19     Q.     So, feel free to take a moment to
20 look at this document. So, I just handed to you
21 Berks County 53, and it does have a title of
22 disciplinary action report. Had you ever seen
23 this document before?
24     A.     Vaguely. But I guess I signed it,

1  so, yeah, I must have got it sometime.
2      Q.    Is that your signature on the
3  second page?
4      A.    Yes, it is.
5      Q.    And there is also some writing
6  above the signatures?
7      A.    Uh-huh.  Yes.
8      Q.    Did you write that?
9      A.    Yes, I did.
10     Q.    And do you recall when you
11  received this?
12     A.    I don't recall, but it looks like
13  December 3rd.
14     Q.    And did you receive a copy for
15  yourself?
16     A.    I'm -- I'm sure I did.  That's
17  usually the protocol for that.
18     Q.    And what did you understand this
19  document to mean?
20     A.    It's just a disciplinary action
21  report.
22     Q.    After you receive a disciplinary
23  action report do you have the ability to appeal
24  this?

1      A.    Yes.  I think you do.
2      Q.    And did you?
3      A.    I remember speaking with my union
4  rep.  I don't know what -- if we went through
5  the whole appeal process or I don't know what
6  came about it.  I don't remember vaguely.  I
7  don't --
8      Q.    So, do you remember whether or not
9  you appealed it?
10     A.    I don't.  But what does this have
11  to do with ⬛ E.D. ⬛?  What does this have to do
12  with -- this is something totally different.
13  Does it have something to do with ⬛ E.D. ⬛?
14     Q.    It was in your file and it was a
15  disciplinary matter, so I wanted to ask you
16  about it.
17     A.    Okay.  Well, I don't really want
18  to talk about this.  It doesn't have anything to
19  do with what you are talking.  This is something
20  totally separate, isn't it?
21     Q.    It was in your file.  I believe
22  I'm entitled to ask you about it.  I don't have
23  that many more questions about it.
24     A.    Okay.  I mean, I don't know a lot.

1  I forget about it.
2      Q.    That's fine if you don't remember.
3      A.    You know what I mean?  It's like
4  he said she said.  You know, I didn't say it, he
5  said it, you know --
6      Q.    What I wanted to ask you was do
7  you recall after this whether you were spoken --
8  you know, did you have -- do you remember before
9  you got this report did you have an opportunity
10  to speak or answer questions about what
11  happened?  Was there a proceeding or a meeting?
12     A.    I think per my union there is a
13  set way that these situations are dealt with,
14  and they can't go outside of those set
15  requirements.  So --
16     Q.    Sure.  Afterwards do you recall
17  receiving any counseling or any discussions
18  about what happened by supervisors or by
19  management?
20     A.    I don't recall.  I don't think so.
21  You mean like -- you know, like about this
22  incident?
23     Q.    Yes.
24     A.    Like when I came back?

1      Q.    Yes.
2      A.    You mean did they say I need to
3  get retrained or something?  I don't understand.
4      Q.    Did anyone have any --
5      A.    No.  I just came back to work.
6      Q.    Okay.
7      A.    I don't think there was anything.
8  I forget.  I don't recall a lot of it, so --
9      Q.    Okay.  That's fine.  All right.
10  And I just have one more.
11            -  -  -
12            (Whereupon, the document was marked
13  as Berks County 54 for identification.)
14            -  -  -
15            MR. CONNELL:  I hate to do this to
16  you, Sue Ming, but at the next chance of a break
17  that would work for you, if we could just take a
18  quick break, a comfort break.
19            MS. YEH:  I'm just going to ask a
20  couple questions about this and then we can
21  break.
22            MR. ARCHAMBEAULT:  Is that okay?
23            MS. YEH:  Does that work for you?
24  Or we could take a break right now.



1      MR. CONNELL:  No.  Feel free to at
2  a time that works for you, that's fine with me.
3  Thank you.
4  BY MS. YEH:
5      Q.    I just handed you Berks County 54.
6  It also is titled Disciplinary Action Report.
7  The date is September 11, 2014.  Have you seen
8  this document before?
9      A.    Yes.  I mean, I don't recall
10 verbatim, but, yeah, I do remember seeing it.
11     Q.    Did you sign this document?
12     A.    I did.
13     Q.    Is that your signature on the last
14 page?
15     A.    It is.
16     Q.    And there's some writing just
17 above that.  Is that your handwriting?
18     A.    Yes, it is.
19     Q.    You had noted earlier that you
20 were terminated from employment on September
21 11th?
22     A.    Yes.
23     Q.    Is this the notice that you
24 received regarding the termination of your

1  employment?
2      A.    I don't know if this is the formal
3  document for that or not.  This is a
4  disciplinary action report.  I don't know if
5  this is a termination.  I don't know if the
6  county sent me something else saying you are
7  terminated or what.
8      Q.    Okay.  That's fair enough.
9            Before you signed it did you have
10 an opportunity to review the document, if you
11 remember?
12     A.    Yeah.  I mean, there was time to
13 do that, yes.
14     Q.    Okay.  And you wrote here, I do
15 not agree with these statements presented ask
16 facts by the county.  I, Daniel Sharkey, will
17 attach a statement at a later date prior to
18 grievance proceedings.
19           Did you write that?
20     A.    Yes.  I stated I did.
21     Q.    Okay.  And you said that you will
22 attach a statement at a later date.  Do you know
23 if you did, in fact, attach a statement at a
24 later date?

1      A.    No.
2      Q.    And it also notes here grievance
3  proceedings.  Do you know if you initiated any
4  grievance proceedings?
5      A.    No.
6      Q.    Let me clarify it.  Let me ask did
7  you initiate grievance proceedings?
8      A.    No.
9      Q.    And I believe this is public
10 record, but you subsequently were convicted of
11 institutional sexual assault; is that correct?
12     A.    Yes.
13     Q.    And did you plead guilty to that?
14     A.    I did, yes.
15           MS. YEH:  Why don't we take a
16 break now because I know that Mr. Connell --
17           MR. CONNELL:  Thank you.
18           MS. YEH:  And I may not have that
19 many more questions.
20           MR. CONNELL:  Thank you.
21             - - -
22           (Whereupon, a short recess
23 occurred.)
24             - - -

1            MS. YEH:  Mr. Sharkey, I actually
2  have no more questions, but the other attorneys
3  may have questions for you.
4            THE WITNESS:  Okay.
5            MR. CONNELL:  Do you mind if I go
6  first?
7            MR. JONES:  No, go ahead.
8            MR. CONNELL:  Okay.  Thank you.
9             - - -
10           EXAMINATION
11             - - -
12 BY MR. CONNELL:
13     Q.    Mr. Sharkey -- actually, we will
14 go back off the record.
15             - - -
16           (Whereupon, there was an
17 off-the-record discussion.)
18             - - -
19 BY MR. CONNELL:
20     Q.    Mr. Sharkey, my name is Matthew
21 Connell.  I introduced myself when I walked
22 through the door this morning.  I'm the attorney
23 that represents the County of Berks, the Berks
24 County Residential Center, Diane Edwards,



1 Matthew Malinowski, Jamie Himmelberger, Brittany
2 Rothermel, Erika Taylor in this litigation.
3 Anybody else?
4        MS. AMBROSE:  John Behm.
5        MR. CONNELL:  And John Behm.
6 Thank you.
7 BY MR. CONNELL:
8    Q.    And during this deposition Ms. Yeh
9 has issued your subpoena to attend to this
10 deposition and as counsel for other parties in
11 the deposition I, too, have the opportunity to
12 ask you questions as I feel necessary to, you
13 know, determine this -- in accordance with this
14 litigation.
15        I am going to spend a few moments
16 going through instructions with you.  I know Ms.
17 Yeh did, as well, and I don't mean to bore you
18 and I don't mean to unnecessarily rehash what
19 you already know and/or talked about.
20        There are some things I'm going to
21 question you about that would overlap certainly
22 with what Miss Yeh said.  Probably the most
23 part.  Then I will have some other things that
24 Miss Yeh did not get into that I will want to

1 talk to you about.
2    A.    Okay.
3    Q.    I don't do that to trick you.  I
4 don't do that to drag this thing out.  It's more
5 a matter of satisfying my curiosity on behalf of
6 my clients and to fully advocate on their
7 behalf.  Okay?
8    A.    Yes.
9    Q.    First, if -- during the course of
10 the deposition or while I'm asking you questions
11 I would ask you to let me know if you don't
12 understand anything I say.  It's very important
13 that you understand my questions so that you
14 give the best answer that you can give.
15    A.    Okay.
16    Q.    Okay.  If you ask -- if I ask you
17 a question and you don't know the answer to it I
18 don't know is a perfectly fine answer.
19    A.    Okay.
20    Q.    If I ask you a question and you
21 don't remember something, you don't remember, of
22 course, is a perfectly fine answer as long as
23 it's a truthful answer and it's your best
24 answer.  That's what we're looking for.  Okay?

1    A.    Okay.
2    Q.    If you do give an answer to a
3 question, as is obvious, the court reporter is
4 taking down everything in the room and if you
5 give an answer to a question it will be
6 considered to be your best answer unless you
7 tell us that you can't answer the question for
8 some reason.  Okay?
9    A.    Okay.
10    Q.    If at any point you need to take a
11 break, please speak up.  A couple times we have
12 taken breaks here that were asked by others.
13 You certainly may take a break, also.
14    A.    Okay.
15    Q.    So, if you feel the need to do
16 that, please let us know.  We would just ask
17 generally that you answer the question that's on
18 the table, so to speak, before we take such a
19 break.
20        You had indicated that you first
21 started with the county at the Berks County
22 Youth Center, correct?
23    A.    Yes.
24    Q.    When you started at the Berks

1 County Youth Center you received training there,
2 as well, correct?
3    A.    Yes.
4    Q.    And, when you received training at
5 the Berks County Youth Center, what sort of --
6 do you recall any of the details of the types of
7 training you received?
8    A.    It was very -- I mean, it was very
9 similar to when I got -- when I was hired at the
10 residential center, as well.  I mean, it was
11 very similar.
12    Q.    Were the topics of training
13 similar?
14    A.    Yes.
15    Q.    Okay.  And do you recall training
16 on the topic of sexual abuse/assault prevention
17 and intervention, also know as SAAPI, S-A-A-P-I?
18    A.    What is it again?
19    Q.    Sexual assault/abuse prevention
20 and intervention?
21    A.    I don't know.
22    Q.    Okay.  If you had signed off on
23 documents that you had received training on that
24 topic and others, would you have signed those



1  willingly and acknowledging that you received
2  that training?
3      A.    No, because, like I said before,
4  some of these were in binders and I would
5  just -- you would go through them and just sign
6  them.
7      Q.    Okay.  And was it your
8  understanding --
9      A.    So, that wasn't like -- you know,
10 like I said with the code of ethics, it wasn't
11 like somebody sat down with me and said, okay,
12 this is the code of ethics and we're going to
13 talk about this for the next hour.
14     Q.    Okay.
15     A.    I think there's too much in that
16 binder to actually sit down and do it.  So, a
17 lot of times they would just -- I would sit
18 there at a table and the supervisor would leave
19 and I would sign.  I would just go like this and
20 sign them.
21     Q.    Well, let me ask you this --
22     A.    Under my own free will.
23     Q.    It was your understanding that it
24 was your duty and responsibility to read them

1  and understand them, correct?
2      A.    That's what I was told, yes.
3      Q.    Okay.  And, when you first started
4  at the Berks County Youth Center, is it your
5  testimony that you were just sat there with a
6  binder and signed everything?
7      A.    No, not at the youth center I
8  don't believe.  I think it was more in depth at
9  the youth center.
10     Q.    Okay.
11     A.    And I think the policies probably
12 changed.  I forget.  The training at the youth
13 center was at least a week --
14     Q.    Okay.
15     A.    -- as opposed to a couple days
16 when I went back at the residential center.
17     Q.    So, when you returned to the Berks
18 County Residential Center you have a period of a
19 couple days of training, correct?
20     A.    Yeah, it was a couple days.
21     Q.    Okay.  And that training was
22 conducted by supervisors, correct?
23     A.    Yes.
24     Q.    When you returned to the youth

1  center did you -- well, let me step back a
2  little bit.  I'll strike that question.  It was
3  misstated.
4          Your employment at the youth
5  center ended because the facility was closed,
6  correct?
7      A.    It was closing, yes.  Yeah,
8  everybody was --
9      Q.    And did you take what was offered
10 as a voluntary layoff at the time?
11     A.    Yes.  I think they had positions
12 opened up at the residential center or you could
13 take the unemployment and severance and all
14 that.  I forget what the whole package deal was,
15 but --
16     Q.    And when you -- when the facility
17 was closing your first choice was to take the
18 voluntary layoff and severance package, correct?
19     A.    I don't know if it was my first
20 choice.  I mean, I was kind of torn between
21 whether to go over to the residential center or
22 to, you know, move onward, I guess.
23     Q.    And what did you choose to do?
24     A.    I eventually chose to go another

1  route.  You know, I took the layoff.
2      Q.    And then you received the
3  severance package, et cetera, in accordance with
4  the agreement with the union?
5      A.    Yes.
6      Q.    And then you later came back and
7  reapplied for a position at the Berks County
8  Residential Center?
9      A.    No, I did not reapply at all.
10     Q.    Oh, how did that come about?
11     A.    I think there's something in our
12 union where you're put on kind of like a --
13     Q.    Oh, recall list?
14     A.    -- recall list.
15     Q.    My apologies.  So, you remained a
16 member of the union?
17     A.    I'm not sure how that works, but I
18 would imagine, yeah, for that period of time, I
19 guess.  There was a certain amount of days, I
20 think, you were allowed to be on that list.  I
21 don't know the specifics on it.
22     Q.    What is your understanding about
23 how it came about that you ended up employed at
24 the Berks County Residential Center after your



1  layoff?
2      A.      They had a position open on second
3  shift, and I guess they kind of just went down a
4  list.
5      Q.      And somebody called you?
6      A.      And somebody called me from human
7  resources.
8      Q.      All right.  And then you decided
9  to accept that position?
10     A.      Yes.
11     Q.      All right.  So, you go back.  And
12  how long a period of time was it between the
13  time you left your position at the youth center
14  and you started again in the Berks County
15  Residential Center?
16     A.      Six months.  I'm not sure exactly.
17     Q.      Okay.  Less than a year?
18     A.      Less than a year.
19     Q.      Okay.  And when you went back to
20  the Berks County -- when you went to the Berks
21  County Residential Center were you among a group
22  of individuals who started at the same time or
23  was it just you?
24     A.      It was just me on second shift.

1      Q.      Okay.  And then you went
2  through --
3      A.      You mean like during training?
4      Q.      Yeah.  Yeah.  For example --
5      A.      No, it was just me during that
6  time in the training room.
7      Q.      So, it was you with supervisors?
8      A.      Unless there was somebody that
9  would come down for additional training, you
10  know, like the quarterlies or --
11     Q.      The what?
12     A.      Like you would have to go through
13  random training throughout your whole time
14  there.  It's not like you just get trained once
15  and then you're done.  It's like stuff that
16  happens.
17     Q.      So, when you received -- when you
18  started there you received training for a period
19  of a couple days and then you also received
20  quarterly training, is that what you mean?
21     A.      I'm not sure if it's quarterly or
22  if each one -- each one is designated for its
23  own, you know.  One might be yearly, one might
24  be -- that's out of my realm.  They would just

1  tell you you're due for training.
2      Q.      Okay.
3      A.      You would go down to the room and
4  whatever the training was.
5      Q.      So, if there were records that
6  indicated you received something in the area of
7  40 to 50 hours of training a year during your
8  time at the Berks County Residential Center
9  would that surprise you?
10     A.      No.
11     Q.      Okay.  And that training was on
12  various topics?
13     A.      Yeah.  Whatever -- yeah, it could
14  have been -- if you were due, you were due.
15     Q.      Okay.
16     A.      Or they would pass it out while
17  you were working.
18     Q.      When you said you just looked at
19  the binder and signed off, were you referring to
20  policies?
21     A.      No.  He would just give me
22  everything.  There was everything that he would
23  give me.  He gave me stacks of paper.
24     Q.      But I'm saying are those stacks of

1  papers policy manuals?
2      A.      I signed some policies.  There was
3  a separate binder of those.
4      Q.      And you were aware of the policy
5  manual and being able to access it at any time,
6  right?
7      A.      No.
8      Q.      No?
9      A.      I don't know.  What -- what --
10  what policy manual?
11     Q.      The standard operating policy
12  manual at the Berks County Residential Center.
13     A.      Yeah.  I think it was upstairs in
14  one of the desks.
15     Q.      And you knew that while you worked
16  there, and you knew that it was available to you
17  to review at any time you felt you needed to
18  review it?
19     A.      Yes.
20     Q.      When you testified earlier -- or
21  strike that.
22          You testified earlier that you
23  spoke with Jason Mills, Len Kopetsky and Brandon
24  Witmer at various times about -- in some form or



1 fashion about **E.D.** correct?
2     A.    Yes.
3     Q.    Do you have any recollection as to
4 when **E.D.** first entered the facility?
5     A.    No idea.
6     Q.    And the last time you were in the
7 facility was in August of 2014, correct?
8     A.    Yes.
9     Q.    Now, you had indicated that you
10 had sexual intercourse with **E.D.** on two
11 occasions, correct?
12     A.    Yes.
13     Q.    And then you also had indicated
14 that there was a period of time before you had
15 ever had sexual intercourse that you and **E.D.**
16 **E.D.** kissed and/or hugged?
17     A.    Yes.
18     Q.    From the time that you first
19 kissed **E.D.** , can you identify the period
20 of time between then and when you had spoken
21 with any supervisor about her?
22     A.    I don't know that answer.
23     Q.    Can you estimate? Was it more
24 than a day?

1     A.    I don't know.
2     Q.    So, it could have been just a
3 single day before you first kissed her that
4 you --
5     A.    Right, I don't know. I don't want
6 to give you the wrong answer.
7     Q.    I understand. But what I'm saying
8 it could have been that short period of time?
9 If you don't know what period of time it was, it
10 could have been just a day before, you don't
11 know?
12     A.    Right.
13     Q.    Okay. I want to ask you a couple
14 quick questions about your recollection of the
15 facility. You at -- periodically you worked at
16 the A1 post?
17     A.    I mean, you rotate around, so --
18     Q.    So, at some point you worked the
19 A1 post?
20     A.    This is -- I mean, the way it used
21 to work when I was there is you would start --
22 if that's me here, like my next day post would
23 be here and my next day post would be there and
24 my next day post -- it would just -- you would

1 go on this assignment sheet. So, my next -- on
2 Thursday, 7/31, so I knew the next day when I
3 came in I was probably going to be a floater.
4     Q.    Okay. Does that --
5     A.    And then the next day --
6     Q.    And he is referring to Berks
7 County 19.
8     So, the next day -- if taking your
9 example that you just pointed at, what was the
10 date that you just pointed at?
11     A.    July 31st.
12     Q.    So, right below that would be
13 August 1st. So, you indicated the next shift
14 over?
15     A.    Actually, I'm outside there.
16     Q.    Okay. So, you had actually
17 skipped over the floater position and went from
18 M1 on 7/31 to outside --
19     A.    Uh-huh.
20     Q.    -- on 8/1?
21     A.    Yes.
22     Q.    Okay. So, is there anywhere in
23 there where you are listed as the A1 post?
24 Anywhere on --

1     A.    On this paper?
2     Q.    -- on Berks County 19?
3     A.    No.
4     Q.    Do you recall ever working the A1
5 post?
6     A.    During my whole time there?
7     Q.    Yes.
8     A.    Yes, I worked there numerous
9 times.
10     Q.    Okay. That's why I said
11 periodically. Sometimes you would be working --
12     A.    Yeah. You work every single one
13 of these posts.
14     Q.    Okay. Do you have recollection
15 ever leaving the A1 post to allow visitors in
16 from the lobby area?
17     A.    Yes, I'm sure I've probably done
18 it a couple times.
19     Q.    Okay. You seem to exert some
20 level of confusion over when a key is needed --
21 or a electronic key card or a key is needed to
22 pass through doors to go into the lobby or to go
23 to the outside.
24     The doors going to the outside rec



1  area are automatic sliding doors, you would
2  agree with that? Or, no. Correction. The
3  person who's working at the outside -- who's
4  assigned to outside, when do they go outside?
5      A.    Whenever they -- well, whenever
6  they do like a perimeter check. They are
7  supposed to go out there and check it first --
8      Q.    Okay.
9      A.    -- before their shift starts or
10  right when their shift starts they're supposed
11  to go out there, and you sign a logbook saying
12  you have checked the area of any kind of hazards
13  or safety concerns or anything.
14      Q.    And also times where residents go
15  outside?
16      A.    And then when the residents are
17  out there and then the end of your -- you know,
18  the different times when it needs to be cleared.
19      Q.    Now, if there is a -- if there is
20  a resident outside and the outside officer goes
21  outside as well, there's nothing preventing a
22  resident from later -- another resident from
23  following and going outside. You agree with
24  that?

1      A.    No. They would radio -- that's
2  what the radios are for.
3      Q.    And what would happen with the
4  radio under that circumstance?
5      A.    Whoever was down in the A1 or A
6  floor area, you know, they would -- the
7  residents would say I want to go outside.
8      Q.    Okay.
9      A.    And they would radio to the
10  outside unit and say there's six residents
11  coming outside.
12      Q.    Okay. And then the residents can
13  go outside?
14      A.    The residents can go outside.
15      Q.    They didn't need a key to get
16  through the doors?
17      A.    No. They can push them, I
18  believe. I'm not really sure how the key system
19  really -- I mean --
20      Q.    So, it's possible --
21      A.    It's been a couple years since
22  I've --
23      Q.    Right. Understand.
24      A.    Okay.

1      Q.    But it's possible that there is no
2  key leading to the outside rec area and no key
3  leading to the lobby area, that those doors are
4  not locked for egress purposes? It's possible?
5  You just don't recall?
6      A.    I don't recall.
7      Q.    Okay.
8          MS. YEH: If I could just clarify,
9  when you said egress, could you --
10          MR. CONNELL: My purpose of egress
11  is going from the inside of the building to the
12  outside as opposed to ingress. Am I wrong about
13  that?
14          MS. YEH: You could be right, but
15  I just wanted to clarify what you were meaning
16  from -- when you asked the question you were
17  talking about people from the inside going to
18  the outside. Is that what you mean by egress?
19          MR. CONNELL: Correct. Correct.
20  BY MR. CONNELL:
21      Q.    Is that what you understood I
22  meant, by the way?
23      A.    I did, yes.
24      Q.    Okay. You were asked some

1  questions about the shower rooms in the resident
2  areas of the facility. And I just -- I came
3  away from what you had said being a little
4  confused, so I just want to be clear. There are
5  rooms that are on the residents' area on the B
6  floor, correct?
7      A.    (Witness nods).
8      Q.    That are designated for residents'
9  showers?
10      A.    (Witness nods).
11      Q.    Is that a yes?
12      A.    Yes. Sorry. I keep forgetting.
13      Q.    And those rooms themselves are
14  where residents go in, presumably remove
15  clothing, shower, reclothe and come back out
16  into the common hallway?
17      A.    Presumably, yes.
18      Q.    Is it your testimony that you
19  don't know whether there are cameras in there or
20  not?
21      A.    I don't know if there's cameras in
22  there or not. I have never seen a camera in
23  there, but then I wasn't looking for a camera.
24  And I was rarely in there unless they would tell



1  us if there was a shower issue or, you know,
2  like a water leak or, you know, something like
3  that where we would have to go in there.
4      Q.    But you wouldn't be surprised if
5  you were -- if someone were to say there's no
6  cameras in there?  That wouldn't surprise you?
7      A.    That wouldn't surprise me.
8      Q.    Now, talking a little bit more
9  about cameras, you had indicated that you didn't
10 know where all the cameras were?
11     A.    Right.
12     Q.    But they are not hidden or at
13 least -- strike that.  There are cameras that
14 are obvious --
15     A.    Yes.
16     Q.    -- within the facility, correct?
17     A.    Yes.
18     Q.    And those cameras that are obvious
19 within the facility are located in common areas?
20     A.    As far as I know, yes.
21     Q.    And what do you mean by common
22 area?  When I say common area, you answered.
23 What did you think I meant by that?
24     A.    A common area?

1      Q.    Yes.
2      A.    Would be like a main hallway, a
3  main -- you know, where the TVs, where the
4  residents transit or the staff transit.
5      Q.    Okay.  And the dayrooms would be
6  considered common areas?
7      A.    Yes.  When I say common area,
8  that's what I mean.  I mean the dayrooms.  So,
9  yeah, those where the TV rooms are up on the B
10 floor and the same thing on the lower floor and
11 all the hallways.
12     Q.    Okay.
13     A.    I don't know for sure where the
14 cameras are pointing, but I'm assuming that
15 there's cameras in those areas.
16     Q.    Well, there are --
17     A.    You could physically see them.
18     Q.    Describe what you mean by that.
19     A.    What, physically seeing them?
20     Q.    Yes.
21     A.    I mean, they are like your typical
22 like, you know, dome looking camera on the -- on
23 the --
24     Q.    In the ceiling?

1      A.    In the ceiling.  Ceiling tiles or
2  whatever.
3      Q.    So, when you are walking down the
4  hallway, you, Dan Sharkey, are walking down the
5  hallway, you know that there's a camera there
6  and a camera there because you can physically
7  see them?
8      A.    Right.
9      Q.    Okay.  And you knew this from the
10 outset of your employment at the Berks County
11 Residential Center?
12     A.    That there was cameras in there?
13     Q.    Yes.
14     A.    Yes.
15     Q.    Now, I think you might have
16 referred at some point today to the video group
17 or something to that effect.  Did you have
18 access to -- or strike that.
19         Those cameras, do you have any
20 idea where they go, what they do?  What they
21 stream to, if they stream?  What they record?
22 Do you know anything about them?
23     A.    I know where the room was, yes.
24 I've been in that room.

1      Q.    You've been in the room?
2      A.    Yes.
3      Q.    How have you been in the room?
4      A.    With supervisors.
5      Q.    And did you have access to the
6  room?
7      A.    I did not have access.  It's just
8  the supervisors.  As far as I know just the
9  supervisors had the key to that room.
10     Q.    Okay.  And do you recall where
11 that room was located?
12     A.    It's right across from the -- on A
13 floor or the lower floor across from the staff
14 bathrooms.
15     Q.    Okay.  And did you have -- is it
16 your understanding that the room that it was in
17 was locked?
18     A.    Yeah.  You had to be with a
19 supervisor.  I believe a supervisor was the only
20 one who had a key to that.
21     Q.    Okay.  Did you --
22     A.    On my shift.  Like I don't know
23 when the administration is there, you know, I
24 don't know who has a key to it.



1    Q.    Okay.  When -- and, incidentally,
2    was there anything broadcasting that particular
3    room as the room where the monitors were?
4    A.    What do you mean?
5    Q.    Was there a placard on the door
6    that said video monitoring room or anything like
7    that?
8    A.    I don't recall.  I just knew that
9    was -- I think most of the staff there knew that
10   was the video room.
11   Q.    Okay.
12   A.    Or where the cameras were.
13   Q.    And you have seen it before.
14   Describe for us physically what you saw.
15   A.    The inside of the room?
16   Q.    Yes.
17   A.    It's a real cramped room.  You
18   can't really fit too many people in there.
19   There's a chair with like a computer and they
20   would -- you know, I think, you know, you would
21   just go in there and look at video.
22   Q.    Do you know if the computer
23   identified live streaming or if it was just a
24   recording system?

1    A.    The only time I viewed it was when
2    it was -- when somebody would say you got to
3    come see this, check this out, and then we would
4    go look at it and -- so, I'm assuming that was
5    on the recorded side of my part in it.
6    Q.    Okay.  Before the first time you
7    ever kissed  did you look at video in that
8    room?
9    A.    No.
10   Q.    Okay.  So, when -- describe the
11   circumstance where you did see it.  You said if
12   a supervisor said come on, you got to see this?
13   A.    Right.
14   Q.    Was that at some point after you
15   kissed E.D.?
16   A.    I've never seen any of the video
17   of anything that I did in that facility
18   regarding to this.
19   Q.    Related to --
20   A.    Related to what you are trying to
21   get at.  I never saw any video of anything.
22   Q.    Related to --
23   A.    I mean, I have a stack of videos
24   in here, but I have never even looked at them.

1    So, I have never seen any video of myself or
2    E.D. walking into another room or --
3    Q.    Okay.  So, just let me step back a
4    little bit, because I'm getting a little bit
5    confused.
6          When I asked you questions about
7    how you knew about the video room --
8    A.    Right.
9    Q.    -- you said supervisor would call
10   me in there and say you got to check this out?
11   A.    Right.  As like a joke.  As
12   something fun to do.  Like the one time like
13   somebody was mopping the floors, a staff member
14   was mopping the floors and lost his footing and
15   it was funny.  So, it was like America's
16   Funniest Home Videos type thing.
17   Q.    So, let me ask you this:  When --
18   so, I asked you had you seen that room, been
19   shown that room by a supervisor at any time
20   before you first kissed E.D.  The answer to
21   that question would then be?
22   A.    Yes?
23   Q.    That's answering a question with a
24   question.  Let me step back.

1    A.    Before any interaction with her I
2    was -- I was -- after I met her I don't think I
3    was ever in that room.
4    Q.    Okay.  So, you knew where that
5    room was --
6    A.    But I don't know --
7    Q.    -- before you ever knew who E.D.
8    E.D. was?
9    A.    Oh, yeah, definitely.
10   Q.    And you had been in that room at
11   some point before you ever knew who E.D.
12   E.D. was?
13   A.    Yes.
14   Q.    But you knew that you didn't have
15   access to that room?
16   A.    Right.  It's my understanding that
17   you needed a supervisor.
18   Q.    Okay.  E.D. says -- has
19   told me and others in this room that you told
20   her that you could watch her through the
21   cameras.
22   A.    Never said that ever.
23   Q.    Okay.  Could you ever watch her
24   through the cameras?



1    A.    I would have to be with somebody
2  else.
3    Q.    Okay.
4    A.    I would have to be with a
5  supervisor or somebody that has access to that
6  room, and I would never -- no.  That never
7  happened.
8    Q.    The answer to the question is you
9  never did that?
10    A.    Never happened.
11    Q.    And you never told her that you
12  did that?
13    A.    Never told her that.  I wouldn't
14  tell her that because I know that's not
15  possible.
16    Q.    Okay.  Did she ever ask you about
17  whether you had access to the cameras?
18    A.    I don't --
19    Q.    Do you not understand my question?
20    A.    I do understand it.  I mean, no.
21  No, I don't think I have ever had a conversation
22  with her about the cameras.
23    Q.    Okay.  About -- well, okay.
24    A.    I don't think any resident there

1  has ever asked me about the cameras or if I can
2  watch them in the cameras.  Nobody has ever
3  asked me that.
4    Q.    So, she never engaged in that
5  conversation with you and you never engaged in
6  any conversation with her about being able to
7  watch her through the cameras?
8    A.    No.  That's -- no.
9    Q.    Okay.  So, your belief is if she
10  had said that that would be an inaccurate
11  statement by her?
12    A.    That would be an inaccurate
13  statement, yeah.
14    Q.    By her?
15    A.    By her, yes.
16    Q.    You were asked questions about
17  supervisors and you said they were often in
18  their office.  You knew how to access a
19  supervisor if need be, correct?
20    A.    Phone or radio.
21    Q.    Okay.  You carried a radio with
22  you at all times on your shift?
23    A.    Not all -- not all the time, but,
24  yeah, most -- most times, yes.

1    Q.    Okay.  And do you understand what
2  the term conducting a sweep means?
3    A.    Conducting a sweep?
4    Q.    Or doing sweeps?  Sweep as part of
5  the responsibilities of a shelter care
6  counselor?
7    A.    You mean like checking rooms and
8  stuff like that as -- is that what you mean?
9  I'm not sure.
10    Q.    Sure.  And I'll clarify.  My first
11  question is do you understand what the term
12  sweep is?  Does it mean anything to you?
13    A.    I'm going to say no.
14    Q.    Okay.  But checking -- like
15  walking up and down hallways?
16    A.    Oh, okay.  Yeah.  Check.  Yes, I
17  do.
18    Q.    There is a difference between
19  walking up and down hallways and room checks,
20  you will agree with that?
21    A.    Yeah.  Room check are a little
22  more involved.
23    Q.    Room checks involve using a
24  flashlight at night to flash on the ceiling or

1  the floor to insure that the residents are in
2  there and breathing?
3    A.    Right.
4    Q.    And that's done after 8:00 p.m. in
5  the evening?
6    A.    I forget the times, but if that's
7  the time, yes.
8    Q.    Okay.  And second shift -- what
9  hours did you work on second shift?
10    A.    I believe it was 2:15 to 10:30.
11    Q.    Okay.  So, part of your
12  responsibilities would have been doing room
13  checks at some point during your shift, correct?
14    A.    Yes, since it's signed on here,
15  the assignment sheet.
16    Q.    And then you also -- you also have
17  the responsibility to do sweeps, correct?
18    A.    Yes, depending on where you're --
19  you want to keep moving.  They tell you not to
20  stay in -- you know, plop yourself in a chair
21  for eight hours.  You know, try to avoid that.
22    Q.    Right.  You are supposed to move
23  around and --
24    A.    Right.  Move about, yeah.  Not



1  necessarily you don't have to go like -- you
2  know, it's not like you're continuously moving.
3  You know what I mean?
4      Q.    Sure.
5      A.    You can sit down and interact or,
6  you know, play and game or something like that
7  and then get up and you kind of make your
8  presence around the facility.
9      Q.    Did you understand that term of
10  moving around the facility as doing sweeps?
11      A.    Yes.
12      Q.    All right.  You mention
13  interaction.  Would you agree that there was an
14  expectation that there would be a level of
15  interaction with residents?
16      A.    Yes.  I think they -- they require
17  you to do that.
18      Q.    Including whether it be talking to
19  them, playing games with them, watching movies
20  with them, meeting with them?
21      A.    Yes.  It can be a wide range of
22  things.  And there were structured activities
23  that, you know, ping pong tournaments and so,
24  you know, they encouraged group interaction.

1      Q.    Would you agree that it's not
2  unusual during -- of course, speaking of the
3  time that you worked there, that it was not
4  unusual for staff and residents to be
5  interspersed with each other?
6      A.    Do you mean like commingling type?
7      Q.    Yeah, commingling?
8      A.    No.  That happens -- it happens a
9  lot.
10      Q.    On a typical day walking
11  through -- you know, if you walked through one
12  hallway, through a dayroom, down another hallway
13  on either A or B floor it would not be unusual
14  to see staff and residents commingling?
15      A.    Right.
16      Q.    Talking?
17      A.    Yes.
18      Q.    Playing games, perhaps?
19      A.    Yes.
20      Q.    Working on a computer together,
21  perhaps?
22      A.    Yes.
23      Q.    Those are all standard activities?
24      A.    You would see that if you walked

1  in there.
2      Q.    Okay.  You were asked questions
3  with regards to your interactions with other
4  staff members, so I want to ask you a couple
5  quick questions about that.  Okay?
6      A.    Okay.
7      Q.    You had indicated with supervisors
8  that contact was minimal and that contact with
9  other staff members, they were the people you
10  would interact with the most?
11      A.    Right.
12      Q.    So, your contact with supervisors
13  on a normal shift without any exciting event
14  when you are interacting with staff -- I mean,
15  interacting with residents, did you ever feel
16  the need to have a supervisor present in your --
17  in your presence at all times?
18      A.    No.
19      Q.    Did the job require direct
20  supervision on a daily basis?
21      A.    No.
22      Q.    So, when you --
23      A.    They got upset when you would do
24  that.

1      Q.    I'm sorry?
2      A.    That's like they would -- you
3  know, we all were grown adults.  I think they
4  all knew what the job entailed.  So, I don't
5  think they would micromanage everything.  At
6  least our supervisors didn't do that.
7      Q.    And as a staff member would your
8  expectations have been that you didn't need to
9  be micromanaged in a daily routine at the job?
10      A.    Right.  Some supervisors did that
11  and some didn't.
12      Q.    But if an unusual event occurred
13  you understood you had ways to access the
14  supervisors?
15      A.    Yes.  You had the radio or your
16  partner on that floor had a radio or there was
17  phones.
18      Q.    Okay.  Did you ever feel like you
19  were unsupervised?
20      A.    No.
21      Q.    Did -- now I'm going to ask you a
22  question about the interactions with staff.  My
23  first question that I was left with from your
24  testimony is it almost sounded as if when you



1  were being asked questions that there was an
2  expectation that you almost have a wing man with
3  you at all times everywhere you move around the
4  facility.  Is that the way you thought it should
5  have been?
6      A.     At the facility?
7      Q.     Yes.
8      A.     When I worked there?
9      Q.     Yes.
10     A.     No.  You had -- no.  It was like
11  you had a partner so, you know, B1, B2, so you
12  would know who you are working with and kind of
13  get a gist of how your day's going to be
14  according to who you are working with.  You
15  know, there's a lot of -- you know, you are
16  paired up with other people.
17     Q.     All right.  When you say paired
18  up, what I'm trying to clarify is --
19     A.     No.  And you are walking around.
20  You are not there -- you're not walking -- you
21  might be walking around with somebody, like if a
22  floater is not really doing anything, he might
23  be talking about, you know, the Flyers or
24  something.

1      Q.     But would you say it is unusual or
2  not unusual to be completely separate from the
3  other partner throughout the course of the day?
4      A.     For a long period of time?
5      Q.     For any period of time?
6      A.     Yeah.  I don't -- I don't
7  understand that question really.
8      Q.     And that's fair, and please tell
9  me when that happens.
10         So, you indicated like B1 or B2 --
11  B1 sits at the desk or generally is in the desk
12  area, and B2 is generally in the back area where
13  there's a TV and the cafeteria --
14     A.     Right, right.
15     Q.     -- correct?
16         Okay.  So, if B2 -- if there is a
17  resident in the back area --
18     A.     Yes.
19     Q.     -- watching TV, B2's
20  responsibility is to insure that they are okay,
21  right?
22     A.     Yes.
23     Q.     B1 would still have the
24  responsibility to be up in the dayroom area?

1      A.     Yes.
2      Q.     So, there were natural
3  circumstances throughout the day where B1 and B2
4  would not be side-by-side?
5      A.     Oh, yes.  Even like you were
6  saying before with the sweeps, you know, your
7  job was to go down the hallway and check and
8  make sure everything was all right during those
9  times.  If there was residents back there B1 and
10  B2 would not be in eyesight of each other.
11     Q.     Okay.  And that's what I'm getting
12  at.  The responsibility or expectation is not B1
13  and B2 waddle about the facility --
14     A.     No.
15     Q.     -- together the entire time?
16     A.     No.
17     Q.     The expectation was that they'd be
18  separate and intermingling and supervising
19  residents separately?
20     A.     Right.  You were basically in
21  charge of that floor.
22     Q.     You had been asked questions about
23  the computer rooms.  I got a couple quick
24  questions for you on them.  Okay.  You had

1  indicated you interact with Spanish speaking
2  residents in a variety of ways including
3  language services, using other residents, using
4  other staff and using a computer program.
5         Do you recall using Google
6  Translate?
7      A.     I do.  I'm not sure if it was
8  called that.  It was in the library where all
9  the books were and stuff.
10     Q.     Okay.  So, there were computers in
11  a room where all the books were, yes?
12     A.     There was a couple, yes.
13     Q.     And what floor would that have
14  been on?
15     A.     That's on A floor.
16     Q.     Do you recall there being another
17  room, like an internet cafe that had computers
18  in it, as well?
19     A.     Yes.
20     Q.     So, there were actually two rooms
21  with computer access or internet access
22  available to residents and staff, correct?
23     A.     Yes.
24     Q.     And one was the library with the



1  books in it and one was what was referred to
2  typically as the internet cafe or something like
3  that?
4      A.    Yes.
5      Q.    Would you use the library in both
6  of those -- strike that.
7            Would you use the computer in both
8  of those rooms?
9      A.    No.
10     Q.    Which would you typically use?
11     A.    The one that was going down
12  towards the classroom on the A floor on the
13  lower floor.
14     Q.    And is that the one --
15     A.    Not the cafe.
16     Q.    Okay.  So, that's the one you
17  referred to as the library?
18     A.    Yes.
19     Q.    And you would agree that the
20  library is more of a closed room than the
21  internet cafe is?  You don't understand the
22  question?
23     A.    Well, no, I understand the
24  question.  I don't understand what you mean by

1  closed.  Like -- I mean, there's windows and a
2  door.
3      Q.    Well, the internet cafe was
4  almost --
5      A.    It was offices before, yeah.
6      Q.    It's almost all windows?
7      A.    Right, right.
8      Q.    Like see through walls?
9      A.    Right, but you could see in there.
10  You could see where I was at.
11     Q.    The computer room?
12     A.    Where the library is.  You could
13  walk in there and --
14     Q.    Yes, but there was a door that
15  opened and closed?
16     A.    Right, right.  It's not like the
17  internet, the cafe.
18     Q.    Do you know as you sit here today
19  or do you recall as you sit here today that --
20  whether there were cameras in the library?
21     A.    I do not know that.
22     Q.    Okay.  You were -- you were aware
23  that you had language services available to you
24  to use to communicate with residents if need be?

1      A.    Yes.
2      Q.    And you understood that to use
3  language services you had to fill out a report?
4      A.    Yes.
5      Q.    Do you understand that you had --
6  one of the reasons why you had to fill out that
7  report is because language services bills the
8  county for its services?
9      A.    Yes.
10     Q.    So, if a bill came in, somebody
11  used language services and there wasn't a
12  report, there would be no way to pay the bill or
13  compare the bill to what it had been used for?
14     A.    Right.  I don't know all the
15  particulars about that, but that sounds about
16  right.
17     Q.    Did you ever use language services
18  to communicate with ?
19     A.    No.
20     Q.    When you communicated with 
21  did you ever use anything other than other
22  residents or the computer?
23     A.    My cell phone.
24     Q.    Okay.  You did mention cell phone.

1  And that cell phone, that's something -- your
2  personal cell phone you are referring to,
3  correct?
4      A.    Yes.
5      Q.    You were not issued a county cell
6  phone at that time?
7      A.    No.
8      Q.    And you said you don't recall
9  whether Google Translate was the program that
10  you used to communicate when on the computer?
11  Do you know what Google Translate is, as we sit
12  here right now?
13     A.    I do, yeah.  I just don't know if
14  that's -- if there's other ones that you can
15  use.  I remember like being on it.  I don't know
16  if it said Google Translate on it.
17     Q.    But it's possible?
18     A.    Yeah.  It looks -- you know, it
19  was very -- I don't know if there's other
20  programs that you can use, but it was very
21  similar to that.
22     Q.    And there were times where you sat
23  with  at the computer, correct?
24     A.    There was only a couple times we

1  did that.  That wasn't like -- that wasn't an
2  everyday thing.
3      Q.    All right.  And when you sat at
4  the computer with  at the library, was
5  that times where you kissed and hugged?
6      A.    No, because there was other
7  residents and Patricia was there.  It was --
8      Q.    Open and obvious?
9      A.    What's that mean?
10     Q.    Well, when you were sitting in
11 there, was it open to other people when you were
12 with her?
13     A.    No.
14     Q.    Okay.  You said --
15     A.    Because other residents could be
16 in and using those computers and looking at
17 library books, as well, so it's not --
18     Q.    Right.  So, you were out in the
19 open?
20     A.    Right, right.
21     Q.    And you said it happened on only a
22 couple of times?
23     A.    Yeah.  It was maybe two or three
24 times, maybe.

1      Q.    And is this -- how long?  Can you
2  identify how long that you were -- would sit on
3  the computers with her?
4      A.    No, I don't recall.
5      Q.    I mean, it wasn't during the
6  entirety of your eight-hour shift?
7      A.    No.
8      Q.    You continued to do your job?
9      A.    Yes.
10     Q.    You -- at some point during your
11 deposition you were asked the question whether
12 you appealed the termination of your employment
13 and you said, no, you did not, and you didn't
14 want to put anybody through that I think is the
15 words that you used?
16     A.    What was that you said?
17     Q.    I think the words you used was you
18 did not want to put anybody through that?
19     A.    Yeah.  I'm not sure.  I spoke
20 with -- I remember speaking with my union rep.
21 I don't know if it was about the previous one or
22 if it was about that one.  I don't recall.
23     Q.    But you chose not to grieve it?
24     A.    I didn't end up doing it, I don't

1  believe.
2      Q.    Let me ask you this just frankly.
3  When you kissed and hugged , you knew that
4  was wrong, correct?
5      A.    Yeah.
6      Q.    When you had sexual intercourse
7  with her, you knew that was wrong?
8      A.    Yes.
9      Q.    You knew it was against policy,
10 right?
11     A.    Yes.
12     Q.    And you knew that it was against
13 your training, right?
14     A.    Yes.
15     Q.    And you knew that when you did
16 those things that if you had gotten caught you
17 would at least get in trouble with your
18 employer, correct?
19     A.    Oh, at least, yes.
20     Q.    Did you know that it was criminal
21 behavior at the time you were doing it?
22     A.    I don't think so, no.
23     Q.    Okay.  But you knew that you
24 probably would at least lose your job --

1      A.    Yes.
2      Q.    -- if you got caught doing those
3  things?
4      A.    Yes.
5      Q.    Did you believe that 
6  believed that she would get in trouble also if
7  she was found doing those things?
8          Did you follow that question,
9  because it might have been a horrible question,
10 and I'll rephrase it.
11     A.    No, I understand.
12     Q.    You understand?  Okay.
13     A.    I'm just trying to figure out how
14 to word it.  I think during this whole time like
15 she knew everything she was doing.  You know
16 what I mean?  It wasn't like I was -- I didn't
17 force myself on any of this.
18     Q.    And I'm going to ask you questions
19 about that.
20     A.    Oh, okay.  So, then can you
21 restate that question and I'll try to give you
22 an answer for that question?
23     Q.    Yes.  And I'm going to ask you a
24 few questions along those lines.  I mean,

1 frankly, in the Complaint in this case she says
2 you raped her against her will, and I'm going to
3 ask you questions about that.
4      A.     You don't get six to 23 months for
5 doing that.
6      Q.     Yes, I understand.
7      A.     Okay.
8      Q.     And I want to ask you that.
9      A.     Because my sentence would have
10 been a lot higher.
11      Q.     You will get a chance to talk
12 about the allegations that are included in the
13 Complaint.
14      A.     Love to.
15      Q.     But before I get there I want
16 to -- during the time frame of your -- do you
17 mind if I call it a relationship?
18      A.     That's what it was.  She should be
19 calling it that, too.
20      Q.     And at times she has called it
21 that.
22          So, during the course of time of
23 that relationship did you believe that she --
24 did you have reason to believe that she thought

1 she would get in trouble if that relationship
2 was discovered?
3      A.     I don't think so.  She never said
4 that to me and that was never expressed at all.
5      Q.     Okay.  Would you agree with me
6 that because of at least your concern that you
7 could lose your job, if not more, if the
8 relationship was discovered you actively
9 concealed it?
10      A.     We both did.
11      Q.     You and  **E.D.**  both actively
12 concealed it, correct?
13      A.     Yes.  That's why I don't know why
14 you got all the names of these people on that
15 paper, because all those people would have
16 reported me in a second.
17      Q.     And I'm going to ask you about
18 that, as well.  But first what I want to do, if
19 you can explain for me what  **E.D.**  did to
20 conceal the relationship?
21      A.     Like I say before, like when we
22 were in the laundry room or we were in -- if I
23 was -- my job to help cleaning downstairs or if
24 I was getting a mop bucket out of the kitchen,

1 she would come back there and, you know, we
2 would kiss and hug or we would do whatever while
3 we were off -- off camera.  We knew where all --
4 where we weren't on camera.  She knew, as well.
5      Q.     All right.  So, when you had those
6 physical interactions with her you knew that you
7 were in locations that would not be captured by
8 cameras, correct?
9      A.     Right, hence the part of trying to
10 conceal it because I thought like, oh, yeah, not
11 going to get in trouble.
12      Q.     And she also knew that you were in
13 areas that would not be caught on camera, that's
14 what you're telling us?
15      A.     Yes.
16      Q.     Did you and she ever actually
17 discuss the fact that you're in an area that's
18 not covered by cameras?
19      A.     Yes.  That's why she would
20 always -- she would ask to go to the clothing
21 closet, which is down the medical wing where
22 there are no cameras, and there's not one in the
23 clothing closet, at least at the time when I
24 worked there.

1      Q.     Okay.  And this is a location
2 where the two of you would engage in physical
3 interaction?
4      A.     A couple times, yeah.  That's just
5 one -- that's just one, like you said, where the
6 cameras aren't that she knew about.
7      Q.     Okay.
8      A.     And if I was M1 she would ask if
9 she could go back to the clothing closet.
10      Q.     Okay.  How are you doing, by the
11 way?  Do you need a break or anything?
12      A.     I'm a little amped up, but, no,
13 I'm fine.
14      Q.     Okay.  And I want to give you the
15 opportunity to say what you need to say.
16      A.     Okay.
17      Q.     On the occasions where you and she
18 would hug and/or kiss, can you estimate in any
19 way how long of a period of time you would
20 actually be in an embrace or be in a kiss?
21      A.     It would be minutes.
22      Q.     Okay.
23      A.     It could be anywhere from a minute
24 to ten minutes.



1    Q.    Okay.
2    A.    For what you are saying there.
3    Q.    So, you would estimate that ten
4    minutes would be the longest, not including the
5    sexual intercourse?
6    A.    Right, right.
7    Q.    The two instances of that?
8    A.    Right.
9    Q.    The instances where you and she
10   would kiss and/or hug the maximum length of
11   which you are saying would be about ten minutes?
12   A.    Yeah.  That would probably be a
13   little high.  I'm not sure, because there would
14   be like the staff and like she had her lookouts
15   there and like the staff would come by or --
16   Q.    Describe for me what you mean by
17   she had her lookouts.  And you referenced that
18   when Miss Yeh was asking you questions.  You
19   referred to Patricia and, I'm sorry, what was
20   the --
21   A.    Her name was Maria.  I forget her
22   last name.  I don't know Patricia's last name,
23   either, but --
24   Q.    Interestingly, is Maria -- just as

1    a quick aside, do you recognize the name at the
2    top of that document?  I'm showing him Berks
3    County 1.
4    A.    I believe that's her, yes.
5    Q.    That's her friend that you are
6    referring to, Maria?
7    A.    Yeah, and she had a son named
8    Jose, I believe.
9    Q.    Jose?
10   A.    Jose or Juan, one or the other.
11   He was about 14.  13, 14.
12   Q.    Okay.
13   A.    She spoke fluent English.
14   Q.    This Maria friend?
15   A.    That's the Maria -- if that's the
16   one that's -- it was her, Patricia and ▇▇E.D.▇▇ .
17   Q.    Okay.  And you believe that the
18   last name indicated on the top of what we have
19   marked as Berks County 1 is the Maria -- is the
20   last name of the Maria you are referring to as
21   being ▇▇E.D.▇▇ friend?
22   A.    It looks -- it looks similar, yes.
23   MS. YEH:  Could you just read that
24   for the record?

1    MR. CONNELL:  I can't read it.
2    MS. YEH:  Oh, you can't read it?
3    MR. CONNELL:  But the exhibit is
4    part of the record.  If you would like to look
5    at it right now, feel free.
6    MR. ARCHAMBEAULT:  So, do you want
7    to spell it for the record or --
8    MR. CONNELL:  You can do whatever
9    you like with it.  I don't mind.  I don't feel
10   the need to spell it for the record.
11   MR. ARCHAMBEAULT:  Okay.
12   MR. CONNELL:  But if you want to.
13   MS. YEH:  It looks like it might
14   start with a Q.
15   MR. CONNELL:  But, again, it's
16   part of the record because it's been marked as
17   Berks County 1.  And this, by the way, is the
18   document you guys identified or produced the day
19   before ▇▇E.D.▇▇ deposition.
20   BY MR. CONNELL:
21   Q.    So, I'm sorry.  Back to the
22   reference to lookout.  When you referred to them
23   as lookouts, why did you believe they were
24   lookouts?

1    A.    Because there was -- as the time
2    went on, there was incidents of where like
3    ▇▇E.D.▇▇ would come in, like I told you about the
4    incident where the -- or I told her about when I
5    went to the bathroom and she came in.  Patricia
6    basically held the door and Maria was a lookout
7    or I saw her every time I would come out of a
8    room or ▇▇E.D.▇▇ would come into it, I would come
9    out and those two would be standing right there.
10   Q.    Did you and ▇▇E.D.▇▇ ever discuss
11   the fact that they were looking out for other
12   staff or --
13   A.    I did not know.  I knew they were
14   friends.  They hung out with each other a lot,
15   but I didn't know they were lookouts, but I kind
16   of got that feeling towards -- as time went on.
17   Q.    Was there ever an incident where
18   you and ▇▇E.D.▇▇ were in an uncameraed location
19   engaged in either kissing or hugging where
20   either Patricia or Maria interrupted you?
21   A.    Yes.
22   Q.    When they interrupted you on those
23   occasions did you understand the interruption to
24   be to give you a warning that somebody was



1  coming?
2       A.    I didn't know at the time, but as
3  I reflect back on it now, yeah.
4       Q.    Okay.  That's what your belief was
5  in hindsight, that that's what --
6       A.    In hindsight, yeah.  Somebody
7  banging on the door.  I didn't -- that was a
8  clue for her to get out.
9       Q.    Did you personally ever have a
10 concern if you were engaged in hugging or
11 kissing that you should have had a lookout, or
12 did you rely upon maybe these two folks would
13 cover your back?
14      A.    No, I wasn't in cahoots with them.
15 I wasn't in cahoots with all three of them.  I
16 didn't know about the other two.  I knew they
17 were friends.
18      Q.    Right.  I guess --
19      A.    But I didn't catch onto the
20 whole --
21      Q.    Lookout?
22      A.    -- lookout thing until later,
23 until it was too late.
24      Q.    Okay.  But my question -- I guess

1  my question is is it fair to say you never had
2  your own lookouts?
3       A.    No, I didn't.
4       Q.    You did not?
5       A.    No.
6       Q.    Okay.  And -- okay.  The other
7  people that you mentioned on the papers and you
8  don't know why they are there, I'm going to run
9  through a few names for you just so that we're
10 clear as to who we are talking about.
11      A.    Okay.
12      Q.    Jamie Himmelberger?
13      A.    Yes.
14      Q.    Matt Malinowski?
15      A.    Yes.
16      Q.    Erika Taylor?
17      A.    Yes.  You asked me if I knew who
18 they were, if I worked with them or recognize
19 the names?
20      Q.    Well, that's fair, because I
21 probably wasn't clear enough.  Let's step back
22 and start all over.  If you can tell me are they
23 folks that you worked with.
24      A.    Okay.

1       Q.    Jamie Himmelberger?
2       A.    Yes.
3       Q.    Matt Malinowski?
4       A.    Yes.
5       Q.    Erika Taylor?
6       A.    Yes.
7       Q.    Brittany Rothermel?
8       A.    Yes.
9       Q.    John Behm?
10      A.    Yes.
11      Q.    Now -- and there's been testimony
12 to this.  Brittany, Erika, Matt and Jamie have
13 all testified that they were on the second
14 shift.  Would you agree with that?
15      A.    Yes.
16      Q.    John Behm testified that he was a
17 second shift SCC/kitchen --
18      A.    Yes.
19      Q.    -- employee.  You agree with that?
20      A.    Yes, I do.
21      Q.    Would you agree that Mr. Behm
22 spent the bulk of his time if not the entirety
23 of his time in the kitchen area?
24      A.    Yes.

1       Q.    Let me ask you this:  At any time
2  when you were engaged in a kiss or hug with
3  Miss -- with ▮E.D.▮ did you -- to your
4  knowledge, any staff ever see you?
5       A.    Not to my knowledge, no.
6       Q.    Okay.  Do you have any reason to
7  believe that any staff ever saw you engaged in a
8  kiss or a hug?
9       A.    Can you say that again?
10      Q.    Do you have any reason to believe
11 that any staff ever saw you engage in a kiss or
12 a hug with ▮E.D.▮?
13      A.    No.
14      Q.    When -- on the two instances where
15 you and ▮E.D.▮ engaged in sexual intercourse do
16 you have any knowledge that any staff saw you
17 engage in that behavior?
18      A.    No.
19      Q.    Do you have any reason to believe
20 that any -- any staff -- and you might have
21 answered this question already, and my apologies
22 if you did -- saw you enter the downstairs
23 female bathroom where you and ▮E.D.▮ engaged in
24 sexual intercourse?



1    A.    No.
2    Q.    Okay.  And, I'm sorry.  Where was
3  the other room where you and E.D. engaged in
4  sexual intercourse?
5    A.    It was upstairs on B floor, last
6  room on the right.
7    Q.    What you believe to be Patricia's
8  bedroom?
9    A.    Yes.
10    Q.    Do you have any reason to believe
11  that any staff member saw you engage in sexual
12  intercourse in that room?
13    A.    No.
14    Q.    No staff member walked in on you
15  at any point when you were engaged in sexual
16  intercourse?
17    A.    No.
18    Q.    No staff member ever walked in on
19  you when you were engaged in a hug or a kiss
20  with E.D. ?
21    A.    No.
22    Q.    And this is going to seem
23  ridiculously repetitive, but so that the record
24  is clear, I'm going to ask you those same

1  questions about each of those individuals we
2  just identified as being your coworkers during
3  the period of time.  Okay?
4    A.    Okay.
5    Q.    If you can just bear with me, I
6  think it's something that needs to be seen or
7  heard on the record.  Okay?
8    A.    Okay.
9    Q.    Do you have any reason to believe
10  that Jamie Himmelberger ever saw you engage in a
11  hug, kiss or any other physical contact between
12  you and E.D. ?
13    A.    No.
14    Q.    Do you have any reason to believe
15  that Matt Malinowski ever saw you engage in a
16  hug, a kiss, sexual intercourse or any other
17  physical contact between you and E.D. ?
18    A.    No.
19    Q.    Same question with regard to Erika
20  Taylor.  Do you have any reason to believe that
21  she ever saw you engage in a hug, kiss or other
22  physical contact or sexual intercourse with
23  E.D. ?
24    A.    No.

1    Q.    Do you have any reason that
2  Brittany Rothermel ever engaged -- strike that.
3          Do you have any reason to believe
4  that Brittany Rothermel ever saw you in a hug,
5  kiss, engaged in sexual intercourse or have any
6  other physical contact with E.D. ?
7    A.    No.
8    Q.    Do you have any reason to believe
9  that John Behm ever saw you engage in a hug,
10  kiss, sexual intercourse or other physical
11  contact with E.D. ?
12    A.    No.
13    Q.    Do you have any reason to believe
14  that Diane Edwards ever saw you engage in a hug,
15  kiss, sexual intercourse or other physical
16  contact with E.D. ?
17    A.    No.
18    Q.    Your last date of employment was
19  August 18th, 2014.  Does that sound right to
20  you?
21    A.    My last date of employment?
22    Q.    Okay.  Thanks for clarifying,
23  because that was probably a bad question.  You
24  were put out on administrative leave on August

1  18th, 2014, correct?
2    A.    I don't know.  That sounds about
3  right.
4    Q.    It was sometime in mid-November?
5    A.    It was the middle of August.
6    Q.    The middle of August?
7    A.    Yeah.  I wasn't sure if it was the
8  16th or the 18th.  I'm not sure.
9    Q.    Okay.  Your employment was
10  terminated on September 11th, 2014?
11    A.    Yes.
12    Q.    Between the time that you were put
13  on administrative leave and the time that you --
14  your employment was terminated you spoke -- you
15  had a sit-down with Diane Edwards and Dave Smith
16  to discuss the allegations, correct?
17    A.    Yes.
18    Q.    By the way, did you ever come to
19  learn how it was that this whole thing came out?
20    A.    Just from --
21    Q.    If it's from your conversation
22  with Mr. Sadonsky that --
23    A.    No, it's not.
24    Q.    Okay.

1    A.    I think it was from the Bern
2    Township Police or somebody -- it was somebody
3    that was doing the investigation that said.
4    Q.    Did you sit down with the Bern
5    Township Police?
6    A.    Never.
7    Q.    Okay.  Just by way of background,
8    the records indicate that some residents came to
9    staff at some point in August and said they want
10   to tell about what they believe is a
11   relationship between you and .  Is
12   that your understanding of how it came out?
13   A.    Yes.
14   Q.    Do you know there's testimony in
15   this case and there are records to suggest that
16   a young girl walked into the bathroom, the first
17   floor female bathroom when you and E.D. were
18   engaged in sexual intercourse?  Is it your
19   understanding that that occurred?
20   A.    Yeah.  She walked in there, yes.
21   Q.    And is it your understanding that
22   it was within a few days' time of that incident
23   where the girl walked in that residents
24   approached staff and told them about what was

1    going on?
2    A.    Yes, as far as I know.
3    Q.    Okay.  And it was after you
4    were -- and you were put on administrative leave
5    sometime in mid-August and terminated in
6    September 11, 2014.  Between those two periods
7    of time is when you sat down with Dave Smith and
8    Diane Edwards?
9    A.    It was -- it was a couple days
10   after, yeah.  It was like the Tuesday or
11   Wednesday.
12   Q.    A couple days after you were put
13   on administrative leave?
14   A.    I believe it was that next week,
15   yes.  I knew everything that was going on.
16   Q.    What do you mean you knew?
17   A.    I knew about the investigation, I
18   knew who was there, I knew the feds were there.
19   I knew everything.  There was somebody in there
20   who was telling me everything, so --
21   Q.    Okay.  Well, before I -- let me
22   ask you -- and I can ask you about that, but
23   before I ask you about that, prior to -- perhaps
24   even prior to today but prior to September 11th,

1    2014 had you ever told anybody that was employed
2    with Berks County that you and E.D.
3    hugged, kissed or engaged in sexual intercourse?
4    A.    Yes.
5    Q.    Who did you tell?
6    A.    Darrius Palmer.
7    Q.    And when did you tell Darrius
8    Palmer?
9    A.    He was my inside -- inside man
10   that was telling me what was going on inside of
11   there, because I met up with him on the outside,
12   he texted me.  That was my contact on the
13   inside.
14   Q.    And when you told him about this
15   was it after you were put on administrative
16   leave?
17   A.    He knew about it, because he sent
18   me a picture of E.D. on his phone when
19   I was on vacation in the Outer Banks.  So, he
20   knew about it prior to anybody.
21   Q.    He sent you a picture?
22   A.    Yep, of her undressed or she took
23   his phone or something, but somebody sent me a
24   picture of her in her bra and panties while I

1    was on vacation in the Outer Banks, and it was
2    on his phone.
3    Q.    Other than Darrius Palmer, do you
4    have reason to believe -- did you tell anybody
5    else about your relationship with E.D. ?
6    A.    Of that list of employees or just
7    you said anybody?
8    Q.    Well, that list of employees,
9    anybody on that list?
10   A.    No, I didn't tell any -- I didn't
11   tell any of them, no.  That's why I was
12   surprised when Darrius Palmer's name wasn't on
13   that list.  He should probably be the only one
14   on that list.
15   Q.    Okay.  One moment.
16         When was the last time you spoke
17   to Darrius Palmer?
18   A.    I spoke with him all through that
19   summer into that fall.  That was probably
20   about -- that was probably about the end of it.
21   Q.    When you sat down with Dave Smith
22   and Diane Edwards a couple days after going out
23   on administrative leave do you know if one of
24   them or both of them were taking notes of the

1  conversation?
2      A.    I don't recall.
3      Q.    Okay.  Is it fair to say that
4  during your conversation with them you were not
5  truthful?
6      A.    No.  I lied.
7      Q.    When you lied, did you lie not
8  just about yourself but anything that they --
9  and I don't know -- strike that.
10          Did they ask you anything about
11  Darrius?
12      A.    I don't remember.
13      Q.    If they did ask you anything about
14  Darrius would you have lied about that, as well?
15      A.    Probably at that time, yes.
16      Q.    So, you -- if anybody asked you
17  about Darrius at that time you would have
18  covered for him?
19      A.    Well, I have covered for him since
20  2014.  So, yeah.
21      Q.    Okay.  Can you tell us the
22  approximate dates of your vacation to the Outer
23  Banks back in August of 2014?
24      A.    That was the first week in August.

1      Q.    First full week of August?
2      A.    First week of August, I believe,
3  yes.
4      Q.    All right.  There are records
5  indicating that you were off August 3rd through
6  August -- returned to work on August 9th, 2014.
7  Does that sound about right?
8      A.    That sounds about right, yes.
9      Q.    Do you believe that Darrius
10  concealed his knowledge of your relationship
11  with ▆▆▆▆▆?
12      A.    Yes, because I read his statement
13  in here and it's -- he didn't tell everything
14  that he should have been telling.
15      Q.    When he gave a statement to the
16  Bern Township Police?
17      A.    I don't know who the statement is
18  for.  I would assume it's for the Bern Township
19  Police or the feds that were there.  They were
20  doing the investigation.  He made it sound like
21  he didn't know anything.
22      Q.    And you believe that that is not
23  truthful?
24      A.    That's a lie.

1      Q.    Okay.  You had talked -- you had
2  talked about ▆▆▆▆ taking your cell phone for a
3  period of time.  Was that -- it was unclear from
4  my questions -- from the question you were being
5  asked whether the time that she had taken your
6  cell phone, was it over a period of days or just
7  one single shift?
8      A.    I think it was the same day.  Same
9  shift.
10      Q.    So, some point she grabbed --
11  because your answer to the question was before I
12  left the facility, and I felt that that was unclear
13  whether you left the facility that day or
14  whether -- when you left the facility -- before
15  on August 18th?
16      A.    Oh, no, no.  I got it back that
17  same day.
18      Q.    And you believe that she had used
19  your cell phone to call her mother and to take
20  pictures?
21      A.    Yes.
22      Q.    Do you recall if she ever used her
23  cell phone to play music?
24      A.    I don't know that.

1      Q.    Okay.  Was there a period of time
2  during that shift where she had your cell phone
3  but you were not -- like you had gone about
4  doing your job and then went back and tried to
5  retrieve your cell phone later?
6      A.    Right, because she had -- once she
7  had it, she kind of took it.  So, I didn't
8  really have any way of getting it back.  So, I
9  can't --
10      Q.    Do you recognize that she could
11  have blackmailed you through this whole thing?
12      A.    I've been wondering that since
13  2014.
14      Q.    And -- so, you got the cell phone
15  back before you left the facility that day that
16  she took it?
17      A.    Yes.
18      Q.    The time where Patricia took the
19  ring from you, was that the same day --
20      A.    No.
21      Q.    -- as the cell phone?
22      A.    No.
23      Q.    Different day?
24      A.    Different day.



1     Q.     Which came first, the cell phone
2  or the --
3     A.     The ring.
4     Q.     And to this day you never got the
5  ring back?
6     A.     No, or the phone.
7     Q.     Do you have any idea where the
8  phone ended up?
9     A.     No idea.
10     Q.     I thought you said you got the
11  phone back that day before you left the
12  facility?
13     A.     Oh, I mean like once the feds came
14  and took it and the police and -- I mean, I'm
15  saying like I physically don't have that phone.
16     Q.     They seized that phone as a result
17  of the criminal investigation?
18     A.     They had a search warrant for the
19  phone.  Like once I gave them the phone, then
20  the phone was gone.  But I did have that same
21  phone in my hand when they came to get it.
22     Q.     Were there pictures of **E.D.** on
23  the phone?
24     A.     Yes.

1     Q.     And did you ever share those
2  pictures with anybody?
3     A.     No.  I deleted them off.  When I
4  got home, I saw them on there and I believe I
5  deleted them that night or the next day.
6     Q.     Were those pictures -- was **E.D.**
7  clothed or not?
8     A.     She had undergarments on.
9     Q.     And it's your understanding that
10  either she or one of her friends at the facility
11  took those pictures?
12     A.     Yes.  I'm pretty -- I don't know
13  who it was, but I'm pretty sure it was Patricia.
14     Q.     You did not take them?
15     A.     I did not take those pictures, no.
16     Q.     Did she -- did you ever discuss
17  with her those pictures?
18     A.     No.
19     Q.     At a point after September 11th,
20  2014 also -- the ring was found in **E.D.** bra.
21  Did you ever know that?
22     A.     Never knew that.
23     Q.     Also found in her room was a piece
24  of paper with your name on it and a four digit

1  code.  Did you ever hear that before?
2     A.     Never heard that.  No.
3             MS. AMBROSE:  It's 44, if that's
4  what you're looking for.
5             MR. CONNELL:  Thank you.
6  BY MR. CONNELL:
7     Q.     I'm going to show you two
8  documents that have previously been marked as
9  exhibits Berks County 43, which you might have
10  been asked about already, and I apologize if you
11  did.  43.
12     A.     Uh-huh.
13     Q.     Is 43 -- and that's 44, if you
14  want to take a moment to look at them.
15     A.     Yep.
16     Q.     Okay.  Well, my first question,
17  43, just to get it out of the way, is that the
18  ring we're talking about?
19     A.     Yes.
20     Q.     And would it surprise you if you
21  learned that that ring was found by a staff
22  member in September of 2014 in **E.D.** -- well,
23  **E.D.** removed it from her bra?
24     A.     Would it surprise me?

1     Q.     Would that surprise you?
2     A.     No.
3     Q.     Why would it not surprise you?
4     A.     Because she took it.  She wouldn't
5  give it back.
6     Q.     Did she ever express particular
7  interest in your ring?
8     A.     No.  They wanted to check out the
9  Gallic writing, Patricia did, and that's the
10  last time I saw it.
11     Q.     Okay.  Prior to the date where
12  they took the ring and didn't return it to you
13  was there any discussion about that ring --
14     A.     No.
15     Q.     -- with them?
16     A.     No.  That was given to me by my
17  wife.
18     Q.     You have had a moment to look at
19  Berks 44.
20     A.     I did, yes.
21     Q.     Have you ever seen that document
22  before?
23     A.     I've never seen it, no.
24     Q.     Beside your name is a series of



1 numbers.
2 A. Yes.
3 Q. It looks like 6073?
4 A. Uh-huh.
5 Q. Does that number mean anything to
6 you?
7 A. It doesn't ring any bells, no. I
8 don't know. Unless somebody -- unless that was
9 like my code for my phone or something like that
10 and she might have saw me punch it in or
11 something. I don't know.
12 Q. But it doesn't otherwise mean
13 anything to you?
14 A. No.
15 Q. Are you familiar with the term
16 hygiene check?
17 A. Yes.
18 Q. What does hygiene check mean to
19 you?
20 A. Where you go into the resident's
21 room with the resident and kind of do like an
22 overall inspection of their living quarters.
23 Q. And is it your understanding that
24 the -- what is your understanding of the purpose

1 of those checks?
2 A. Make sure -- I mean, for disease
3 and bacteria and, you know, viruses and just
4 keep the facility clean overall.
5 Q. The idea is to continue the
6 protection and the safety of the residents?
7 A. Yeah. All the residents, yeah,
8 and who they are living with and staff.
9 Q. Do you have an understanding --
10 strike that.
11 Have you had any contact with
12 E.D. since you were put on administrate
13 leave --
14 A. No.
15 Q. -- from the county?
16 A. No.
17 Q. Referring -- this is a document
18 you already saw today. It's just my copy of it,
19 Berks 54.
20 A. Okay.
21 Q. It should still be in front of you
22 somewhere.
23 A. Uh-huh.
24 Q. Turning to where you signed -- the

1 page that you signed off on, can you -- in
2 your -- you wrote it. Can you read what you
3 wrote there just so that it's clear for the
4 record?
5 A. I do not agree with these
6 statements presented as facts by the county. I,
7 Daniel Sharkey, will attach a statement at a
8 later date prior to grievance proceedings.
9 Q. Okay. Thank you.
10 You were asked questions with
11 regards to other staff members sending E.D. to
12 you.
13 A. Uh-huh.
14 Q. Do you recall talking about that?
15 A. I do, yes.
16 Q. All right. Can you describe what
17 you mean by that? Let me rephrase the question.
18 If -- by implication if you
19 believe somebody is sending someone to you, that
20 means you are somewhere else, will you agree
21 with that?
22 A. Right.
23 Q. So, if, for example, you were on
24 the outside shift and E.D. showed up on your

1 post on the outside post, you believe someone
2 sent her to you?
3 A. I mean --
4 Q. What --
5 A. Go ahead.
6 Q. What would -- what would that
7 belief be based upon if you weren't there in the
8 first instance?
9 A. Because there was staff members
10 that told me themselves that they would send
11 them to me.
12 Q. Okay. And what staff members, by
13 the way, would tell you that?
14 A. I don't know. It could just be
15 random ones. It was guys that thought this was
16 funny.
17 Q. Would you agree with me it's not
18 any of the names of people who are identified as
19 defendants in this case?
20 A. No, not -- not -- not that list
21 you read, no.
22 Q. Okay. And when we say the term
23 sending to, if -- perhaps it's a hypothetical,
24 perhaps it's not. If E.D. goes to the desk on



1  B1 and asks where you are --
2      A.     Uh-huh.
3      Q.     -- would your expectation be that
4  the staff member would or would not say, oh,
5  Sharkey is down working outside today and tell
6  her where you are?
7      A.     I guess they would tell her.  I
8  mean --
9      Q.     Is it your understanding that
10  that's how it happened when they sent her to
11  you?
12      A.     Maybe earlier on, but as time --
13  as this became a joke to everybody, even when we
14  were down at briefing this was a joke.  This
15  was -- you know, **E.D.** was -- they were letting
16  **E.D.** do her laundry on second shift, they cut
17  it to first.  They let her do hers on second
18  shift.  I mean, they made exceptions for her so
19  if I went in the laundry room, she would ask me
20  for laundry soap.  It was -- it was a joke.  So,
21  yeah, I mean, everybody thought it was a joke.
22      Q.     Who's everybody who thought it was
23  a joke?
24      A.     Everybody that was on my shift.

1      Q.     Including the people who we have
2  talked --
3      A.     No, they didn't.  No.  These
4  people -- no.  That's why I don't understand
5  these people.  Jamie -- Jamie never did
6  anything.  If anything, Jamie was helping me
7  out, but, no.  I mean, no, nobody on that list.
8  Malinowski didn't do anything.  Those people
9  didn't do anything to justify being on that
10  list.  The only person that knew about it was
11  Darrius Palmer, but everybody was -- no one on
12  that list joked about it, but here was like --
13  like Dan Hollinger would think this was a joke
14  and, you know, Darrius thought it was a joke,
15  and -- you know, it was every day at briefing.
16  It was every fricking day.  The supervisors knew
17  about it.
18      Q.     What supervisors knew about it?
19      A.     Jason Mills and Len Kopetsky.
20  Every day when I come into briefing.  Oh, she
21  waited to do her laundry on second shift.  That
22  must be for Sharkey.  It was a daily -- a daily
23  thing after awhile, after a certain period of
24  time.

1      Q.     Okay.  After how long a period of
2  time?
3      A.     I don't know.  After a couple
4  weeks of her being there.  Two to three weeks,
5  two weeks.  I don't know how long she was there
6  for, but --
7      Q.     Did you ever tell any of those
8  folks that you engaged in physical contact with
9  her?
10      A.     The ones on that list?
11      Q.     No.  Len Kopetsky or Jason Mills?
12      A.     Well, I spoke of the one incident
13  where I was kind of trapped in one of the
14  resident rooms.  That was a physical
15  altercation.  I mean, there was no -- like
16  nothing sexual, but, I mean, yeah, she -- I
17  was -- I was having trouble getting out of the
18  room.
19      Q.     Was that before or after the first
20  time you and she engaged in a kiss?
21      A.     Before.
22      Q.     Okay.
23      A.     This kind of snowballed.  It kind
24  of started out as like petty high school stuff

1  and it kind of just grew from there.
2      Q.     But you will agree with me that
3  you never told Len Kopetsky or Jason Mills that
4  you and she were engaged in kissing?
5      A.     No.  He -- they knew, because the
6  one comment that Jason Mills made was we got a
7  bunch of John Reiches working here, and that was
8  in front of everybody.
9      Q.     What did you mean by that?
10      A.     Well, John Reich was a former
11  employee that had a similar situation to mine.
12  Not so extreme, but --
13      Q.     And when was that?
14      A.     That was over in the old building,
15  I'm assuming.
16      Q.     When you say a similar situation
17  not as extreme as yours --
18      A.     He was hitting on females and had
19  some run-ins with female residents there, as
20  well.
21      Q.     Did you have reason to believe
22  that he engaged in sexual contact or conduct
23  with female residents?
24      A.     I never worked with John Reich.  I



1 was working the detention center.
2    Q.    So, you are speaking of an
3 individual, an employee which you were not
4 employed there at the time?
5    A.    Well, I knew John.
6    Q.    Okay.
7    A.    Everybody knew what John's
8 situation was.
9    Q.    All right.  And --
10    A.    I'm just telling you about the
11 comment he made.  I don't -- you know, I don't
12 care about John.  You know what I mean?  I'm
13 just telling you about the comment was made.  I
14 mean, people knew -- you know, knew about it.
15    Q.    Knew about -- what do you believe
16 that people knew about?  That's what I'm asking
17 you.
18    A.    They knew that we were having a
19 relationship in the facility.
20    Q.    Who knew that?
21    A.    Specifically?
22    Q.    Yes.
23    A.    I guess most of the people that
24 worked there.

1    Q.    We went through the list of people
2 that we --
3    A.    I'm not here to throw people under
4 the bus.
5    Q.    And I'm not asking you to throw
6 people under the bus.
7    A.    Okay.  I don't -- I don't want to
8 even get in that game, but I'm just -- Darrius
9 is the guy that knew -- knows everything.
10 Darrius is -- why he's not on that list is
11 beyond me.  Why Malinowski is on that list and
12 John Behm it's crazy.  I don't even understand.
13 But -- or Jamie or Erika.
14        I mean, Jamie told me to watch out
15 for her so -- at one point.  So, I mean --
16        Can we take a break for a minute?
17    Q.    Of course.
18    A.    I need to use the bathroom.
19    Q.    Yes, please.
20    A.    Sort of calm down a little bit.
21        MR. CONNELL:  Absolutely.
22        - - -
23        (Whereupon, a short recess
24 occurred.)

1        - - -
2 BY MR. CONNELL:
3    Q.    During a break in the deposition,
4 Mr. Sharkey, you were kind enough to open up the
5 contents of the box you brought with you today
6 and we attorneys have had an opportunity to
7 review -- at least thumb through the records,
8 and for the most part it appears to be for the
9 most part records that have been generally
10 produced through discovery or otherwise publicly
11 available, such as criminal pleading records.
12 You also have a stack of audio and video -- or
13 CDs, and you have indicated that you don't know
14 what's on them.  They are marked.  We have all
15 looked at them.  What I would ask is on the
16 record that you acknowledge that you cannot let
17 anything happen to these records or documents,
18 videos.  That you must preserve them.  Do you
19 understand that?
20    A.    Gotcha.
21    Q.    At least for the purposes of this
22 civil litigation.
23    A.    It's going to go right back down
24 into my basement.

1    Q.    We are also trying to get access
2 to those records, too, but if for some reason --
3    A.    I can -- I'm sorry.
4    Q.    If for some reason we are unable
5 to, through our respective clients or local
6 police departments we are not able to get these,
7 we may ask you to bring them again at a mutually
8 convenient time, place and location that we can
9 sit and review them.
10    A.    I understand.
11    Q.    I hope to not have to put you
12 through that, and we can probably do it on our
13 own, but it will be vital that you not let
14 anything happen to those.  They are technically
15 evidence in this case.
16    A.    Right.  That's why -- this is the
17 first I've even looked at the box.  I actually
18 looked at it when Alan gave it to me, but, yeah,
19 I understand.  I'll take care of them.
20        MR. CONNELL:  I appreciate that.
21 And I appreciate, Mrs. Sharkey, that you
22 assisted with that process.
23        MRS. SHARKEY:  No problem.
24        MR. CONNELL:  We're back off the



1  record.
2          - - -
3          (Whereupon, a short recess
4  occurred.)
5          - - -
6  BY MR. CONNELL:
7          Q.    And, actually, I'm going to have a
8  few documents to show you and I'm not going to
9  spend a lot of time -- detail of going through
10  them.  It will take a few minutes for us to go
11  through each one kind of mechanically, but that
12  won't take a lot of time.  And I have just a few
13  more questions.
14          Now, you have been sued as a party
15  in this case.  Do you understand that?
16         A.    Yes.
17         Q.    And I don't know if you have ever
18  received it or not, but there has been multiple
19  Complaints filed in this case.  A Complaint is a
20  document that initiates the litigation.  It's
21  where  brings her allegations against
22  everybody who is named.  All right.
23          On May 30th of this year the most
24  recent Complaint was filed.  It's the Third

1  Amended Complaint.  Do you recall ever seeing
2  that document?
3          A.    I do.  I think I have them all
4  through e-mail through your office and I think
5  as well as -- I'm fortunate enough to get copies
6  of those.  I don't really read too much into
7  them, but -- it's like a different language to
8  me sometimes.
9          Q.    And in a lot of instances it
10  almost is a different language, so I can
11  appreciate that.  But I'm going to -- I want to
12  go through a few of these things.  And I'm going
13  to read them to you and, I apologize, but I
14  don't have a copy of this document with me.  I
15  only have the one that has my notes on it which
16  I should not share with anybody.  And if you can
17  just bear with me.
18          There's an allegation in this
19  Complaint that you were grooming  by
20  bestowing favors on her, including allowing her
21  to use the cell phone, allowing her to call her
22  mother, to take pictures, use the internet,
23  giving toys and clothes to her and her son.
24          Do you believe that you were doing

1  that?
2          A.    No.
3          Q.    Okay.  Do you believe that the
4  relationship between and she was mutual?
5          A.    Yes, and consensual.
6          Q.    It was consensual?
7          A.    Yeah.
8          MS. YEH:  Objection to the extent
9  it calls for a legal conclusion.
10  BY MR. CONNELL:
11         Q.    Do you believe that -- and I
12  apologize for prying.  Do you believe that you
13  and Ms.  had feelings for each other?
14         A.    At one point, yes.
15         Q.    Did she express those feelings to
16  you?
17         A.    Yes.
18         Q.    And what did she say in terms of
19  expressing her feelings to you?
20         A.    I don't know.  At one point she
21  wrote me like a letter and -- I mean, she
22  took -- for some reason she used to take my like
23  sweaty T-shirt when I was outside playing
24  soccer.  You know, just little stupid stuff like

1  that.
2          Q.    Did you believe there was an
3  emotional attachment?
4          A.    Yes, for a certain period of time.
5          Q.    Did you ever promise to help her
6  with her immigration issues?
7          A.    No.
8          Q.    Did you ever believe that you had
9  the authority to help her with her immigration
10  issues?
11         A.    No.
12         Q.    I asked you a little while ago if
13  you believe that there was -- there may have
14  been some blackmail going on from her to you.
15  Do you believe that she engaged in any sort of
16  relationship with you in order to assist her
17  asylum proceedings?
18          MS. YEH:  Objection.  It calls for
19  speculation, but you may answer.
20  BY MR. CONNELL:
21         Q.    I'm asking you what you believe.
22         A.    Yes, I do.
23         Q.    And why is it that you have that
24  belief?



1    A.    At one point when she got, I
2    guess, news from her attorneys or from her
3    asylum people or whoever that she would possibly
4    get deported everything kind of amped up a
5    little bit.  Everything kind of multiplied.
6    Q.    Okay.  What do you mean by that?
7    A.    Like she was like more into me at
8    that point, and it was like more -- you know,
9    she was everywhere I was.  It was more than
10   normal after she -- there was a group of people
11   that got some bad news about possibly being
12   deported or whatever the step was in the process
13   where they got bad news.
14   Q.    Okay.
15   A.    And she happened to be one of
16   them, I believe.  There was a couple of them.  I
17   forget who the other ones were, but --
18   Q.    And did she share that with you?
19   A.    She did, yes.
20   Q.    Okay.  And based upon the timing
21   of her affections for you, is that a fair way to
22   say it?
23   A.    Uh-huh.
24   Q.    You believe that there was a

1    connection between her outward affections for
2    you and the timing of her receiving bad news on
3    her immigration proceedings?
4    A.    Yes.
5    Q.    Did she ever express that to you
6    verbally?
7    A.    About her getting bad news or all
8    that kind of together?
9    Q.    Well, let's start with her getting
10   the bad news with regards to her immigration
11   proceedings?
12   A.    She did let me know that, as did
13   other residents.  But, yeah, she did.
14   Q.    And after she let you know that
15   did she ever discuss with you its connection to
16   her relationship with you?
17   A.    Yes.  She had talked about --
18   towards the end about having children at one
19   point.
20   Q.    Having children with you?
21   A.    After that time, after that.
22   That's why kind of like when I say it got amped
23   up a little bit or multiplied after that before,
24   you know, I lost my job.

1    Q.    So, she --
2    A.    But she would start talking about
3    family and living together and that kind of
4    stuff.
5    Q.    With you and she?
6    A.    Right, right.
7    Q.    And did you reciprocate those
8    conversations?
9    A.    I didn't.  I always told her that
10   she was -- her anticipation was to go down to
11   live with her mom I believe somewhere in
12   Georgia, and I always said when you get down
13   there you'll meet somebody down there and you'll
14   forget all about, you know, ever being here.
15   Q.    She goes on to allege that you --
16   that you initiated the touching of her and that
17   you kissed her in the laundry room.  Did you
18   ever forcibly kiss her in the laundry room?
19   A.    No.  Everything we did was
20   consensual and mutual.  There was no force or
21   anything like that or violence or whatever.
22   Q.    Did she ever indicate to you that
23   she was ever upset with the attention you gave
24   her?

1    A.    No.
2    Q.    Did you ever become angered or
3    insulted when she refused to touch you?
4    A.    No.
5    Q.    She indicates that on a Sunday
6    afternoon at around 3:00 p.m. in, approximately,
7    July that you followed her into the ladies' room
8    and forced her to engage in sexual intercourse.
9    Did you ever force her to engage in sexual
10   intercourse?
11   A.    No, never.
12   Q.    Did -- do you recall whether there
13   was ever even any intercourse in July after --
14   A.    I was off on Sundays and Mondays,
15   so that would have been a weird day.  Like it
16   had to have been like a switch or something.
17   Q.    You also indicated that the sexual
18   intercourse did not occur until after your
19   vacation in the Outer Banks, correct?
20   A.    That was the second -- the second
21   time.  My wife just informed me that my Outer
22   Banks trip was in June.
23   Q.    Okay.  Now -- so, you had a June
24   Outer Banks?



1    A.    June Outer Banks and I think went
2  to Vermont in August.
3    Q.    Okay. So, you were off for a week
4  in August?
5    A.    Yes.
6    Q.    And was the sexual intercourse
7  before or after your week off in August?
8    A.    After.
9    Q.    It was after?
10   A.    It was that last -- it was that
11 16th or whatever. Whatever that Saturday was.
12   Q.    Okay. So, were both instances of
13 sexual intercourse after the week off in August?
14   A.    No, I don't think so.
15   Q.    You had previously testified that
16 there were only a couple days between the
17 instances of sexual intercourse.
18   A.    You keep saying Outer Banks,
19 though. I think we went to -- oh, this is my
20 first -- the first -- we got back on like the
21 9th or something like that.
22   Q.    Let's step back a second. In
23 previously answering questions you had indicated
24 that there was just a couple days --

1    A.    Right.
2    Q.    -- between the first instance of
3  sexual intercourse and the second instance of
4  sexual intercourse. Is that correct?
5    A.    Yeah. I'm not sure of the exact
6  days. I know the one was on the 16th and I'm
7  not sure --
8    Q.    Let me ask you this: If Outer
9  Banks was in June --
10   A.    Right.
11   Q.    -- could it have been two months
12 between the instances of sexual intercourse?
13   A.    No, it wasn't that long.
14   Q.    It is more likely to be --
15   A.    A couple weeks.
16   Q.    A couple weeks?
17   A.    Right, right.
18   Q.    So, I think there was an instance
19 of sexual intercourse and then a couple weeks
20 before the second instance of sexual
21 intercourse?
22   A.    Right, because the relationship
23 progressed. So, it wasn't like -- you know, it
24 was like -- you know, it was like we didn't have

1  sex this month and sex this month. It was
2  like -- it was like quick. It wasn't -- you
3  know what I'm saying? It wasn't like --
4    Q.    Yes, and I'll be honest --
5    A.    -- during a short period of time.
6    Q.    And you are kind of confusing me a
7  little bit, because you had testified earlier in
8  answering questions from Miss Yeh that there
9  were just a couple days between the first time
10 you had sexual intercourse and the second time
11 you had sexual intercourse.
12   A.    Right.
13   Q.    You are confident that the second
14 sexual intercourse occurred in mid-August
15 because it was shortly before it all came to
16 light, correct?
17   A.    It was that last day I worked on
18 Saturday, the second time. The first time I'm
19 having trouble recollecting, but they were
20 within a short period of time.
21   Q.    Let me do this: I will -- there
22 is -- yesterday Brittany Rothermel was deposed
23 and you may not know this but she took a
24 statement from the little girl --

1    A.    Uh-huh.
2    Q.    -- who walked in. If I could find
3  it. I'm looking for the --
4          MS. AMBROSE: 39 and 40.
5  BY MR. CONNELL:
6    Q.    And I recognize that you did not
7  write this statement and I recognize you
8  probably never have seen this statement before,
9  but this is a statement given by Brittany
10 Rothermel after she had an interview with the
11 little girl.
12   A.    Uh-huh.
13   Q.    Brittany Rothermel reports that
14 the conversation occurred with the little girl
15 on August 18th, and that the little girl told
16 her that the incident where she walked in with
17 you and  E.D.  was on August 10th. Does that
18 make sense?
19   A.    That does not make sense at all.
20   Q.    Why does that not make sense?
21   A.    Because it was the last day I
22 worked before I left, before -- it was the last
23 day I worked.
24   Q.    Okay. The last day you worked --



1    A.    The last Saturday I worked.
2    Q.    And was that the incident that
3  occurred in the first floor bathroom?
4    A.    Right.
5    Q.    Okay.  So, the first time there
6  was sexual intercourse that was in the bedroom
7  on the second floor?
8    A.    Right.
9    Q.    Okay.
10    A.    But nobody came in.  Nobody came
11  in during that time.
12    Q.    The one in the bedroom?
13    A.    Yeah.  Nobody knew about that one.
14  That was before.
15    Q.    And then this one was the girl
16  walked in?
17    A.    Yeah.
18    Q.    And you don't think it could have
19  been August 10th?
20    A.    Unh-unh.  No.
21    Q.    But it was definitely before
22  August 18th, yes?
23    A.    I think it was the 16th.  I'm
24  almost positive it was the 16th.

1    Q.    Okay.  And you don't recall the
2  date of the first instance --
3    A.    I don't, no.
4    Q.    -- in the bedroom?
5        And I'm not going to spend much
6  more time on these allegations in the Complaint.
7  I just want to make sure that we're clear.
8        After the allegation that you had
9  forced her to engage in sexual intercourse in
10  the ladies bathroom, the next allegation is
11  shortly thereafter he met her in the
12  recreational area and demanded that she follow
13  him into the same bathroom and, again, forced
14  her to have sexual intercourse.  Did that occur?
15    A.    No, it did not.  Isn't that stuff
16  on video?  You can see that that doesn't happen
17  on video.
18    Q.    Well, there's no video inside the
19  bathrooms.
20    A.    No.  I'm saying if we left the
21  area and I forced to -- like forced meaning
22  having to grab her, wouldn't that be on video me
23  forcing her back into the bathroom?
24    Q.    And I can assure you that there's

1  no video that I have seen that does that, shows
2  that.
3    A.    I'm just making sure everybody is
4  on the same page and I'm just making sure
5  everybody has the same video.
6    Q.    This is what I need to explore
7  with you is that allegation --
8    A.    I apologize.
9    Q.    -- that ▮▮E.D.▮▮ is making.
10    A.    Okay.  I apologize.
11    Q.    And just because she alleges that
12  it happened doesn't mean that you -- you have
13  the opportunity to deny that.
14    A.    I understand.
15    Q.    But she said that there was a
16  third occasion where you, once again, forced her
17  to have sex with him.  Again, you never forced
18  her to have sex you with?
19    A.    Never did.
20    Q.    Again, I'm not going to spend a
21  lot of time with this, but it is kind of a rote
22  process here.
23        MR. CONNELL:  We will have that
24  marked as the next Berks County number.

1          - - -
2        (Whereupon, the document was marked
3  as Berks County 55 for identification.)
4          - - -
5  BY MR. CONNELL:
6    Q.    Mr. Sharkey, can you just take a
7  moment and look at that for me, please.
8    A.    Uh-huh.  Yep.
9    Q.    Does that look familiar to you?
10    A.    Yeah.  These are the competencies
11  that we used to do.
12    Q.    The competencies?
13    A.    That's what they were called.
14    Q.    Okay.  And that's your signature
15  on the front?
16    A.    Yes.
17    Q.    Okay.  And -- do you recall
18  filling that sheet out under the Berks County
19  Residential Training Department Sexual Abuse and
20  Assault Prevention and Intervention?  Do you
21  remember filling out that document?
22    A.    No.
23    Q.    You did not fill out the document?
24    A.    You asked me if I remember filling



1 it out.
2    Q.    I'm sorry.  You are right.
3    A.    No, I do not remember it.  This is
4 my handwriting, though.
5    Q.    Okay.  Very good.
6         - - -
7         (Whereupon, the document was marked
8 as Berks County 56 for identification.)
9         - - -
10 BY MR. CONNELL:
11   Q.    Same question, sir.
12   A.    Uh-huh.
13   Q.    There's a signature line there for
14 Daniel Sharkey --
15   A.    Yes.
16   Q.    -- dated 1/16/14.  Is that your
17 signature?
18   A.    Yes.
19   Q.    And when you -- you recognize that
20 when you signed a document indicating that you
21 understand the policies and procedures listed
22 above apply to you?
23   A.    Yes.
24   Q.    You understood that to apply to

1 you, correct?
2    A.    Yes.
3    Q.    That's it for that document.
4         MR. CONNELL:  I don't want to be
5 duplicative.  Do you recall the code of ethics
6 that you presented to Mr. Sharkey earlier what
7 the date was on that?
8         MR. ARCHAMBEAULT:  It was the
9 initial hire or the rehire, I guess.
10        MS. AMBROSE:  May 29th, 2013.
11        MR. CONNELL:  May 29th, 2013?
12        Okay.  We already used that.  I
13 don't want to be duplicative.
14        This would be the next one.
15        - - -
16        (Whereupon, the document was marked
17 as Berks County 57 for identification.)
18        - - -
19 BY MR. CONNELL:
20   Q.    Do you know what this document is?
21   A.    Nope.  No.
22   Q.    Okay.  This document identifies
23 your name and a start date of 9/6/2006.  Does
24 that sound like about a correct date when you

1 started at the youth center?
2    A.    Yes.
3    Q.    Do you see the various topics for
4 training?
5    A.    Yes.
6    Q.    Orientation training?
7    A.    Yes, I do.
8    Q.    Does that look accurate to the
9 issues that you have been trained on at your
10 initiation or orientation training recognizing
11 that's almost -- that was a long time ago?
12   A.    We're looking in this first column
13 here?
14   Q.    I'm looking at these topics up at
15 the top here.
16   A.    Yes.  Yes.  From what I see, yeah.
17   Q.    Now, on the first column below
18 there, employee recertification training --
19   A.    Yes.
20   Q.    -- there's a column for training
21 content.  Can you scan those and see if there's
22 anything in there that you don't believe that
23 you were trained on?
24   A.    And we're talking trained for this

1 length of period of time, as well?  Just so we
2 can be clear.  I mean, these are definitely --
3    Q.    Sure.
4    A.    These are definitely the stuff
5 they do, but this isn't the amount of time that
6 this is done in.  I mean, because like 12 hours,
7 safe crisis management 12 hours?  I mean,
8 that's -- no.  And this is for me going back to
9 the Berks County Residential Center?
10   Q.    Well, no, because this is
11 recertification training and there's the date
12 trained section, then the third column is date
13 trained, which would indicate --
14   A.    The 13th, right?
15   Q.    -- the date that you received that
16 training.
17   A.    2013, right?
18   Q.    Correct.
19   A.    There's no way I have 50.5 hours
20 of training.  I'm sorry.  That's not the way it
21 works.
22   Q.    And you don't believe there is
23 50.5 hours of training in 2013?
24   A.    This might be required by the



1 Department of Public Welfare for them to put
2 this on this computer.
3     Q.    Okay.
4     A.    But this is not what happens at
5 the Berks County Residential Center when I was
6 there.
7     Q.    All right. Do you recall
8 receiving sexual abuse and assault prevention
9 and intervention training?
10     A.    Yes. Not for an hour and a half.
11     Q.    Okay. And you received training
12 on code of ethics?
13     A.    Where is that at, code of ethics?
14     Q.    A little bit further down the
15 page.
16     A.    I mean, vaguely. I mean, I signed
17 the paper, yeah. I don't think they went --
18 like I said, I don't think they went verbatim
19 word-for-word and explained it to me in a half
20 hour. Food safety four hours? I don't know.
21     Q.    The code of ethics also is a
22 policy. Do you recall that?
23     A.    Just the one -- I mean, I don't
24 remember if -- I mean, you guys showed it to me.

1 I don't remember.
2     Q.    Okay. But you don't -- as you sit
3 here today, you don't remember that it was a
4 policy even though you had signed off on it, but
5 over time you don't recall that being a policy,
6 is that your testimony?
7     A.    Well, I never like walked in the
8 building was like I need to remember today that
9 the code of ethics is a policy.
10     Q.    Okay.
11     A.    I'm sure it was. You know what I
12 mean? I don't mean to be disrespectful to
13 you --
14     Q.    No, I understand.
15     A.    A lot of this stuff is just --
16     Q.    But you also --
17     A.    -- assumed.
18     Q.    You also -- you also acknowledge
19 that code of ethics are not -- you understood
20 that you shouldn't be having --
21     A.    Oh, yeah.
22     Q.    -- kissing --
23     A.    I answered those questions
24 already.

1     MR. CONNELL: We will make that
2 the next one.
3     - - -
4     (Whereupon, the document was marked
5 as Berks County 58 for identification.)
6     - - -
7 BY MR. CONNELL:
8     Q.    Do you recognize that document?
9     A.    No, I do not.
10     Q.    Okay. Did you ever see this
11 before?
12     A.    I have never seen it before, no.
13     Q.    Just trying to speed things along.
14     MR. CONNELL: Have that marked as
15 the next one.
16     - - -
17     (Whereupon, the document was marked
18 as Berks County 59 for identification.)
19     - - -
20 BY MR. CONNELL:
21     Q.    Actually, I'm going to ask you to
22 put that on top. I'm going to ask you to take a
23 look at that document. Does that document look
24 familiar to you?

1     A.    It looks like an overhead slide or
2 PowerPoint presentation.
3     Q.    Okay. Something that you would
4 have seen during your training at Berks County
5 Residential Center?
6     A.    This specific one?
7     Q.    Yes.
8     A.    No, I don't know. I don't know if
9 they did that in a PowerPoint or not.
10     Q.    You don't have a recollection?
11     A.    I don't know.
12     Q.    Do you have recollection of seeing
13 this in a training?
14     A.    No.
15     Q.    Okay. Do you believe that you did
16 not receive this in training or you just don't
17 recall whether you did not?
18     A.    I don't recall the specific piece
19 of -- you know, this particular slide. I don't
20 remember. I don't want to say. I'm not sure if
21 this was done as a group or --
22     Q.    You just don't recall?
23     A.    I don't recall.
24     Q.    And as we had indicated at the



1 outset, if you don't recall something, that's a
2 perfectly fine answer.
3          MR. CONNELL:  This will be the
4 next one.
5              - - -
6          (Whereupon, the document was marked
7 as Berks County 60 for identification.)
8              - - -
9 BY MR. CONNELL:
10     Q.     Can you just take a moment and
11 look at that.
12     A.     Sure.
13     Q.     And when you have the opportunity
14 to review it I'll ask you a quick question about
15 it.
16     A.     Go ahead.  You can ask me a
17 question about it.
18     Q.     If you can turn to the second
19 page.
20     A.     Yes.
21     Q.     Is that your signature at the
22 bottom of the page?
23     A.     Yes, it is.
24     Q.     That's all.

1     A.     Okay.
2          MR. CONNELL:  Next one.
3              - - -
4          (Whereupon, the document was marked
5 as Berks County 61 for identification.)
6              - - -
7 BY MR. CONNELL:
8     Q.     Sir, is that your writing on that
9 page?
10     A.     Yes.
11     Q.     And did you sign the bottom of it?
12     A.     Yes.  Is that it for that one?
13     Q.     I'm sorry?
14     A.     That's it for that one?
15     Q.     Yes.  Told you this would be easy.
16              - - -
17          (Whereupon, the document was marked
18 as Berks County 62 for identification.)
19              - - -
20 BY MR. CONNELL:
21     Q.     Okay.  This is Berks 62, Berks
22 County 62.  Same questions as before.  Is that
23 your handwriting?
24     A.     Yes.

1     Q.     And is that your signature?
2     A.     Yes, it is.
3     Q.     Now, there is a second page to
4 that.
5     A.     Oh, okay.
6     Q.     If you can, is that your writing?
7     A.     Yes.
8     Q.     Can you read that by chance?
9     A.     Are you making fun of my
10 handwriting?
11     Q.     Well, I'll tell you what, my
12 handwriting is about as bad as I've ever seen
13 and I often can't read it myself.
14     A.     I gotcha.
15          Not born with disabilities.
16 Developed due to abuse or neglect.  Demonstrates
17 infantile behaviors.  Believes in unusual
18 sophisticated behaviors.  I believe that's
19 prostitution.  Maybe that's an i.e. type things,
20 example.
21     Q.     Okay.  I just wanted to clarify
22 that for the record because I couldn't make it
23 out.
24          MR. CONNELL:  And in the interest

1 of moving things forward I'm going to
2 double-check my notes, but I think I'm done
3 asking Mr. Sharkey questions just with the
4 opportunity to re-ask a couple at the end if
5 need be.  Thank you very much for your patience
6 sir.
7              - - -
8          EXAMINATION
9              - - -
10 BY MR. JONES:
11     Q.     Afternoon, Mr. Sharkey.  My name
12 is Landon Jones.  I am an Assistant U.S.
13 Attorney.  I'm the lawyer in a related case for
14 the federal government, effectively ICE.
15     A.     Okay.
16     Q.     And in this case I'm the lawyer
17 for an individual named Josh Petrey who you were
18 asked about earlier.
19     A.     Yes.
20     Q.     I would ask you to please take a
21 look at Berks County Exhibit 19, which is the
22 duty assignment sheet exhibit you looked at at
23 the start of your deposition today.
24     A.     Did I get that?



1    Q.    You had it.
2        MS. YEH:  Yes.  It was the first
3  document.
4        THE WITNESS:  Oh, the assignment
5  sheet.  Sorry.  Here.  Oh, it's up top.  Okay.
6  BY MR. JONES:
7    Q.    Do these duty assignment sheets of
8  which Exhibit 19 is an example, did they
9  determine what your responsibilities would be on
10  a day-to-day basis?
11    A.    Yes.
12    Q.    Is it correct that your duty post
13  and, therefore, your day-to-day responsibilities
14  were determined by your Berks County
15  supervisors?
16    A.    Yes.
17    Q.    Is it also correct that -- well,
18  strike that.
19        When I say ICE, you know I'm
20  talking about the immigration authorities?
21    A.    Yes, I do.
22    Q.    Is it also correct that ICE
23  officials did not control or dictate what you
24  did on a day-to-day basis?

1    A.    No, they didn't.
2    Q.    And ICE officials also didn't
3  control where you performed your job
4  responsibilities; is that right?
5    A.    No, they didn't.
6    Q.    And ICE officials also did not
7  control or dictate how you performed your job
8  responsibilities?
9    A.    No.
10    Q.    They did not?
11    A.    No, they did not.
12    Q.    All right.  You can set aside
13  Berks County Exhibit 19.
14        You were asked earlier about
15  Mr. Petrey, and I heard your testimony which I
16  think was that you do not really know him; is
17  that right?
18    A.    No, I don't.
19    Q.    Okay.  So, I'm going to ask you a
20  few questions which in light of that testimony
21  may seem sort of obvious, but I want to ask them
22  just so that we're clear on the record.
23    A.    Okay.
24    Q.    Is it correct that Mr. Petrey is

1  not a friend of yours now?
2    A.    He is not a friend.
3    Q.    Is it also correct that you did
4  not consider him a friend in 2014?
5    A.    He was not a friend when I worked
6  at the residential center.
7    Q.    Did you ever tell [E.D.],
8  [E.D.] that he was your friend?
9    A.    No.
10    Q.    Did you ever suggest to [E.D.], to
11  [E.D.] that you had the ability to influence
12  her treatment by immigration authorities?
13    A.    No, I did not.
14    Q.    Did you ever suggest to her that
15  you had the power or the ability to influence
16  whether she would be deported or removed from
17  the country?
18    A.    No, I did not.
19    Q.    Did you ever tell Mr. Petrey about
20  your relationship with [E.D.]?
21    A.    No.
22    Q.    Did you ever tell any ICE official
23  about your relationship with [E.D.]?
24    A.    No.

1    Q.    Do you have any reason to believe
2  that Mr. Petrey ever saw you engage in any
3  hugging, kissing, sexual intercourse or other
4  physical contact with [E.D.]?
5    A.    No.
6    Q.    Do you have any reason to believe
7  that Mr. Petrey was aware of your relationship
8  with [E.D.]?
9    A.    No.
10    Q.    Do you have reason to believe that
11  any ICE official was aware of your relationship
12  with [E.D.]?
13    A.    No.
14    Q.    You testified earlier that you had
15  raised concerns about [E.D.] behavior towards
16  you with some of your Berks County supervisors.
17  Do you remember that testimony?
18    A.    Yes.
19    Q.    Okay.  Did you raise those
20  concerns with any ICE official at any time?
21    A.    No.  I -- very limited.  I barely
22  even talked to immigration officials in that
23  building ever.
24    Q.    And so the answer is no?



1    A.    No.  No.  Sorry.
2        MR. JONES:  All right.  Thank you.
3  I don't have any further questions.
4        MS. YEH:  I just had one
5  clarification question and that's all I have for
6  you.
7            - - -
8        EXAMINATION
9            - - -
10  BY MS. YEH:
11    Q.    You had described or mentioned
12  briefings and, as I understand it, I don't
13  recall if it was you who stated it or someone
14  else, was a briefing conducted before the shift
15  started or at the start of the shift?
16    A.    I believe our technical time was
17  to start -- the start of our shift was 2:30.  We
18  were supposed to be on the floor at 2:30.  So,
19  that why we punched in 2:15.  It gives
20  management and supervisors a little bit of a
21  window just to describe how the next shift will
22  work, how many intakes are coming in or
23  discharges or if there's any kind of events
24  going on or what's going for the next shift.

1    Q.    And so do the briefings occur in
2  that, approximately, 2:15 to 2:30 window or did
3  it start before you would go onto the post?
4    A.    Yes.
5    Q.    Okay.  And who attended those
6  briefings?
7    A.    Whoever was on for that shift.
8    Q.    So, would it be everyone who was
9  working that shift who would attend those
10  briefings?
11    A.    Right, unless they were -- unless
12  they were already on first shift.  A lot of them
13  would have to stay up on the floor due to, you
14  know, the numbers, whatever.  If they are
15  working -- they volunteered to work first, then
16  they worked second, as well, then they wouldn't
17  come down to briefing.  So, not everybody would.
18    Q.    But all the other individuals
19  aside -- not the ones that you mention, but all
20  the other individuals starting their -- the
21  second shift would attend those briefings?
22    A.    Right.  Usually everybody that's
23  in these blocks would be there unless that
24  instance would have occurred where they were

1  working first, as well.
2    Q.    Okay.  I have no other -- and who
3  led the briefings?
4    A.    Well, they started off with the
5  book person would describe how the day went for
6  that eight hours or whatever and then the
7  supervisors would kind of -- the supervisors
8  would say, okay, go ahead whoever the first
9  shift book person was, and they would describe
10  how the first eight hours was and what's going
11  on, and then the supervisors would dictate what
12  was going to happen next on their shift and what
13  our duties were.
14    Q.    So, you mentioned supervisors.
15  Would that be the supervisors you mentioned
16  before such as Jason Mills and Len Kopetsky?
17    A.    They were my everyday supervisors,
18  but then they would -- you know, as I said
19  before, they kind of rotate and switch and stuff
20  like that.  So, a majority of the time it was
21  Jason Mills and Len Kopetsky.  That was my
22  second shift supervisors.
23    Q.    So, they were present or conducted
24  the meetings or the briefings, excuse me?

1    A.    You said conducted the meetings?
2    Q.    I'm sorry.  Let me rephrase that.
3  It was confusing.
4        Were they present at those
5  briefings?
6    A.    Yes, they were present.  It had to
7  be a supervisor before we got started.  We
8  waited for them to come down.
9        MS. YEH:  Okay.  I have no other
10  questions.
11            - - -
12        EXAMINATION
13            - - -
14  BY MR. CONNELL:
15    Q.    You had indicated that there was
16  joking about the relationship in the briefings?
17    A.    Yes.
18    Q.    Describe what joking you're
19  referring to.
20    A.    I think just people -- staff
21  members and they knew about the relationship in
22  the facility, so it was --
23    Q.    Describe what you said about
24  relationship, because you had indicated to me



1  before that you tried to hide it from a bunch --
2  from everybody?
3       A.    Right.  I didn't say it to them.
4  They -- it was on the assumption that we were in
5  a relationship.  So, they would say, you know,
6  like -- like, for instance, like I said before,
7  when they stopped doing laundry on second shift
8  because it was too much, you know, some days
9  ██████ was allowed to do hers on second shift.
10  So, it became, oh, that's for Dan, or ██████
11  up there getting dressed up or, you know, it
12  turned into a joke.
13      Q.    Did you ever hear -- can you
14  identify any specific individual that you can
15  attribute those comments to?
16      A.    No, I'm not going to do that.  It
17  did happen, though.
18      Q.    But you can't identify an
19  individual?
20      A.    No.
21           MR. CONNELL:  I don't have any
22  further questions.
23           MR. JONES:  Nothing for me.
24           MS. YEH:  Nothing for me, either.

1           MR. CONNELL:  Mr. Sharkey, thank
2  you very much for your time, sir.  Appreciate
3  your patience.
4           MS. YEH:  Thank you very much for
5  coming and meeting with us.
6           (Witness excused.)
7                - - -
8           (Deposition concluded at
9  approximately 3:00 p.m.)
10               - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1
2    C E R T I F I C A T E
3
4
5    I HEREBY CERTIFY that the witness
6  was duly sworn by me and that the
7  deposition is a true record of the
8  testimony given by the witness.
9
10          *Sherry L. Stills*
11
      Sherry L. Stills,
      Court Reporter
12    Notary Public
      Dated:  7/24/2017
13
14
15       (The foregoing certification
16  of this transcript does not apply to
17  any reproduction of the same by any
18  means, unless under the direct
19  control and/or supervision of the
20  certifying reporter.)
21
22
23
24

1           DEPOSITION ERRATA SHEET
2
3
4  Our Assignment No.  J0611382
5  Case Caption:  E.D.
6  vs.  Daniel Sharkey, et al.
7
8    DECLARATION UNDER PENALTY OF PERJURY
9  I declare under penalty of perjury
10  that I have read the entire transcript of my
11  Deposition taken in the captioned matter or the
12  same has been read to me, and the same is true
13  and accurate, save and except for changes and/or
14  corrections, if any, as indicated by me on the
15  DEPOSITION ERRATA SHEET hereof, with the
16  understanding that I offer these changes as if
17  still under oath.
18       Signed on the _____ day of
19  _____, 20____.
20
21  _____
22       DANIEL WILLIAM SHARKEY
23
24



```
 1          DEPOSITION ERRATA SHEET
 2     Page No.____Line No.____Change
 3     to:_____
 4     Reason for change:_____
 5     Page No._____Line No._____Change
 6     to:_____
 7     Reason for change:_____
 8     Page No._____Line No._____Change
 9     to:_____
10     Reason for change:_____
11     Page No._____Line No._____Change
12     to:_____
13     Reason for change:_____
14     Page No._____Line No._____Change
15     to:_____
16     Reason for change:_____
17     Page No._____Line No._____Change
18     to:_____
19     Reason for change:_____
20     Page No._____Line No._____Change
21     to:_____
22     Reason for change:_____
23     SIGNATURE:_____DATE:____
24          DANIEL WILLIAM SHARKEY
```

```
 1          DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change
 3     to:_____
 4     Reason for change:_____
 5     Page No._____Line No._____Change
 6     to:_____
 7     Reason for change:_____
 8     Page No._____Line No._____Change
 9     to:_____
10     Reason for change:_____
11     Page No._____Line No._____Change
12     to:_____
13     Reason for change:_____
14     Page No._____Line No._____Change
15     to:_____
16     Reason for change:_____
17     Page No._____Line No._____Change
18     to:_____
19     Reason for change:_____
20     Page No._____Line No._____Change
21     to:_____
22     Reason for change:_____
23     SIGNATURE:_____DATE:____
24          DANIEL WILLIAM SHARKEY
```

