# EXHIBIT 4

```
1            UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                     -  -  -
     E.D.                    :
4                            :
            v.               :
5                            :
     DANIEL SHARKEY, et al.  :  NO. 16 CIV. 2750
6
               -  -  -
7             July 10, 2017
               -  -  -
8
9            Oral deposition of JAMIE
10  HIMMELBERGER, taken pursuant to notice, was held
11  at the Berks County Government Offices, 633
12  Court Street, 14th Floor, Reading, Pennsylvania,
13  commencing at 1:09 p.m., on the above date,
14  before Sherry L. Stills, Court Reporter and
15  Notary Public for the Commonwealth of
16  Pennsylvania.         -  -  -
17
18
19
20
21
             ESQUIRE DEPOSITION SOLUTIONS
22              1835 Market Street
                  Suite 2600
23          Philadelphia, Pennsylvania 19103
                 (215) 988-9191
24
```

```
1   APPEARANCES:
2
        PENNSYLVANIA INSTITUTIONAL LAW PROJECT
3       BY:  SU MING YEH, ESQUIRE
        718 Arch Street
4       Suite 304S
        Philadelphia, Pennsylvania  19106
5       (215) 925-2966
        smyeh@pailp.org
6       Representing the Plaintiff
7
8       THE MacMAIN LAW GROUP LLC
        BY:  MATTHEW J. CONNELL, ESQUIRE
9            TRICIA M. AMBROSE, ESQUIRE
        101 Lindenwood Drive
10      Suite 160
        Malvern, Pennsylvania  19355
11      (484) 318-7803
        MConnell@macmainlaw.com
12      TAmbrose@macmainlaw.com
        Representing all Berks County defendants
13      except Daniel Sharkey
14
15      U.S. DEPARTMENT OF JUSTICE
        UNITED STATES ATTORNEY'S OFFICE
16      BY:  LANDON Y. JONES, ESQUIRE
        615 Chestnut Street
17      Suite 1250
        Philadelphia, Pennsylvania  19106
18      (215) 861-8323
        landon.jones@usdoj.gov
19      Representing the Defendant,
        Jeremiah Petrey
20
21  ALSO PRESENT:
22      Christopher Brigante, Intern
        Diane Edwards
23      David Smith
        Brittany Rothermel
24      Matthew Malinowski
```

```
1                    -  -  -
                I N D E X
2                    -  -  -
3   Testimony of:  JAMIE HIMMELBERGER
4     BY MS. YEH          5, 127
      BY MR. JONES        119
5     BY MR. CONNELL      123
6
                    -  -  -
7              E X H I B I T S
                    -  -  -
8
     NO.            DESCRIPTION         PAGE
9
     Berks County 29  Code of ethics      83
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
1                    -  -  -
2           DEPOSITION SUPPORT INDEX
3                    -  -  -
4
5   Direction to Witness Not to Answer
6   Page Line  Page Line       Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line  Page Line       Page Line
12  None
13
14
15  Stipulations
16  Page Line  Page Line       Page Line
17  5    2-6
18
19
20  Question Marked
21  Page Line  Page Line       Page Line
22  None
23
24
```



1                    - - -
2          (It is hereby stipulated and agreed by
3    and among counsel that sealing, filing and
4    certification are waived; and that all
5    objections, except as to the form of questions,
6    be reserved until the time of trial.)
7                    - - -
8          JAMIE HIMMELBERGER, after having
9    been duly sworn, was examined and testified as
10   follows:
11                   - - -
12         EXAMINATION
13                   - - -
14   BY MS. YEH:
15        Q.    Good morning -- or good
16   afternoon --
17        A.    Good afternoon.
18        Q.    -- excuse me.  Can you please
19   state your name for the record?
20        A.    Jamie Himmelberger.
21        Q.    And can you just spell your name,
22   please?
23        A.    J-A-M-I-E H-I-M-M-E-L-B-E-R-G-E-R.
24        Q.    Have you ever had your deposition

1    taken before?
2         A.    No.
3         Q.    I'm just going to go through a few
4    ground rules so we are all on the same page.  As
5    you can see, everything -- and I should
6    introduce myself.  My name is Su Ming Yeh and I
7    represent the plaintiff here, ▮▮▮ **E.D.**
8    **E.D.** .  Everything that I say and that you say
9    will taken down by the court reporter here.
10        A.    Uh-huh.
11        Q.    So, I'm going to ask that you make
12   all your responses verbal.  Do you understand
13   that?
14        A.    Yes.
15        Q.    So, the court reporter can't take
16   down a shake of the head or a nod of the head.
17   So, I'm going to ask you to say yes, no or
18   whatever you want your response to be.
19        A.    Okay.
20        Q.    And do you understand that you are
21   under oath today?
22        A.    Yes.
23        Q.    And do you understand that means
24   you will be answering my questions truthfully?

1         A.    Yes.
2         Q.    And if at any point you do not
3    understand a question will you let me know?
4         A.    Yes.
5         Q.    And if at any point you feel that
6    your prior answer was either incomplete or
7    incorrect can you let me know?
8         A.    Yes.
9         Q.    And is there anything preventing
10   you from answering my questions truthfully
11   today?
12        A.    No.
13        Q.    Are you on any medication that
14   might affect your ability to testify today?
15        A.    No.
16        MR. CONNELL:  Su Ming, can we go
17   off the record for just one moment?
18        MS. YEH:  Yes.
19                   - - -
20         (Whereupon, there was an
21   off-the-record discussion.)
22                   - - -
23   BY MS. YEH:
24        Q.    Okay.  Can you tell me where you

1    live generally?  Not your specific address,
2    but --
3         A.    Reading, Pennsylvania.
4         Q.    And what is your date of birth?
5         A.    ▮▮▮▮▮▮
6         Q.    And can you describe your
7    educational background?
8         A.    I went to Kutztown University,
9    majored in criminal justice.
10        Q.    And did you receive a Bachelor's?
11        A.    Bachelor's degree.
12        Q.    And was that a Bachelor of arts
13   degree?
14        A.    Bachelor of science.
15        Q.    Of science.  Okay.  And do you
16   have any other training or education beyond what
17   you just described?
18        A.    No.
19        Q.    And what is your current job or
20   vocation?
21        A.    Shelter care counselor at the
22   Berks County Residential Center.
23        Q.    How long have you worked there?
24        A.    Five years.



ESQUIRE
DEPOSITION SOLUTIONS

1      Q.      Do you remember what year you
2  started?
3      A.      2012, I believe.
4      Q.      What did you do, if anything,
5  before that?
6      A.      I worked at the Berks County
7  Juvenile Detention Center.
8      Q.      Okay.  And how long did you work
9  there?
10     A.      One year full time but previous to
11 that I worked part-time here and there for about
12 six months.
13     Q.      So, do you recall when you started
14 there?
15     A.      2011.
16     Q.      And was that in your full-time
17 position or was it just generally when you
18 started?
19     A.      That was my full time.
20     Q.      Okay.  Did you have any jobs
21 before your position at the juvenile detention
22 center?
23     A.      Nothing major.  I mean, I had jobs
24 here and there in college and high school.

1      Q.      So, was your job at the juvenile
2  detention center your first job after college?
3      A.      Yes, in my degree of major.
4      Q.      Okay.  And can you just tell me
5  what your job title was at the juvenile
6  detention center?
7      A.      Juvenile correctional counselor.
8      Q.      And what did that entail?
9      A.      Monitoring the juveniles that were
10 being held there.
11     Q.      Okay.  And were they held in the
12 sense that they were not permitted to leave of
13 their own choice?
14     A.      No, they were not permitted to
15 leave.
16     Q.      Okay.  And do you know if they
17 were held for criminal reasons as opposed to
18 sort of civil or mental health reasons?
19     A.      Criminal.
20     Q.      Have you ever been sued or been a
21 defendant in a lawsuit in your professional
22 capacity?
23     A.      No.
24     Q.      And do you have any criminal

1  convictions?
2      A.      No.
3      Q.      So, what I'd like to do is I'd
4  like to focus on your job duties as a shelter
5  care counselor at Berks.
6      A.      Okay.
7      Q.      So, can you describe what your
8  responsibilities are as a shelter care
9  counselor?
10     A.      Keeping the residents safe at all
11 times, participating in daily activities with
12 them, helping them with their everyday needs.
13     Q.      Okay.  So, you said keep the
14 residents safe.  Can you --
15     A.      Uh-huh.
16     Q.      -- just describe what you mean by
17 that?
18     A.      Making sure they are not hurting
19 themselves or hurting others.
20     Q.      And what about participating in
21 daily activities?
22     A.      It could be sports activities
23 outside, it could be art activities, it could be
24 field trips.

1      Q.      When you say sports -- let's start
2  with sports.  What is your role in that?  Are
3  you coaching them, are you supervising it or are
4  you making sure it happens?
5      A.      We can supervisor or we can play
6  along with them.  If they are playing a soccer
7  game we can play.
8      Q.      And what about the art activities?
9      A.      We would just generally facilitate
10 it.
11     Q.      Okay.  Are there art teachers who
12 come in or is it just more that --
13     A.      No.  I mean, we have volunteers
14 sometimes that come in and help out, but, yeah,
15 it's up to us.
16     Q.      Okay.  You had mentioned sports.
17 Are those typically played -- where are those
18 typically played?
19     A.      Outside.
20     Q.      And what about the art?
21     A.      On the activity floor on the
22 second floor.
23     Q.      And, when you say second floor, is
24 that the floor -- the ground level where you can



1 enter the building or is it another floor you
2 are referring to?
3     A.   It's the floor where you enter.
4     Q.   Okay. So, just for -- to be
5 clear, the floor where you enter we're going to
6 refer to as the second floor?
7     A.   Yeah.
8     Q.   Okay. And if you go up one floor
9 from that --
10     A.   The third floor.
11     Q.   -- that would be the third floor.
12         Is there a first floor?
13     A.   Yes, but residents don't have
14 access to that.
15     Q.   Okay. And do staff have access to
16 that?
17     A.   Yes.
18     Q.   So, is the second floor also
19 referred to as the A floor?
20     A.   Yes.
21     Q.   And the third floor is referred to
22 as the B floor?
23     A.   Yes.
24     Q.   Okay. All right. Going back to

1 some of the activities you were describing, you
2 also mentioned field trips?
3     A.   Uh-huh.
4     Q.   Can you describe some of the field
5 trips? First of all, what are field trips for
6 the residents?
7     A.   It's just a way for the residents
8 to get out and do something fun for the day or
9 for a few hours.
10     Q.   And what kind of field trips are
11 done?
12     A.   To the park, to Reading Philly
13 baseball games, to parades, to the mall, to the
14 pet store. Anything that our recreation
15 director, recreation coordinator would come up
16 with.
17     Q.   Who are those field trips designed
18 for?
19     A.   Kids and adults.
20     Q.   And who typically goes on those
21 field trips?
22     A.   Staff. Line staff like myself.
23     Q.   Do the supervisors go on the field
24 trips?

1     A.   No.
2     Q.   And do the children go on the
3 field trips?
4     A.   Yes.
5     Q.   And what about the children's
6 parents?
7     A.   Yes.
8     Q.   Do the children's parents ever go
9 without their children?
10     A.   If they have older teenage
11 children that are allowed to roam the facility
12 without their parents, yes.
13     Q.   You had just stated if the older
14 children are allowed to roam the facility
15 without their parents. Can you explain what you
16 mean by that?
17     A.   I believe the age is ten. If you
18 are ten or older you are allowed to roam around
19 the building without a parent supervising you.
20 If you are under ten you have to be with a
21 parent at all times.
22     Q.   Okay. Are there any individuals
23 who are older than ten but are under 18 who
24 don't have a parent with them?

1     A.   No.
2     MR. CONNELL: Wait. Don't have a
3 parent?
4     MS. YEH: Living with them at the
5 facility.
6     THE WITNESS: We --
7     MR. CONNELL: Hold on. Hold on.
8 Can we discuss relevance of that issue?
9     MS. YEH: I'm sorry. Maybe I
10 misunderstood her response.
11     MR. CONNELL: If you want to
12 clarify. I mean, if there's a question on the
13 table as to whether there is a juvenile residing
14 at the facility without an adult family member
15 present I don't know how that ties into the case
16 at all.
17     MS. YEH: Right. I don't think it
18 does.
19     MR. CONNELL: And I don't know the
20 answer to the question.
21     MS. YEH: Right. I don't think it
22 does, but maybe I misunderstood her response.
23     MR. CONNELL: Can we just
24 rephrase to see where we're at?



1      MS. YEH:  Yes.
2  BY MS. YEH:
3      Q.     So, do all children who live there
4  have parents with them?
5      A.     Yes.
6      Q.     Okay.  Sorry.  I just
7  misunderstood.
8          Okay.  So, what you were
9  specifying was that if you are a child, which do
10  you mean someone who is under 18?
11     A.     Yes, you are under 18.
12     Q.     So, if you were under 18 but you
13  are older than ten you are allowed to walk
14  around the facility by yourself?
15     A.     Yes.  The parent is there but
16  doesn't have to supervise that child at all
17  times.
18     Q.     I understand.  So, the parent
19  doesn't have to be in the same room with them?
20     A.     Sure.
21     Q.     That's what you mean?
22     A.     Yes.
23     Q.     Okay.  But, if you are under ten,
24  then you have to have the parent supervising the

1  child at all times, is that what you mean?
2      A.     Yes.  Yes.
3      Q.     Okay.  So, similar I think what
4  you were referring to earlier was if they were
5  allowed to walk or roam the facility by
6  themselves say between the ages of ten to 18
7  they are also permitted to go on a field trip by
8  themselves?
9      A.     Yes.
10     Q.     Sort of comparable to other
11  situations.  Like if you are an older child you
12  might be permitted more independence?
13     A.     Sure.  Yes.
14     Q.     And does the parent have to
15  approve or sign off on their child going on the
16  field trip?
17     A.     Yes.
18     Q.     And how often do the field trips
19  take place?
20     A.     Weekly.
21     Q.     Are all residents permitted to
22  participate in the field trips?
23     A.     Yes.
24     Q.     And what is the signup process for

1  the field trips?
2      A.     There is no signup process.  Our
3  recreation coordinator, she's the one who puts
4  the lists together and she tries to get all the
5  kids out in rotation.
6      Q.     Okay.  So, when you say rotation,
7  does that mean that not all of the children in
8  the facility go the same day?
9      A.     Sure.  I mean, sometimes we have
10  like, you know, 30 kids.  We have to break them
11  up into smaller groups and bring them out, you
12  know, one day to the next.
13     Q.     Okay.  Generally how big are the
14  groups that you bring out?
15     A.     They can range from five to
16  whatever our bus holds.  I think our bus holds
17  like maybe -- I want to say ten or 12.
18     Q.     And is that ten or 12 total people
19  including parents?
20     A.     Well, that would have to include
21  staff.
22     Q.     Okay.  Ten or 12 --
23     A.     So, you would have the driver and
24  then you would have to have an extra staff in

1  the back to monitor the children.  So, that
2  would include the staff.
3      Q.     And how many staff typically
4  accompany the residents on the field trips?
5      A.     Typically it has to be two, but if
6  you're taking a bus full you could take a third
7  staff.
8      Q.     Okay.  So, you mentioned in terms
9  of daily activities sports, art and field trips.
10  Are there any other activities?
11     A.     Helping them with laundry, taking
12  them to medical, helping with phone cards.
13  Sometimes they don't know how to use a phone
14  card if they need to make a phone call.  We
15  would assist them with their daily routine.
16     Q.     Okay.  So, laundry, medical, phone
17  cards, daily routine.  Anything else?
18     A.     I think that's it.
19     Q.     Okay.  I'm going to ask you
20  about -- a little bit about each of them.
21     A.     Okay.
22     Q.     So, you mentioned the laundry.
23  Can you describe what the process is for a
24  resident to do laundry?



1    A.    There is a laundry sheet that's
2  printed out by the supervisors and they have --
3  it's usually about three families a day who do
4  their laundry and then, you know, each day it's
5  a different three families.
6    Q.    Okay.  Now, I know you were
7  sitting in, so some of this might be repetitive,
8  but I just want to confirm since you are a more
9  recent staff person.
10   A.    Uh-huh.
11   Q.    What was previously marked as
12  Berks County 21.  You had mentioned earlier that
13  there's a -- I can't remember the exact word you
14  used, but basically a list?
15   A.    Uh-huh.
16   Q.    Is this -- looking at this which
17  is titled Berks County Family Residential
18  Program Rooms Nine through 16 Laundry Schedule,
19  is this the schedule for families to do the
20  laundry?
21   A.    Yes.
22   Q.    And typically where is this
23  posted?
24   A.    Outside the laundry room.

1    Q.    And how many laundry rooms are
2  there?
3    A.    Two.  One in each wing.
4    Q.    Are residents assigned a certain
5  laundry room?
6    A.    Yes.  It depends on if their room
7  is on that side of the wing, that's the side
8  that they would do the laundry on.
9    Q.    So, are they assigned the laundry
10  room that's in the wing where their room is?
11   A.    Where their room is at, yes.
12   Q.    Are they permitted to use the
13  other laundry room?
14   A.    If for some reason there was, you
15  know, laundry -- say one family had a family of
16  four or five, things can get backed up and the
17  other side might only have one or two families,
18  sure, we could take the laundry to the other
19  side to keep things moving.
20   Q.    Would they seek permission from
21  you to do that?
22   A.    Yes.
23   Q.    All right.  So, could you describe
24  the process of how a resident would do laundry?

1    A.    Well, if it's their day they will
2  come to staff, ask staff, hey, it's my day to do
3  laundry.  So, then we would -- I would, as staff
4  stand, at the door, let the resident go in, put
5  their laundry into the wash.  The resident comes
6  out into the hallway.  I go into the laundry
7  room.  There is a locked cabinet and I unlock
8  it, I get the soap out.  I have to inventory it,
9  lock the cabinet back up and then I put the soap
10  into the laundry dispenser.
11   Q.    Okay.  You just said that you put
12  the laundry soap in the dispenser.  Do you put
13  their clothes in, too, or does the resident do
14  that?
15   A.    No.  They would put their clothes
16  in.  I will just fill the part that pulls out
17  and you put the soap in.  I would fill that, and
18  then I start the washer for them.
19   Q.    And then what happens after that?
20   A.    I leave.  I close the door which
21  locks behind me and we wait until the laundry is
22  ready to be changed over.
23   Q.    And are the residents permitted to
24  stay in the laundry room with their laundry?

1    A.    No.
2    Q.    And how big is the laundry room?
3    A.    Not very big.  It's long but
4  narrow, and there's a lot of things stored in
5  there, so there's not really room to move
6  around.
7    Q.    Okay.  Not really room to stay
8  and --
9    A.    Yeah.  There's nowhere to go.  You
10  know, it's narrow and long, but --
11   Q.    Okay.  And how do either you or
12  the resident know that the laundry is done?
13   A.    You can usually either hear at the
14  door.  There's a window and you can hear if it's
15  still running or they'll come and ask us to
16  check it.
17   Q.    Okay.  And, assuming the laundry
18  is done, then what's the next process?
19   A.    I open the door with my keys and I
20  let the resident go in and remove their laundry
21  from the washing machine and change it over to
22  the dryer.
23   Q.    I'm sorry.  Do you do that or does
24  the resident do that?



1     A.     The resident.
2     Q.     Okay.  And then what happens after
3 that?
4     A.     The resident will come out into
5 the hallway and then I will proceed in and turn
6 the dryer on.
7     Q.     Okay.  At that point would the
8 resident be able to add new laundry?
9     A.     Yes.  If they had to wash more
10 clothing they could continue by putting more
11 laundry in the washer.
12     Q.     Can a new resident come and add
13 laundry at that time?
14     A.     If the washing machine is
15 unoccupied, yes, but I wouldn't allow both
16 residents in there at the same time.
17     Q.     Okay.  So, only one resident is
18 allowed at a time?
19     A.     Yes.
20     Q.     Is the resident's child allowed
21 the laundry room?
22     A.     Yes.
23     Q.     So, after let's say the laundry is
24 now in the dryer --

1     A.     Uh-huh.
2     Q.     -- I believe you had said that the
3 resident leaves and you close the door behind
4 you?
5     A.     Uh-huh.
6     Q.     It's a self-locking door?
7     A.     Yes.
8     Q.     And then what happens when the
9 laundry is dry?
10     A.     Well, either I'll recognize it or
11 the resident will, once again, hear it and then
12 she'll ask me, you know, can we check my wash,
13 and then I'll unlock the door and she'll check
14 to see if it's dry.
15     Q.     Who has keys to the laundry room?
16     A.     Staff.
17     Q.     Do all staff have keys to the
18 laundry room?
19     A.     Yes.
20     Q.     Are all residents aware that all
21 staff have keys to the laundry room?
22     A.     Yes.
23     Q.     Does that include the supervisors,
24 as well?

1     A.     Yes.
2     Q.     Do residents have keys to the
3 laundry room?
4     A.     No.
5     Q.     Are there certain hours that you
6 are allowed in the laundry room or hours that
7 you are allowed or not allowed in the laundry
8 room?
9     A.     No.
10     Q.     And are there cameras in the
11 laundry room?
12     A.     No.
13     Q.     If it's not a resident's day to do
14 their laundry, are they permitted to do laundry
15 on a day that's not on their schedule?
16     A.     If all the families that are
17 listed are finished with their laundry, yes.
18     Q.     And do they have to seek
19 permission to do that?
20     A.     Yes.
21     Q.     And what's the process of seeking
22 permission?
23     A.     There's always staff around, so
24 just approach a staff and ask them, you know,

1 hey, I have laundry that needs to be done.  Can
2 I wash it when everyone else is finished?
3     Q.     So, they can ask you verbally?
4     A.     Sure.
5     Q.     Do they have to fill out a form at
6 all?
7     A.     No.
8     Q.     You had also -- so, we're going to
9 turn to the next.
10     A.     Okay.
11     Q.     Did I miss anything about the
12 laundry process?
13     A.     No.
14     Q.     Oh, I did have one question.
15         MR. CONNELL:  Okay.  Are we
16 stopping with that first question about didn't
17 miss and going --
18         MS. YEH:  I'm actually going back
19 to laundry.
20         MR. CONNELL:  Okay.
21 BY MS. YEH:
22     Q.     You had stated earlier that there
23 are also supplies in the laundry room?
24     A.     Yes.



1    Q.    What type of supplies are there?
2    A.    Well, there's locked supplies such
3 as soap, body wash and laundry detergent, but
4 then there's shelving with toothpaste, tooth
5 brushes, sanitary pads, diapers, deodorant, and
6 then there are two sets of washing machines and
7 dryers and a cleaning cart and a mop station.
8    Q.    What do you mean by cleaning car?
9    A.    Cart.
10    Q.    Oh, cart.
11    A.    Sorry.
12    Q.    So, I believe you said that the
13 soap and those type of things are locked?
14    A.    Yeah.  Anything that could be --
15 anything that anyone could drink and harm
16 themselves with is locked up like the toxic
17 stuff.
18    Q.    And who has the key to that?
19    A.    Line staff.
20    Q.    Do all line staff have the key to
21 that?
22    A.    Well, actually, that is a
23 combination, but all the staff have the
24 combination to that.

1    Q.    Oh, a combination lock?
2    A.    Uh-huh.
3    Q.    And do supervisors have the
4 combination lock?
5    A.    Yes.
6    Q.    But do residents have the
7 combination lock?
8    A.    No.
9    Q.    The other supplies that you
10 mentioned such as I believe you said diapers,
11 sanitary pads?
12    A.    Yeah.
13    Q.    Those are not locked?
14    A.    No.
15    Q.    How are those distributed?
16    A.    By request.  Verbal request.
17    Q.    Is a resident allowed to go in and
18 take it themselves?
19    A.    No.  They must request it.
20    Q.    And how do they make that request?
21    A.    Verbally to the staff that's on
22 that floor at that time.
23    Q.    And do they need to fill out a
24 form or a slip at all?

1    A.    No.
2    Q.    Are there quotas or a maximum
3 number of items they may request?
4    A.    No.
5    Q.    Are there certain times of day
6 that they are allowed to make those requests?
7    A.    No.
8    Q.    So, they can make a request for an
9 item at any point?
10    A.    24 hours a day.
11    Q.    So, let's say there is kind of a
12 need in the middle of the night and they need a
13 diaper, for example.  May they do that?
14    A.    Absolutely, yes.
15    Q.    Did I miss anything with respect
16 to the laundry room?
17    A.    I don't believe so.
18    Q.    Okay.  You had mentioned medical.
19 Can you just describe what your role is with
20 that?
21    A.    Okay.  Every day the medical staff
22 will print out a sheet of people who gets meds
23 and what time.  So, it's our job to get the
24 resident and take them back to medical when it's

1 time for their appointments if they take
2 medicine or if they have to see the psychologist
3 or social worker.
4    Q.    Okay.  And I guess what is your
5 role in making sure that all happens?
6    A.    I -- I'm basically just -- you
7 know, I go out and get them and bring them back
8 and then let medical know that they are here and
9 then I wait with them.
10    Q.    Are the residents allowed in that
11 area by themselves?
12    A.    No.
13    Q.    So, they must be with a staff
14 member?
15    A.    They must be accompanied, yes.
16    Q.    Okay.  And it sounds like the
17 medical staff are the ones who take care of all
18 the medical services?
19    A.    Yeah.  I basically -- I'm just the
20 transporter.  I find the resident, bring them
21 back, let medical know they are here for their
22 appointment.  They wait in the waiting room and
23 I wait until they are finished.  And, when
24 residents are no longer in that medical area,



1  then I can exit the medical wing.

2      Q.    All right. And you mentioned
3  phone cards, just helping them, making sure they
4  can use them; is that right?

5      A.    Yep.

6      Q.    Okay. Is there anything else
7  during the day that -- in terms of daily
8  activities that you are responsible for?

9      A.    I'm responsible for a lot of
10  things but, I mean, that's just a generalization
11  of the things. I mean, every day day-to-day
12  things are different. What one family may need
13  is different from another family.

14      Q.    And are you responsible for trying
15  to meet the needs even if they are different
16  needs from one family?

17      A.    Absolutely, yes.

18      Q.    So, if you could pull up Berks
19  County 19. It's the Second Shift Unit and Duty
20  Assignments.

21      So, Ms. Taylor had testified
22  earlier about the different -- about this
23  document as well as the different positions.

24      A.    Uh-huh.

1      Q.    So, again, this might be
2  repetitive, but since you are a more recent
3  employee I'm going ask you to explain some of
4  these things, as well.

5      So, first can you just explain
6  what this document is?

7      A.    This shows what post I will be
8  stationed at from day-to-day.

9      Q.    Okay. So, if it says Jamie -- for
10  example, July 31st it says Jamie for A1 A floor
11  cleaning. I'm sorry. Did I do that right?

12      A.    Yeah.

13      Q.    Yes, July 31st.

14      A.    Uh-huh.

15      Q.    That means that you know that you
16  have to --

17      A.    That I'm -- I'm manning the A1
18  post and at the end of the night I have cleaning
19  on A floor.

20      Q.    Okay. And when do you receive
21  this schedule?

22      A.    Well, sometimes its done a few
23  days ahead and sometimes the supervisors forget
24  to do it and you don't know until you come in

1  that day.

2      Q.    Do you have to do any preparation
3  at all for any of these positions ahead of time?

4      A.    No.

5      Q.    So, if they give it to you that
6  day, you would still be able to perform your
7  duties?

8      A.    Yes.

9      Q.    And are there ever times when --
10  let's say if someone calls out sick, how is that
11  managed as far as you know?

12      A.    Well, then you would take a
13  floater because they don't really have a
14  specific post and then you would fill in whoever
15  is absent with an available floater.

16      Q.    Okay. All right. So, I just want
17  to go through. The first one -- column says B1
18  logbook.

19      A.    Uh-huh.

20      Q.    Can you describe what that post
21  is?

22      A.    Okay. Well, they are on the B
23  floor on the third floor. They maintain the
24  logbook. It's basically records of everything

1  that goes on that day. When we eat, when free
2  movement begins and free movement ends, when
3  visitors come in, lawyers come in, social visits
4  come in. Everyone who is in the building or
5  leaves the building. When reports are written
6  they are documented. Any medical records such
7  as reports that they would give us, those are
8  documented. And then two censuses daily or --
9  well, I shouldn't say daily. Two censuses on
10  second shift are performed. Those are logged.

11      I mean, you have other duties. I
12  mean, you -- you make sure that all the keys
13  that we carry are accounted for. You are doing
14  a lot of answering the phone and logging
15  everything in the book.

16      Q.    Okay. You described -- you used
17  the word -- term free movement. Can you explain
18  what you mean by that?

19      A.    Free movement begins at 8:00 a.m.
20  and ends at 8:00 p.m. It basically means that
21  they are free to move about the building and go
22  outside any time between 8:00 and 8:00 except
23  for mealtimes.

24      Q.    When you say outside you mean

1  outside in the yard area?
2     A.    In the yard area, yes.
3     Q.    Are they able to move freely in
4  the yard area between these hours?
5     A.    Between the free movement hours,
6  yes.
7     Q.    Okay.  And you mentioned the
8  mealtimes.  When are those meals?
9     A.    Breakfast is roughly 6:30 to 8:00.
10  Lunch is from 12:00 to 1:00, and dinner is 5:30
11  to 6:30.
12     Q.    Okay.  And, when the residents
13  eat, do the staff supervise them during the
14  meals?
15     A.    Yes.
16     Q.    So, there is staff accompanying
17  the residents in the rooms where the meals are
18  given?
19     A.    Yes.
20     Q.    And must the residents eat in that
21  room?
22     A.    The dining room, yes.
23     Q.    Okay.  And then where do the staff
24  eat?

1     A.    In the dining room, as well.
2     Q.    Is there a staff area in the
3  dining room?
4     A.    No.  We all eat together.
5     Q.    I'm sorry.  Could you just
6  clarify?  Do the staff all eat together or do
7  the staff eat with the residents?
8     A.    The staff eat with the residents
9  together.
10     Q.    Okay.  Do you have to eat the same
11  food as the residents also?
12     A.    You don't have to, but many of us
13  do.
14     Q.    Okay.  You mentioned that there
15  are two censuses on the second shift?
16     A.    Uh-huh.
17     Q.    What do you mean by that?
18     A.    Well, the first one is conducted,
19  I believe, around 3 o'clock when the kids get
20  out of school.  And the second one is done at 8
21  o'clock when everyone comes up from free
22  movement.  It's basically making sure that
23  everyone is accounted for and that we didn't
24  leave behind, especially the one at 8 o'clock.

1  We want to make sure that, you know, everyone is
2  up on the B floor, that we left no one outside,
3  no one down on A floor.
4     Q.    Okay.  And you had -- it sounds
5  like you were clarifying that there might be
6  other censuses during the day but --
7     A.    There is one on first shift.  When
8  residents wake up and make their way to
9  breakfast first shift does a census.
10     Q.    You had mentioned answering
11  phones?
12     A.    Uh-huh.
13     Q.    What would that be for?
14     A.    Outside people calling.  It could
15  be, you know, people who want to schedule
16  visits, it could be people just inquiring about
17  people they know that are there, it could be
18  other staff members in different parts of the
19  building, especially the A1 person.  They are
20  responsible for answering the door if there are
21  any visitors.  So, if there is a lawyer or a
22  family visits, they would collect the names and
23  call me and give me the names and I would have
24  to log it in the logbook.

1     Q.    So, there's a phone also at the
2  desk?
3     A.    At the desk, the B1 desk, yes.
4     Q.    Like a regular phone, not just a
5  walkie-talkie?
6     A.    No, it's a regular phone.
7     Q.    Okay.  So, going to B2 kitchen
8  cleanup.
9     A.    Uh-huh.
10     Q.    What are those responsibilities?
11     A.    B2 is kind of just the assistant
12  of B1 because, obviously, B1 has a lot of
13  responsibilities with the logbook.  So, B2 helps
14  out with 15-minute sweeps and assisting
15  residents with whatever they may need out of the
16  laundry room.  Yep.  They're just there to help
17  out.
18     Q.    Okay.  Is the person on the B1
19  post supposed to stay at the desk?
20     A.    Yeah.  I mean, other than doing
21  15-minute sweeps down the hallway you're
22  generally at the desk.
23     Q.    The 15-minute sweeps, is that
24  conducted by both of those individuals, B1 and



1  B2?
2      A.     Yeah, as long as they are done,
3  either B1 or B2 can do them.
4      Q.     Okay.  How many people do the
5  15-minute sweep at a time?
6      A.     It would be one person at a time.
7      Q.     Okay.  So, that's not both?  It's
8  not that both staff members are doing it
9  together?
10     A.     No.
11     Q.     But one person does it?
12     A.     Yeah.  One person would do it and
13  one person would stay at the desk so that they
14  could monitor what's going on in the dayroom.
15     Q.     Does the B2 have any -- post have
16  any other responsibilities?
17     A.     Other than this kitchen cleanup,
18  no.
19     Q.     And when does the kitchen cleanup
20  take place?
21     A.     After residents have finished
22  their meals.
23     Q.     Is that after each of them -- so,
24  this is the second shift?

1      A.     Uh-huh.
2      Q.     Would it just be for dinner for
3  that shift?
4      A.     Yeah.  This would be the dinner
5  shift.
6      Q.     Okay.  So, going to A1 and A floor
7  cleaning, can you describe the responsibilities
8  of that post?
9      A.     Of A1?
10     Q.     Yes.
11     A.     Like I said, A1 basically answers
12  the front door if there are any visitors or, you
13  know, UPS comes by to drop off packages.  We let
14  lawyers in, family visitors in, things like
15  that.
16     Q.     Is the A1 post located in any --
17  you know, like, for example, we discussed
18  earlier -- you had said that B1 typically is at
19  the desk?
20     A.     Yeah.
21     Q.     What about the A1 post?
22     A.     Well, A1 would stay around the
23  desk area helping out A2 and A3 as long as there
24  was no one at the door.  So, typically on second

1  shift there's not as many visitors as there are
2  during the day.  So, you might not need the A1
3  as much.  So, they would assist on the A floor
4  desk on the second floor.
5      Q.     And when you say desk, is that
6  desk located in the dayroom?
7      A.     Yes.
8      Q.     Are you able -- from that desk are
9  you able to see the front entrance or the --
10     A.     No.  I mean, you can see some --
11  some ways down the hallway, but you cannot see
12  all the way down, and you can't see the front
13  door, no.
14     Q.     Okay.  Aside from the duties of
15  answering the door and generally staying at the
16  desk, are there any other specific
17  responsibilities for that post?
18     A.     15-minute sweeps.
19     Q.     And where are those sweeps
20  conducted?
21     A.     Down the wings, east and west
22  wing, and down the long hallway towards the
23  front door.
24     Q.     And during those sweeps does the

1  staff person go into the rooms?
2      A.     You step in and check and make
3  sure you can see around the corners.
4      Q.     Okay.  And, again, on the A floor
5  are those conducted each staff member at a time
6  one-by-one as opposed to doing it together with
7  another staff member?
8      A.     Yeah, you would do it by yourself.
9      Q.     All right.  So, let's turn to A2
10  and A3.
11     A.     Okay.  A2 and A3, they basically
12  monitor the activities that are going on on A
13  floor.  They do 15-minute sweeps sweeping the
14  halls.  They run activities.  That's basically
15  our activity floor.  We have, you know, the art
16  room, exercise room, there could be movies going
17  on, there's a chapel.  It's mainly in the
18  dayroom and the east wing.  Our west wing is the
19  classrooms and, when they are not being
20  occupied, they are locked.
21     Q.     The rooms themselves or the
22  hallway is locked?
23     A.     The rooms themselves.  The
24  classrooms.


ESQUIRE
DEPOSITION SOLUTIONS

1   Q.    Okay.  So, turning to M1 and
2   clothing closet/trash, what are the job duties
3   for that post?
4   A.    Well, that's the medical unit.
5   So, you would get a sheet with all the
6   appointments and the people who get medications,
7   and you would be responsible for transporting
8   the people back there because it's in a locked
9   area.  So, you would need a staff with keys and
10  you bring them to their appointment.  There's a
11  clothing closet back there, so you would monitor
12  them in the clothing closet.
13  Q.    So, this is similar to what you
14  discussed earlier in terms of when we discussed
15  responsibilities with respect to medical --
16  A.    Yes.
17  Q.    -- and things like that for this
18  post?
19  A.    Yep, that's it.
20  Q.    Okay.  And the next line says
21  floater and then below it says school?
22  A.    Yep.
23  Q.    And what are the responsibilities
24  of the floater?

1   A.    So, when we start at 2:30 school
2   is still going on for -- I think it ends at 3:00
3   or 3:15.  So, you head right to school and you
4   help out in the classrooms until school is over.
5   And then you would come out to the floor and
6   help where needed.  You would help with breaks,
7   fill in for people so they could take their
8   break.  If we had admissions usually the
9   floaters would facilitate admissions or
10  discharges.
11  Q.    Okay.  In terms of that is there a
12  separate staff who takes care of intake or
13  admissions, or is it always --
14  A.    It's --
15  Q.    -- the shelter care counselors?
16  A.    It's shelter care counselors.
17  Q.    And would it always be one of
18  these people listed here?
19  A.    It's whoever is on and available,
20  usually a floater.  But if it's a female adult,
21  it would be a female staff.  And, likewise, if
22  it was a male adult, it would be a male staff.
23  Q.    Okay.  Just to clarify, there are
24  both male and female residents who are at the

1   facility?
2   A.    Yes.
3   Q.    And do you recall in 2014 if there
4   was more of one than the other?
5   A.    I think back then typically it was
6   more women than men.
7   Q.    Has that changed?
8   A.    Yeah.  We have way more men now
9   than we have women.
10  Q.    Okay.  The last column says
11  outside and it also says serve?
12  A.    Uh-huh.
13  Q.    Can you describe what that post
14  requires?
15  A.    Outside post basically sits and
16  waits at the outside door, the door that leads
17  out into the outside recreation area, and they
18  wait until a resident or family comes down who
19  would like to go outside.  And then, if a family
20  does come down or someone comes down, you would
21  accompany them outside.
22  Q.    And would you be the only staff
23  person outside with them?
24  A.    Sometimes.

1   Q.    Are there any job posts that are
2   not reflected on any of these columns that you
3   ever had as a shelter care counselor?
4   A.    No.
5   Q.    So, this would be a complete
6   reflection of jobs you would have had on second
7   shift?
8   A.    Yes.
9   Q.    If -- if a staff member is
10  assigned to let's say the B floor, do they
11  typically stay at B floor at least until the
12  free movement time is finished?
13  A.    Yes.
14  Q.    And similarly with the A floor, do
15  they stay on the A floor?
16  A.    Yes.
17  Q.    We had mentioned or I believe you
18  had used the word supervisors.  Can you just
19  explain what you mean by supervisors?
20  A.    They are my boss.  They -- they
21  are there to supervise to make sure that I'm
22  doing what I'm supposed to be doing.
23  Q.    And how many supervisors do you
24  have?



1    A.    At that time?
2    Q.    Yes.
3    A.    Two.
4    Q.    And do you remember who they were?
5    A.    Len Kopetsky and Jason Mills.
6    Q.    When you were on the second shift
7  did they have the same shift?  Like did they
8  have matching shifts as the staff?  For example,
9  do the supervisors also work like 2:30 to 10:30
10 or did they have a separate shift?
11   A.    I don't understand the question.
12   Q.    So, for example, in some
13 facilities the supervisors might work like a
14 9:00 to 5:00 job, and so the shifts don't
15 exactly correspond.  Did Jason Mills and Len
16 Kopetsky also -- when you started at 2:30, did
17 they also start at 2:30?
18   A.    Yes.
19   Q.    And then they were present through
20 the end of the shift?
21   A.    Yes, same hours.
22   Q.    And generally what would you --
23 how would they supervise you?  Were they present
24 or was it more so you would go to them on an as

1  needed basis?
2    A.    Well, they would be in the office
3  doing paperwork and things of that nature, but
4  they would come out every once in a while and do
5  their rounds around the floor.  Check out all
6  the different posts, make sure everything was
7  going smoothly.
8    Q.    And how would you contact them if
9  for some reason you need to?
10   A.    Either with the phone at the desk
11 or the radio that we keep on our hip.
12   Q.    And what would be reasons why you
13 would need to contact a supervisor?
14   A.    If I have a question or an issue
15 arises, if there's an emergency or maybe if a
16 resident had a complaint or a request that I
17 could not fulfill without getting permission
18 first.
19   Q.    And at least back in 2014 did you
20 find the supervisors to be accessible?
21   A.    Yes.
22   Q.    Did the supervisor -- to your
23 knowledge, were the supervisors the ones who
24 made the assignments here?

1    A.    Yes.
2    Q.    Were there ever times when you
3  were short staffed?
4    A.    If we were, then there was
5  mandatory overtime.  So, if we were short
6  staffed, a first shifter would be mandated to
7  work with us on second.
8    Q.    Did it ever happen in the reverse,
9  if you were mandated to work -- let's say you
10 were on second shift, you would be mandated to
11 work on third shift?
12   A.    I was mandated to third shift many
13 a times.
14   Q.    Okay.  You had talked about
15 15-minute sweeps, and this is -- I'm going to
16 pull up Berks County 20.  Earlier Miss Taylor
17 had testified that when room checks were
18 conducted at least after 8 o'clock that would be
19 documented.  Is that your experience?
20   A.    Yes.
21   Q.    So, similarly, you might conduct
22 room sweeps at earlier times but they would not
23 be marked down?
24   A.    Yes.

1    Q.    But then after 8 o'clock or so you
2  would start making notations in the log?
3    A.    8:30, yes.
4    Q.    8:30?  Okay.  So, if you can just
5  turn to the third page of this document.  On the
6  bottom it says Berks 02907.
7    A.    Yes.
8    Q.    So, just to confirm, what is this
9  document?
10   A.    Resident room check sheet.  It's
11 the document you would sign off on after you
12 have conducted your room check.
13   Q.    And have you seen this type of
14 document before?
15   A.    Yes.
16   Q.    And do you have to fill out this
17 document on a regular basis?
18   A.    When you're working second or
19 third shift, yes.
20   Q.    Okay.  Looking at this page, in
21 the middle section --
22   A.    Uh-huh.
23   Q.    -- there's a series of boxes.  The
24 date is listed as August 13th, 2014.



1    A.    Uh-huh.
2    Q.    And then on the bottom it says
3  employee names (printed) and one of the names
4  says Jamie?
5    A.    Yes.
6    Q.    Is that you?
7    A.    Yes.
8    Q.    Did you write that or did someone
9  else write that?
10    A.    I wrote that.
11    Q.    And is your signature or are your
12  initials anywhere else on this page?
13    A.    Yes.
14    Q.    Can you indicate where or describe
15  where?
16    A.    8:30, 8:45, 9:00, 9:15, 9:30,
17  10:00 and 10:15.
18        MR. CONNELL:  What date?
19        THE WITNESS:  8/13/14.
20        MR. CONNELL:  Thank you.  I'm
21  sorry.  I just wanted to make sure we're on the
22  page to look later.
23  BY MS. YEH:
24    Q.    And what does that indicate?

1    A.    That indicates that those were the
2  15-minute checks that I did.  The 9:45 I was on
3  break.  So, Rebecca filled in and did my
4  15-minute check for me.
5    Q.    Okay.  And is your -- are your
6  initials anywhere else on the page?
7    A.    No.
8    Q.    Okay.  And so I have to apologize
9  because sometimes it's hard to read people's
10  handwriting.  It looks like other boxes are
11  initialled but you are saying that they are not
12  your initials?
13    A.    Correct.  The initials next to
14  like -- so, the males are initialing -- they're
15  initialing on the left.  The females are
16  initialing on the right.
17    Q.    Oh, male staff?
18    A.    Yes.
19    Q.    And is that always how you fill
20  out the form?
21    A.    Yes.
22    Q.    Okay.  The male staff would sign
23  on the left part of the box?
24    A.    Yeah, and then there's that slash

1  and then the female staff sign on the right
2  side.
3    Q.    So, it looks like from 8:30 to
4  9:15 you are the only individual conducting the
5  room checks?
6    A.    Yes.
7    Q.    And then from 9:30 on it appears
8  that two staff members are conducting room
9  checks.  Am I reading that right?
10    A.    Yes.
11    Q.    And then if it's on both sides
12  does that mean that there was a male staff
13  member conducting room checks and a female staff
14  member conducting room checks?
15    A.    Yes.  This indicates that there
16  was no male adults with infant children, so
17  there was no need for 15-minute room checks to
18  be done until 9:30.
19    Q.    Okay.  So, just explain the reason
20  for that.
21    A.    Okay.  So, 8:30 we start with
22  infant bedtime.  It was only females who had
23  infants.  So, I was the only one performing
24  checks.  The males didn't have to start checks

1  until 9:30 because that's when juveniles -- all
2  juveniles have to go to bed on a school night --
3  wait.  No.  A weekend.  I'm sorry.  Weekends
4  they're allowed to stay up until 9:30.  A school
5  night they have to be in bed at 9:00.  So, I'm
6  assuming this was either -- yeah, a weekend.
7  So, then once all the juveniles are in their
8  rooms, then the males have to start doing
9  checks, as well.
10    Q.    Okay.  And do the adults have a
11  bedtime?
12    A.    No.
13    Q.    Must the adults stay on the B
14  floor between 8:00 p.m. through 8:00 a.m.?
15    A.    Yes.
16    Q.    Do they have to stay in the room?
17    A.    No.
18    Q.    Are they allowed to go to the
19  dayroom?
20    A.    Yes.
21    Q.    So, if -- strike that.
22        With respect to the rooms for the
23  residents --
24    A.    Uh-huh.



1    Q.    -- how many residents are in each
2  room give or -- if there's a maximum or a
3  minimum number?
4    A.    Six is the maximum.
5    Q.    And must all the residents be of
6  the same gender?
7    A.    Yes.
8    Q.    I should say all adult residents
9  must be the same gender?
10    A.    Yes.
11    Q.    The children might be of different
12  genders?
13    A.    Yes.
14    Q.    When you conduct the room checks
15  do you go into the room?
16    A.    You are to open the door and --
17  well, at night we have a flashlight.  So, you're
18  to open the door, step in, look around the
19  corner and shine the flashlight either on the
20  floor or the ceiling and make sure that they are
21  breathing and in good condition.
22    Q.    Okay.  And then at least for the
23  second shift do you have to conduct those room
24  checks all through the end of the shift?

1    A.    Yeah.  They continue -- third
2  shift will continue them throughout the night.
3    Q.    Okay.  And are you allowed to
4  enter a room where the residents are of an
5  opposite gender as you?
6    A.    No.
7    Q.    And at night let's say a parent
8  has a resident child who is under the age of
9  ten, must they stay with their child all night
10  with them?
11    A.    No.  Once the child is asleep they
12  may come back out and watch TV in the dayroom,
13  use the law library, use the telephone room.
14  There's a kitchenette.
15    Q.    So, as long as they stay on the B
16  floor they are allowed to use the other
17  resources, if you will?
18    A.    Yes.
19    Q.    At the time in 2014 do you recall
20  predominantly what language did they speak?
21    A.    Spanish.
22    Q.    Do you know if there are other
23  people who spoke other languages there at that
24  time?

1    A.    Yes.
2    Q.    And what was the most common
3  language that was spoken?
4    A.    Spanish.
5    Q.    And you know if you are able to --
6  would you say most of the residents spoke
7  Spanish or were coming from Spanish-speaking
8  countries?
9         MR. CONNELL:  I'm going to object
10  to the form of the question as being vague.  You
11  can answer if you understand.
12         THE WITNESS:  The main language
13  was Spanish, yes.
14  BY MS. YEH:
15    Q.    And did those residents speak
16  English?
17    A.    If any of them did, very little.
18    Q.    And do you speak Spanish?
19    A.    No.  I know some vocabulary that I
20  have picked up along the way, but I can't
21  conversate (ph) in Spanish, no.
22    Q.    How do you communicate, then, with
23  the residents?
24    A.    If they need something from me,

1  usually I know like toothbrush or laundry, those
2  kind of simple things.  If it's a bigger issue
3  or concern then I would take them to language
4  services.
5    Q.    Earlier we had talked about, for
6  example, the laundry process and getting
7  supplies.  How would you communicate with the
8  residents -- let's say a resident wanted to do
9  their laundry.  How would that work?
10    A.    Well, I know the word for laundry.
11  So, I mean, lavanderia.  You know, I have picked
12  up a lot of simple stuff along the way.  So,
13  like the daily needs I can help that or they'll,
14  you know, point to what they need.  Hey, help
15  me.  Okay.  What do you need?  And then we'll
16  go -- you know, they will say in here, the
17  laundry room.  Okay.  You need to do laundry,
18  that kind of thing.  But if it's an issue or a
19  problem that I don't understand, I would go to
20  language services.  If it's something that is --
21  you know, say I come to a mom and say your child
22  is on a trip today, do you give permission for
23  them to go on that trip and, you know, she
24  doesn't understand me, I could take her to the



1  computer where we have internet for them. It's
2  their own internet cafe. And I could get on
3  Google Translate and put it in there. Hi. You
4  know, your child is supposed to go on a trip
5  today. We're going to the mall. Is that okay?
6  Do you give us your consent? Can you sign this
7  form for me? Simple stuff like that. But if
8  it's a serious issue or problem, then I would
9  use language services.
10     Q.     Okay. You mentioned the computer
11  bank?
12     A.     Uh-huh.
13     Q.     Back in 2014, where was that
14  located?
15     A.     I believe -- well, they started
16  out in what was the library, and then they were
17  moved to -- or wait. Hold on. I'm trying to
18  think now. They were moved around quite a lot.
19  I think they went from the library to the --
20  what is now the case workers' office, and now
21  they are on the A floor at the dayroom.
22     Q.     All right. And by any chance do
23  you remember when they were moved from the
24  library to the case workers' office?

1     A.     I do not.
2     Q.     Okay. So, when you described the
3  process of using the internet to translate --
4     A.     Uh-huh.
5     Q.     -- is that something you did -- is
6  that something you do now?
7     A.     Yeah, every once in a while if
8  it's an issue of non-importance.
9     Q.     Okay. And do you recall if you
10  did that in 2014?
11     A.     I may have. I'm not -- I mean, I
12  don't recall.
13     Q.     Okay. And you had noted that if
14  it's something a little more serious then you
15  would use language services.
16     A.     Yes.
17     Q.     Can you describe the process of
18  how you would use that?
19     A.     You would locate a language
20  services form. You would go into the interview
21  room which was located on A floor at the desk,
22  like right next to the desk. There's just
23  basically a table, a phone and some chairs.
24  Dial the number. They would ask you what

1  language you need. You tell them. They will
2  give you an interpreter number and hook you up
3  with the interpreter. And then you would have
4  it on speaker so I could speak in and then the
5  interpreter could reply back to the resident and
6  then you would fill in the start and end time.
7          There's two pieces of paper to the
8  form. There is a white copy and a yellow copy,
9  and they both go to the case worker. And one
10  goes into the resident's file and I guess the
11  other goes to whoever pays the bill for the
12  services.
13     Q.     And are there any staff who speak
14  Spanish?
15     A.     Yeah.
16     Q.     And would you be able to utilize
17  their interpretation services?
18     A.     I would say if it was something
19  that wasn't a serious issue, yes. But, like I
20  said, I mean, until Brittany started as a
21  translator it was just people who knew more than
22  I did but weren't fluent, either. So, I mean, I
23  would only rely on them if it was something
24  small.

1     Q.     Okay. So, it sounds like at least
2  until Brittany started, if it was something --
3  it sounded like there was a little bit of
4  language -- ability to speak other languages by
5  staff members, but if anything was serious you
6  would still utilize language services?
7     A.     Yes.
8     Q.     Okay. All right. And in
9  performing your, you know, various duties on
10  your posts --
11     A.     Uh-huh.
12     Q.     -- how much interaction do you
13  have with other staff members?
14     A.     You don't have a lot of
15  interaction. I mean, sometimes you could be put
16  on a -- you know, a trip together or you would
17  facilitate an activity together, but when you're
18  on the floor we are not -- we are not allowed to
19  group up. We are to spread out and monitor all
20  areas of the building. We're not allowed to
21  congregate and, you know, chitchat and hang out.
22  I mean, we're there to do a job, so we spread
23  out and monitor different areas.
24     Q.     Okay. So, that way you can sort



1   of spread out your supervision, if you will?
2       A.      Yes.
3       Q.      And if you are on the same floor,
4   let's say you are both on the B floor --
5       A.      Okay.
6       Q.      -- would you interact with that
7   staff member more frequently or more often than
8   you would -- on that shift than presumably if
9   someone else was on a different floor?
10      A.      Yeah.  B floor is smaller.  You
11  have less area to cover.  So, yes.  And you have
12  to communicate with the person who has the
13  logbook a lot more.  A floor there's more ground
14  to cover.  It's a bigger area.  So, yeah.
15      Q.      Okay.  And are there cameras in
16  the facility?
17      A.      Yes.
18      Q.      And they are video cameras?
19      A.      Yes.
20      Q.      And are you aware of where they
21  are located?
22      A.      Yes.
23      Q.      Are there cameras, for example, in
24  the dayroom?

1       A.      Yes.
2       Q.      And can you describe where else
3   the cameras are located?
4       A.      Hallways, outside, in the medical
5   unit, in the dining room.
6       Q.      Okay.  Are there cameras in the
7   residents' rooms?
8       A.      No.
9       Q.      What about the bathrooms?
10      A.      No.
11      Q.      The laundry room?
12      A.      No.
13      Q.      Dining room?
14      A.      Yes.
15      Q.      And you mentioned the hallways.
16  Does that also include, for example, the area
17  where -- the hallway that leads to the door to
18  the outside?
19      A.      Yes.  Also in the visitation room.
20      Q.      There's a camera?
21      A.      Uh-huh.
22      Q.      Okay.  And do you have the ability
23  to view those videos?
24      A.      No.

1       Q.      And do you know who does have
2   access to those videos?
3       A.      Supervisors and management.
4       Q.      And are they viewing those videos
5   simultaneously as things occur, or they have the
6   ability to review them at some other point?
7       A.      They have the ability to review
8   them when they need to.
9       Q.      Okay.  So, I'm going to ask you a
10  little bit about the training that you received.
11      A.      Okay.
12      Q.      And so I understand that you
13  started first at the juvenile detention
14  center --
15      A.      Yes.
16      Q.      -- I believe is what you called
17  it?
18      A.      Yes.
19      Q.      At that time were you a Berks
20  County employee?
21      A.      Yes.
22      Q.      Okay.  And currently you're a
23  Berks County employee?
24      A.      Yes.

1       Q.      So, when you first started as a
2   Berks County employee did you receive training?
3       A.      Yes.
4       Q.      And then when you started again as
5   a shelter care counselor at the Berks County
6   Residential Center did you receive training?
7       A.      Yes.
8       Q.      Can you describe for me the
9   training that you received as a shelter care
10  counselor?
11      A.      Sure.  Safe crisis management and
12  CPR, first aid, SAAPI procedures, all of our
13  policies and procedures in our standard --
14  standard operating procedures.  I mean, there's
15  a lot of them.  Communicable diseases, human
16  trafficking.
17      Q.      Approximately -- that's fine.  I
18  understand there are a lot of different
19  topics --
20      A.      Yeah.
21      Q.      -- and you may not remember
22  everything.
23      A.      Yes.
24      Q.      Do you recall how long the



1  training took when you first started?
2     A.    It's -- I believe it's about 40
3  hours of training that we get per year.
4     Q.    And was the training conducted at
5  the facility or off site somewhere?
6     A.    At the facility.
7     Q.    And do you remember getting any
8  training on sexual abuse or sexual harassment?
9     A.    Yes.
10    Q.    Do you by any chance have any
11  responsibility in developing that training?
12    A.    No.
13    Q.    Do you conduct the training?
14    A.    No.
15    Q.    Okay.  And who conducts the
16  training?
17    A.    The trainers.
18    Q.    And who are the trainers?
19    A.    The names?
20    Q.    Sure.
21    A.    Okay.
22    Q.    If you remember.
23    A.    Sure.  Jason Mills was a trainer
24  at the time.  Brandon Witmer and Corby -- Jason

1  Corby.
2     Q.    And were they all supervisors?
3     A.    Yes.
4     Q.    And the training that you had on
5  sexual abuse and sexual harassment, can you
6  describe the type of training?  For example, was
7  it people who did the training or was it by
8  video?
9     A.    We got a packet of information and
10  then we had basically what was sort of like a
11  test to test our knowledge on it.
12    Q.    Okay.  And the trainers that you
13  described, do they conduct the training?
14    A.    Yes.
15    Q.    And so, for example, did they --
16  they like spoke?  They didn't just push a button
17  on a video, they actually talked to you?
18    A.    Yes.
19    Q.    Okay.  So, I'm going to ask you to
20  pull up Berks County 23.  And, actually, I
21  apologize.  I had a couple more questions just
22  about the training before I get to this page.
23          Do you know if there is a
24  PowerPoint at all or any type of thing they

1  showed on the screen during the training?
2     A.    Yes.
3     Q.    And did you end up saving copies
4  of that?
5     A.    Did I save copies of it?
6     Q.    Or did you -- did they give you
7  copies or materials of other types?
8     A.    I'm sure that they did but, I
9  mean, if I wanted a copy, they are available.  I
10  could get any of the trainings.
11    Q.    Okay.  And do you remember at all
12  if during the training there was any like
13  discussion amongst the trainees?  For example,
14  facilitated discussions by the trainers?
15          MR. CONNELL:  Object to the
16  question being vague.
17          MS. YEH:  Sure.  I can further
18  clarify if you would like.
19          MR. CONNELL:  Thank you.
20  BY MS. YEH:
21    Q.    In terms of the training you had
22  discussed earlier that it's the trainer who
23  talks as opposed to, for example, pushing a
24  button on a video.

1     A.    Uh-huh.
2     Q.    During that training does the
3  trainer also facilitate discussion among the
4  people in that room?
5     A.    Yes.  If you're training in a
6  group, yes.
7     Q.    Sort of like a workshop style, if
8  you will?
9     A.    Yes.
10    Q.    All right.  So, now I'm going to
11  turn your attention to this document --
12    A.    Okay.
13    Q.    -- Berks County 23.  You had
14  testified earlier that you also received
15  training on the different policies and
16  procedures.  Were you trained on this particular
17  policy that's titled Standard Operating
18  Procedures and Policies, Chapter:  Sexual Abuse
19  and Assault, Prevention and Intervention?
20    A.    Yes.
21    Q.    And do you recall when you would
22  have received that training?
23    A.    We receive it yearly.  I can't
24  tell you the date of the last time, but it's a



1   yearly training.
2       Q.      Okay. So, are you trained that --
3   what are you trained with regard to staff
4   members and contact with the residents?
5       A.      We're trained in recognizing the
6   warning signs, we're trained in how to prevent
7   it, the procedures to take if it were to happen
8   and the protocols.
9       Q.      Okay. So, just as you had
10  mentioned warning signs, what would be some
11  warning signs?
12      A.      If someone was giving more
13  attention to one resident as opposed to the
14  others or bringing in gifts and things for that
15  one resident.
16      Q.      Okay. And that would be a warning
17  sign for what specifically?
18      A.      Special treatment.
19      Q.      And would it be also a possible
20  warning sign for sexual abuse?
21      A.      I wouldn't say it's a warning sign
22  for -- for sexual abuse, but it's a warning sign
23  for special treatment and special treatment
24  could get you into bigger problems.

1       Q.      Okay. And bigger problems meaning
2   what?
3       A.      Leading into things escalating
4   such as sexual abuse.
5       Q.      Okay. And what are you trained
6   with respect to whether or not contact between
7   staff members and residents is permitted?
8       A.      What kind of contact? Like I
9   don't understand the question.
10      Q.      Sure. More specifically a contact
11  that might be defined as sexual in nature?
12      A.      Well, we're not allowed to touch
13  them in any way sexually or, you know, rubbing
14  someone's shoulder or anything like that.
15      Q.      Is physical contact prohibited
16  generally between staff members and residents?
17      A.      Yes.
18      Q.      And specifically I'm talking about
19  adult residents?
20      A.      Yes.
21      Q.      And is it the same with the
22  residents who are children?
23      A.      Is what the same?
24      Q.      The prohibition on physical

1   contact?
2       A.      Physical contact? There's times
3   where we have to pick small children, toddlers
4   and babies up, you know. We're only allowed to
5   touch residents if it's an emergency. You know,
6   if there was an emergency and we need to perform
7   CPR or first aid then, yeah, we would have to
8   touch them. But if it doesn't warrant an
9   emergency, then, no, there wouldn't be any
10  physical contact.
11      Q.      Sure. So, there might be
12  situations that would warrant physical contact
13  but otherwise it's --
14      A.      Prohibited.
15      Q.      -- prohibited?
16      A.      Yes.
17      Q.      Okay. So, if you could -- you had
18  earlier mentioned, I believe, SAAPI training?
19      A.      Uh-huh.
20      Q.      And just explain what you mean by
21  SAAPI.
22      A.      Well, that is sexual abuse/assault
23  prevention/intervention.
24      Q.      Okay. Do you know who the SAAPI

1   program coordinator is at the facility?
2       A.      Yes. Supervisors.
3       Q.      They are all considered to be
4   coordinators?
5       A.      Well, I believe that one may be
6   like the head, Mary Beth Campitelli, but I
7   believe that they're all trained in it.
8       Q.      Okay. And you had discussed
9   earlier that you were trained in terms of
10  warning signs and a few other matters and, I
11  apologize, I don't remember exactly what you
12  stated, but sort of warning signs and
13  recognition of sexual abuse?
14      A.      Uh-huh.
15      Q.      So, we discussed warning signs.
16  What are some ways that you might be able to
17  recognize if there's a situation where there is
18  sexual abuse or sexual assault?
19      A.      If a resident isn't acting their
20  normal selves, such as being withdrawn, crying,
21  looking depressed, hiding out in their room more
22  than usual, not engaging in activities or
23  socializing with residents that they have become
24  friends with while at the facility.



1    Q.    Okay.  And what training did you
2 receive to deal with a situation if you observed
3 that?
4    A.    We would take that person to
5 language services, ask them if they are having
6 any issues or troubles or, you know, concerns.
7 And, if they are, then we could make a referral
8 to our mental health department.
9    Q.    All right.  And are you required
10 to report it if you have -- if you have seen
11 those either warning signs or have seen the
12 signs where you think there might be sexual
13 abuse or assault?
14    A.    Yes.
15    Q.    And who would you report that to?
16    A.    I would report it to my supervisor
17 and the medical staff.
18    Q.    Okay.  And do you know if those
19 reports are kept confidential?
20    A.    I'm sorry.  We write a lot of
21 reports, so --
22    Q.    The specific report relating to a
23 possible complaint of sexual abuse or sexual
24 assault?

1    A.    Yes, that would remain
2 confidential.
3    Q.    And do you play any role in the
4 investigation of any of those complaints?
5    A.    No.
6    Q.    Do you play any role in terms of
7 keeping track or keeping data of any of those
8 complaints?
9    A.    No.
10        MR. CONNELL:  Are you doing okay?
11 Do you need a break or anything?
12        THE WITNESS:  No.  I'm fine.
13 BY MS. YEH:
14    Q.    Do you need a break at all?
15    A.    No.
16    Q.    After there has been either report
17 or allegation of sexual abuse, what training did
18 you receive with respect to the person who might
19 be a victim of sexual abuse?
20        MR. CONNELL:  Object to the
21 question being vague.  You can answer if you
22 understand the question.
23        THE WITNESS:  Can you rephrase it
24 one more time?

1 BY MS. YEH:
2    Q.    Yes.  Let's say what training did
3 you receive if you become aware of an individual
4 who has been a victim or possible victim of
5 sexual abuse?
6    A.    So, if a resident were to come to
7 me and confide in me and say they were sexually
8 abused, I would make sure to take her directly
9 to medical.  I wouldn't let her, you know,
10 shower, do anything, you know, in case of
11 possibly destroying evidence.  And then I would
12 alert my supervisor who would alert, you know,
13 all the upper management and ICE and the police.
14 Medical would decide whether they wanted to send
15 her out for, you know, a checkup or a rape kit
16 of some sort.  That's really all I would do on
17 my end.
18    Q.    Have you ever received a report
19 from a resident about possible sexual abuse or
20 sexual assault?
21    A.    No.
22    Q.    Have you ever had a resident
23 report something of an urgent matter to you?
24    A.    No.

1    Q.    Are you trained to address issues
2 of either a complaint or urgent matter when a
3 resident approaches you?
4    A.    Yes.
5    Q.    And what training do you receive
6 about the residents who are at the facility, if
7 any?
8        MR. CONNELL:  I'm going to object
9 to the question being vague.  I mean, in excess
10 of what she has already talked about and all the
11 training she has received?
12        MS. YEH:  Yes.
13 BY MS. YEH:
14    Q.    Specifically about the population
15 who might be at the facility.  Do you learn
16 anything -- before you started did you learn
17 anything in particular about the individuals who
18 might be at the facility?
19        MR. CONNELL:  I'm going to object
20 to the question as being vague.  You can answer
21 if you understand.  I guess I just don't
22 understand how she could be trained about some
23 individual who may or may not appear at the
24 facility at some point in the future.  Your



1  question was are you trained on the individuals
2  who will be at the facility.
3         MS. YEH:  Right.
4  BY MS. YEH:
5      Q.    So, for example, previously you
6  were at the juvenile detention center?
7      A.    Uh-huh.
8      Q.    I imagine that the individuals
9  housed at the juvenile detention center were
10 different types of individuals in a number of
11 reasons, perhaps age or criminal background than
12 the individuals at the Berks County Residential
13 Center; is that correct?
14     A.    Yes.
15     Q.    All right.  When you started were
16 you provided descriptions of the types of
17 individuals who would be housed at the Berks
18 County Residential Center?
19     A.    Yes.
20     Q.    And what information did you
21 receive?
22     A.    Just, you know, the types of
23 places that they are coming from.  You know,
24 like I said earlier, human trafficking, things

1  like that.
2      Q.    Okay.  And are you made aware that
3  individuals might be coming from other
4  countries, for example?
5      A.    Yes.  That's the purpose of the
6  facility.
7      Q.    Okay.  I want to make sure.
8      A.    Yes.
9      Q.    And, obviously, you know that the
10 people at your facility are people who are
11 coming with children?
12     A.    Yes.
13     Q.    And are you made aware that they
14 might be coming from countries where there is
15 some type of challenges in the life or
16 difficulty in those countries?
17     A.    Yes.
18     Q.    Have you heard of any -- you know,
19 aside from what this lawsuit is about, have you
20 heard of any other complaints of either sexual
21 abuse or improper sexual behavior?
22     A.    No.
23     Q.    And what type of training do you
24 receive on code of ethics?

1      A.    How to conduct myself in a
2  professional manner while I'm at work.
3               - - -
4         (Whereupon, the document was marked
5  as Berks County 29 for identification.)
6               - - -
7  BY MS. YEH:
8      Q.    I have just handed you Berks
9  County 29 which on the top just says Topic Area:
10 Code of Ethics.
11        Have you seen this document
12 before?
13     A.    Yes.
14     Q.    And what is it?
15     A.    The ethics that I am to hold while
16 I am an employee at the residential center.
17     Q.    Okay.  And how often do you
18 receive training on the code of ethics?
19     A.    I believe every year.
20     Q.    We discussed this a little bit
21 earlier in terms of what is permitted and not
22 permitted between staff as well as residents,
23 but I just want to turn your attention to
24 paragraph 17 on the second page --

1      A.    Uh-huh.
2      Q.    -- which states generally about
3  the juvenile corrections counselor/shelter care
4  counselor being in a supervisory position to the
5  residents, and it discusses the issue of
6  favoritism and becoming overly friendly.
7         Do you -- first of all, do you see
8  that?  You do see that paragraph?
9      A.    Yes, I see it.
10     Q.    Okay.  And do you recall getting
11 specific training with regard to this specific
12 point in paragraph 17?
13     A.    Yes.
14     Q.    Okay.  And is that your signature
15 on the bottom?
16     A.    Yes.
17     Q.    And do you know who signed next to
18 you?
19     A.    It looks like Jason Mills.
20     Q.    So, he's also the training
21 coordinator?  According to this it's the
22 training coordinator, so someone signed there.
23     A.    At the time, yes.
24     Q.    Okay.  And just can you -- we



1  talked a little bit about this, as well. Can
2  you just describe generally the practices or
3  policies with respect to cross gender
4  supervision at the facility? So, more
5  specifically, when is a staff member permitted
6  to supervise a resident of the opposite gender?
7      A.    When they are in the common areas.
8      Q.    Anywhere else?
9      A.    No. Just -- as far as opposite
10 gender goes, just the common areas.
11     Q.    Can you describe what you mean by
12 common areas?
13     A.    Hallways, dayrooms, medical wing.
14 That's it.
15     Q.    Okay. What about the outside? Is
16 that considered a common area?
17     A.    Yes, that is, as well.
18     Q.    Okay. And what would be the areas
19 that it's not permitted to supervise a resident
20 of the opposite gender?
21     A.    Bedrooms, bathrooms, shower rooms.
22 Yeah, I think that's it.
23     Q.    You mentioned shower rooms. Just
24 so we know, where are the shower rooms located?

1      A.    They are located in a separate
2  room. There are no showers in the bedrooms.
3  They have to enter a room with showers and there
4  are two shower rooms. One for males and one for
5  females, and they are on opposite wings.
6      Q.    So, is one designated for males
7  and one designated for females?
8      A.    Yes.
9      Q.    And, similarly, can the residents
10 use the shower room of the opposite gender?
11     A.    No.
12     Q.    So, they must use the showers for
13 their specific gender?
14     A.    Unless they're children, but
15 adults, yes.
16     Q.    And bathrooms you said. Where are
17 the bathrooms located?
18     A.    They have bathrooms in each room.
19     Q.    Okay. And are there bathrooms
20 located elsewhere in the facility?
21     A.    Yes.
22     Q.    And where are those?
23     A.    There is a bathroom on the third
24 floor by the desk, because the first two rooms

1  on each side don't have a bathroom in their
2  room, so they use that separate bathroom that is
3  by the desk. And there are resident bathrooms
4  downstairs across from the immigration wing.
5      Q.    Those bathrooms that are located
6  opposite the immigration wing you noted the
7  residents can use, right?
8      A.    Yes.
9      Q.    Who else is able -- is allowed to
10 use -- sorry. Strike that.
11            Who else are allowed to use those
12 bathrooms that you just referenced?
13     A.    Only residents.
14     Q.    If a visitor comes in what
15 bathrooms do they use?
16     A.    In our front lobby we have
17 restrooms for visitors.
18     Q.    And are staff allowed to use the
19 bathrooms that you had noted are across the hall
20 from the immigration door?
21     A.    No.
22     Q.    Are there separate bathrooms for
23 the staff?
24     A.    Yes. There is one down on the

1  second floor and there are two on the third
2  floor.
3      Q.    Okay. You had mentioned that on
4  the third floor there are, I believe, two other
5  bathrooms for the residents who are in the front
6  rooms?
7      A.    There is one bathroom --
8      Q.    Okay.
9      A.    -- for the rooms that are -- the
10 first room on each side of the hallway. They
11 don't have their own bathroom in their bedroom,
12 so they share that one common bathroom.
13     Q.    Are they the only people allowed
14 to use that bathroom?
15     A.    Yes.
16     Q.    Are other residents allowed to use
17 that bathroom?
18     A.    Only the residents that are in
19 rooms one and nine.
20     Q.    Okay. Is a male counselor
21 permitted to be alone with a female resident?
22     A.    No.
23     Q.    And do you recall if that was the
24 case in 2014?



1    A.    Yes.  Wait.
2    Q.    So, let's maybe clarify that.
3    Was -- in 2014 was a male staff member permitted
4    to be -- to supervise a female resident?
5    A.    No.
6    Q.    Okay.  I'm now going to ask you
7    about .  Do you remember her?
8    A.    Vaguely.
9    Q.    And what do you remember about
10   her?
11   A.    I remember she was a young woman
12   from Central America.  She had a maybe
13   three-year-old son.  She was there for, I don't
14   know, a few months to a year.
15   Q.    All right.  Do you remember when
16   you first met her?
17   A.    I don't recall our first
18   interaction, no.
19   Q.    Okay.  Do you have a first memory
20   of her?
21   A.    Nothing that stands out.
22   Q.    Okay.  And what do you remember
23   about her aside from what you just described?
24   Anything else?

1    A.    I remember her having a very
2    energetic son who used to hang out with E.D.
3    friend, Patricia, she had two young children, as
4    well.  So, they would all play together.
5    Q.    Was E.D. treated any differently
6    by the staff members there?
7    A.    No.
8    Q.    And what about her son?
9    A.    No.
10   Q.    Was she treated differently by the
11   other residents?
12   A.    Not that I had witnessed.
13   Q.    And did you know Daniel Sharkey?
14   A.    Yes, I did.
15   Q.    And how did you know him?
16   A.    Through employment.
17   Q.    And do you recall when you first
18   knew him?
19   A.    I worked in the detention center
20   with him but I was on the second shift and he
21   was on first shift.  So, I only knew him in
22   passing.
23   Q.    Okay.  And then did you both get
24   jobs at the Berks County Residential Center

1    around the same time?
2    A.    No.  When the detention center
3    closed I, in order to save my job, took a
4    temporary position with the residential center
5    and he took the layoff.
6    Q.    Okay.  Do you recall, then, when
7    you started working together?
8    A.    I'm not sure when he was rehired,
9    no.
10   Q.    Okay.  Can you describe the -- the
11   work relationship that you have with him?
12   A.    He was manipulative.  His demeanor
13   wasn't always the very nicest.  He created a lot
14   of stirs between staff.
15   Q.    Can you describe what you mean by
16   stirs by staff?
17   A.    If he heard someone -- if he heard
18   a staff complaining about other staff, he would
19   be the first one to run to that staff and blow
20   it out of proportion and create friction amongst
21   each other.
22   Q.    Okay.  And how often did that
23   happen?
24   A.    Pretty regularly.

1    Q.    And you had mentioned he was
2    manipulative.  Can you explain?
3    A.    He would just play staff against
4    each other.
5    Q.    Do you know if he also played
6    residents against each other?
7    A.    I don't know personally.  I didn't
8    witness that, no.
9    Q.    Okay.  So, you said he would play
10   staff against each other.  Were there any
11   specific examples that you remember?
12   A.    Yeah.  Him and two other coworkers
13   that had been congregating in the parking lot
14   taking long breaks and other staff would
15   complain about it, wondering where they are, why
16   they weren't on the floor.  And I guess he
17   caught wind of the complaints and he went around
18   telling the other staff and, you know, it
19   angered the other staff members.  There was a
20   staff member that didn't like, you know -- there
21   were three -- there were three of us women that
22   he basically blamed it on, and then he got
23   another staff angry at us and he didn't talk to
24   us for weeks.

1    Q.    And do you remember when this
2 happened?
3    A.    No, I don't know exactly.
4    Q.    Okay.  Do you know if it was
5 before 2014 by any chance?
6    A.    It was before any incidences with
7 **E.D.** , but I don't know other than that.
8    Q.    Okay.  Were there any other
9 examples that you can remember?
10    A.    Sure.  He had made racist
11 comments, he had made sexist comments and that
12 was towards staff.
13    Q.    So, what kinds of racist comments
14 did he make towards staff?
15    A.    In briefing in front of the whole
16 shift and the supervisor he told an African
17 American male staff that he should wash his face
18 with bleach.
19    Q.    And what happened after he made
20 that comment?
21    A.    Well, people wrote statements and
22 then he was put on investigative leave, I guess
23 you could say, and then he was suspended for two
24 weeks, I believe.

1    Q.    And did you have to take part in
2 any type of investigation at all?
3    A.    I only wrote a statement and I met
4 with Diane and human resources.
5    Q.    Were you present when he made the
6 comment?
7    A.    Yes.
8    Q.    So, you heard it yourself?
9    A.    Yes.
10    Q.    Were there any other racist
11 comments that you heard about?
12    A.    Not that I recall.
13    Q.    Okay.  You mentioned he also made
14 sexist comments?
15    A.    Yes.
16    Q.    Can you describe that?
17    A.    I guess it's sexist comments, but
18 there was a woman who was pregnant and she was
19 helping to move a bed and another female staff
20 said, oh, no, don't do that.  Let me do it.
21 You're pregnant.  I wouldn't want you to, you
22 know, jeopardize your child.  And his comment
23 that he thought was funny was, you put your
24 child at risk when you opened your legs.

1    Q.    And were you present when he --
2 were you there when he made that comment?
3    A.    Yes.
4    Q.    Did you hear any other sexist
5 comments?
6    A.    I might have but not that stuck
7 out like that.
8    Q.    Those two in particular?
9    A.    Those two are the ones that like
10 you won't forget.
11    Q.    Right.  Right.  Do you recall him
12 making any other comments that may be demeaning
13 about other individuals?
14    A.    Constantly.  I mean, he just
15 always wanted to be the joker.  You know what I
16 mean?  The more people that laughed the more he
17 did it.
18    Q.    And so what kind of jokes did he
19 make?
20    A.    Inappropriate ones.
21    Q.    Like?
22    A.    Vulgar.
23    Q.    When you say vulgar, were they
24 like profanity, were they sexual in nature?

1 What do you mean by that?
2    A.    Profanity, I guess.  I mean, the
3 one with opening your -- putting your child at
4 risk, I mean, to me that's, you know, sexual and
5 vulgar and it's inappropriate and it's demeaning
6 to other staff.
7    Q.    Sure.  Sure.  And do you know if
8 other staff members also heard him make these
9 types of comments?
10    A.    The racist comment, it was our
11 entire shift that was working that day because
12 it was in the briefing room where we all meet to
13 brief with the shift prior, and Len Kopetsky was
14 the supervisor that day.
15        The comment about the female staff
16 was, I believe, in front of two or three other
17 staff that happened to be around the desk at the
18 time.
19    Q.    Okay.  And what did you do when
20 you heard that comment?
21    A.    I had told Diane and human
22 resources about the comment when I met with them
23 about the racist comment.  It all happened
24 around the same time.

1    Q.    Okay.  And had you told anyone
2  about the other -- you know, you mention that he
3  would make vulgar comments and jokes.  Did you
4  tell that to anyone else?
5    A.    It was usually in front of a group
6  of people because, like I said, he -- he always
7  wanted to, you know, be funny.  I don't know if
8  he was trying to impress people or what he was
9  trying to do, but it wasn't typically by myself.
10  It was with other staff.
11    Q.    Okay.  So, other staff were --
12  also, as far as you know, heard it and were
13  aware of it?
14    A.    Yes.
15    Q.    Okay.  And do you know -- did you
16  ever tell any of the supervisors or anyone else
17  about his -- the other comments that he made,
18  the vulgar comments or his joking around?
19    A.    Yes.
20    Q.    And who did you tell?
21    A.    My supervisors and Diane Edwards.
22    Q.    Was that a separate time from when
23  you met with him about the race comments or was
24  that in a previous occasion?

1    A.    They were -- no.  Well, yeah, it
2  was all together at the same time.
3    Q.    Before he made the racist comments
4  had you told anyone about his jokes or comments?
5    A.    I don't think it got that bad
6  until he was suspended for the racist comments.
7    Q.    Okay.  You had said it hadn't
8  gotten that bad.  Had he made some other
9  comments prior to the racist comment?
10    A.    Here and there, sure, but I don't
11  know off the top of my head.
12    Q.    Okay.  Did you see his behavior
13  change at all after he came back from his
14  suspension?
15    A.    Absolutely.
16    Q.    Okay.
17    A.    He came back with a vengeance.
18    Q.    And when you say vengeance, what
19  did he do?
20    A.    He told me that the entire time he
21  was on two weeks leave that he sat at the bar
22  calling the Department of Public Welfare making
23  claims about how disgusting our facility was,
24  that there were rodents running around, that,

1  you know, basically he was trying to shut us
2  down.
3    Q.    And presumably he was not
4  successful in shutting you down, but do you know
5  if anything came from his complaints?
6    A.    I wouldn't know, but I'm sure that
7  the agencies have to take it seriously and they
8  have to look into those things.
9    Q.    Okay.  And you said he came back
10  with a vengeance.  Did he do or say anything
11  else?
12    A.    He just basically told me that he
13  wanted to shut the facility down and he wanted
14  Diane Edwards out of a job.
15    Q.    Okay.  So, did you see any other
16  actions that he took or were you aware of any
17  other actions that he took?
18    A.    Not that I recall.
19    Q.    Okay.  And how did -- were other
20  staff aware of -- you said he came back with a
21  vengeance.  Were other staff aware of his
22  attitude?
23    A.    I'm not sure.  When he told me
24  that it was just me that was there.  So, I don't

1  know if he was telling other staff the same
2  things.  I don't know.
3    Q.    Okay.  And what did you do when
4  you heard him say that?
5    A.    I mean, there's nothing I really
6  could do.
7    Q.    Okay.  And did you still have to
8  work with him at that time?
9    A.    Yeah.  I mean, we didn't work
10  together in the same area every day.  You get
11  moved around.  You work with different people.
12  So, once in a while, sure, I would work with
13  him, but generally we get moved around.  We get
14  rotated.  We don't work with the same person
15  every day.
16    Q.    Were you on the same shift?
17    A.    Yes.
18    Q.    Okay.  But you were maybe at
19  different posts it sounds like?
20    A.    Yes.
21    Q.    All right.  And did you ever have
22  to work on the same floor together after that?
23    A.    Yes.
24    Q.    And did you have to -- aside from



1 the time that you were on the same floor did you
2 have to interact with him?
3    A.    Sure.  I mean, we had to
4 communicate with each other.  We were running a
5 floor together, you know.
6    Q.    Okay.  So, you know, you testified
7 he made these vulgar comments and whatnot.  How
8 did he deal with the residents?
9    A.    The ways he would say things came
10 across as like sarcastic, his tone, and a lot of
11 residents would pick up on it, you know.  But I
12 don't know if they ever filed any grievances
13 about it.
14    Q.    Okay.  And did anything else
15 happen at all after he came back from his leave?
16    MR. CONNELL:  Object to the
17 question as being overly broad.  Anything else?
18 BY MS. YEH:
19    Q.    With respect to his -- for
20 example, you mention that he seemed to have a
21 vengeance.  Did you see a change in his behavior
22 at least towards the residents after he came
23 back?
24    A.    I don't recall.

1    Q.    Okay.  Did he have a change of
2 behavior with other staff members?
3    MR. CONNELL:  You mean other than
4 what she has already testified to?
5    MS. YEH:  Yes.  She testified, for
6 example, that she was alone with him when he
7 stated that he came back with a vengeance.  So,
8 I'm wondering if he was that way with other
9 people, as well.  It's to her knowledge.
10    MR. CONNELL:  Well, I think that
11 you have already asked her with regards to
12 residents.  If you are trying to develop some
13 sort of employment claim here, I think that
14 deposition is left for a better -- for another
15 day unless we can discuss how it matters his
16 interactions with other staff and how it ties
17 into the allegations in this Complaint.  I mean,
18 it seems like you are dragging on with
19 unnecessary questions with regards to
20 Mr. Sharkey.  We get that -- we established he's
21 been convicted of a crime and his interactions
22 with residents and his interactions with the
23 current deponent.  Where are we going with other
24 staff?

1    MS. YEH:  I think it is relevant
2 just if she observed -- she had earlier
3 testified that she observed him making comments
4 in front of a number of staff, and then she
5 testified this was in front of just her.  So, I
6 want to know if there were other situations
7 where he made other comments after the leave to
8 her as well as other people in a larger setting.
9    MR. CONNELL:  Comments related to
10 his interactions with residents or with staff?
11    MS. YEH:  No.  His attitudes or
12 comments to staff members.  It might be with
13 residents or it might not be.
14    MR. CONNELL:  Ask her to rephrase
15 the question.
16    THE WITNESS:  Can you rephrase the
17 question?
18 BY MS. YEH:
19    Q.    After his leave -- first of all,
20 you earlier testified --
21    A.    Uh-huh.
22    Q.    -- that he came back with a
23 vengeance --
24    A.    Uh-huh.

1    Q.    -- and he made comments to you
2 that he wanted to shut down the facility.
3    A.    Uh-huh.
4    Q.    Were you aware or did you observe
5 him making those comments to other staff members
6 if you were present?
7    A.    No.
8    Q.    Okay.  After his -- or strike
9 that.
10    Did you ever see Daniel Sharkey
11 with ████ E.D. ████?
12    A.    Alone, no, but with -- in like a
13 group setting, yes.
14    Q.    Okay.  Did you ever see him paying
15 attention to ████ E.D. ████?
16    A.    Not more than you would pay
17 attention to any other resident, no.
18    Q.    Did you ever see him paying
19 attention to Joshua, ████ E.D. ████ son?
20    A.    Like special attention?
21    Q.    Right.
22    A.    No.
23    Q.    And what about to Patricia
24 Trochez-Rivera?



1   A.   No.
2   Q.   Were there counselors who were
3   friends with Sharkey, as far as you know?
4   A.   I mean, I don't know how close of
5   friends. I mean, there were people who would go
6   out, you know, after work as a group, but, you
7   know, to call someone a friend, I mean, that
8   depends on how you view the definition of a
9   friend. I mean, coworkers would get together
10  and go out after work sometimes, but anything
11  further than that I don't know.
12  Q.   Okay. And did you socialize with
13  him after work, outside the work context?
14  A.   Once in a blue moon, but in a
15  group setting with other coworkers.
16  Q.   Do you know if Sharkey was
17  friends with any of the immigration staff or
18  friendly, however you want to define?
19  A.   I don't believe that he was.
20  Q.   Did you ever notice if **E.D.** got
21  more dressed up for second shift?
22  A.   I had heard that in the morning
23  she would, I mean, do her hair, do her makeup,
24  wear nicer things, yes.

1   Q.   And did you ever see that or did
2   you have an opportunity to see it?
3   A.   I never had the opportunity to see
4   it because I was a second shifter. So, when I
5   came in, that's just how she looked all the
6   time.
7   Q.   Okay. And did you ever observe
8   staff members sending **E.D.** over to
9   Mr. Sharkey?
10  A.   No.
11  Q.   Did you hear of any residents
12  asking for besos?
13  A.   No.
14  Q.   And do you know what besos refers
15  to?
16  A.   Kisses.
17  Q.   Okay. And, as you are likely
18  aware, this lawsuit is about the -- based on an
19  improper relationship between Daniel Sharkey and
20  **E.D.** . When did you become aware of that?
21  A.   After he was put on investigative
22  leave.
23  Q.   Okay. And do you remember how you
24  heard about it?

1   A.   I think when I came back to work
2   residents were talking about it, staff were
3   talking about it. Well, they were talking about
4   how there was like an investigation and
5   residents were being interviewed, but I didn't
6   have all the details.
7   Q.   Okay. Did you ever get like a
8   formal notice by supervisors or by the facility
9   at all?
10  A.   No. Some of us were brought in
11  and questioned by Dave, Diane and human
12  resources, but it was just questioning us on
13  what we knew or what we had maybe seen. They
14  never told us what had, you know, happened or
15  was going on.
16  Q.   Okay. And you said you were taken
17  in to be questioned or interviewed by Dave,
18  Diane and HR?
19  A.   Yes.
20  Q.   Do you remember who the HR person
21  was?
22  A.   I don't know her name.
23  Q.   Okay. So, it was a female?
24  A.   It was a female, yes.

1   Q.   Okay. And during that interview
2   did you make an effort to be truthful during
3   that interview?
4   A.   Yes.
5   Q.   All right. I'm going to ask you
6   to turn to Berks County 27. Have you ever seen
7   this before?
8   A.   Yep.
9   Q.   And when did you see it?
10  A.   When my lawyer showed it to me.
11  Q.   So, I don't want you to discuss
12  anything or tell me anything that you discussed
13  with your lawyer --
14  A.   Okay.
15  Q.   -- at all. Aside from the time
16  that he showed it to you had you seen it?
17  A.   No.
18  Q.   Okay. And do you know who wrote
19  this?
20  A.   Either Dave or Diane.
21  Q.   Do you recognize the handwriting
22  at all?
23  A.   I don't know their handwriting,
24  no.



1    Q.    Okay.  All right.  It looks like
2 in terms of -- I'm just going to refer to some
3 of the notes here and I know you -- you didn't
4 write these note, correct?
5    A.    No.
6    Q.    So, you didn't write these notes
7 but I'm just going to ask you about it.
8    A.    Okay.
9    Q.    The question that's written down
10 is sups, which I'm guessing is supervisors on
11 the floor or the office, question mark.  And
12 there's a notation that says what I think reads
13 always could be there more.  After 8:00 p.m.
14 they are in office.
15         Do you recall discussing that
16 issue at all?
17    A.    Yeah.
18    Q.    And do you recall making a
19 statement like that?
20    A.    Sure.  I said they could always be
21 out more, but after 8:00 -- 8:00 p.m. they tend
22 to be in the office more.
23    Q.    Okay.  Do you remember anything
24 else about that topic from that interview?

1    A.    No.
2    Q.    Okay.  And then I guess it's a
3 couple lines down from that the note says,
4 stopped Sharkey in laundry room and says don't
5 be stupid, there are no cameras.
6         Do you know what that is referring
7 to?
8    A.    Yes, I do.
9    Q.    Can you describe that?
10    A.    Dan and I were B1 and B2, I don't
11 know respectively who was B1 and B2.  I think
12 that I was B1 and that I had the logbook, but I
13 can't be sure.  I was at the desk and I decided
14 it was time to do a 15-minute PC or a 15-minute
15 sweep.  So, I went down the west wing hallway
16 doing my sweep and I came to the laundry room
17 and I saw Dan at the back wall.  His back was
18 facing me.  He was getting soap out of the
19 locked laundry cabinet and ▆E.D.▆ was at the
20 washing machine putting wash into the washing
21 machine.
22    Q.    Okay.  And then what did you do
23 when you saw that?
24    A.    I told him ▆E.D.▆ in here.  She

1 shouldn't be in here.  There's no cameras.  You
2 know, don't be stupid.  You need to come out or
3 she needs to come out.
4    Q.    So, was it unusual for a male
5 staff member to be in there with a female
6 resident?
7    A.    Yes.
8    Q.    And how did -- what happened after
9 you made that comment?
10    A.    He proceeded out or -- well, she
11 came out first, I believe.  I don't know.  She
12 put laundry in and then I guess she came out
13 because he had the soap.  So, he would have came
14 out last because he put the soap in.
15    Q.    Okay.  Did you see any other
16 incidences of them in the laundry room together?
17    A.    That was the only time.
18    Q.    And is that something that you
19 mentioned to anyone else or told anyone else?
20    A.    No.
21    Q.    All right.  And then -- okay.
22 Three lines down from that it notes, I saw his
23 Facebook page with snitches get stitches.
24         So, did you see his Facebook page?

1    A.    I believe a coworker showed me the
2 post.
3    Q.    Okay.  So, I'm just going to refer
4 you to Berks County 26.  Yeah, that's the one.
5         Is that the Facebook post you were
6 just referencing, if you remember?
7    A.    Yes.
8    Q.    Yes.  Did you see it on your own
9 at all on Facebook?
10    A.    No, I did not see it.  I had heard
11 from a coworker who showed it to me.
12    Q.    And they had it on their --
13    A.    Phone.
14    Q.    -- phone?
15    A.    Yes.
16    Q.    And what was your reaction when
17 you saw it?
18    A.    Shocked.
19    Q.    And why were you shocked?
20    A.    I thought it was pretty ballsy.
21    Q.    Of him?
22    A.    Of him, yeah.
23    Q.    And why do you say ballsy?
24    A.    Because he just got put on leave



1  and he's already in enough trouble.  Why would
2  you put yourself into any more trouble?  You
3  obviously knew that people at work were going to
4  see this.  It's not going to help your case.
5      Q.    Okay.  Did you see the Facebook
6  post as threatening at all?
7      A.    I didn't feel personally
8  threatened but I know other staff -- fellow
9  staff, they were worried.
10     Q.    Okay.  The next line says Jill and
11  Sandy are worried about retaliation.
12           Do you remember --
13     A.    Yes, I do remember.
14     Q.    Do you remember what you meant by
15  that?
16     A.    They told me they were
17  legitimately scared that he would come back to
18  the facility and be in the parking lot when we
19  left.
20     Q.    So, they were specifically scared
21  about him, Daniel Sharkey?
22     A.    Yes.
23     Q.    And, just to clarify, Jill and
24  Sandy are other staff members there?

1      A.    Yes.
2      Q.    And then the last line there says
3  is Dan AWOL a lot, question mark.  No.  Brittany
4  said he would disappear.
5           Do you remember that topic?
6      A.    Yes.
7      Q.    Can you tell me what you remember?
8      A.    Well, I never experienced him
9  abandoning his post and leaving me for long
10  periods of time, but Brittany had said that she
11  did experience that.
12     Q.    Okay.  After the incidents were
13  reported or came to light, if you will, were
14  there any changes at the facility in terms of
15  policies or procedures?
16     A.    I don't know off the top of my
17  head.
18     Q.    And Ms. Taylor had earlier
19  testified that she recalls the training on
20  either sexual abuse or sexual harassment.  Do
21  you recall something like that?
22     A.    I don't recall it being changed.
23  We were always trained on it.
24     Q.    Okay.  Do you recall there was any

1  change with respect to the clothing policy for
2  the residents?
3      A.    Yes.
4      Q.    Okay.  And what was that?
5      A.    It got more specific about what
6  was permitted and what was not permitted.
7      Q.    Can you describe what you mean?
8      A.    Sure.  Tank tops, revealing
9  clothes, shirts that are cut too low, short
10  shorts, stuff that's way too tight because it's
11  too small to wear it to the point where, you
12  know, skin is hanging out.
13     Q.    Those were items that were no
14  longer allowed?
15     A.    I mean --
16           MR. CONNELL:  I'm going to object
17  to the question of being misleading.
18           MS. YEH:  Okay.
19  BY MS. YEH:
20     Q.    So, can you just explain --
21           MR. CONNELL:  She testified that
22  there was no change at first, and you're
23  suggesting that they are things that were
24  unallowed.

1           MS. YEH:  Well, she just said
2  that --
3           MR. CONNELL:  There's no evidence
4  that this stuff was permitted before.
5           MS. YEH:  Okay.  Well, I'm -- let
6  me see if I can --
7           MR. CONNELL:  Please don't mislead
8  the witness, counsel.
9           MS. YEH:  I'm not misleading the
10  witness.  If you have an objection I can
11  rephrase the question.
12           MR. CONNELL:  Well, my objection
13  is you are misleading my witness.  I'm going to
14  state it a little more aggressively than I may
15  otherwise.
16  BY MS. YEH:
17     Q.    All right.  Can you explain what
18  you meant by those specific articles of clothing
19  when you listed those items?
20     A.    Those are the things that are not
21  permitted.
22     Q.    Okay.  And why did you just list
23  those items?
24     A.    You asked me to go into detail



1 about the clothing that's not permitted in the
2 facility.
3     Q.    So, those are specific examples of
4 items that were not permitted?
5     A.    Yes.
6     Q.    And you said the policy became
7 more specific?
8     A.    Yes.
9     Q.    Okay.  And those were the specific
10 items that you were naming?
11     A.    Yes.
12     Q.    Okay.  And I'm just going to ask
13 you to turn to Berks County 25.
14          Have you seen this policy
15 before --
16     A.    Yes.
17     Q.    -- or this document before?
18     A.    Yes.
19     Q.    And when have you seen it?
20     A.    When it came out.  When it went --
21 when it went into effect and when it was
22 revised.
23     Q.    Okay.  And the date here, it says
24 effective date.  11/1/2014 for effective date,

1 and revised date 11/1/2014.  Do you recall
2 receiving the document?
3     A.    Yes.  When there's a change to the
4 standard operating procedure they print it out
5 for all staff to read and we have to sign off
6 that we are aware of the change and we
7 understand the change.
8     Q.    Okay.  After this change came into
9 effect did you observe any differences in the
10 implementation of this particular policy?
11     A.    No.
12          MR. CONNELL:  Objection to the
13 question as vague.  You can answer if you
14 understand.
15          THE WITNESS:  No, we didn't
16 implement it any differently.
17 BY MS. YEH:
18     Q.    Okay.  After the -- there was a
19 report about the relationship between E.D. and
20 Mr. Sharkey did you see any changes in E.D.
21 behavior at all?
22     A.    Sure.  She seemed -- she seemed to
23 stay in her room more often.  She wasn't really
24 socializing with the other women.

1     Q.    And do you know if the other women
2 were treating her any differently?
3     A.    Not that I had witnessed.
4     Q.    Okay.  Do you know if she was
5 treated any differently by staff members?
6     A.    Not that I had witnessed.
7          MS. YEH:  Okay.  All right.  I
8 think I'm done, but just give me one minute.
9          - - -
10          (Whereupon, there was an
11 off-the-record discussion.)
12          - - -
13          MS. YEH:  Okay.  I have no other
14 questions.
15          THE WITNESS:  Thank you.
16          MR. JONES:  And I have few
17 questions.  I don't know if you are good to go
18 or if you would rather take a break now?
19          THE WITNESS:  I'm good.
20          - - -
21          EXAMINATION
22          - - -
23 BY MR. JONES:
24     Q.    Okay.  My name is Landon Jones.

1 I'm Assistant U.S. Attorney.  I represent Josh
2 Petrey in this matter.  Do you know Mr. Petrey?
3     A.    Yes.
4     Q.    And how do you know him?
5     A.    Just through work.
6     Q.    Okay.  Do you have occasions to
7 interact with him in the course of your job?
8     A.    Yes.  When he comes out of his
9 office.
10     Q.    Okay.  Can you describe the way in
11 which he comes out of his office?
12     A.    When he comes out of his office
13 back in the immigration wing, he typically comes
14 to the A floor desk on the second floor and will
15 request to see residents.  He will request staff
16 to locate them or to call up to other areas in
17 the facility.
18     Q.    And then what does he do once the
19 resident has been brought to him?
20     A.    He will go in the staff interview
21 room which is right near the A floor desk and
22 use the language services phones in there.
23     Q.    Do you know what he does once he's
24 finished with that meeting?



1    A.    He goes back to his office in the
2  immigration wing.
3    Q.    Aside from occasions when he may
4  have asked you to help locate a resident, has he
5  ever told you how to do your job?
6    A.    No.
7    Q.    Has any ICE employee ever told you
8  how to do your job aside from something like
9  that?
10    A.    No.
11    Q.    Was he -- was Mr. Petrey present
12  when Mr. Sharkey made the racist comment you
13  described to Miss Yeh?
14    A.    No.
15    Q.    Was he present when he made the
16  sexist comment that you described to Miss Yeh?
17    A.    No.
18    Q.    Do you ever recall any instance
19  when Mr. Petrey was present when Mr. Sharkey was
20  making any kind of vulgar or offensive comment?
21    A.    No.
22    Q.    Did -- strike that.
23         You mentioned in the course of
24  your testimony, I think, that sometimes the

1  counselors would actually play sports or games
2  with the residents outside?
3    A.    Uh-huh.
4    Q.    Do you recall that?
5    A.    Yes, I recall.
6    Q.    Okay.  I think you also mentioned
7  that sometimes the counselors will eat with the
8  residents in the dining hall; is that right?
9    A.    Yes.
10    Q.    Okay.  Is it -- for someone who
11  came from a correctional background those types
12  of policies might strike someone as kind of
13  non-adversarial.  Is that fair to say?
14    A.    I'm not really sure.
15    Q.    Okay.  That's all right.  It's a
16  bad question.
17         Were those policies a change for
18  you coming from the juvenile detention center?
19    A.    No, 'cause we ate with the
20  juveniles, as well.
21    Q.    Well, never mind.  I'm not going
22  to -- I'm not going to probe that further.
23         I think you mentioned earlier that
24  Mr. -- you were not aware of Mr. Sharkey being

1  friends or friendly with any of the immigration
2  officials; was that correct?
3    A.    Correct.  I'm not aware that he
4  was friends with them.
5    Q.    Okay.  That includes Mr. Petrey?
6  You have no reason to believe that Mr. Sharkey
7  was friends or friendly with Mr. Petrey?
8    A.    No, I don't believe that they
9  were.
10         MR. JONES:  Okay.  I have no
11  further questions.  Thank you very much.
12         THE WITNESS:  You're welcome.
13         MR. CONNELL:  I have a couple
14  quick questions.
15         THE WITNESS:  Okay.
16              - - -
17              EXAMINATION
18              - - -
19  BY MR. CONNELL:
20    Q.    Way back at the beginning of the
21  deposition you were asked to describe the
22  laundry process, and you described how staff
23  goes in, obtains the soap, fills the soap, has
24  access to other items in the laundry room?

1    A.    Yes.
2    Q.    When the staff goes in the laundry
3  room, do they close the door behind them?
4    A.    No.
5    Q.    Would you get locked in if you did
6  close the door behind you if it's a self-locking
7  door?
8    A.    No.  It only locks from the
9  outside.
10    Q.    Is there anything preventing
11  anybody from walking in behind the staff when
12  they are in the laundry room?
13    A.    Nothing prevents it and it does
14  happen, but as a staff you should be aware of
15  your surroundings.
16    Q.    Okay.  So, it's possible that
17  somebody can walk in on somebody else when they
18  are in the laundry room?
19    A.    Yes.
20    Q.    On the instant where you saw
21  Mr. Sharkey in the laundry room and **E.D.** was
22  in there, as well, do you have any idea whether
23  **E.D.** walked in on Mr. Sharkey or how that came
24  about?



1   A.      I don't know who walked in first,
2   but since he was getting laundry out -- or soap
3   out of the cabinet I did not know if he knew or
4   was aware that she possibly could have come in
5   behind him.
6       Q.      You also were answering questions
7   about the dining room and you indicated that
8   residents must eat in the dining room.  You
9   agree that they have food available to them
10  outside of the dining room?
11  A.      Yes, but provided meals from the
12  kitchen must be eaten in the dining room.
13  Anything that's bought on commissary or sent to
14  them from family members may be eaten out in the
15  dayroom or in their bedroom.
16      Q.      There is also food available to
17  them in the dayroom?
18  A.      Yes.
19      Q.      And you indicated that staff eat
20  with residents in the dining room?
21  A.      Yes.
22      Q.      Do staff eat in one corner and
23  residents in another corner?
24  A.      No.  We are told to sit among the

1   residents with the residents and spread out.
2       Q.      So, is it unusual at all to see
3   staff sitting together with residents
4   intermingling during chow time?
5   A.      No.  It is encouraged.
6       Q.      Have you ever used Google
7   Translate with a resident?
8   A.      Yes.
9       Q.      Have you ever used Google
10  Translate with a resident of the -- a male
11  resident?
12  A.      Yes.
13      Q.      Is there anything unusual about
14  that?
15  A.      No.
16      Q.      Okay.  And this is a question I
17  think -- I don't think it was intended to
18  mislead you, but I think the way it shows up on
19  the transcript will be misleading.  You were
20  asked a question in 2014 male staff could not
21  supervise female residents and you answered yes.
22          Could male staff supervise female
23  residents in common areas?
24  A.      In common areas, yes.

1       Q.      Okay.  Male staff were not
2   permitted to supervise female residents in
3   bedrooms, bathrooms and shower rooms, correct?
4   A.      Correct.
5       Q.      Did you ever see Mr. Sharkey touch
6   E.D. breasts or buttocks at any time?
7   A.      No.
8       Q.      Did you ever see Mr. Sharkey and
9   E.D. kiss at any time?
10  A.      No.
11      Q.      Did you ever see Mr. Sharkey and
12  E.D. hug at any time?
13  A.      No.
14          MR. CONNELL:  That's all the
15  questions I have.
16          MS. YEH:  Just one clarification
17  point.
18              -  -  -
19          EXAMINATION
20              -  -  -
21  BY MS. YEH:
22      Q.      With regard to when you saw Mr.
23  Sharkey and E.D. in the laundry room together,
24  what was E.D. doing when you saw -- you had

1   stated, I believe, that Mr. Sharkey was getting
2   something from the locked cabinet?
3   A.      Yes, and his back was facing me
4   and E.D. .  E.D. was behind him putting
5   laundry into the washing machine.
6           MS. YEH:  Okay.  That's all.
7           MR. CONNELL:  Anything else?
8           MR. JONES:  No.  No, thank you.
9           (Witness excused.)
10              -  -  -
11          (Deposition concluded at
12  approximately 3:26 p.m.)
13              -  -  -
14
15
16
17
18
19
20
21
22
23
24



```
1
2      C E R T I F I C A T E
3
4
5      I HEREBY CERTIFY that the witness
6    was duly sworn by me and that the
7    deposition is a true record of the
8    testimony given by the witness.
9
10
11
       Sherry L. Stills,
12     Court Reporter
       Notary Public
13     Dated:  7/17/2017
14
15        (The foregoing certification
16   of this transcript does not apply to
17   any reproduction of the same by any
18   means, unless under the direct
19   control and/or supervision of the
20   certifying reporter.)
21
22
23
24
```

```
1              DEPOSITION ERRATA SHEET
2    Page No.____Line No.____Change
3    to:_____
4    Reason for change:_____
5    Page No._____Line No._____Change
6    to:_____
7    Reason for change:_____
8    Page No._____Line No._____Change
9    to:_____
10   Reason for change:_____
11   Page No._____Line No._____Change
12   to:_____
13   Reason for change:_____
14   Page No._____Line No._____Change
15   to:_____
16   Reason for change:_____
17   Page No._____Line No._____Change
18   to:_____
19   Reason for change:_____
20   Page No._____Line No._____Change
21   to:_____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        JAMIE HIMMELBERGER
```

```
1              DEPOSITION ERRATA SHEET
2
3
4    Our Assignment No.  J0611338
5    Case Caption:  E.D.
6    vs.  Daniel Sharkey, et al.
7
8      DECLARATION UNDER PENALTY OF PERJURY
9    I declare under penalty of perjury
10   that I have read the entire transcript of my
11   Deposition taken in the captioned matter or the
12   same has been read to me, and the same is true
13   and accurate, save and except for changes and/or
14   corrections, if any, as indicated by me on the
15   DEPOSITION ERRATA SHEET hereof, with the
16   understanding that I offer these changes as if
17   still under oath.
18        Signed on the _____ day of
19   _____, 20___.
20
21   _____
22        JAMIE HIMMELBERGER
23
24
```

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change
3    to:_____
4    Reason for change:_____
5    Page No._____Line No._____Change
6    to:_____
7    Reason for change:_____
8    Page No._____Line No._____Change
9    to:_____
10   Reason for change:_____
11   Page No._____Line No._____Change
12   to:_____
13   Reason for change:_____
14   Page No._____Line No._____Change
15   to:_____
16   Reason for change:_____
17   Page No._____Line No._____Change
18   to:_____
19   Reason for change:_____
20   Page No._____Line No._____Change
21   to:_____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        JAMIE HIMMELBERGER
```

